**E-FILED**
Tuesday, 26 April, 2005  02:12:31 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF ILLINOIS

## AT PEORIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  05-10012 |
| | ) | |
| JASON D. MALONE, | ) | |
| | ) | |
| Defendant. | ) | |

## RESPONSE TO MOTION TO SUPPRESS

Now comes the United States of America by Jan Paul Miller, United States

Attorney for the Central District of Illinois, and Bradley W. Murphy, Assistant United

States Attorney, and in response to defendant's *Motion To Suppress*, states as follows:

## I. FACTUAL BACKGROUND

### A.    The Search Warrant

1.    An investigation into drug trafficking at 4105 North Brookdale,

Apartment #2C3, in Peoria, Illinois led to the issuance of a search warrant for the

apartment and the person of Jason D. Malone on January 10, 2005.  The warrant was

timely executed at approximately 1:00PM on January 14, 2005.

2.    Officers knocked on the apartment door and loudly announced,

"police with a search warrant."  After receiving no response from inside, officers

announced their purpose two more times and received no response.  The apartment

door was breached and officers entered and conducted a protective sweep of the

apartment.

       3.     In a bedroom, Jason Malone and his girlfriend, Davida Vogel, were located in the bed.  Vogel was ordered off the bed and secured.  Malone, who was secured in a sitting position on the edge of the bed, sat with his head down saying nothing.  Officer Tim Moore then attempted to check Malone's mouth because it is common for drug dealers to attempt to eat their drugs to avoid prosecution.

       4.     Immediately after Officer Moore asked, "Has anyone checked his mouth?", Malone turned away from Moore, laid back down on the bed face down and started chewing on something in his mouth.  Moore ordered Malone several times to spit out what was in his mouth after observing what appeared to be crack cocaine in his mouth.  Malone refused to obey Moore's commands and continued to chew.  At this time, Malone spit out a small amount of the crack cocaine, mumbled that it was all he had, and continued to chew.  Fearing that Malone was attempting to destroy a much larger amount of crack cocaine left in his mouth, Officer Wilson then used his taser on Malone's back.  Malone immediately spit out several grams of crack cocaine mixed with chewed up plastic baggies and defecated in his boxer shorts.

       5.     A further search of the apartment discovered a small amount of crack cocaine in a jewelry box in the bedroom.  Based on the foregoing, and on the officer's discovery of an outstanding arrest warrant for Malone, he was taken into police custody.

      **B.**     **The Motion To Suppress**

       1.     The defendant, Jason D. Malone, has now filed a *Motion To Suppress* the evidence obtained as a result of the search of the contents of his mouth

after the taser was used.  He does not contest the probable cause to search the apartment or his person.  He does not contest the crack cocaine found elsewhere in the apartment, nor does he contest the crack cocaine spit out by the defendant prior to the use of the taser.

2.     The defendant contends that the use of the taser, to inflict an electrical shock, in order to recover evidence (or prevent its destruction) constitutes an unreasonable search under the Fourth Amendment.

## II.     Analysis

### A.     Legal Framework

1.     The touchstone of the Fourth Amendment is reasonableness. Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances.  *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).  The defendant has the burden of showing that the police executed a warrant in an unreasonable manner. *United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985); *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994).

2.     The defendant cites *United States v. Husband*, 226 F.3d 626 (7th Cir. 2000), in support of his argument that the method employed to obtain the evidence (taser) was unreasonable.  In *Husband*, the defendant, who was believed to be concealing drugs in his mouth, refused to open his mouth after being placed under arrest.  *Id.* at 628.  He moved to suppress the small plastic bags containing crack cocaine removed from his mouth after he lost consciousness when an anesthetic was administered in order to execute the search warrant for his person.  *Id.* at 629.  His motion was denied below, and on appeal, the Seventh Circuit reversed and remanded

for further factual findings.  *Id.* at 629, 636.

      3.    What the defendant herein has not told this Court is that, following the remand, the Seventh Circuit found that the use of the anesthetic <u>was</u> reasonable after applying the balancing test found in *Schmerber v. California*, 384 U.S. 757 (1966).  *See United States v. Husband*, 312 F.3d 247, 255-56 (7th Cir. 2002).  Further, the Court found the intrusion (administering the sedative) to lie somewhere between the search held to be constitutional in *Schmerber* (compelled blood sample for DWI suspect) and the search held to be unconstitutional in *Rochin v. California*, 342 U.S. 165 (1952) (after breaking into suspect's home, his stomach was pumped in order to recover drugs he was seen swallowing).  *Id.* at 252-53.

      4.    The *Schmerber* balancing test requires consideration of the following factors:  (1) the extent to which the procedure may threaten the safety or health of the individual; (2) the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity; and (3) the community's interest in fairly and accurately determining guilt or innocence.  *See Winston v. Lee*, 470 U.S. 753, 760-61 (1985); *Husband*, 312 F.3d at 253.

**B.    Application of the Schmerber test.**[1]

1.    <u>Community Interest</u>:  In order to determine the reasonableness of the officer's conduct in this case, this Court must weigh the defendant's individual interests against the community's interest in fairly and accurately determining guilt or innocence.  This community interest is of great importance.  *Winston*, 470 U.S. at 762. In addition, the community has a strong interest in being free from the menace of crime. *Husband*, 226 F.3d at 632-33.  As in the *Husband* case, if the police had not been able to recover the drugs from the defendant's mouth, it is highly unlikely that they would have been able to prosecute him for a drug trafficking offense.  The defendant would then have been free to resume his criminal activities.  The government's interest in recovering the evidence is strong.  In this case, the officers had witnessed the defendant chewing on what appeared to be crack cocaine, and recovery of the drugs was a matter of getting the defendant's mouth open.  The recovery of drugs from the defendant's person (here his mouth) is the strongest type of evidence of possession for use at a trial.  The strong community interest in recovering evidence from the defendant's person was served by the quick action of Officer Wilson.

2.    <u>Safety</u>:  This Court must also consider the extent to which the taser may have threatened the safety or health of the defendant.  The taser used in this case

---

[1]It is somewhat unclear whether the defendant is contending that the police used an unreasonable method to serve a search warrant (as was argued in *Husband*) or that the search of defendant's mouth was a warrantless intrusion (as was argued in *United States v. Nelson*, 36 F.3d 758 (8th Cir. 1994).  In either event, this court's analysis would be similar, so the government has chosen to frame the issues under the *Schmerber* test.  It should be noted that, contrary to *Nelson*, Judge Easterbrook assumes that a search warrant for the person of a suspect authorizes a search inside his mouth, rather than just of his clothing and skin. *Husband*, 226 F.3d at 638.

uses technology which is intended to subdue a subject with non-lethal force.  The taser uses electrical signals to temporarily override the central nervous system and skeletal muscles.  It causes muscle contractions that result in temporary incapacitation.  The taser is programmed to deliver a five-second electrical current.  (See attached Exhibit "A")

Officer Wilson did not use the taser on the defendant for the full five-second burst.  The taser was employed for only a three-second interval until the defendant spit out the remainder of the crack cocaine in his mouth.  (See attached Exhibit "B")  Wilson was authorized to carry and use the taser because he had received the required police department training in the proper use of the taser.  In this particular case, the taser, a form of non-lethal force, was used with restraint by the trained officer.

Several studies have found that the taser, when properly used, causes only momentary discomfort and is a safe and reliable method of obtaining compliance from a subject.  Internet access to these studies can be found at http://www.taser.com/savinglives/index.htm.  One recent study by the Potomac Institute which reaches this conclusion is attached as Exhibit "C".

The taser was used to incapacitate the defendant for three seconds in order to thwart the destruction of evidence by him.  At no time was lethal force used. Every effort was made to protect the health and safety of the defendant consistent with the strong interest that the community has in recovering evidence.  Additionally, the use of the taser to remove the crack cocaine from the defendant's mouth potentially minimized the risk of a toxic overdose from ingestion of the drugs that defendant was chewing.

3.    <u>Intrusion</u>:  Another factor for this Court to consider is the extent of the intrusion upon the defendant's dignitary interests in personal privacy and bodily integrity.  The police action, during the execution of a search warrant for the person of the defendant, did penetrate his body using electrical current to temporarily override his nervous system.  The intrusion caused by the taser is arguably less extensive than that found to be reasonable in *Husband*, where a doctor administered a sedative which caused unconsciousness for 15 minutes.  *See Husband*, 226 F.3d at 637.  In addition, Husband stopped breathing and the doctor had to administer forced breathing until Husband could breathe on his own.  *See Husband*, 312 F.3d at 249-50.

In the instant case, the defendant was stunned for three seconds without loss of consciousness or breathing.  The apparent loss of muscle control resulted in a bowel movement.  The intrusion and consequences were a result of the defendant refusing to open his mouth.  The defendant had no constitutional right to destroy or secret evidence.  *See Segura v. United States*, 468 U.S. 796, 816 (1984).  The exclusionary rule was not designed to reward the destruction of evidence.  The intrusion into the defendant's privacy and body was minimal in terms of duration and consequences.  The defendant brought this intrusion on himself by refusing to open his mouth.

