**E-FILED**
Friday, 24 June, 2005  06:13:57 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | NO.  05-10012 |
| | ) | |
| JASON MALONE, | ) | |
| | ) | |
| Defendant. | ) | |

_____

**SUPPLEMENTAL MEMORANDUM**

NOW COMES the defendant, JASON MALONE, by Karl W. Bryning, Assistant Federal

Defender, and supplements his previous Motion to Suppress Evidence (Incorporating

Memorandum of Law) as follows:

1.      On April 27, 2005 the Court indicated a desire for additional information

regarding the issue of safety/risk involved with taser use and granted Defendant's request to

supplement the record.

2.      Safety is defined as "The state of being safe" by the Webster's II New College

Dictionary.

3.      Risk is defined as "Possibility of suffering harm or loss: Danger." by the

Webster's II New College Dictionary.

4.      The Convention against Torture and Other Cruel, Inhumane or Degrading

Treatment or Punishment defines torture as: "...***any act by which severe pain or suffering,

whether physical or mental, is intentionally inflicted on a person for such purposes as***

obtaining from him or a third person information or a confession, punishing him for an act he or

a third person has committed or is suspected of having committed, or intimidating or ***coercing***

*him* or a third person, or for any reason based on discrimination of any kind, ***when such pain or suffering is inflicted by*** or at the instigation of or with the consent or acquiescence of ***a public official or other person acting in an official capacity***. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions."(emphasis added)

5.     More specifically, *Schmerber v. California*, 384 U.S. 757, (finding that evidence of analysis of petitioner's blood taken over his objection by a physician while petitioner was in a hospital after being arrested did not violate petitioner's Fourth Amendment right to be free of unreasonable searches and seizures) addressed safety and risk stating:

> Such [blood] tests are a commonplace [sic] in these days of periodic physical examination (13) and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves ***virtually no risk, trauma or pain***. (emphasis added)

The same cannot be said of electrical shock by a Taser or any other stun gun.

6.     The *Schmerber* Court described a procedure in stark contrast to electrical shock administered with a weapon described as a "pain compliance tool." further elucidating it's analysis of the "risk, trauma or pain" element by footnote 13:

> The blood test procedure has become routine in our everyday life. ***It is a ritual for those going into military service as well as those applying for marriage licences. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same***, though a longer, routine in becoming blood donors. *Breithaupt v. Abram*, 352 U.S., at 436 S. Ct. at 410 (emphasis added)

The same cannot be said of electrical shock by a Taser or any other stun-gun.

7.     Similarly, in utilizing the factors set forth in *Schmerber* the Court in *Winston v. Lee*, 470 U.S. 753, 105 S. Ct. 1611 (Surgery to remove bullet from defendant for use as evidence found unreasonable under Fourth Amendment) specifically noted *Schmerber's* consideration of

the safety or health of the individual as ***including pain***: "[F]or most people a [blood test] involves virtually no risk, trauma, or pain." citing *Schmerber* at 761

8.      There is no doubt that stun guns and specifically the Taser X26 is extremely painful whether the electrified fishhook-like barbs are used or, as in the case at bar, the electrical contacts are pressed to skin. Peoria County Police General Order 400.96 states: "The X26 Taser does not rely on pain to achieve compliance but incapacitation through the central nervous system. ***However, when used as a stun gun the X26 Taser is a pain compliance type of weapon.***" (emphasis added) (EXHIBIT A)

9.      U.S. Probation Officer Keri Walsh voluntarily subjected himself to a Taser jolt as part of a training exercise and described the experience as the most painful experience of his life. Nearly a year later he retained visible marks on his skin. Newscasters have described the pain inflicted in terms of being "gored by a bull over and over again." (EXHIBIT B)