Other than *Husband*, the closest factual situation to the instant case was found in *United States v. Holloway*, 906 F.Supp. 1437 (D.Kan. 1995), where officers administered pepper-spray to Holloway after he resisted their efforts to remove the drugs he was hiding in his mouth.  *Id.* at 1439.  The use of the pepper-spray was determined to be a reasonable method of compelling the removal of the drugs from

Holloway's mouth.  *Id.* at 1443.

> The use of the taser herein is arguably less intrusive than the pepper-spray used on Holloway.  The spray caused Holloway physical distress and difficulty breathing which caused officers to take him outside to the open air to alleviate the discomfort.  *Id.* at 1439-40.  The defendant herein suffered a loss of muscle control for three seconds and a bowel movement.

III.    <u>CONCLUSION</u>

A.    **The defendant's *Motion To Suppress* should be denied because the officers' conduct was reasonable.**

> 1.    The community's interest in fairly and accurately determining defendant's guilt is strong.  The officers were, at the same time, thwarting the defendant's destruction of evidence and obtaining strong proof of his possession of contraband.

> 2.    The defendant's health and safety were not threatened by the use of the taser.  The taser was used with restraint to obtain the defendant's compliance with a lawful police command.  The use of such non-lethal force under the circumstances should be encouraged.

> 3.    The intrusion by the use of the taser was minimal.  The defendant was stunned for three seconds without loss of consciousness or breathing.  This incapacitation was relatively slight compared to other intrusions which have been held to be reasonable.

B.    **Although the use of the taser was reasonable under the**

**circumstances herein, the government desires to preserve two other bases upon**

**which to deny the defendant's *Motion To Suppress.***

        1.      Inevitable discovery.  *See Segura v. United States*, 468 U.S. 796, 816 (1984).

        2.      Good Faith.  *United States v. Leon*, 468 U.S. 897, 921-22 (1984).

      **WHEREFORE**, the United States respectfully requests that defendant's *Motion To Suppress* be denied.

                   Respectfully submitted,

                   UNITED STATES OF AMERICA

                   JAN PAUL MILLER
                   UNITED STATES ATTORNEY


                   **s/: BRADLEY W. MURPHY**
                   BRADLEY W. MURPHY
                   Assistant United States Attorney
                   One Technology Plaza
                   211 Fulton Street, 4th Floor
                   Peoria, Illinois 61602
                   Telephone: 309.671.7050



## GENERAL ORDER

| | |
|---|---|
| **NUMBER** 400.96 | |
| **EFFECTIVE DATE** 9/20/04 | |

| SUBJECT **TASER** | NUMBER OF PAGES **5** |
|---|---|
| DISTRIBUTION **Commissioned Personnel** | SUPERSEDES **N/A** |
| CALEA REFERENCE **N/A** | OTHER REFERENCE **N/A** |
| AUTHORITY *Gary Poynter* | **Gary W. Poynter** **Acting Police Chief** |

### I.   PURPOSE

It is the intent of the Peoria Police Department to provide to officers the X26 Taser, a conducted energy weapon, and the training on that weapon in order to bring about successful conclusions to incidents involving combative, non-compliant, armed or violent subjects. The X26 Taser is designed to incapacitate a subject with a minimal potential for death or serious injury. This weapon will offer the department's officers an alternative to resolve an incident in a less lethal manner, and to protect both officers and others from harm, to include the subject on whom the weapon is being used.

### II.   DEFINITION

The X26 Taser is deployed as an officer safety tool and is an addition to other police self-defense techniques and tools. The X26 Taser is to be used by trained personnel on subjects that are threatening to actively resist or are actively resisting an officer or the subject poses an articulable threat of harm to an officer or another person. It may also be used when the subject poses a threat of harm to himself, such as a self-inflicted injury or a suicide attempt.

The X26 Taser is an additional police tool and is not intended to replace firearms or self-defense techniques. The X26 Taser may be used to control dangerous or violent subjects when deadly force does not appear to be justified and/or necessary; or attempts to subdue the subject by conventional methods have been or likely will be ineffective. Another situation is when there is reasonable expectation that it will be unsafe for officers to approach within contact range of the subject.

The X26 Taser falls into the category of less lethal force technology and equipment meaning that when used properly there is less likelihood of death or serious injury to the subject than if deadly force is used. Less lethal force is defined as force used to subdue or render a subject non-threatening with a lower probability of effecting fatal consequences. The X26 Taser when used pursuant to training is not considered use of deadly force or to constitute the infliction of great bodily harm.



GOVERNMENT EXHIBIT 'A'

General Order 400.96
Page 2 of 5

The X26 Taser fires two probes up to a distance of 21 feet from a replaceable cartridge. These probes are connected to the weapon by high voltage insulated wire. When the probes make contact with the target the X26 Taser transmits powerful electrical pulses along the wire and into the target through up to two inches of clothing. The pulses send 26 watts electrical signals to temporarily override the central nervous system and directly control the skeletal muscles. This causes uncontrollable muscle contractions thus causing temporary incapacitation.

The X26 Taser does not rely on pain to achieve compliance but incapacitation through the central nervous system. However, when used as a stun gun the X26 Taser is a pain compliance type of weapon.

III.    **POLICY**

The Peoria Police Department will use the <u>X26 Taser</u>, also described as a <u>Conducted Energy Weapon</u>, in accordance with product recommendations and specifications prescribed by the manufacturer, Taser International. This weapon will be deployed in a manner to ensure maximum effectiveness and safety. This order adopts all criteria outlined in General Order 400.35 (Use Of Force). Nothing in this policy shall be construed as the creation of a higher legal standard of safety or care in an evidentiary sense with respect to third part claims. This policy is for departmental use only and does not apply in any criminal or civil proceeding.

IV.    **PROCEDURES**

A. Only those officers who have undergone the department's (or authorized equivalent) minimum 4 hours of taser training will be authorized to carry and deploy the X26 Taser.

B. The use of the X26 Taser is the equivalent to the use of OC spray on the use of force continuum outlined in General Order 400.35.

C. Only properly functioning X26 Tasers shall be carried on duty.

D. Every discharge of the X26 Taser that involves the firing of the cartridge or the use of the stun gun on a person shall require the completion of a detailed police report. In addition, the officer deploying the X26 Taser shall complete a "Taser Use Report". This does not include training situations or demonstrations in approved areas. The X26 Taser shall never be displayed or used in an unnecessary or unprofessional manner.

E. The X26 Taser is programmed to deliver a 5-second electrical current if the officer releases the trigger after firing. It will continue to discharge if the officer holds the trigger in the firing mode. The officer using the weapon can stop the discharge of the X26 Taser at anytime by manually turning the weapon fire selector to off or to the "S" position. It is recommended that during the field deployment and use against a violent subject, the full 5 second cycle (or longer as required) be delivered to gain maximum effectiveness and compliance of the subject(s) effected by the X26 Taser.

F. The officer deploying the X26 Taser shall not aim the X26 Taser at the eyes, face, or neck of the subject. The X26 Taser is laser sighted and the top probe will follow the alignment

of the front and rear sights and/or the laser aiming sight. The bottom probe will travel at an 8-degree downward angle below the aimed point/laser sighted area. The bottom probe will drop approximately 1 foot for every 7 feet it travels from the weapon to the target. The officer shall where feasible, aim at the center mass of the subject from the rear.

G. The officer deploying the X26 Taser must keep his hands away from the front of the weapon (discharge area) at all times unless the safety is in the safe position and the X26 Taser is deactivated.

H. The X26 Taser shall not be fired near flammable liquids or gases. The X26 Taser can ignite gas and other flammables. Some self-defense sprays are flammable and shall not be used in conjunction with the X26 Taser. The Peoria Police Department's OC spray is not flammable. The X26 Taser shall not be deployed in or around a suspected meth lab.

I. X26 Taser cartridges have expiration dates printed on the label. Cartridges shall not be used beyond the expiration date for duty purposes, but shall be turned in and can be used for training purposes.

J. The officer using the X26 Taser shall when possible, prior to deployment of the X26 Taser, give a verbal warning to the subject and police personnel on scene, that the taser is going to be deployed. This can be done by yelling "taser taser" prior to deploying the weapon.

K. Assisting officers at the scene shall assess the potential threat to the deploying officer and provide appropriate cover, including lethal force if it becomes necessary.

L. After a taser is deployed, officers at the scene shall first ensure the subject is under control and as soon as practical shall monitor the subject of the taser deployment for any possible injuries. If the probes are imbedded in any sensitive tissue areas, such as: the neck, groin, face, or the breast of a female, the officer(s) shall arrange for transport of the subject to a medical facility for removal and care. If the probes are imbedded in a non-sensitive area, a Fire Department EMT unit will be called to the scene to remove the probes and administer the appropriate care to the subject. The subject shall be evaluated at the scene by Fire Department EMT'S. If the subject's condition requires further medical treatment or the subject is complaining of injury or pain; then the subject shall be transported to a hospital.