10.     There is also no doubt that physical harm may result from Taser X26 exposure in "drive stun mode." Taser International's own document entitled **"User Warnings, Risks, Liability Release and Covenant Not to Sue",**(EXHIBIT D), is prefaced by the statement: "If you volunteer to experience a TASER Exposure, you <u>must</u> read and sign this Form <u>prior</u> to any TASER Exposure." clearly states that in "drive stun mode" the Taser can cause permanent injury:

>       **8.      Use of the TASER device in a drive stun mode can cause marks and <u>scarring</u> that may be permanent.** (emphasis added)

11.     Furthermore, Taser International's instruction materials depict "Drive Stun Scarring" and state:

INSTRUCTOR NOTES: The photos are actual results of drive stuns that were directly applied to the subjects resulting in apprehension. In a dynamic

environment, drive stun electrodes may slide on the skin of a thrashing subject causing multiple burn marks, scratches, and scarring, as opposed to single electrode marks if the drive stun is applied directly without movement. The severity and duration of these marks, scratches and scars may vary. (Version 12 pg. 196)(EXHIBIT D)

Notably, while providing evidence of safety risks, this description does not consider the use of a

Taser in drive stun mode on a handcuffed and non-combative subject as in the case at bar.

12.      The Journal of Forensic Science, in an article entitled *Cutaneous Current Marks Due to a Stun Gun Injury,* (EXHIBIT E), states: "We report a case in which the histological examination of the victim's skin revealed current-like alterations cause by the use of a stun gun." More ominously, the study notes: "The application of an electric shock to the arms or legs has not been considered life threatening, but when applied to the thoracic region close to the heart, it is thought to cause cardiac arrhythmia, especially in persons with severe pre-existing heart disease." In the case at bar Mr. Malone was stunned in the back directly behind his heart.

13.      Locally, in Peoria County, Brandon Jordan died as a result of electrocution from a stun gun. His foster mother, Francine Knox, was convicted of Involuntary Manslaughter; Aggravated Battery of a Child and Endangering the Life or Health of a Child and was sentenced to 14 years in prison. The case was prosecuted by Peoria County State's Attorney Kevin Lyons. Dr. Mari I. Jumbelic, a board certified Forensic Pathologist, testified for the prosecution in pertinent part:

Q:      Doctor, describing those burns a little bit more, how many electrocution cases have you seen?
A:      I've seen numerous electrocution cases, probably, myself, personally, at least a dozen and many more during my experience at the Cook County Medical Examiner's Office.
Q:      And do electrical burns leave a distinctive type of pettern on the skin or do a distinctive thing to the skin?
A:      Yes, they cause a burn on the skin.

Q:     Okay. And did you examine those lesions that you described on the child?
A:     Yes, I did.
Q:     And did you – did you examine them microscopically?
A:     Yes, I took sections, meaning I cut the skin away at the point where I could see those injuries; and they go into a preservative and then are sliced with a very thin knife and then looked at under an – an then stained and looked at under a slide.
Q:     And what was your determination following that?
A:     ***That they were due to a stun gun.*** (emphasis added)(EXHIBIT F)

The prosecutor also elicited the following:

Q:     So there was no internal reason for this child's death.
A:     Correct.
Q:     Doctor, with a reasonable degree of medical certainty, can you tell us what caused those burns on the child's chest?
A:     Yes.
Q:     What was your opinion please?
A:     ***That they were caused by electrocution from a stun gun***. (emphasis added) (EXHIBIT G)

14.     The Jury found beyond a reasonable doubt that Ms. Knox committed the crime of Involuntary Manslaughter charging that she "performed an act likely to cause death or great bodily harm to some individual, in that she ***shocked Brandon Jordon, a child born October 26, 1993, with a stun gun, thereby causing the death of Brandon Jordon.***" (emphasis added) (EXHIBIT H)

15.     Nationally, deaths have caused law enforcement agencies, municipalities, news organizations and human rights organizations to question manufacturers claims of safety. Inspired in part by the death of a Chicago man after police used a Taser on him this year, Illinois recently passed a law requiring background checks and waiting periods for stun gun use. (EXHIBIT I). This occurred after the City of Chicago stopped use of stun guns after two deaths following Taser use by Chicago Police Officers.