M. Probes removed from the subject shall be handled as a biohazard and the probes and cartridge packaged as such to be placed into evidence.

N. The X26 Taser shall have the information on the discharge downloaded as soon as practical for investigation and evidentiary purposes.

O. The X26 Taser shall only be loaded with departmental issued air cartridges.

P. The X26 Taser shall be considered a weapon and be kept and stored as such.

Q. The X26 Taser shall not be handled or used by unauthorized personnel.

General Order 400.96
Page 4 of 5

R. The X26 Taser shall not be used for personal use.

V.  **SUPERVISORS RESPONSIBILITIES**

A. The sergeant shall respond to the scene of any deployment of the X26 Taser or where there is an expected deployment of the X26 Taser.

B. The shift commander shall respond to the scene after a deployment of the X26 Taser and shall evaluate the incident and ensure the appropriate investigative personnel are notified if necessary.

C. The sergeant shall ensure that all reports on the incident are completed by officers at the scene.

D. The sergeant shall make certain the subject of the taser deployment receives medical treatment if it is necessary.

E. The sergeant shall ensure that photos are taken of the subject of the taser use.

F. The deployment of the X26 Taser shall be reviewed by the Patrol Captain or his designee.

VI.  **TACTICAL DEPLOYMENT**

A. Where feasible, use verbal commands and point the laser sight at the subject prior to firing.

B. Additional cartridges available to use are recommended in case the first probes miss the target or there is a malfunction.

C. Back –up officer(s) shall be present to assist in the arrest or to use other force options as appropriate and needed, depending on the situation.

D. Officers shall aim at center mass and from the rear if possible.

E. Officers shall use cover and distance to ensure officer safety.

F. Officers shall avoid using the taser on a subject who is on the roof of a building or similar location where he or she could be injured from the fall after being incapacitated.

G. Officers shall avoid using the taser on a subject in deep bodies of water due to the chance of the subject drowning.

VII.  **X26 TASER PROJECT COORDINATOR  RESPONSIBILITIES AND DUTIES**

The X26 Taser Project Coordinator shall:

General Order 400.96
Page 5 of 5

A.  Receive, inspect, and ensure the maintenance and replacement of X26 Tasers assigned to departmental personnel.

B.  Establish and maintain systems to record the issuance of the X26 Taser and air cartridges. Serial numbers shall be recorded.

C.  Maintain an adequate supply of cartridges and other necessary equipment related to the X26 Taser.

D.  See that defective or damaged tasers, cartridges or accessory equipment are returned to the supplier. This will also include obtaining service from the supplier.

E.  Provide initial certification training on the X26 Taser as well as annual re-training.

F.  Review reports on the deployment of the X26 Taser and make any recommendations for changes in training or policy.

*This directive provides general guidelines to personnel regarding proper practices and is for internal use only. It is not intended to enlarge an officer's criminal or civil liability in any way, except as to any disciplinary action that might arise. It shall not be construed as the creation of a higher standard of safety or care in an evidentiary sense, with respect to third party claims. Violations of this directive, if proven, can only form the basis of a complaint by this department, and then only in an employment related proceeding.*

CASE #_____

# *TASER® USE REPORT*

Date/Time: _____ TASER Officer's Name: _____

E-mail: _____ Department: _____

Dept Address: _____ Phone: _____

On Scene Supervisor: _____Officer(s) Involved: _____

TASER Model (check one): ___ X26 ___ M26

TASER Serial #: _____ Medical Facility: _____ Doctor: _____

Nature of the Call or Incident: _____ Charges: _____ Booked: Y / N

Location of Incident: ( ) Indoor ( ) Outdoor ( ) Jail ( ) Hospital

Type of Force Used (Check all that apply): ( ) Physical ( ) Less-lethal ( ) Firearm ( ) Chemical

Nature of the Injuries and Medical Treatment Required: _____

Admitted to Hospital for Injuries: Y / N    Admitted to Hospital for Psychiatric: Y / N

Medical Exam: Y / N    Suspect Under the influence: Alcohol / Drugs (specify): _____

Was an Officer, Police Employee, Volunteer or Citizen Injured other than by TASER? Y / N

Incident Type (circle appropriate response(s) below):

Civil Disturbance   Suicidal   Suicide by Cop   Violent Suspect   Barricaded   Warrant   Other

Age: _____ Sex: _____ Height: _____ Race: _____ Weight: _____

TASER use (circle one): Success / Failure    Suspect wearing heaving clothes: Y / N

Number of Air Cartridges fired: _____    Number of cycles applied: _____

Usage (check one): ( ) Arc Display Only   ( ) Laser Display Only   ( ) TASER Application

TASER: Is this a dart probe contact: Y / N    Is this a drive stun contact: Y / N

Approximate target distance at the time of the dart launch: _____ feet

Distance between the two probes: _____ inches   Need for an additional shot? Y / N

Did dart contacts penetrate the subject's skin? Y / N    Probes removed on scene: Y / N

Did TASER application cause injury: Y / N    If yes, was the subject treated for the injury: Y / N

DESCRIPTION OF INJURY:
_____

CASE #_____

## APPLICATION AREAS
**(Place "X's" where probes hit suspect <u>AND</u> *"O's" where stunned*)**



SYNOPSIS:

_____
_____
_____
_____

Need for additional applications? Y / N    Did the device respond satisfactorily? Y / N

Describe the subject's demeanor after the device was used or displayed?

_____
_____
_____

Chemical Spray: Y / N        Baton or Blunt Instrument: Y /N

Authorized control holds:  Y / N    If yes, what types: _____

Describe other means attempted to control the subject: _____

Photographs Taken:  Y / N    Report Completed by: _____

*ADDITIONAL INFORMATION*

_____
_____
_____



**TASER Information**

| | | **Downloaded By** | |
|---|---|---|---|
| **Serial #** | *X00-060404* | **Name** | *JERRY BAINTER* |
| **Model #** | *X26* | **Dept** | *PEORIA* |
| **X26 Software Version** | *15* | **Rank** | *SGT* |
| **Dataport CD Version** | *15.5* | **Windows Version** | *Microsoft® Windows NT(TM) Service Pack 1* |
| **Record Date Range** | *All Data* | | |
| **Computer Time Zone** | *Central Standard Time* | **Report Generated** | *04/21/05 20:43:41 (local)* |
| **Using Daylight Savings Time** | *No* | | |

**Recorded Firing Data**

| Seq | GMT Time | Local Time | Duration | Temp | Battery |
|---|---|---|---|---|---|
| 0003 | 09/03/04 14:37:51 | 09/03/04 09:37:51 | 5 | 30 | 99 |
| 0004 | 09/03/04 14:37:57 | 09/03/04 09:37:57 | 5 | 30 | 99 |
| 0005 | 09/03/04 14:38:04 | 09/03/04 09:38:04 | 5 | 31 | 99 |
| 0006 | 09/21/04 22:06:42 | 09/21/04 17:06:42 | 3 | 28 | 98 |
| 0007 | 09/22/04 13:08:15 | 09/22/04 08:08:15 | 3 | 27 | 98 |
| 0008 | 09/23/04 00:55:22 | 09/22/04 19:55:22 | 1 | 33 | 98 |
| 0009 | 09/23/04 02:12:41 | 09/22/04 21:12:41 | 1 | 33 | 97 |
| 0010 | 09/27/04 00:19:49 | 09/26/04 19:19:49 | 5 | 25 | 95 |
| 0011 | 09/27/04 00:20:04 | 09/26/04 19:20:04 | 5 | 26 | 94 |
| 0012 | 10/24/04 23:40:13 | 10/24/04 18:40:13 | 2 | 25 | 92 |
| 0013 | 10/26/04 21:07:54 | 10/26/04 16:07:54 | 5 | 30 | 92 |
| 0014 | 11/10/04 23:09:35 | 11/10/04 17:09:35 | 1 | 27 | 89 |
| Seq | GMT Time | Local Time | Duration | Temp | Battery |
| 0015 | 11/30/04 20:52:30 | 11/30/04 14:52:30 | 4 | 27 | 89 |