16.     Investigative reports by *The Arizona Republic* have extensively covered the issue

of Taser safety and suggest that company claims are misleading and manipulative. (EXHIBIT J)

17.    International watchdog group, Amnesty International, released a detailed report examining deaths where stun guns were involved and calling for further research on specific at risk groups. (EXHIBIT K)

18.    The American Civil Liberties Union has issued statements warning against Taser use and the risk of injury and death and decried the "current practice of allowing weapons manufacturers to control the training and use of this new, often lethal, technology.(EXHIBIT L)

19.    Unbiased and independent information on safety/risk is difficult to find. Even the most recent $500,000 government funded study, described as "the first to look at the safety of stun guns independent of Taser.", was discovered to have employed Taser International's top medical officer as an adviser as one of four advisors.  Dr. Robert Stratbucker reportedly received cash and stock options from Taser and was dismissed from the study only after his connection to Taser was discovered. (EXHIBIT M)

20.    Additionally, recent reports have cast doubt upon the independence a Department of Defense Study by revealing Taser International's influence and refuting company claims of no involvement. (EXHIBIT N)

21.    Stun gun manufacturers have aggressively promoted their weapons to law enforcement with claims of safety and have a substantial stake in maintaining that claim. Positive safety information is reported to have increased stock value by 60% in one month.(EXHIBIT O) and  many police agencies have expended funds to purchase stun guns and based upon claims made by the manufacturers.

22.    In the present circumstances, the unreasonableness of using a Taser in "drive-stun mode" is evidenced, in part, by the fact that use fits the definition of torture. Obviously, stunning

an advancing violent suspect as an alternative to shooting him with a gun is far different from stunning a handcuffed person in an attempt to prevent the destruction of what might later prove to be of evidentiary value. Here, use of a Taser in "drive-stun" mode, as a "pain compliance type weapon",  is infliction of severe pain for purposes of coercing compliance.

23.    In *Rochin v. People of California*, 342 U.S. 165, 72 S.Ct. 205, as in the case at bar, police found the defendant in his bedroom, partly dressed, on the side of the bed with a female companion. Though the police in *Rochin* saw the defendant put something in his mouth, after asking "who's stuff is this", and the police in the present case did not see Mr. Malone place anything in his mouth, in both instances police attempted to extract what was in the defendant's mouth by force and then by a highly invasive procedure. At least Rochin was taken to a hospital and the procedure was administered by medical personnel. The procedure in the case at bar, that caused Malone to spit up blood and defecate upon himself in his home, was administered by police without medical personnel present. Then defense submits that in Malone's case, as in *Rochin*,  "...–this course of proceeding by agents of the government to obtain evidence is bound to offend even hardened sensibilities. They are too close to the rack and the screw to permit of constitutional differentiation." *Rochin* at 210

24.    The fact that Mr. Malone was unarmed, handcuffed, non-combative, seated, partially dressed, in the bedroom of his home, that there were no medical personnel present, that his medical condition was unknown, that it was believed that he had ingested cocaine, that the warrant did not specifically authorize the procedure, that the procedure can effects the nervous system, that the procedure can leave permanent physical injuries, that the full extent of the physical consequences of the procedure are unknown, that the procedure is specifically designed to cause extreme pain, and that the procedure caused Malone to defecate involuntarily and spit up

blood, are just a few of the facts that make this use of a stun-gun unreasonable in this case.