GOVERNMENT EXHIBIT 'B'

| | | | | | |
|---|---|---|---|---|---|
| 0020 | 12/01/04 04:20:47 | 11/30/04 22:20:47 | 1 | 32 | 89 |
| 0021 | 12/01/04 04:21:19 | 11/30/04 22:21:19 | 1 | 31 | 89 |
| 0022 | 12/09/04 00:18:53 | 12/08/04 18:18:53 | 1 | 28 | 87 |
| 0023 | 12/09/04 04:45:14 | 12/08/04 22:45:14 | 5 | 29 | 87 |
| 0024 | 12/09/04 04:45:21 | 12/08/04 22:45:21 | 5 | 29 | 86 |
| 0025 | 12/09/04 04:45:27 | 12/08/04 22:45:27 | 5 | 30 | 86 |
| 0026 | 12/09/04 04:46:09 | 12/08/04 22:46:09 | 6 | 31 | 85 |
| 0027 | 12/09/04 04:46:30 | 12/08/04 22:46:30 | 11 | 32 | 85 |
| 0028 | 12/16/04 01:55:18 | 12/15/04 19:55:18 | 2 | 29 | 84 |
| 0029 | 01/14/05 18:58:16 | 01/14/05 12:58:16 | 3 | 29 | 83 |
| 0030 | 02/03/05 03:22:35 | 02/02/05 21:22:35 | 1 | 32 | 81 |
| 0031 | 03/15/05 23:44:33 | 03/15/05 17:44:33 | 1 | 29 | 78 |
| 0032 | 03/24/05 06:00:20 | 03/24/05 00:00:20 | 1 | 27 | 77 |
| 0033 | 03/31/05 14:54:24 | 03/31/05 08:54:24 | 2 | 29 | 77 |
| 0034 | 03/31/05 14:54:40 | 03/31/05 08:54:40 | 2 | 29 | 77 |

**Recorded X26 Time Changes**

| Seq | GMT Time | Local Time | Change Type |
|---|---|---|---|
| 0001 | 09/03/04 14:37:25 | 09/03/04 09:37:25 | FROM |
| 0002 | 09/03/04 14:37:25 | 09/03/04 09:37:25 | TO |
| 0016 | 11/30/04 20:53:45 | 11/30/04 14:53:45 | FROM |
| 0017 | 11/30/04 20:56:49 | 11/30/04 14:56:49 | TO |
| 0018 | 11/30/04 20:58:18 | 11/30/04 14:58:18 | FROM |
| 0019 | 11/30/04 20:58:19 | 11/30/04 14:58:19 | TO |

End of Report.

A POTOMAC INSTITUTE FOR POLICY STUDIES REPORT:
NUMBER 05-04

# EFFICACY AND SAFETY
# OF ELECTRICAL STUN DEVICES



DR. DENNIS K. MCBRIDE
MS. NATALIE B. TEDDER

29 MARCH 2005

POTOMAC INSTITUTE FOR POLICY STUDIES
901 N. STUART STREET, SUITE 200
ARLINGTON, VA 22203
703/525-0770
www.potomacinstitute.org

*The Potomac Institute for Policy Studies is an independent, 501(c)(3), not-for-profit public policy research institute. The Institute identifies and aggressively shepherds discussion on key science and technology issues facing our society, providing in particular, an academic forum for the study of related policy issues. From these discussions and forums, we develop meaningful science and technology policy options and ensure their implementation at the intersection of business and government.*



GOVERNMENT
EXHIBIT
`C`

POTOMAC INSTITUTE FOR POLICY STUDIES

## Table of Contents

Table of Contents ........................................................................................................................2
Executive Summary ....................................................................................................................3
Introduction and Statement of the Problem.............................................................................6
Background:  Efficacy and Safety of Stun Device Technology ...............................................7
Evidence Regarding the Efficacy and Safety of Stun Technology .........................................10
Conclusions..................................................................................................................................16
Appendix A: Bibliography ........................................................................................................17

We would like to express our deepest gratitude to the members of the Executive Committee who were vital in the planning and execution of this conference.  We appreciate their guidance and support throughout this endeavor.

General Al Gray
Dr. Bruno D.V. Marino
Mr. Tom O'Leary
Mr. Ken Stethem

2

POTOMAC INSTITUTE FOR POLICY STUDIES

## Executive Summary

On February 23rd and 24th, 2005, The Potomac Institute for Policy Studies in Arlington, Virginia, hosted a two-day conference entitled "Stun Devices: Uncertainties and Gaps in Knowledge." The conference was co-sponsored by Aegis Industries, Inc. The purpose of the conference was to bring together experts from various fields including medical and health effects, safety and regulatory issues, policy, and industry practices, to discuss what we know about stun device technology and offer insight and suggestions on filling the current gaps in knowledge.

A plenary session was held to discuss the current status of the stun device debate, and the group heard from individuals regarding such issues as current research endeavors, policy concerns, regulations, and the status of the industry. The floor was open to discussion and input was encouraged and received from all members, which was beneficial in making sure all relevant issues were thoroughly addressed.

Conference attendees were then assigned to one of four breakout groups: (1) Policy, led by Dr. Dennis McBride of the Potomac Institute for Policy Studies; (2) Health Effects, led by Dr. Marom Bikson of the City College of New York; (3) Regulatory & Safety, led by VADM Thomas Barrett of the Potomac Institute for Policy Studies; and (4) Industry, led by Mr. Ken Stethem of Aegis Industries, Inc. These groups met with the objective of evaluating issues related to their domain, and developing conclusions and recommendations, which would be presented on Day 2, to all participants who were in the plenary session. The conference ended with a scheduled press conference to summarize the findings and recommendations from each group.

The conference thus served to inform the preparation of this manuscript. The Potomac Institute for Policy Studies is responsible for the information contained within the report. It is important to note that, as in any conference of world-class experts, there was not absolute unanimity on every conclusion reached. The purpose of this report is to objectively evaluate the relative efficacy and safety of stun devices in the context of law enforcement use, and in the near absence of federal governmental attention.

Synopsis of Findings:

- There is no universally accepted terminology or definition for non-lethal weapons in the realm of law enforcement. For our purposes, we adopted the Department of Defense (DoD) definition, and are convinced that this language is appropriate for use by stun device manufacturers and end users. The point of non-lethal technologies is that they are employed with an *intent not* to kill, but to incapacitate temporarily. The public should become educated on this fundamental issue of non-lethal technologies.
- The last and only federal regulatory review of stun device safety was conducted in 1976 by the Consumer Product Safety Commission. The technology evaluated at that time was found not likely to be lethal to normally healthy adults. We have found no report whose purpose was to claim that stun devices are ineffective or unsafe.
- We found a fundamental FDA philosophy to be useful for evaluating the safety and effectiveness of devices such as stun guns. This methodology considers the risks associated with a device *relative to its efficacy*, and considers no product to be completely devoid of risk.

3

POTOMAC INSTITUTE FOR POLICY STUDIES

- There are no federal restrictions or guidelines for stun device use—nor for importation from foreign suppliers for that matter. Moreover, there is no regulating body (private or public) and there are no industry standards.
- Due to the fact that law enforcement agencies are managed at the local level, placement of stun devices on the force continuum may vary amongst organizations. Although some organizations offer exemplary use of force rules, there is no universally agreed upon matching of tactics (use of force) with threatening behavior.

We found direct and indirect evidence specifically regarding the safety and effectiveness of stun technology:

- Indirect Evidence of Efficacy
    - Acquisition of stun devices by law enforcement agencies across the country is increasing substantially.
    - Organizations other than traditional law enforcement agencies have actively voiced support for stun device use as a non-lethal option.
- Direct Evidence of Efficacy
    - Individual law enforcement agency reports offer statistics on situational use and employment results, and a compelling majority of these report favorable success rates, particularly as compared to other techniques and devices.
- Indirect Evidence of Safety
    - Available animal modeling results offer confirming scientific evidence that the employment of stun technology is relatively safe.
- Direct Evidence of Safety
    - Examination of the 72 mortality cases appearing in an Amnesty International 2004 report reveals that in no instance was stun employment singularly indicated or implicated as the specific cause of death, although the application of stun devices could not be ruled out as a possible contributing factor.
    - Analysis of the 72 mortality cases showed that other contributing factors included pre-existing morbidity, such as heart disease; and other significant factors such as excessive drug ingestion, and multiple force applications (e.g., baton + wrestling + stun).

Study Conclusions:

- Based on the available evidence, and on accepted criteria for defining product risk vs. efficacy, we believe that when stun technology is appropriately applied, it is relatively safe and clearly effective. The only known field data that are available suggest that the odds are, at worst, one in one thousand that a stun device would contribute to (and this does not imply "cause") death. This figure is likely not different than the odds of death when stun devices are not used, but when other multiple force measures are. A more defensible figure is one in one hundred thousand.

- No federal regulative body has asserted oversight of current non-lethal stun technology. As a result, there is insufficient guidance for public and private management. One result of this deficiency is that there are currently no broadly accepted engineering standards in this field.

4

POTOMAC INSTITUTE FOR POLICY STUDIES

We believe that the establishment of industry-driven, government-endorsed standards will contribute significantly to better understanding of this technology domain. We expect better understanding will in turn help shape market (demand and supply) dynamics for products. Competition may also contribute to an increase in the community's self-management of safety issues.