25.     In contrast to the present case, *United States v. Husband*, 312 F. 3d 247 (Upholding hospital use of anesthesia by doctor pursuant to specific warrant to retrieve evidence from mouth) while allowing an invasive procedure to extract drugs,  specifically noted that the procedure was conducted by medical personnel, in a hospital, after a warrant specifying the procedure was issued, and the procedure was motivated, in part, by a desire to protect the life and health of the defendant. The same is not true in the case at bar. Similarly, the Court noted that the district court "...found that Dr. Gravett consulted another physician as well as two medical texts." and testified that the situation posed a "medical emergency." *Husband* at 254.  No such care or concern was afforded Mr. Malone and despite attempts by the Government to raise the issue testimony from the police officers involved made it clear that Mr. Malone's life and health were of no concern to them at all.

WHEREFORE, defendant respectfully requests that this Honorable Court suppress all evidence obtained as a result of the illegal search of Mr. Malone.

Respectfully submitted,

Richard H. Parsons
Federal Public Defender


BY: _____
     s/ Karl W. Bryning

Karl W. Bryning
Assistant Federal Public Defender
Attorney for Defendant
401 Main Street, Suite 1500
Peoria, Illinois 61602
Phone: 309/671-7891
FAX: 309/671-7898

Email: karl_bryning@fd.org

EXHIBIT LIST

A.    Peoria Police Department General Order 400.96, Page 2., Effective September 20, 2004.

B.    KMOU St. Louis, Special Report on Tasers, February 14th  and 15th 2005

C.    Taser International User Warnings, Risks, Liability Release and Covenant Not to Sue.

D.    Taser International Training Materials: Drive Stun Scarring, Version 12 11/04.

E.    Case Report, *Cutaneous Current Marks Due to a Stun Gun Injury,* Journal of Forensic Sci. May 2003

F.    Partial Trial Testimony of Dr. Mari I. Jumbelic in the case of *People of the State of Illinois v. Francine M. Knox*

G.    Partial Trial Testimony of Dr. Mari I. Jumbelic in the case of *People of the State of Illinois v. Francine M. Knox*

H.    Involuntary Manslaughter Charge in case of *People of the State of Illinois v. Francine M. Knox*

I.    Chicago Tribune Front Page Story, *State to restrict stun-gun buys,* June 3, 2005

J.    Arizona Republic Articles Regarding Taser International and Stun-Gun Use: Taser Safety Record Under Fire July 19, 2004; Officer's Injury Tied to TASER, December 27, 2004; Taser Doctor's Credibility Questioned January 23, 2005; Index of Arizona Republic Articles.

K.    Amnesty International Report: *Excessive and lethal force? Amnesty International's concerns about deaths and ill-treatment involving police use of tasers*

L.    American Civil Liberties Union Press Release: *ACLU of Massachusetts Issues Recommendations on Less Lethal Force Policies for Police*, May 10, 2005 and American Civil Liberties Union Press Release: *ACLU Urges Rhode Island Police to Shun 'Stun Guns',* September 2, 2004

M.    USA Today Article: *Taser official removed as adviser on stun gun study*, May 12, 2005

N.    Arizona Republic Article: *Taser tied to 'independent' study that backs stun gun*, May 21, 2005 and Amnesty International Press Statement: *Third So-Called 'Independent' TASER Study Linked to Manufacturer*, May 23, 2005

O.    Amnesty International Press Release: *Taser-Related Deaths Hit Triple-Digits as Manufacturer (TASER) Grossly Exaggerates the Number of Lives Saved By TASERs Amnesty International Documents 103 TASER-Related Deaths and Disputes Claims That*

*TASERs Have Saved 6000 Lives*, April 1, 2005

<u>                    CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2005, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the following:

Mr. Bradley Murphy, Assistant United States Attorney, One Technology Plaza, 211 Fulton Street,

Suite 400, Peoria, Illinois 61602.



<u>s/ Karl W. Bryning</u>

Karl W. Bryning
Assistant Federal Public Defender
Attorney for Defendant
401 Main Street, Suite 1500
Peoria, Illinois 61602
Phone: 309/671-7891
FAX: 309/671-7898
Email: karl_bryning@fd.org