- We strongly recommend that additional research be conducted at the organism, organ, tissue, and cell levels. The mortality figures cited could conceivably reflect inaccuracies in reporting or perhaps there are other factors, such as efficient and effective medical care availability. Moreover, the vast majority of targeted individuals have been relatively young males. The community needs to understand the specific effects of varying electrical wave forms on relevant organic matter of all body types in the immediate time frame of stun application, and in the downstream time course as well, to include possible psychiatric and other non-lethal effects.

POTOMAC INSTITUTE FOR POLICY STUDIES

# Introduction and Statement of the Problem

We believe there have been well over 100,000 known actuations of electrical stun technology (or merely, stun devices or guns) by law enforcement officers over the last five years.[1] Several police and enforcement organizations confidently claim that the technology is safer and more effective than other non-lethal, and even lethal alternatives. However, there are reports of nearly 100 in-custody deaths that have occurred in association with the employment of stun devices. Although coroners' reports do not specifically indicate that stun employment "caused" death, there is legitimate concern that the significant electrical surge produced by this technology contributed to, or indeed perhaps even caused, death.

Opposition to (or at least critical concern regarding) stun device use is championed by non-government organizations such as the American Civil Liberties Union (ACLU), the Southern Christian Leadership Conference (SCLC), and Amnesty International. The ACLU has called on law enforcement agencies in Rhode Island, Colorado, and California to tighten use of force policies, and to only allow the use of stun devices in situations that present a "true threat" to human life. The SCLC recently held a rally in Pensacola, Florida to launch its national campaign against the use of stun devices, and intends to hold future hearings on stun device use in the State of Georgia. Amnesty International has undertaken the most critical review, and in the process, has done the stakeholder community a tremendous service by documenting the history of this technology, and chronicling episodes of stun employment, particularly in cases with unfortunate outcomes.

Reference to "stakeholder community" above is for our purposes a very important issue. Unlike nearly any other technological domain, there appears to be no U.S. government regulatory organization that has taken "responsibility" for stun device safety. That is, there is no "controlling legal authority" for stun technology regulation. Although the Department of Justice (DOJ) has begun a study on the safety of stun devices, to date, no Federal agency has taken ownership of the issue. The last government assessment of stun safety was conducted by the U.S. Consumer Product Safety Commission (CPSC) in 1976. It found that the product should not be lethal to a normally, healthy person.[2] Furthermore, the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) has not classified the current 'conducted-energy weapon' as a firearm, since this proprietary technology uses compressed nitrogen gas as the propellant. The ATF has therefore offered no restrictions or guidelines for stun device use.[3]

So, although stun devices are guns, they are not firearms. They have been in commercial use significantly for nearly 30 years and there are unsubstantiated claims that they can kill. The salience of this issue has increased due in part to recent reporting of mortalities in temporal association with police use of stun devices. This study was conducted in order to clarify issues of effectiveness and safety of current stun technology.

---

[1] The number of stun device actuations is constantly increasing. TASER International estimates the total number of actuations of TASER products only, to be around 200,000. While we acknowledge the continually increasing total, in order to make consistent calculations we will use 100,000 as the actuation figure.

[2] See May 2, 1985 press release # 85-022 from the Consumer Product Safety Commission. Available at www.cpsc.gov/CPSCPUB/PREREL/prhtml85/85022.html.

[3] Interestingly, there are Second Amendment issues associated with stun devices. Anticipated case law here will be very important from a policy perspective.

POTOMAC INSTITUTE FOR POLICY STUDIES

## Background:  Efficacy and Safety of Stun Device Technology

Electrical stun technology has been available and commercially traded for more than a quarter century.  The original market, of course, was focused on private purchase in support of personal security.  The leading manufacturer of stun devices, TASER International, Inc., reports that it has retailed roughly 100,000 devices for private use, and that approximately 135,000 units have been sold to law enforcement organizations.  Sales of the devices indicate clear and growing demand.  The TASER-specific units range in cost from around $400 to upwards of $1,000 and as a result, retail demand for personal use is arguably dominated by middle-and-upper income individuals and families.[4]

Stun devices are currently used by some 7,000 law enforcement agencies in the United States.  However, use of these devices is limited or made unlawful in certain jurisdictions.  A summary of legal and policy restrictions is shown in Table 1.  It is reasonable to assume that restrictions on, or the criminalization of, stun use are derived from concerns regarding safety, and not from doubts concerning the technology's effectiveness.

Table 1.  State & Local Limitations to Stun Device Use[5]

| STATES WHERE STUN DEVICES ARE ILLEGAL | |
|---|---|
| Hawaii | Hawaii State Law. Rev. Stats. Title 10, Chapter 134. |
| Massachusetts | Massachusetts State Law. Ann. Law of Massachusetts. Chapter 140. |
| Michigan | The Michigan Penal Code Act 328 of 1931. Chapter 750.224a |
| New Jersey | New Jersey State Law. New Jersey Stat. Ann. Title 2C. Chapter 39-1. Senate, No. 2871 -- L.1985, c. 360 |
| New York | New York Consolidated Law Book 39. Penal Law. Article 265 |
| Rhode Island | General Laws of Rhode Island. Title 11, Chapter 47. Statute Subsection 11-47-42. |
| Wisconsin | Wisconsin Sta. Ann. Chapter 393. Chapter 941.295 |
| STATES WHERE STUN DEVICES ARE LEGAL, BUT WITH SOME RESTRICTIONS | |
| Connecticut | Connecticut Criminal Law Title 53 - Crimes, Title 53a - Penal Code, title 54 Criminal Procedure, Chapter 950 Section 53a-3 |
| Florida | 790.001 (15) |
| Illinois | Identification Card Act. Chapter 720. Criminal Law and Procedure, Article 24. Deadly Weapons. |
| Indiana | IC 35-47-8 |
| North Carolina | §14-269 |
| North Dakota | North Dakota Century Code Title 62.1 and Article 10-12 |

---

[4]There is a "secondary market" within stun device retail, in that consumers can purchase devices at a much lower rate through the Internet.  We anticipate that future issues may arise here, after consumers are unable to verify the origin or manufacturer of the device.

[5] State and city code information available through several retail sites including http://www.1stlinesecurity.com/stunres.html and http://www.beststungun.com/stun-gun-laws.html#den

POTOMAC INSTITUTE FOR POLICY STUDIES

| Washington | House Bill 1580, adding new chapter to Title 9 RCW |
|---|---|
| **CITIES WHERE STUN DEVICES ARE ILLEGAL** | |
| Annapolis, MD | Section 11.44.070 Electronic weapons (Ord. O-59-85 § 1: prior code § 17-35) |
| Baltimore, MD | Baltimore City Code 115. (Ord. 385.1985) |
| Howard County, MD | Sec. 8.404 (C.B. 38 1985) |
| District of Columbia | DC Code Ann. Title 6, Chapter 23. Firearms Control. |
| Philadelphia, PA | Philadelphia City Ordinance. Statute 10-825 Stun Guns. |

The use of stun technology by law enforcement agencies has increased significantly over the past five years. Indications of growth include sales figures for the principal supplier, TASER International, Inc. TASER revenue has grown from around $2.2 million in 1999, to an estimated $67 million for fiscal year 2004.[6] In addition, a number of police organizations (and individuals) have specifically and publicly claimed that the technology is very effective, and represents a vital capability in the force repertoire.[7] Clearly, the devices do represent an option in law enforcement's "force continuum." Whereas stun devices provide a means short of deadly force, they are arguably more effective, and even safer than other elements of the dimension, such as baton use or employment of chemical sprays. Figure 1 shows a graphic of the Canadian Use of Force Model; it provides a representative depiction of the relationship between "force" and the types of "threat" that are encountered by police.[8] Because law enforcement is regulated by individual states, there is no national use of force model in the United States. However, organizations such as the International Association of Chiefs of Police, exemplar rules of engagement (through the National Law Enforcement Policy Center) for law enforcement agencies on such issues as use of force, electronic control weapons, and other less than lethal weapons.

---

[6] The SEC makes TASER International, Inc. company financial filings available through the EDGAR system at http://www.sec.gov/edgar/searchedgar/webusers.htm

[7] This statement is supported by numerous individual agency reports including those from Chandler, Arizona; Cape Coral, Florida; Madison, Wisconsin; and Orange County, Florida.

[8] This model is taken from the September 2004 British Columbia Police Complaint Commissioner report on Taser Review. The terms used for Canadian subject behavior levels correspond to the following U.S. resistance level terms: Cooperative/Cooperative; Passive Resistant/Verbal Non-Compliance; Active Resistance/Defensive Resistance; Assaultive/Active Aggression; Grievous Bodily Harm or Death/Deadly Assault.

POTOMAC INSTITUTE FOR POLICY STUDIES

Figure 1: Canadian Use of Force Model



Without providing detail here, it is important to note that police organizations develop tactics, and train on selecting context-dependant force options based on perceived levels of aggressive behavior. Police necessarily react to behavior and not intent. A conceptual set of considerations can be inferred from the figure and is confirmed anecdotally by police organizations as follows: (1) the stun option provides a satisfactory alternative relative to the use of deadly force; (2) the stun option does not represent (A) an unsatisfactory alternative to a perhaps less aggressive option and as a result, (B) it does not produce collateral consequences (e.g., death or injury) that would not have resulted with the (claimed) less aggressive option. We must turn to the available evidence to confirm or disconfirm these key claims.[9]

---

[9] It is important to note that many states are placing stun devices on the same level of the force continuum as oleoresin capsicum(OC) spray (due to ease of subject "after care"), which is lower than impact weapon use and lethal force. Information available at www.policemag.org

9

POTOMAC INSTITUTE FOR POLICY STUDIES

## Evidence Regarding the Efficacy and Safety of Stun Technology

The two fundamental and obvious technical questions associated with the employment of non-lethal devices in general, and electrical stun technology in particular, are as follow: (1) are they effective, and (2) are they safe? "Safe" and "effective" are of course relative terms, and therefore must be (A) clarified, (B) quantified, and (C) objectively evaluated. Perhaps the largest contribution to confusion over the stun device debate is a lack of precision in terminology. We believe that clarity and universality of definitions is vitally important, and thus we provide the following treatment of terms and concepts.

_Non-Lethal Devices Defined_. Military forces have long used tactics, techniques and procedures that range from extremely lethal, to those that are considerably less than lethal. Fundamental to this military continuum that is at least as old as Sun Tzu, and typical of today's military-engineering-legal enterprise, formal definitions have been vetted and adopted in military parlance. We commend the DoD definition of non-lethal weaponry as follows:

> _"Weapons that are explicitly designed and primarily employed so as to incapacitate personnel or materiel, while minimizing fatalities, permanent injury to personnel, and undesired collateral damage to property and the environment."[10]_

The importance of this definition is the emphasis placed on the intent of employment, and not on the unintended outcome of employment. That "force" is used necessarily implies potential harm to tissue or organs, but, at least as military doctrine clearly articulates, the intention of non-lethal technology is not to kill, but rather to incapacitate—and to do so temporarily. Although we know of no similarly published doctrine from law enforcement organizations, we believe that the military definition of non-lethal technology is particularly appropriate in the case of stun devices in law enforcement, and thus we have adopted it for our purposes.

_Efficacy (or Effectiveness) and Safety Defined_. There are several philosophical models that can be used to frame and subsequently, to define the relative effectiveness—and relative safety of a particular technology. These range from the engineering rigor of military test and evaluation processes, to business-related analyses of product movement to consumers. We chose to follow a conservative Food and Drug Administration (FDA) philosophy for defining efficacy and safety, primarily because of the putative life-and-death matters that have been made central to the stun device debate.

A thematic characteristic of FDA product regulation is the following: efficacy and safety are not examined as mutually independent variables. The fundamental precept of FDA regulation is best portrayed from the source itself: "Although (medical products) are required to be safe, safety does not mean zero risk, since all (medical products) are associated with risks. A safe (medical product) is one that has reasonable risks, given the magnitude of the benefit expected and the

---

[10] DoD Policy Directive 3000.3, updated November 2003.

10

POTOMAC INSTITUTE FOR POLICY STUDIES

alternatives available," (U.S.FDA[11]; The reader may substitute "law enforcement devices" for "medical products").

No useful technology is perfectly safe. This can be said of *any* technology, even devices that are designed specifically and exclusively to save lives, such as seatbelts or air bags—which themselves can and do kill (to be discussed in relative terms later). The question of efficacy and safety thus decomposes to the following efficacy dominated concerns (A) Does the technology do what it is intended to do at the behavioral level? Does it provide an effective option among force options? Is it an alternative to deadly force, or is it an alternative for other, perhaps less "aggressive" non-lethal tools? Does it incapacitate targeted individuals and targeted individuals only? What is a perpetrator's perception of the use of this technology vis-à-vis other force options? Safety-oriented interrogatives include: (B) Is the underlying effect (physiologically) understood, and is it reasonable, given the claimed effectiveness? Let us first consider the sources of evidence and then provide an interim assessment.

Table 2 depicts the realm of possible sources of evidence that are considered presently. Information available includes directly applicable data from field experience, and indirectly applicable data from laboratory research and other more or less formal studies. We were not convinced that all of the questions outlined in the former paragraph could be answered with confidence at this time. We have concentrated on the two principal issues: efficacy and safety.

Table 2:  Currently Available Evidence Sources

|  | DIRECT | INDIRECT |
|---|---|---|
| **Effectiveness** | Anecdotal Reports Law Enforcement Agencies | Sales to Police Departments Non Law Enforcement Activity |
| **Safety** | Medical Reports Volunteer Episodes | Laboratory Studies Modeling & Simulation |

*Direct Evidence of Effectiveness.* Direct evidence of effectiveness derives from police reports. These are almost invariably positive. The difficulty here is that critics may reasonably argue that police organizations have a bias in favor of stun devices, and that this bias contaminates any self-report of effectiveness. However, we believe that this is blindly dismissive of law enforcement reporting. Summaries from various law enforcement agencies show a consistent pattern of contexts, and of outcomes of use. The Los Angeles Sheriff's Department, for example, claims a 94 percent effectiveness rate for stun devices. This compares very favorably with success from other techniques and devices such as pepper spray. The latter is believed to provide no better than an 85 percent effectiveness rating. We know of no evidence of targeting, accuracy, or reliability issues that might compromise the effectiveness of stun technology.

---

[11] U.S. FDA Report (May 1999) *Managing the Risks from Medical Product Use. Part 1: Background – What are the Risks and What is FDA's Role in Managing Risk?*. The reader may substitute "law enforcement devices" for "medical products".

11

*Indirect Evidence of Effectiveness.* Indirect evidence for efficacy derives primarily from the fact that purchases by law enforcement agencies continue to increase. Based on the assumption that local and state governments make budget decisions in a competitive, vetted, and publicly accountable way, the simple observation that purchases (and repeat customership) continue to increase is an indirect but strong suggestion that the devices are doing what they are purchased to do.

Indirect evidence also arises from the fact that enterprises other than traditional law enforcement agencies, as well as foreign governments such as the U.K., France, and Finland are utilizing this technology. Other support can be inferred from recent decisions by the Department of Homeland Security (DHS) and Transportation Safety Administration (TSA), which now approves the deployment and use of stun devices by specially trained personnel on board commercial aircraft. A 2004 USA Today article noted that stun devices are the only non-lethal weapon that could be used safely on airline flights.[12] Groups such as the Airline Pilots' Association (ALPA) believe that these devices can be valuable for cabin security. Currently, flight attendants are not permitted to carry firearms, therefore the stun device creates an option for securing and protecting the aircraft and its passengers. The Association of Flight Attendants supports this policy, although currently no domestic airline carrier has deployed stun devices on their aircraft. It should be noted, however, that several foreign carriers are using this technology on international flights.

*Direct Evidence of Safety.* The most direct evidence of safety for stun technology derives from examination of post deployment, or use reports. The range of outcomes available here varies from incidents of in custody mortality, to episodes in which no apparent medical sequelae obtain at all (i.e., no morbidity). Amnesty International has produced an annotated tabularization of the 72 mortality cases known at the time of its publication.[13] Examination of each case reveals that in no instance was stun employment singularly indicated or implicated as the cause of death. On the other hand, causes of death normally address vital organ (brain) function or cessation; thus stun device employment to the body would not ordinarily be listed as a cause, per se, but rather as a possible contributing factor. Records of the mortality events reveal other consistent and significant patterns, to which we turn next.

The average age of those who died was 36.5, and all but one were apparently male.[14] Depending on the criteria used, 25 to 33 individuals died as the result of drug overdose, as specifically indicated by Coroner or Medical Examiner reports.[15] This included over-dosages of cocaine (19 to 26 cases) and methamphetamine (6 to 7 cases). The level of detail in the documentation shows that unequivocal, multiple use of force was evident in 44 cases. If we subtract the cases in which handcuffing was used without clear indication of significant force, 40 cases

---

[12] Levin, A. and Woodyard, C. (2004, November 08). "Stun Guns OK'd for use on airline". *USAToday*, p. 1A. Retrieved March 1, 2005 from http://www.usatoday.com/printedition/news/20041108/1a_bottomstrip08_dom.art.htm

[13] See Appendix A of Amnesty International. (November 2004). United States of America: Excessive and lethal force? Amnesty International's concerns about deaths and ill-treatment involving police use of tasers. Retrieved February 11, 2005, from https://web.amnesty.org/library/index/ENGAMR511392004

[14] This inference is based on the first names of the deceased. The single female was actually a fetus.

[15] There is inconsistency based on reporting standards across jurisdictions. We report the most conservative calculations based on scrutiny of the Amnesty International compilation.

12

POTOMAC INSTITUTE FOR POLICY STUDIES

required multiple use of force. There is only one case in which only stun use was applied (see below for details). These multiple force cases included forceful restraint (often requiring several officers wrestling the individual to restraint, "hog-tieing," sometimes to a position that compromised breathing), baton use, chemical spray application, and stun use. There were 14 double-use (e.g., baton and stun) incidents, 24 triple use events, and 6 cases in which 4 or more types of force were employed. The modal application (based on unequivocal reporting) was three forms of force (mean = 2.8; median = 3). This indicates of course that no single application of force used (restraint, stun, etc.) can be singularly identified as the leading element among the "cause of death" contributors. The number of stun applications per individual ranged from 1 to 13 (the latter figure is an outlier— the range otherwise was 1 to 6 stun applications). Median and modal stun application were approximately 2 applications per individual (though the mean = 3.57 due partly to the outlier). From the annotation, it does not appear that any death occurred during or immediately after stun application[16].

Following is a synopsis of the six accounts in which stun application was specifically cited as a salient contributor to death. Average age for these individuals was approximately 39, and use of force was multiple in all cases. Significant heart disease was specifically cited in two cases, and drug overdose (or failure to take prescription medication) was evident in all but one case. The single case in which stun application was the only force used in a death-related case was for an individual who fell, presumably as the result of loss of postural control, and sustained a fatal injury to the head—i.e., before law enforcement officials were able to access the individual. Thus, from Amnesty's compilation, we are able to confidently isolate stun device application as the principal contributor to death in one instance, and this was due to secondary means (by falling). The pattern almost invariably associated with deaths wherein drugs were involved, and in which stun and other devices were employed, appears to be that of nearly super-human physical struggle, principally against law enforcement officials. A nascent but increasingly respected medical interest in the associated medical trauma is converging on a constellation of symptoms that are being termed "excited delirium syndrome."[17] Here, in theory, "patients" "out-run" their aerobic reserve and expire, either through fibrillation or otherwise. A key point should be made here: excited delirium syndrome implies mortality caused by multiple factors over-driving the cardiovascular-pulmonary system, and not heart failure produced through electrical surge (from a stun device) applied to or conducted to the heart.

Death associated with in-custody episodes in which stun devices were *not* used also occur, of course. Civilians Down, an advocacy and support group for families who have lost loved ones while in police custody, report that nearly 1,000 people die in police custody each year.[18] This sets up an important hypothesis relative to the isolated contribution of stun devices to in custody demise. If stun devices are "the cause," and not merely a contributing factor, then there should be significantly more deaths after or during in custody stun-use evolutions than for other (e.g., chemical spray or

---

[16] This finding is important in light of the fact that when electric defibrillation devices are applied in order to purposefully change heart rhythmicity, the effect is immediate. It is also important to note that defibrillation devices are applied proximal to the heart, surge to 60 Amperes, and do not cause heart attacks, but rather reverse them.
[17] Excited Delirium Syndrome or Acute Exhaustive Mania were cited as cause of death in several of the Amnesty International compilation cases.
[18] Information is available at www.civiliansdown.com.

POTOMAC INSTITUTE FOR POLICY STUDIES

baton use) episodes in which stun devices specifically were not used. The evidence here favors the conclusion that stun devices cannot be isolated as the sole, or even a principal cause of death.[19]

In summary of the cases cited to date, if we consider the incidents in which stun technology contributed (singularly or in combination) to death, the range is from 1 to 72 mortalities. If we also accept that the applications of stun devices (for demonstration, or for effect) range from 60,000[20] to 100,000, the probability of death being associated with stun application ranges from 1 (specific death) in 100,000 (custodial + demonstration uses); to a maximum of 72 (temporally-associated deaths) in 60,000 (custodial uses[21]). This means that a safety factor for stun application is on the order of 0.999 to 0.99999. Stated another way, the probability of death after stun device administration to the body is from one in a thousand to one in one hundred thousand. Looked at from a different probability perspective, the likelihood of death due specifically to air bag deployment in modern automobiles is such that for every 50 individuals saved, one is killed.[22] One stun device manufacturer claims that stun devices have saved some 7,000 lives. If true, the most conservative saved/killed ratio for stun devices is 70:1. Based on the data cited above, this number is more likely 700:1 or greater.

A second set of direct data derives from an informal assessment of approximately 40,000 employments of stun devices applied to volunteer law enforcement officers. This process serves the purpose of teaching police the effects of the electrical surge from a personal involvement level, and it thereby presumably inspires some increment of wisdom before the device is used on private citizens. We have found no evidence of mortality or morbidity when police are voluntarily stunned. A legitimate argument here is that this is a faulty sample set because the vast majority of police officers are healthy young males with no exotic drugs in their systems. On the surface, this is a fair criticism. However, in reality, the vast majority of those who have been incapacitated by stun devices were themselves young males. Indeed the Amnesty International compilation cited above included nearly exclusively male (average age, mid-thirties) targets.[23]

*Indirect Evidence of Safety.* The best available indirect evidence of stun device safety comes from modeling efforts, either *in vitro, in vivo* (with live animal models), or *in silico* (modeling and simulation). The quantity of information available is not formidable, but the quality of the

---

[19] As one example, a March 1994 report derived from data collected by the International Association of Chiefs of Police (IACP) states: "*A total of 30 incidents were found between August of 1990 and December of 1993 in which the death of a subject occurred following a spraying with OC. The 30 cases, all involving male decedents, share several commonalities. All subjects behaved in a combative and/or bizarre manner and struggled with the police. Drugs and/or alcohol were involved in most cases. In the majority of cases, OC spray was either ineffective or less than totally effective. Generally, restraint techniques were employed subsequent to spraying, and with one exception, all deaths occurred either immediately or soon after the confrontation.*" The full report can be found at: http://www.zarc.com/english/other_sprays/reports/iacp_oc_death_1994.html.

[20] See next paragraph.

[21] We are obviously using disparate data sets for numerator and denominator here in order to derive a worst-case estimate for possible stun device lethality.

[22] This conclusion is based on National Highway Transportation Safety Board data reporting that from 1990 through 2004 there were 253 confirmed, and 22 unconfirmed airbag related fatalities. The same NTSB data estimates that airbags have *saved* a gross number of between 13,385 and 16,537 drivers, and 3,152 front-right side passengers. http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/TextVer/Anchor-SC-29958

[23] Without elaboration here, one reason that being relatively young and male is partly inoculative is that the skin, musculature, etc., are more voluminous and thus arguably provide more resistance (ohms) and thus more protection for the heart.

14

POTOMAC INSTITUTE FOR POLICY STUDIES

evidence is instructive. We will provide a very brief overview. In fact, we will concentrate on one recent government study.

A recent experimental examination of stun efficacy and health effects was conducted at the U.S. Air Force Research Laboratory. A briefing of the study is available from the Air Force as U.S. Air Force Research Laboratory Technical Report AFRL-HE-BR-TR-2004-0094, September 2004. Dissemination is controlled by DoD Directive 5230.25. The report does not appear in the peer-reviewed literature at this time, however the information in the available briefing is clear. The effort specifically examined the effectiveness (muscle contraction) and cardiac safety (ventricular fibrillation) of stun device application (representing the dose characteristics of a TASER International X-26 product) to swine. The technical community believes this animal to be the best model (due to heart-to-body ratio, etc.) for this type of research.

First, with regard to effectiveness outcomes, it is clear that the stun devices succeeded in causing muscle contraction in the limbs and in producing loss of posture. So at the behavioral and physiological level, evidence of effectiveness seems unequivocal. There is nothing surprising here—this is consistent with reports from law enforcement evolutions with humans, at least at the behavioral level.

With regard to health effects, there were no reported mortalities—no pigs died as the result of stun exposure. In order to understand more fully the physiology of *potential* damage to the body, chemical blood substances known or thought to be associated with muscle damage were collected. In summary, blood pH became more acidic, but returned to normal within an hour of exposure; lactate increased and slowly returned to normal; blood $CO_2$ increased after application but returned to normal within one hour; serum potassium increased, but returned to about six percent of normal within one hour. Although recommending further study, in summary here, the government reported no evidence of heart attack, nor evidence of enduring, down stream effects based on lagging indicators in blood plasma chemistry.

It is very important to underscore the importance of the dosage levels used in this experiment. Electrical pulses were applied to the animals for 5 seconds, each followed by a period of 5 seconds of no exposure. This on-off pattern was repeated continuously for 3 minutes. At the conclusion of this 180-second mode, a one-hour delay was imposed, and the same treatment was applied for another three minutes to each animal. Thus at six exposures per minute, the porcine models received 18 stuns per period, and thus 36 stun dosages, total. Recall that in the Amnesty International compilation of human mortalities, the average number of stuns was reported to be less than five (in fact mode = 2; mean = 3.57). That is, the pigs in the Air Force study received an order of magnitude more stuns than did the humans in the Amnesty International database. This experimental dosage appropriately minimizes the odds of making an inferential error: That no pig died or showed evidence of sustained (plasma substance) morbidity—despite the very high dosage levels—supports a claim of (relative) safety for the stun device, at least as used under experimental control conditions (e.g., placement of terminals on the animal, etc.).

15

POTOMAC INSTITUTE FOR POLICY STUDIES

## Conclusions

Based on the available evidence, and on accepted criteria for defining product risk vs. efficacy, we believe that when stun technology is appropriately applied, it is relatively safe and clearly effective. The only known field data that are available suggest that the odds are, at worst, one in one thousand that a stun device would contribute to (and this does not imply "cause") death. This figure is likely not different than the odds of death when stun devices are not used, but when other multiple force measures are. A more defensible figure is one in one hundred thousand.

No federal regulative body has asserted oversight of current non-lethal stun technology. As a result, there is insufficient guidance for public and private management. One result of this deficiency is that there are currently no broadly accepted engineering standards in this field. We believe that the establishment of industry-driven, government-endorsed standards will contribute significantly to better understanding of this technology domain. We expect better understanding will in turn help shape market (demand and supply) dynamics for products. Competition may also contribute to an increase in the community's self-management of safety issues.

We strongly recommend that additional research be conducted at the organism, organ, tissue, and cell levels. The mortality figures cited could conceivably reflect inaccuracies in reporting or perhaps there are other factors, such as efficient and effective medical care availability. Moreover, the vast majority of targeted individuals have been relatively young males. The community needs to understand the specific effects of varying electrical wave forms on relevant organic matter of all body types in the immediate time frame of stun application, and in the downstream time course as well, to include possible psychiatric and other non-lethal effects.

16

POTOMAC INSTITUTE FOR POLICY STUDIES

# Appendix A: Bibliography

ACLU Urges Rhode Island Police to Shun "Stun Guns". (2004 September 2). Retrieved March 9, 2005, from http://www.aclu.org/PolicePractices/PolicePractices.cfm?ID=16369&c=25.

ACLU Urges San Francisco Police Commission to Exercise Caution in Use of Tasers. (2004 September 21). Retrieved March 9, 2005, from http://www.aclu.org/PolicePractices/PolicePractices.cfm?ID=16559&c=25.

Amnesty International. (November 2004). *United States of America: Excessive and lethal force? Amnesty International's concerns about deaths and ill-treatment involving police use of tasers.* Retrieved February 11, 2005, from https://web.amnsety.org/library/index/ENGAMR511392004

Anglen, R. (2004, July 18). Taser safety claim questions. *The Arizona Republic.* Retrieved March 9, 2005, from http://www.azcentral.com/specials/special19/articles/0718taser-main18.html.

Badertscher, N. (2005, February 15). SCLC calls on police to stop using stun guns. *The Atlanta-Journal Constitution.* Retrieved February 16, 2005, from http://www.ajc.com/news/content/metro/legis05/0205/15legtaser.html.

Berenson, A. (2004, December 7). Justice Dept. Begins Study of Safety of the Taser Electric Gun. *The New York Times,* p. C6.

Bleetman, A., Steyn, R. (2004, April 27). *The Advanced Taser: a Medical Review.* Retrieved February 21, 2005 from TASER International Inc. website: http://www.taser.com/documents/tasersubmit.pdf

Bozeman, W.P. (2003). Medical threat assessment: The Taser M26 less lethal weapon. *The Tactical Edge,* 32-34.

British Columbia Office of the Police Complaint Commissioner. (2004).*Taser Technology Review and Interim Recommendations.*(OPCC File No. 2474).

Bronson, P. (2005, February 22). Taser deaths grossly exaggerated. *The Cincinnati Enquirer.* Retrieved March 1, 2005 from http://news.enquirer.com/apps/pbcs.dll/article?AID=/20050222/COL05/502220309/1004.

Chernicky, D. (2005, March 3). Taser popular with cops. *Daily Press.* Retrieved March 3, 2005, from http://www.dailypress.com/news/local/dp-4870sy0mar03,0,2099248.story?coll=dp-news-local-final.

Citing Deaths in Police Custody, ACLU of Colorado Calls For Limits on Use of Electroshock Weapons. (2004, February 26). Retrieved March 9, 2005, from http://www.aclu.org/CriminalJustice/CriminalJustice.cfm?ID=15167&c=15

17

# POTOMAC INSTITUTE FOR POLICY STUDIES

Coroner rules Taser a factor in death; use called justified. (2005, February 24). *Associated Press*. Retrieved March 1, 2005, from http://www.azcentral.com/news/articles/0224taserdeath-ON.html

Dahlin, A. (2005, February 24 – March 2). SCLC Rallies In Taser Gun Controversy. *The Pensacola Voice*. Retrieved March 9, 2005, from http://www.pensacolavoice.com.

Davison, N. and Lewer, N. (2004). *BNLWRP Research Report No. 6*. Centre for Conflict Resolution, Department of Peace Studies, University of Bradford. Retrieved February 21, 2005, from http://www.brad.ac.uk/acad/nlw/research_reports/.

Fujimoto, L. (2005, February 17). Injuries to officers, suspects cut by MPS's use of Tasers. *The Maui News*.

Hoover's Online—Financial Fact Sheet. Retrieved March 9, 2005, from http://www.hoovers.com/taser/--ID__105070--/free-co-fin-factsheet.xhtml.

International Association of Chiefs of Police. (2001) *Police Use of Force in America*. Available through the IACP website at http://www.theiacp.org/documents/pdfs/Publications/2001useofforce%2Epdf.

International Electrotechnical Commission. (1994). *Effects of current on human being and livestock*. (Technical Report-Type 2, Publication 479-1).

Johnson, K. (2005, February 16). Deaths prompt concerns, reviews on use of stun guns. *USAToday*, p. 1A.

McDonald, W.C., Stratbucker, R.A., Nerheim, M., and Brewer, J.E. (2005). Cardiac Safety of Neuromuscular Incapacitating Defense Devices. *Pacing and Clinical Electrophysiology*, 28, 284-287.

Oshier, A. (2004, December 8). Professor studies taser use—results shocking. *NBC News 2*.

Rathbun, A. (2005, February 28). Experts: Taser guns need more study. *Northwest Indiana Times*. Retrieved March 1, 2005, from http://www.thetimesonline.com/articles/2005/02/28/news/top_news/ffb6c7bd8fb039f286256fb600014e6d.txt.

Schulz, W. and Smith, R. TASER International/Amnesty International Debate [Debate Transcript]. (2005, March 9) *at* Claremont McKenna College. Retrieved March 16, 2005, from www.taser.com.

Study Questions Stun Gun Safety. (2005, February 9). *CBS News*. Retrieved March 1, 2005, from www.cbsnews.com/stories/2005/02/09/eveningnews/printable672709.shtml.

Townsend, E.J.S. (2005, February 28). Police await Taser study results. *Greensboro News & Record*. Retrieved March 1, 2005 from http://www.news-record.com/news/local/gso/taser022805.htm.

18

POTOMAC INSTITUTE FOR POLICY STUDIES

U.S Department of Transportation National Highway Traffic Safety Administration, National Center for Statistics & Analysis. 4th Quarter 2004 *Air Bag Fatality Summary Report & Tables.* Available at http://www-nrd.nhtsa.dot.gov/departments/nrd-30/ncsa/TextVer/Anchor-SC-29958.

U.S. Food and Drug Administration. (1999, May) *Managing the risks from medical product use: creating a risk management framework report to the FDA Commissioner from the Task Force on risk management.* Retrieved March 7, 2005, from http://www.fda.gov/oc/tfrm/Part1.html

Walton, R.D. (2005, February 16). Stun guns aren't for public, police say. *The Indianapolis Star.* Retrieved February 16, 2005, from http://www.indystar.com/articles/4/222629-7984-P.html.

Ward, K. (2005, February 19). Taser usage by local officers unchanged despite controversy. *Northwest Arkansas Times.* Retrieved March 1, 2005 from www.nwanews.com/story/nwat/25502.

19

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF ILLINOIS

# PEORIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  05-10012 |
| | ) | |
| JASON D. MALONE, | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on**, April 26, 2005**, I electronically filed the plaintiff's

**RESPONSE TO MOTION TO SUPPRESS** with the Clerk of the Court using the

CM/ECF system which will send notification of such filing to the following:

**Karl Bryning**
**Assistant Federal Defender**

and I hereby further certify that I have mailed, by United States Postal Service, the

plaintiff's **RESPONSE TO MOTION TO SUPPRESS** to the following non CM/ECF

participants:

**Not Applicable**

**s/: DONALD C. LATTIG**
**DONALD C. LATTIG**
Legal Assistant
Office of the United States Attorney
One Technology Plaza
211 Fulton Street, 4th Floor
Peoria, Illinois 61602
Telephone: 309.671.7050
E-Mail: don.lattig@usdoj.gov