**E-FILED**
Wednesday, 29 June, 2005  08:10:19 AM
Clerk, U.S. District Court, ILCD

| | | NUMBER |
|---|---|---|
| | **GENERAL ORDER** | **400.96** |
| | | EFFECTIVE DATE |
| | | **9/20/04** |

| SUBJECT | NUMBER OF PAGES |
|---|---|
| **TASER** | 5 |

| DISTRIBUTION | SUPERSEDES |
|---|---|
| **Commissioned Personnel** | **N/A** |

| CALEA REFERENCE | OTHER REFERENCE |
|---|---|
| **N/A** | **N/A** |

| AUTHORITY | |
|---|---|
| *Gary Poynter* | **Gary W. Poynter** <br> **Acting Police Chief** |

## I.    PURPOSE

It is the intent of the Peoria Police Department to provide to officers the X26 Taser, a conducted energy weapon, and the training on that weapon in order to bring about successful conclusions to incidents involving combative, non-compliant, armed or violent subjects. The X26 Taser is designed to incapacitate a subject with a minimal potential for death or serious injury. This weapon will offer the department's officers an alternative to resolve an incident in a less lethal manner, and to protect both officers and others from harm, to include the subject on whom the weapon is being used.

## II.    DEFINITION

The X26 Taser is deployed as an officer safety tool and is an addition to other police self-defense techniques and tools. The X26 Taser is to be used by trained personnel on subjects that are threatening to actively resist or are actively resisting an officer or the subject poses an articulable threat of harm to an officer or another person. It may also be used when the subject poses a threat of harm to himself, such as a self-inflicted injury or a suicide attempt.

The X26 Taser is an additional police tool and is not intended to replace firearms or self-defense techniques. The X26 Taser may be used to control dangerous or violent subjects when deadly force does not appear to be justified and/or necessary; or attempts to subdue the subject by conventional methods have been or likely will be ineffective. Another situation is when there is reasonable expectation that it will be unsafe for officers to approach within contact range of the subject.

The X26 Taser falls into the category of less lethal force technology and equipment meaning that when used properly there is less likelihood of death or serious injury to the subject than if deadly force is used. Less lethal force is defined as force used to subdue or render a subject non-threatening with a lower probability of effecting fatal consequences. The X26 Taser when used pursuant to training is not considered use of deadly force or to constitute the infliction of great bodily harm.

**DEFENDANT'S EXHIBIT**

CASE NO.

EXHIBIT NO.  *A*

The X26 Taser fires two probes up to a distance of 21 feet from a replaceable cartridge. These probes are connected to the weapon by high voltage insulated wire. When the probes make contact with the target the X26 Taser transmits powerful electrical pulses along the wire and into the target through up to two inches of clothing. The pulses send 26 watts electrical signals to temporarily override the central nervous system and directly control the skeletal muscles. This causes uncontrollable muscle contractions thus causing temporary incapacitation.

The X26 Taser does not rely on pain to achieve compliance but incapacitation through the central nervous system. However, when used as a stun gun the X26 Taser is a pain compliance type of weapon.

## III. POLICY

The Peoria Police Department will use the <u>X26 Taser</u>, also described as a <u>Conducted Energy Weapon</u>, in accordance with product recommendations and specifications prescribed by the manufacturer, Taser International. This weapon will be deployed in a manner to ensure maximum effectiveness and safety. This order adopts all criteria outlined in General Order 400.35 (Use Of Force). Nothing in this policy shall be construed as the creation of a higher legal standard of safety or care in an evidentiary sense with respect to third part claims. This policy is for departmental use only and does not apply in any criminal or civil proceeding.

## IV. PROCEDURES

A. Only those officers who have undergone the department's (or authorized equivalent) minimum 4 hours of taser training will be authorized to carry and deploy the X26 Taser.

B. The use of the X26 Taser is the equivalent to the use of OC spray on the use of force continuum outlined in General Order 400.35.

C. Only properly functioning X26 Tasers shall be carried on duty.

D. Every discharge of the X26 Taser that involves the firing of the cartridge or the use of the stun gun on a person shall require the completion of a detailed police report. In addition, the officer deploying the X26 Taser shall complete a "Taser Use Report". This does not include training situations or demonstrations in approved areas. The X26 Taser shall never be displayed or used in an unnecessary or unprofessional manner.

E. The X26 Taser is programmed to deliver a 5-second electrical current if the officer releases the trigger after firing. It will continue to discharge if the officer holds the trigger in the firing mode. The officer using the weapon can stop the discharge of the X26 Taser at anytime by manually turning the weapon fire selector to off or to the "S" position. It is recommended that during the field deployment and use against a violent subject, the full 5 second cycle (or longer as required) be delivered to gain maximum effectiveness and compliance of the subject(s) effected by the X26 Taser.

F. The officer deploying the X26 Taser shall not aim the X26 Taser at the eyes, face, or neck of the subject. The X26 Taser is laser sighted and the top probe will follow the alignment

of the front and rear sights and/or the laser aiming sight. The bottom probe will travel at an 8-degree downward angle below the aimed point/laser sighted area. The bottom probe will drop approximately 1 foot for every 7 feet it travels from the weapon to the target. The officer shall where feasible, aim at the center mass of the subject from the rear.

G. The officer deploying the X26 Taser must keep his hands away from the front of the weapon (discharge area) at all times unless the safety is in the safe position and the X26 Taser is deactivated.

H. The X26 Taser shall not be fired near flammable liquids or gases. The X26 Taser can ignite gas and other flammables. Some self-defense sprays are flammable and shall not be used in conjunction with the X26 Taser. The Peoria Police Department's OC spray is not flammable. The X26 Taser shall not be deployed in or around a suspected meth lab.

I. X26 Taser cartridges have expiration dates printed on the label. Cartridges shall not be used beyond the expiration date for duty purposes, but shall be turned in and can be used for training purposes.

J. The officer using the X26 Taser shall when possible, prior to deployment of the X26 Taser, give a verbal warning to the subject and police personnel on scene, that the taser is going to be deployed. This can be done by yelling "taser taser" prior to deploying the weapon.

K. Assisting officers at the scene shall assess the potential threat to the deploying officer and provide appropriate cover, including lethal force if it becomes necessary.

L. After a taser is deployed, officers at the scene shall first ensure the subject is under control and as soon as practical shall monitor the subject of the taser deployment for any possible injuries. If the probes are imbedded in any sensitive tissue areas, such as: the neck, groin, face, or the breast of a female, the officer(s) shall arrange for transport of the subject to a medical facility for removal and care. If the probes are imbedded in a non-sensitive area, a Fire Department EMT unit will be called to the scene to remove the probes and administer the appropriate care to the subject. The subject shall be evaluated at the scene by Fire Department EMT'S. If the subject's condition requires further medical treatment or the subject is complaining of injury or pain; then the subject shall be transported to a hospital.

M. Probes removed from the subject shall be handled as a biohazard and the probes and cartridge packaged as such to be placed into evidence.

N. The X26 Taser shall have the information on the discharge downloaded as soon as practical for investigation and evidentiary purposes.

O. The X26 Taser shall only be loaded with departmental issued air cartridges.

P. The X26 Taser shall be considered a weapon and be kept and stored as such.

Q. The X26 Taser shall not be handled or used by unauthorized personnel.

R. The X26 Taser shall not be used for personal use.

## V.    SUPERVISORS RESPONSIBILITIES

A. The sergeant shall respond to the scene of any deployment of the X26 Taser or where there is an expected deployment of the X26 Taser.

B. The shift commander shall respond to the scene after a deployment of the X26 Taser and shall evaluate the incident and ensure the appropriate investigative personnel are notified if necessary.

C. The sergeant shall ensure that all reports on the incident are completed by officers at the scene.

D. The sergeant shall make certain the subject of the taser deployment receives medical treatment if it is necessary.

E. The sergeant shall ensure that photos are taken of the subject of the taser use.

F. The deployment of the X26 Taser shall be reviewed by the Patrol Captain or his designee.

## VI.    TACTICAL DEPLOYMENT

A. Where feasible, use verbal commands and point the laser sight at the subject prior to firing.

B. Additional cartridges available to use are recommended in case the first probes miss the target or there is a malfunction.

C. Back –up officer(s) shall be present to assist in the arrest or to use other force options as appropriate and needed, depending on the situation.

D. Officers shall aim at center mass and from the rear if possible.

E. Officers shall use cover and distance to ensure officer safety.

F. Officers shall avoid using the taser on a subject who is on the roof of a building or similar location where he or she could be injured from the fall after being incapacitated.

G. Officers shall avoid using the taser on a subject in deep bodies of water due to the chance of the subject drowning.

## VII.    X26 TASER PROJECT COORDINATOR RESPONSIBILITIES AND DUTIES

The X26 Taser Project Coordinator shall:

General Order 400.96
Page 5 of 5

A. Receive, inspect, and ensure the maintenance and replacement of X26 Tasers assigned to departmental personnel.

B. Establish and maintain systems to record the issuance of the X26 Taser and air cartridges. Serial numbers shall be recorded.

C. Maintain an adequate supply of cartridges and other necessary equipment related to the X26 Taser.

D. See that defective or damaged tasers, cartridges or accessory equipment are returned to the supplier. This will also include obtaining service from the supplier.

E. Provide initial certification training on the X26 Taser as well as annual re-training.

F. Review reports on the deployment of the X26 Taser and make any recommendations for changes in training or policy.

*This directive provides general guidelines to personnel regarding proper practices and is for internal use only. It is not intended to enlarge an officer's criminal or civil liability in any way, except as to any disciplinary action that might arise. It shall not be construed as the creation of a higher standard of safety or care in an evidentiary sense, with respect to third party claims. Violations of this directive, if proven, can only form the basis of a complaint by this department, and then only in an employment related proceeding.*

# TASER

## I N T E R N A T I O N A L ®

## User Warnings, Risks, Liability Release and Covenant Not to Sue

TASER International, Inc. does not require a TASER user to experience a TASER device electrical discharge ("TASER Exposure") as a condition of his/her TASER certification. It is up to each law enforcement agency's policy to determine whether its users experience a TASER Exposure as part of their training.

If you volunteer to experience a TASER Exposure, you **must** read and sign this Form <u>prior</u> to any TASER Exposure.

### WARNINGS AND RISKS

1. The TASER devices are non-lethal devices. They are designed to incapacitate a person from a safe distance without causing death or permanent injury. While the extensive medical evidence strongly supports the TASER devices will not cause lasting aftereffects or fatality, it is important to remember that the very nature of physical incapacitation involves a degree of risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities. As with any weapon system, there can be unforeseen and severe consequences and there will always be risk involved in this use of force.

2. Do not use or have flammable liquids and fumes in the vicinity during a TASER device application. The TASER devices can ignite gasoline or other flammables. Some self-defense sprays use flammable carriers like alcohol and would be extremely dangerous to use in immediate conjunction with TASER devices.

3. The TASER device causes temporary incapacitation and the inability to catch yourself as you fall. This incapacitation and the resulting fall can be dangerous and even fatal under specific circumstances.

4. All persons taking a TASER Exposure shall be supported by two spotters so they don't fall. Each spotter should hold an upper arm under the armpit, so that the person can be safely supported and lowered to the ground after being hit without twisting or putting undue stress on the arm or shoulder. If probes are fired in lieu of attaching spent wires or alligator clips, then eye protection is required for both the spotters and the student being exposed. Provided that no probes are attached to the person's arms, there should be no electrical pulses flowing into the spotters and they can safely support the person being shot without any negative impact.

5. The TASER device causes strong muscle contractions which may be severe and may cause physical exertion athletic type injuries to some people. These muscle contractions may result in injuries to muscles, tendons, ligaments, backs, joints and stress fractures.

6. The TASER devices cause pain which can be stressful. This stress may be injurious to some people.

7. Because of parental/guardian consent issues, no minor shall be exposed to a TASER device as part of a training course.

8. Use of the TASER device in a drive stun mode can cause marks and scarring that may be permanent.

If you have a condition or pre-existing injury that would be aggravated by muscle contractions and physical exertion check the appropriate box below and notify the instructor prior to participating in the TASER device exposure.

☐ I have no injuries or known physical or mental conditions that could be aggravated by muscle contractions, physical exertion or exposure to the electrical discharge of TASER devices.

☐ I have the following pre-existing physical or mental injuries or physical conditions that could be aggravated by exposure to the TASER device:
_____
_____
_____

### LIABILITY RELEASE, COVENANT NOT TO SUE AND HOLD HARMLESS

In consideration of the use of TASER International copyrighted training materials and participation in a TASER certification training course, I acknowledge and agree as follows:

1) I understand that a TASER Exposure results in strong muscle contractions, physical exertion and stress and involves the risk of physical injury. I understand that a TASER Exposure is not required by TASER International, Inc. I acknowledge that I have read the above Warnings and Risks and with full knowledge of such risks, I voluntary agree to experience a TASER Exposure and I assume all risks, whether known or unknown, foreseen or unforeseen, inherent in the TASER Exposure.

2) Intending that this Form be legally binding upon me, my heirs, executors, administrators, and assigns, I hereby waive, release, and forever discharge the instructor, my law enforcement agency, TASER International, Inc. and all of its agents, directors and employees of and from any and all claims, demands, rights and causes of action of whatsoever kind and nature, arising from, and by reason of any and all known and unknown physical and mental injuries and consequences thereof, whether foreseen or unforeseen, suffered by me from any and all activities during the Training class, including the TASER Exposure.

3) I further agree that neither I nor my heirs, estate, personal representative, nor any other person or entity will ever institute any action, litigation or suit at law or in equity against the instructor, my law enforcement agency, TASER International, Inc. and all of its agents, directors and employees for any damages, costs, loss or injury arising out of any and all activities during the training class, including the TASER Exposure.

4) I further agree to indemnify and save harmless the instructor, my law enforcement agency, TASER International, Inc. and all of its agents, directors and employees from all liability, loss, costs and obligation of any and every kind on account of or arising out of any injuries or losses, however occurring, arising out of any and all activities during the training class, including the TASER Exposure.

5) In signing this Form, I agree that I have read and understand this entire Form; I understand that it is a promise not to sue and a release and indemnity for all claims; I understand that by signing this Form I am giving up certain legal rights including the right to recover damages in case of injury; and I agree to abide by the terms and conditions of this Form.

Date _____  Signed _____

Printed Name_____

Law Enforcement Agency_____

Mail or fax a copy of this form to:
TASER International
7860 E. McClain Dr., Suite 2
Scottsdale, AZ 85260
Fax: (480) 991-0791

© 2004 TASER International, Inc. TASER®, Shaped Pulse™ and the Globe & Lightning Bolt Logo are trademarks of TASER International, Inc

---

**DEFENDANT'S EXHIBIT**

CASE NO.

EXHIBIT NO. _C_

# Drive Stun Scarring



**INSTRUCTOR NOTES:** The photos are actual results of drive stuns that were directly applied to the subjects resulting in apprehension. In a dynamic environment, drive stun electrodes may slide on the skin of a thrashing subject causing multiple marks, scratches, and scarring, as opposed to single electrode marks if the drive stun is applied directly without movement. The severity and duration of these marks, scratches, and scars may vary.

196

DEFENDANT'S EXHIBIT

CASE NO.

EXHIBIT NO. D

Version 12 11/04

*J Forensic Sci*, May 2003, Vol. 48, No. 3
Paper ID JFS2002008_483
Available online at: www.astm.org

# CASE REPORT

*S. Anders,*[1] *M.D.; M. Junge,*[1] *M.D.; F. Schulz,*[1] *M.D.; and K. Püschel,*[1] *M.D.*

# Cutaneous Current Marks Due to a Stun Gun Injury



DEFENDANT'S EXHIBIT

CASE NO.

EXHIBIT NO. E

**ABSTRACT:** Histological changes of the skin following electrical injury with a stun gun have rarely been described. We report the case of a 61-year-old man who died after having been tortured with a stun gun during a robbery. At autopsy two reddish, dot-like lesions where found on the chest and histological examination revealed electric current-related changes. Only a few reports concerning micromorphological cutaneous changes following stun gun injury have been reported; therefore further investigations concerning the frequency and type of histological findings due to stun gun injuries will be necessary in order to provide sufficient characteristic data for a conclusive interpretation.

**KEYWORDS:** forensic science, current mark, electrocution, forensic histopathology, stun gun, Taser

Stun guns are self-defense devices, which generate an electric current between pointed electrodes to deliver an electric shock. Whether a fatal electric shock can be caused by stun guns is controversial, but there are reports on their use in cases of torture. Little is known about the micromorphological alterations of the skin caused by stun gun injuries.

We report a case in which the histological examination of the victim's skin revealed current-like alterations caused by the use of a stun gun.

## Case report

A 61-year-old handicapped man was the victim of a robbery in his apartment where he was assaulted by a 28-year-old man. The perpetrator's demand for money was refused and the victim was locked up in a small store-room while the robber searched the apartment for money. The search was unsuccessful and the old man was then beaten and tortured with a stun gun and threatened with a pistol. The stun gun had been stolen a few days before the crime ("Paralyser Military," Paradef Co., which delivers 120,000 V, Fig. 1) and was later found near the scene. A neighbor called emergency services after hearing the victim's cries for help. On arrival of the police, the perpetrator had already left the scene, having taken all the money from the victim's wallet (approximately $150). The victim was pronounced dead at the scene. The use of a stun gun was later admitted by the perpetrator.

## Autopsy Findings

Due to occlusive atherosclerosis, bilateral below-the-knee amputation had been performed some years previously. There was se-

vere atherosclerosis of the coronary arteries, and several scarred, as well as recent ischemic infarcts of the myocardium. Other findings in the heart were aortic valvular stenosis, left ventricular hypertrophy (total heart weight 740 g) and right ventricular dilatation and hypertrophy. Additional findings were chronic congestion of the internal organs, chronic bronchitis and emphysema of the lungs. Several haematomas and superficial skin abrasions were found as consequences of blunt force trauma to the head. At the right upper half of the chest, two reddish dot-like lesions were found, 0.3 cm in diameter and 2 cm apart (Fig. 2). Based on the autopsy findings, the cause of death was considered to be left cardiac failure caused by recent myocardial infarction.

Histological examination of one of the dot-like skin lesions revealed loss of the epidermis in the central region. The nuclei of the epidermal cells in the peripheral parts of the lesion showed a near-horizontal elongation (Fig. 3). The subepidermal tissue showed eosinophilic homogenization and early netrophilic inflammation; PTAH staining revealed small amounts of fibrin in this region. The histological examination of the second lesion revealed a superficial abrasion of the epidermis.

## Discussion

Applications of and injuries due to stun guns and Tasers have been the subject of several reports in the forensic as well as the clinical literature (1–4). The danger of the application of electric shock weapons to the human body has been controversially discussed in the forensic literature. The application of an electric shock to the arms or legs has not been considered life threatening, but when applied to the thoracic region close to the heart, it is thought to cause cardiac arrhythmia, especially in persons with severe pre-existing heart disease (5). These theoretical considerations were supported by experimental investigations on anaesthetized pigs, in which the application of stun-gun-generated electric shocks to the left upper half of the chest resulted in periods of arrhythmia, premature ven-

[1] Institute for Legal Medicine, University of Hamburg, Butenfeld 34, 22529 Hamburg, Germany.
Received 14 Jan. 2002; and in revised form 3 Oct. 7 and 22 Dec. 2002; accepted 31 Dec. 2002; published 26 Mar. 2003.

Copyright © 2003 by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959.



FIG. 1—*Stun gun as used in the presented case ("Paralyser Military," Paradef Co.).*



FIG. 2—*Reddish dot-like skin lesions at the right upper half of the chest.*



FIG. 3—*Histology of the lesion seen in Fig. 2, showing nuclear elongation of the epidermal cells, eosinophilic homogenization of the subepidermal tissue, and early neutrophilic infiltration (H&E staining).*

tricular beats and heart block with atrial fibrillation (6). These findings led the authors to the conclusion that electric shocks from stun guns applied to the region of the heart might be fatal.

In contrast, an analysis of 16 fatalities following after the use of Tasers by the police provided some information in humans. The Taser is a hand-held electronic immobilization gun which fires darts that deliver an electrical charge to the targeted body. These authors concluded that the Taser-generated electric shock was a contributing factor in only one of the deaths (7); it should be noted that the authors did not report the body regions involved in these cases.

The extent of the contribution of stun gun use to death in the case presented here could not be answered with certainty. However, torturing the victim with the stun gun likely promoted the cardiac decompensation and contributed to the death of the victim in the sense of a "psycho-physiological" influence (8). The perpetrator was sentenced to 10 years for theft with fatal consequences (according to German law).

At present, the frequency of histologic findings due to the use of stun guns is not known and there are only a few other published observations of the micromorphological or histologic changes of the skin following stun gun injuries (9–12).

Banaschak et al. (9) reported experimental data obtained by applying different types of stun guns to isolated pig skin; no histological changes were found. Ikeda et al. (10) reported a small study on micromorphological changes of the skin after the use of a stun gun (MRT 502R, 60,000 V) on the skin of anaesthetized pigs and on pig skin during the early postmortem interval. Changes similar

to those in our case were only detectable after pre-mortem usage. Furthermore, the authors concluded from their experiments that even macroscopic skin changes are only likely to occur in living individuals. These findings were confirmed by Seta et al. (11) in which the use of a stun gun on anaesthetized pigs produced changes comparable to those in the case presented here. The quantity of the histological changes intensified with the duration of stun gun application. Karlsmark et al. (12) reported collagen calcification to occur 2–4 days after treatment of pig skin with electrical energy. In our case, histological examination of the reddish dot-like skin lesions on the chest revealed a fishbone or streaming-like pattern of the elongated epidermal nuclei and coagulative changes of the subepidermal tissue, representing changes similar to current marks (Fig. 3).

These findings are in agreement with the experimental data gained from the application of stun guns to the skin of living pigs (10,11). To the best of our knowledge, this is the first report of histological skin changes caused by a stun gun in a human victim. In a previously described case (10), the authors focused on the macro-morphological changes but did not describe the microscopic alterations. Small reddish skin lesions which are only a few centimeters apart should raise suspicion of stun gun use as an etiology and histological investigations should be initiated. Finding histological features such as those described here may be supportive of ante-mortem stun gun use as an etiology. Further research and experimental investigation of the histological changes following stun gun injuries will be helpful in more clearly describing the macroscopic and microscopic features of stun gun injury.

## References

1. Barrett SM, Romine-Jenkins M, Fisher DE. Dapsone or electric shock therapy of brown recluse spider envenomation? Ann Emerg Med 1994;24:21–5.
2. Frechette A, Rimsza ME. Stun gun injury: a new presentation of the battered child syndrome. Pediatrics 1992;89:898–901.
3. O'Brien DJ. Electronic weaponry—a question of safety. Ann Emerg Med 1991;20:583–7.
4. Mehl LE. Electrical injury from tasering and miscarriage. Acta Obstet Gynecol Scand 1992;71:118–23.
5. Denk W, Missliwetz J, Wieser I, Tauschitz C. Elektroschockgeräte als Waffe. Arch Kriminol 1995;196:78–86.
6. Giebe W, Biewald GA, Nachbar A, Scheler G. Elektroschocker—eine tödliche Waffe?! Rechtsmedizin 1995;5:138–41.

7. Kornblum RN, Reddy SK. Effects of the Taser in fatalities involving police confrontation. J Forensic Sci 1991;36:434–48.

8. Rothschild MA, Schneider V. Raub mit Todesfolge. Beitr gerichtl Med 1990;48:355–61.

9. Banaschak S, Humpert M, Madea B. Kein experimenteller Nachweis kutaner Veränderungen bei Anwendung sogenannter Elektroschocker. Rechtsmedizin 10;1(Suppl.):S32.

10. Ikeda N, Harada A, Suzuki T. Homicidal manual strangulation and multiple stun gun injuries. Am J Forensic Med Pathol 1991;13:320–3.

11. Seta S, Tsuzuki Y, Miyasaka S, Yoshino M, Sato H, Miyake B. Histological and cytological changes in stun-gun injured pig skin. Jpn J Legal Med 1988;42(Suppl.):65.

12. Karlsmark T, Thomsen HK, Danielsen L, Aalund O, Nielsen O, Nielsen GN, Genefke IK. Tracing the use of electrical torture. Am J Forensic Med Pathol 1984;5:333–7.

Additional information and reprint requests:
Dr. med. Sven Anders, M.D.
Institute of Legal Medicine
University of Hamburg
Butenfeld 34
22529 Hamburg
Germany

1          Q    And you know that because you kept the serial number

2    of the stun gun?

3          A    Yes.

4          Q    That's the same serial number?

5          A    Yes.

6          Q    Doctor, describing those burns a little bit more, how

7    many electrocution cases have you seen?

8          A    I've seen numerous electrocution cases, probably,

9    myself, personally, at least a dozen and many more during my

10   experience at the Cook County Medical Examiner's Office.

11         Q    And do electrical burns leave a distinctive type of

12   pattern on the skin or do a distinctive thing to the skin?

13         A    Yes, they cause a burn on the skin.

14         Q    Okay.  And did you examine those lesions that you

15   described on the child?

16         A    Yes, I did.

17         Q    And did you -- did you examine them microscopically?

18         A    Yes, I took sections, meaning I cut the skin away at

19   the point where I could see those injuries; and then they go

20   into a preservative and then are sliced with a very thin knife

21   and then looked at under an -- and then stained and looked at

22   under a slide.

23         Q    And what was your determination following that?

24         A    That they were due to a stun gun.

Crystal K. Mason, CSR, Official Court Repor

278

DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT  F
NO.

1    Medical Center.  And there was no indication that the child had

2    any drugs in its system at the time he was born.  In addition,

3    there were no abnormality that I saw at the time of autopsy such

4    as a malformed face, certain brain problems that go along with

5    drug and alcohol abuse and then are expressed in the infant, and

6    I did not find any.

7        Q    So there was no internal reason for this child's

8    death?

9        A    Correct.

10       Q    Doctor, with a reasonable degree of medical certainty,

11   can you tell us what caused those burns on the child's chest?

12       A    Yes.

13       Q    What was your opinion please?

14       A    That they were caused by electrocution from a stun

15   gun.

16       Q    Doctor, how does electrocution cause death exactly?

17       A    It's by causing an abnormality in the heartbeat.

18       Q    And in this case, with the stun gun, how is the

19   electrical charge, how does that transfer to the body?

20       A    Well, when the stun gun is placed against the skin,

21   the charge is emitted from the stun gun and it travels along

22   nerves.  In addition, because of its location, in an infant such

23   as this, it's very close to the heart and some of that charge

24   can dissipate directly to the heart.

Crystal K. Mason, CSR, Official Court Report

283

DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.     G

**STATE OF ILLINOIS, PEORIA COUNTY**
**IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT**

☒ THE PEOPLE OF THE STATE OF ILLINOIS,
☐ CITY OF PEORIA, a municipal corporation,

vs

FRANCINE M KNOX                                    IM



DEFENDANT'S
EXHIBIT

CASE
NO. _____

EXHIBIT
NO.  H

Defendant

**INFORMATION**

CASE NO. _94CF1170_

Count_____2 OF 3_____    Class _____3_____

**THE UNDERSIGNED CHARGES:**

That on or about_____MAY 28_____, 19 _94___, in said Peoria County/City of Peoria, State of

Illinois _____FRANCINE M KNOX_____

committed the offense/violation of ____INVOLUNTARY MANSLAUGHTER_____

in that        she, acting in a reckless manner, performed an act likely to cause death
              or great bodily harm to some individual, in that she shocked Brandon Jordan,
              a child born October 26, 1993, with a stun gun, thereby causing the death
              of Brandon Jordan

FILED
NOV 23  2 09 PM '04
MAXINE E. ACTION
CLERK OF THE
CIRCUIT COURT
PEORIA COUNTY, ILL.

in violation of:

☒ Paragraph _____9-3(a)_____, of Chapter _____38_____, Illinois Revised Statues.
              5/9-3(a)                                    720

☐ Section Number _____ code of the City of Peoria.

The undersigned, on oath, says that the facts set forth above are true in substance and matter of fact.

_____KEVIN W LYONS, STATES ATTORNEY_____
                              Complainant

_____
                    (Assistant) State's Attorney

Sworn to me this _23rd_ day of ____NOVEMBER____, 19 _94__.        _____
                                                                      Judge Notary Public.        (seal)

**ORDER**

☐ Based on matters presented, the Court finds probable cause for pretrial detention
    of the defendant(s)._____

☒ Warrant of Arrest to issue based on a finding of probable cause.
☒ Bail Set at $ _____Included $ in Count I_____
☐ In custody, Directive to Sheriff for _____, 19 _____, at _____ A.M./P.M.
☐ Summons to Issue for Appearance on _____, 19 _____, at _____ A.M./P.M.

Entered _____11/23/94_____        _____
                                                              Judge

Form 110 /5m/1-94    **CLERK'S COPY**    **INFORMATION**        Form 110
                                                              94-334 Illnois Office Supply  (R-11-91)

DEFENDANT'S EXHIBIT

CASE NO.

EXHIBIT NO. I

5c Elsewhere

GO TRIBUNE

RELLA MAN'

r suffer from plodding setup

# Chicago Tribune

**FINAL**

**FRIDAY, JUNE 3, 2005**

CHICAGO



## ONTHETOWN

MUSIC: A guide to the Chicago Gospel Festival

SHOWS: Old theaters in danger of destruction

# State to restrict stun-gun buys

## Firearm ID card, 1-day wait will be required

**By Christi Parsons and Gary Washburn**
Tribune staff reporters

Gov. Rod Blagojevich plans to sign legislation Friday that would require people who want

to buy Tasers or other stun guns in Illinois to submit to a background check, just as if they were buying a rifle or other firearm.

The legislation, overwhelmingly approved by state lawmakers with little fanfare this spring, is the strongest response so far in the state to concerns that stun guns are potentially deadly and easy to misuse.

At the same time, a Chicago alderman is pushing a measure to require that sellers report to police, creating a paper trail that investigators could use if crimes are committed with them.

The bill on the governor's desk applies to civilians, although the sponsor said it was inspired in part by the death of a

Chicago man after police used a Taser on him this year.

The measure would require stun-gun buyers in Illinois to have a state firearm owner's identification card—which requires a criminal background check—and wait at least 24 hours before making their purchase.

Though critics contend stun guns aren't lethal, sponsors of

PLEASE SEE **STUN GUNS**, PAGE 19

the proposals say they are just as dangerous as firearms.

"It only makes sense that civilians be required to undergo criminal background checks and a waiting period before they buy something capable of administering that kind of force," said state Sen. Jeff Schoenberg (D-Evanston), author of the bill





Tribune photo by George Thompson

...ivea high-volt, low-amp shock that
tougher for these things, which
should make the standards
...ment. Many stun guns require the us-
target.

# STUN GUNS:
## Ordinance would let city track buyers

CONTINUED FROM PAGE 1

on the governor's desk. "We
should make the standards
tougher for these things, which
have enough voltage to kill
somebody."

But sellers are angry about

the proposals, which they say
wrongly target law-abiding citi-
zens who just want to be able to
protect themselves. Stun guns
should be available to anyone
who thinks they need one, they
argue.

Gregory Tropino, owner of
G.A.T. Guns in Dundee Town-
ship, said he thinks elected offi-
cials are trying to solve prob-
lems that don't exist. The com-
plaints are generally about how
police use stun guns, and not
about abuse by civilians, he
said.

"I haven't seen statistics that
say they're being used that of-
ten," Tropino said. "I don't see
the necessity for the law when

there's not a problem with it."

Stun guns have come under
heightened scrutiny in recent
years, as increased police use
has drawn complaints across
the nation that the devices in-
volve excessive force and can
kill in some cases. In February, a
Chicago man died after police
shocked him with a Taser when
he tried to bite an officer though
medical examiners said Thurs-
day they aren't certain if the
stun gun was a factor in the
death.

Though most criticism cen-
ters on how about 7,000 police
departments nationwide are us-
ing stun guns, there are reports
of street violence involving the

weapons. A 20-year-old Elgin
man who died after a mob fight
in March was shocked several
times with a gun by some-
one involved in the melee, police
said, though the coroner deter-
mined the cause of death was a
blow to the head. And in foun-
Lake, a high school student was
suspended after he shocked an-
other student with a stun gun
two years ago.

In response to safety con-
cerns, several cities and seven
states have banned stun guns
for civilian use, and this year
state lawmakers in other states
have considered passing almost
three dozen laws to restrict the
right to buy and own them. Illi-
nois would be the first state to
require a firearm license to own
a stun gun, according to the Na-
tional Conference of State Legis-
latures

Taser International, the mak-
er of Tasers, said it has sold
more than 100,000 stun guns to
private citizens since 1994,
when the company began sell-
ing to the public. The company
is pushing to increase civilian
sales but refused to say how
many Tasers have been sold in
Illinois.

Stun guns work by delivering
a high voltage, low amperage
shock that makes it difficult for
the target to move and function
for a few seconds. Often similar
to a television remote control in
shape and size, many stun guns
require the user to make phys-
ical contact with the target.

The Taser models, on the oth-
er hand, can work from several
feet away. They use compressed
nitrogen to propel wires capped
with electrodes. Because they

The Taser models, on the other hand, can work from several feet away. They use compressed nitrogen to propel wires capped with electrodes. Because they don't use gunpowder, they aren't considered handguns and so are not regulated by the federal government.

Some stun guns sell for as little as $30. Tasers marketed to private citizens can cost as much as $1,000.

Illinois law generally prohibits people from carrying stun guns anywhere but at their homes and businesses. Bradley Tusk, a top aide to the governor, said Blagojevich would sign the new measure into law Friday.

*'It's getting to the point where it's ridiculous. What's next? Are we going to need a FOID card to own kitchen knives?'*

—Roger Krahl, Carpentersville gun shop owner

Chicago Ald. Edward Burke (14th) originally proposed a ban on the sale and possession of stun guns in the city. But after he discovered that ownership is legal under state law, he decided to push instead for an ordinance requiring sellers to report all sales to the Police Department. Police would keep track of those sales.

If a stun gun is used in a robbery or other crime, Burke argues, police will have the advantage of knowing to whom the device was sold.

The proposal is awaiting consideration by a City Council committee.

Although Tasers are available on the Internet, Burke believes the company would voluntarily comply with an ordinance.

"They are a vendor to the city, and every police sergeant now has Taser," Burke said. "If they would not comply with notification and registration provisions, the city would not agree to purchase their product."

The maker of Tasers insists the products are not deadly. Taser International officials said the company requires criminal background checks for civilians who buy directly from it and refuses to sell to felons.

Any time a civilian model is fired, it releases at least 20 pieces of tiny confetti bearing the serial number, making it possible to trace to the company's records of registered owners.

"No other weapon in the world—guns, knives, chemical and pepper sprays, electronic defense units, or batons—can be traced from evidence at the scene of the crime to the registration of the user," Taser International spokesman Steve Tuttle said.

The National Rifle Association did not actively oppose the stun-gun measure in the legislature. But some local gun dealers, many of whom also sell stun guns, said the changes are a bad idea.

Roger Krahl, owner of R Guns in Carpentersville, said the licensing requirement amounts to at least a monthlong waiting period for people who don't have the firearm identification card. State police can take that long to process an application.

"It's getting to the point where it's ridiculous," Krahl said.

"What's next? Are we going to need a FOID card to own kitchen knives?"

**DEFENDANT'S EXHIBIT**

CASE NO.

EXHIBIT NO.    J

News: Taser Stun Guns

Taser Safety Record Under Fire
Arizona Republic - ROBERT ANGLEN

07/19/04 - Thousands of police departments, including major law enforcement agencies in Tucson and Phoenix, buy Tasers on a claim that the electric stun guns will instantly take down suspects without inflicting lasting harm.

That assertion has generated record sales for Scottsdale's Taser International Inc., which markets its guns as alternatives to deadly force and says its goal is to arm every police officer in America.

But an Arizona Republic investigation reveals that Taser's claims are based on autopsy reports the company never possessed.

For years, Taser officials cited these reports as proof that the stun guns never caused "injury or death to another human being." Now, officials acknowledge they never had those autopsy reports and didn't start collecting them until April.

The Republic's review of autopsies and interviews with medical examiners found Tasers have been linked to at least five deaths.

Medical examiners in three cases involving suspects who died in police custody cited Tasers as a cause or a factor in the deaths. In two other cases, Tasers could not be ruled out as a cause of death.

These deaths raise questions about a weapon police routinely use on drunks, shoplifters, mentally ill people and others who refuse to obey commands. In South Tucson in May, one was used to subdue a 9-year-old girl who police feared might harm herself.

To promote the guns' safety, Taser officials created a report detailing 42 cases of people who died after being shot by a Taser. They say the stun guns were cleared each and every time.

"It is not Taser International that says Taser is not to blame," Taser Chief Executive Officer Rick Smith said in an April news release. "It is the medical examiner's opinion in every single case across the country."

Taser is the outgrowth of a device called the Air Taser, developed by Rick and Tom Smith, working out of the Tucson garage of Jack Cover, developer of the original Taser in the 1970s.

The company said its special report is based on medical examiners' findings and includes "a summary of all the autopsy reports." The company actually relied on media accounts and anecdotal information from police for most of its analysis.

The company's report does not include details suggesting a Taser could have played a role in someone's death. The report also omits published findings of a medical examiner who concluded that electrical shocks from a Taser contributed directly to the death of a man in an Indiana jail.

When presented with cases linking Tasers to deaths, Smith said the medical examiners got it wrong and dismissed their reports.

Smith said medical examiners are generalists who don't have the expertise needed to analyze deaths involving the stun gun. And they often "throw everything" into autopsy reports as a way to cover themselves so they can't be accused of missing something later on.

"There is no penalty for a coroner to be overly broad," Smith said. "These guys deal with the whole broad spectrum of what can go wrong in the human body. Am I going to expect that they are going to be right 100 percent of the time? No."

Smith said his company's report presents the "big picture" of Taser-related deaths. He said it proves that Tasers are not to blame and that actual autopsies are not needed to summarize each case.

"I know in my heart what the truth is," Smith said. "Taser hasn't killed any of these people."

Taser zealously guards its nonlethal reputation. From the moment someone dies after being shot with a Taser, company officials respond with prepared statements, statistical research, medical reports and assurances that the stun gun is not to blame. They said Tasers have saved more than 4,000 lives since 1999.

Often, company officials point to a person's pre-existing conditions and insist the person would have died with or without being shocked by a Taser.

But relatives of those who have died in Taser-related incidents said the company rushes its defense, predicting the outcome of cases before investigations are finished.

Kelly Deitrich, whose brother, Raymond Siegler, died in February after being shot by police with a Taser in a Minneapolis group home for mentally ill people, said Taser's explanations are misleading.

"That is the polite way to say it," she said. "The other way to say it is they are full of you-know-what."

Fatal police shootings in major cities have sent many departments scrambling for alternatives to deadly force.

Stun guns had been around for decades but were distrusted or dismissed by police because they lacked stopping power.

But in 1999, Taser introduced the Advanced M26, promising instant incapacitation without injury; its 50,000-volt charge overrides the central nervous system, forces muscle contraction and is virtually impossible to shrug off.

Officers who volunteered to get zapped by the new guns became instant believers and instant buyers. By 2002, annual sales jumped 44 percent.
Demand for Tasers has sent the company's stock price soaring. The shares, which traded for less than $2 just two years ago, reached $60 in April. The stock took a drubbing later in April after safety questions were raised by media reports, falling back into the mid-20s. It has climbed to $40 since as the company has announced new contracts with law enforcement agencies and the U.S. military.

Medical examiners in different parts of the country have linked Tasers to at least five deaths.

The Republic, using computer searches, media accounts, police reports and Taser's own records, identified 44 cases in the United States and Canada of death following a police Taser strike from September 1999 to March 2004.

Using public-records laws, the Republic requested autopsy reports for those 44 cases and has received 22.

The autopsy of James Borden, who died Nov. 6 after being shot with a Taser for initially refusing to pull up his pants in an Indiana county jail, listed electrical shock as one of three causes of death.

Forensic pathologist Roland Kohr said Borden, 47, died of a heart attack due to an enlarged heart, pharmacologic intoxication and electrical shocks.

Taser included Borden's case in its report on the 42 deaths, but the company left out the part about electrical shock.

Under the heading "medical examiners report," Taser said the coroner ruled Borden's death accidental, "the result of his enlarged heart, drug intoxication and a heart attack."

Rather than the actual Nov. 7 autopsy report, Taser took its description of Borden's death from a February article in the Indiana University student newspaper, the Indiana Daily Student.

Smith said it was a mistake not to include the electrical-shock finding in Taser's report. He promised to immediately correct the company's Web site to reflect all of the medical examiner's findings. But weeks later, the reference remains unchanged.

Smith still challenges the autopsy's validity.

"(The medical examiner) threw in the kitchen sink. He threw it all in there. We think, frankly, that was irresponsible," Smith said. "I don't believe the autopsy is legitimate."

Dr. William Anderson, a former deputy chief medical examiner in Orange County, Fla., reported that Taser shocks and cocaine contributed to the death of a man in 2002.

"We were looking at positional asphyxia," said pathologist William Anderson, who now works as a private forensic consultant in Orlando. "Taser probably got him in that situation."

Positional asphyxia refers to suffocation after being restrained. Anderson said Taser strikes likely made it hard for Jones to breathe.

Nine months after the death, county officials sought a second opinion. Dr. Cyril Wecht concluded the man died primarily of a cocaine overdose.

Anderson said he still thinks the Taser played a part in Jones' death. And he thinks the stun guns have contributed to other deaths.

"I can't for the life of me figure out why the company is resisting that (admission)," he said, adding that Taser officials go too far by insisting the gun has never killed.

Anderson said the guns can interrupt normal heart activity, especially in people prone to cardiac arrhythmia or who have low blood oxygen and are struggling to breathe.

Anderson acknowledged that Tasers are a valuable tool.

"It is safer than shooting someone with a gun," he said. "But you have 40 to 50 cases where people were shot with Taser and died. That's a little too much just to be coincidental."

Smith dismissed each of these cases as inconclusive. He said his company did not have a responsibility to include the entire medical examiners' findings in its report.

He said the only apparent pattern involves drugged suspects exerting all of their strength to fight police. At the end of the fight, the suspect's pulse goes weak and he dies.

"That's unfortunately the pattern of death, and we just don't see any correlation with Taser."

If anything, Smith said, Taser extends the life of those fighting with police because it instantly ends the struggle.

"It is safer to the person than allowing them to fight for another five minutes," he said. "Taser (prevents) people from exerting themselves to that point where they otherwise would have died."

Smith defends with statistics. He said 70,000 people have been voluntarily zapped with Tasers and 45,000 suspects have been shot by police, all without incident.

Some police departments have put Taser purchases on hold because of reports that the gun might be linked to deaths.

"We delayed until we can see what surfaces from some investigations," Fort Valley (Ga.) Police Chief Jan Cary said. "I want to get the smoke cleared and get a clean bill of health for Taser."

Cary said he was looking for a weapon more effective than pepper spray and less physical than a baton.

"Taser would meet the bill. But as we started to firm it up, then we started to get these unexplained deaths," he said.

Police officials in cities across America said there is little evidence that Tasers cause deaths.

They said the stun guns reduce injuries to suspects and officers, save cities millions in worker's compensation claims and liability lawsuits, and drastically reduce the number of officer-involved shootings.

In Phoenix, police report that a year after issuing Tasers to all patrol officers, police shootings dropped 54 percent, from 28 in 2002 to 13 last year, the lowest total since 1990.

Phoenix police Sgt. Randy Force said Tasers have saved the lives of officers and suspects. He called it one of the best additions to the police arsenal in decades.

"It has been a very effective tool for us," he said. "When you look at options officers have, every one of them has a likelihood of causing serious injury or death. Taser is a tool that allows reliable incapacitation without physical injury or death."

# Officer's Injury Tied to TASER

**Dateline:** Phoenix, AZ - 12/27/2004

Robert Anglen
The Arizona Republic

The makers of Taser electric stun guns say their claims of safety are backed by more than 100,000 police officers who have been shocked during training sessions without suffering a single serious injury.

But a doctor working for Taser says a one-second burst from the stun gun was responsible for fracturing the back of a Maricopa County sheriff's deputy in 2002.

The doctor, in a memo obtained by The Arizona Republic, tells Taser that he evaluated former Deputy Samuel Powers and found the officer "sustained a T7 compression fracture as the result of the Taser incident."

Powers was the first person to file a product liability lawsuit against Scottsdale's Taser International, claiming that the shock during a mandatory training exercise forced him into medical retirement and has left him suffering permanent injuries.

He has been joined by other police officers around the country who are coming forward with lawsuits and complaints about injuries they attribute to being shocked with a Taser.

The injury reports appear to contradict Taser's principal assertion of safety and may undercut one of the company's most effective sales pitches. The doctor's memo surprises and concerns police training instructors from Miami to Portland who have shocked their own officers during training and say this could lead them to re-examine how Tasers are used.

The memo also raises questions about Taser's reports to its shareholders. In repeated filings to the Securities and Exchange Commission, Taser says that Powers is alleging that he "injured his shoulder" and makes no mention of the fracture.In his memo, Phoenix orthopedic surgeon Stephen Brown says an undiagnosed case of osteoporosis, a bone-weakening disease, left Powers vulnerable to the Taser shock.

"I think this patient had evidence for pre-existing osteoporosis, which is why, when he received the electrical impulse and resultant muscle contraction, he sustained a T7 compression fracture," the doctor says.

Brown's conclusion that osteoporosis contributed to Powers' injury may add to the list of health conditions that have been cited in several injuries and deaths following shocks from the 50,000-volt stun gun. Among those are heart conditions, mental delirium and drug intoxication.

Although medical examiners nationwide have linked Taser to 11 deaths, company officials claim the stun gun was not a factor and the people would have died whether or not they were shocked.

With Tasers being used by about 5,500 law enforcement agencies, including officers assigned to high school and college campuses, the question of safety is expanding.

Taser officials did not respond to multiple requests for interviews last week.

Police 'brainwashed'

Phoenix lawyers John Dillingham and Tom Wilmer, who represent Powers, say law enforcement agencies have been bombarded by safety assurances from Taser and are buying thousands of stun guns in the belief they have never caused an injury or death.

"This is not a problem with law enforcement. It's a problem with Taser," Dillingham says. "Police officers are brainwashed into thinking that the (stun) gun is safe. They are brainwashed into taking a hit during training and then to use it in the field anytime they want."

Powers, a 15-year veteran of the Maricopa County Sheriff's Office, says in his lawsuit that he was repeatedly told the stun did not pose any risks before he was shocked during a mandatory Taser certification training session.

A video that recorded the training shows Powers standing between two officers, who were supposed to keep him from falling down.

Electrodes are attached to his left ankle and right shoulder. The shock, which lasts no more than a second, causes Powers to yell in pain as his body contracts.

"Immediately upon being shocked, Powers suffered severe pain in his back. He could hardly breath," his lawsuit states. "Within minutes, he realized he had sustained (a) severe injury. He subsequently learned that the shock had caused his seventh thoracic vertebrae to be crushed."

Powers' suit was filed in February in Maricopa County Superior Court. It is scheduled to go to trial in June.

Taser lawyers say Powers should have refused to be shocked. They say he had previously been treated for two herniated disks and had been warned about the muscle contractions caused by Taser.

And before being shocked, lawyers say, Powers watched 12 other deputies experience the shock.

"He observed each deputy's body stiffen from involuntary muscle contractions caused by the Taser, fall to the ground in many instances, and scream out in pain," lawyers say in court filings. "Appreciating the risk and its magnitude, he nevertheless chose to assume that risk by receiving a sample exposure of the Taser."

To help its defense of Powers' suit, Taser lawyers hired Brown to perform an "independent medical examination" in September.

In his memo, Brown says he reviewed Powers' medical records dating back to 1997. He says X-rays taken of Powers several months before the Taser incident do not show any damage to the spine. X-rays taken after the incident confirmed the fracture resulted in a 50 percent reduction of one of the bones in the spinal column.

Brown's office says Taser lawyers have advised him not to comment on the case.

According to Internet medical directories, Brown has practiced in Arizona since 1979 and specializes in joint reconstructive surgery and treating sports-related injuries.

He received his medical degree from Johns Hopkins University School of Medicine in 1973 and began his orthopedic surgical training at Harvard.

Brown notes that Powers, now 46, has moved to Ohio and works as a field appraiser, inspecting and measuring building sites.

"I certainly do feel that (Powers) is not capable of being a police officer if it puts him at risk with very physical activities," Brown says in his memo. "However, I feel the primary reason why he cannot do this is because of his ongoing osteoporosis."

Brown says the compression fracture has healed and is unlikely to give Powers further problems.

"But given the nature of his osteoporosis, he runs the risk of further compression fractures with physical events," he says.

Even after Brown's memo outlined Powers' injuries, Taser continued reporting to shareholders that his lawsuit alleged a shoulder injury.

"We believe the plaintiff's claims are without merit and that this litigation will have no material adverse effect on our business," Taser said in a November report to the Securities and Exchange Commission.

Publicly traded companies are required to file quarterly reports so investors can evaluate the financial health and potential risks facing a company.

"As a regulator, I'm concerned when the public statements investors are relying on are misstated," says Marc Spitzer, chairman of the Arizona Corporation Commission, which regulates public utilities and corporations.

Shocks drive sales

Video images of police being shocked have become commonplace on television newscasts across the country. Taser encourages police officers, along with its employees, shareholders and members of the media to experience a sample shock from the stun gun.

In dozens of press releases and media interviews, the company has touted those shocks as evidence that the stun gun works.

"The field test is really what drives the sales," Taser Chief Executive Officer Rick Smith told The Republic in an interview this year. "That and the volunteering. When officers volunteer to be hit with it . . . they see and feel how effective it is, that is generally when we see it convert to sales."

In his suit, Powers claims Taser "implemented a marketing plan based on misinformation, overstatements, inaccuracies, half truths and false statements in an effort to bolster its claim that 'hits' from Taser weapons do not cause death or permanent injuries."

Taser International in the past required officers to experience an abbreviated shock

before being allowed to carry the stun gun. In 2000, Taser policy shifted to a "strong recommendation" that students take a sample hit from the stun gun.

Taser's CEO says the shock helps officers to understand the power and potential of the weapon.

"We used to require it, but then we made a change," Smith said previously, explaining that various police unions worried about shocks becoming a condition of employment.

"From the company's perspective, it is important because (a shock) gets rid of the skepticism," he says. "From the agency's perspective, it is very important so that (officers) can articulate what they are doing to somebody else."

But only a day after Powers filed his suit in February, Taser blamed the Sheriff's Office for "unreasonably requiring" officers to be shocked.

"If there is evidence that the shock from the (Taser) caused any injuries or damages to the plaintiff," Taser lawyers said in a Feb. 24 court filing, "(Maricopa County Sheriff's Office) and/or Sheriff Joe Arpaio are at fault for unreasonably requiring the plaintiff to be shocked by the Taser . . . as part of its non-lethal weapons training."

A judge tossed out Taser's request to redirect the suit at the Sheriff's Office.

"It looks like a double standard," Arpaio said in an interview. "They are pushing this on me because we used their equipment."

At the time Powers was shocked, Arpaio says his office was following Taser's recommendation and required officers to be hit with a Taser. He says it is no longer a requirement, but an option.

Arpaio knew that Powers had been injured and filed suit against Taser. He says he has bought hundreds of the guns based on the company's claim that it has not caused a death or injury.

Arpaio was unaware of the memo from Taser's doctor until being contacted by a reporter. He says it will prompt him to call for an internal study of Taser safety.

"I'm going to look at the history of Tasers. I'll assign staff to do it," Arpaio says, adding that risks were easily overlooked until an officer got hurt.

The Phoenix Police Department, the first major metropolitan police department in the country to issue Tasers to all of its officers, strongly recommended that officers experience Taser shocks until 2002. That's when two officers suffered minor injuries.

Sgt. Randy Force, department spokesman, says one officer dislocated his shoulder and the other chipped a tooth, both from falls after being shocked.

Force, who says the Taser is one of the best tools law enforcement officers have at their disposal, points out that officers suffer injuries in all types of exercises. That includes firearms training, where officers have inadvertently shot themselves.

The department now prohibits officers from being shocked.

"We stopped doing it because we were putting people at risk," Force says. "It's one

thing to be injured when you don't have an option. But we felt that we did have many options."

Safety issues expanded

Safety issues related to police training add to the concerns raised by other injuries and deaths following Taser shocks.

For years, Taser maintained that its stun guns never caused a death or serious injury. As proof, Taser officials said no medical examiner had ever cited the gun in an autopsy report.

But a Republic investigation this summer found that Taser never had the autopsy reports and didn't start collecting them until April.

Using computer searches, autopsy reports, police reports, media reports and Taser's own records, the newspaper has identified 84 deaths following police Taser strikes in the United States and Canada since 1999.

Of those, 11 autopsy reports to date have linked deaths to the stun gun. Medical examiners cited Taser as a cause or contributing factor in eight deaths and could not rule it out as a cause in three others.

Taser officials dispute those autopsy reports, maintaining that medical examiners don't have the expertise to analyze Taser-related deaths.

Taser officials say the stun gun has saved thousands of lives, giving police the most technologically advanced weapon in decades. Officers agree and credit Tasers with reducing police shootings and injuries to suspects.

Even officers who claim to be injured by the stun gun don't dispute Taser's track record. But they say the company has glossed over potential problems.

"I am really appalled at how departments around the world are taking Taser blindly at their word that the (Taser) is safe, with only the scant testing done," says C. Samuel Babin, a Louisiana sheriff's deputy who is on medical leave with a condition he believes is Taser related.

"I couldn't imagine the (stun gun) passing the scrutiny of an FDA application if Taser was a drug company trying to get a new drug on the market."

Although Tasers were initially marketed as an alternative to deadly force, the stun guns have replaced batons, chemical spray and physical restraint as the weapon of choice for stopping suspects.

Police often use Tasers as a compliance tool against people who make threatening gestures, try to run away or don't obey commands.

A Taser looks and operates like a gun, except that it fires two steel barbs up to 21 feet. The barbs are attached to wires that deliver 5-second bursts of electricity.

Powers received only a fraction of the shock that most suspects experience on the street. He was shocked for one second while criminal suspects often receive multiple shocks lasting five seconds each.

Officers can re-cycle the gun and deliver repeated shocks by holding down the trigger. The cartridge housing the barbs can also be removed, allowing the gun to be used in a fashion similar to a cattle prod, which officers call a "drive-stun."

In Phoenix last year, almost half of the 377 people shot by police with a Taser were shocked more than once.

More injuries reported

Lawsuits, police journals, Internet Web sites, independent medical reports and Taser's own financial reports this year all contain stories about police injuries following Taser training exercises.

Despite Taser's repeated claim that no officer has been injured, the company's November report to the Securities and Exchange Commission outlines three additional lawsuits alleging injuries during Taser training.

Those alleged injuries include a muscle and nerve injury; an arm and shoulder injury; and a rotator cuff injury.

Taser follows the description of each lawsuit with a line saying the case is without merit and has been turned over to the company's insurance carrier.

"Powers' injury is not an isolated event," Dillingham says. "If you look into it nationwide, you will find ruptured disks, other fractures and injuries to other joints."

Babin, a 17-year law enforcement veteran in Slidell, La., says he heard from a dozen police officers after posting a message on a police magazine Web site asking officers about injuries.

"The most common injuries . . . were dislocations or spinal fractures, which would be consistent with the extreme jolt you experience," he says.

Babin says he wanted to hear from other officers after finding his arms and legs covered in bruises following a Taser shock in May.

Babin says another officer who attended his May 4 Taser training class suffered severe chest pains. He says doctors told the officer "the extreme shock began eating away skin tissue from the area around a previous surgery."

Babin says he still bears the scar of a Taser burn. After being shocked, he says, he developed an autoimmune condition that left his body attacking blood platelets. He says he was diagnosed with bone marrow disease that causes spontaneous bleeding and that doctors have been unable to rule out Taser as a cause.

"I really believe officers need to be made aware of the potential danger before subjecting (themselves) to the training," he says.

"Regardless of whether the training is mandatory, as in my case, no one cannot possibly make a voluntary and informed decision if Taser continues to stonewall the issue and the dangers go unheard."

Babin says the instructor and another police administrator "insisted the experience was

safe."

Still, Babin doesn't dispute the benefits of Taser.

"There has been one consensus amongst all of us in law enforcement. All agree, despite injuries . . . that the Taser is a great tool," he says. "I think the current media attention has failed to consider that any force used by police could be and will be life-threatening."

Memo shocks trainers

But police training officers say they were not told about any significant officer injuries. None contacted about Powers' case were familiar with it. And they expressed concern over Brown's evaluation.

"I'm in disbelief," says Miami Police Sgt. Richard Gentry. "That's the first time I've heard anything like that. I will definitely be keeping my eyes open for that."

While it isn't required, Gentry says the department highly recommends officers experience the shock of a Taser.

"I have rode the five seconds twice, myself," he says. "We try to make training as real as possible."

Gentry credits the Taser as one of the most effective weapons ever. He believes that it is responsible for reducing police shootings and preventing officers from engaging in violent confrontations. He says the stun gun was used 250 times between January and November of this year, far more than any other type of force.

Gentry can't recall any officer being injured during Taser training. He says Brown's memo raises issues about pre-existing conditions and hidden problems. He says every officer goes through a physical exam as part of the hiring process, but that does not include tests for diseases such as osteoporosis.

"There is no question that if there is factual data out there, then it should be part of the discussion," he says, adding that he wants to know everything he can about any weapon his department asks officers to carry. "(Officers) are relying on us."

In Portland, Ore., where the department is set to issue Tasers to every officer, Sgt. Robert Day says the memo raises concerns.

"That's the first I've heard about," says Day, who spent months researching Tasers prior to the department's decision to buy the stun guns. "We have certainly not experienced anything like that."

He says until recently, every Taser operator has taken a shock, but as the department expands Taser use, about 30 percent of officers have opted out of the experience. He says Portland officers have not reported any medical problems.

Like Miami and other departments, Portland officers are required to go through a basic physical exam before being hired.

"I would really like more information on it," he says.

More at risk

Brown's evaluation raises the question about Taser's impact on people with osteoporosis and the possibility that many more people could be injured if shocked with a Taser.

The United States Surgeon General advises that osteoporosis affects one in two women and one in four men over age 50.

Osteoporosis is often thought of as a bone-weakening disease. It deteriorates bone tissue, leaving people at risk for fractures.

The National Osteoporosis Foundation in Washington D.C., estimates that 44 million Americans, or roughly 55 percent of all adults over the age of 50, have the disease.

"While osteoporosis is often thought of as an older person's disease, it can strike at any age," the non-profit foundation says on its Web site. "Osteoporosis is responsible for more than 1.5 million fractures annually."

The problem is most people don't know they have the disease until it is too late.

"Osteoporosis is often called the silent disease because bone loss occurs without symptoms," the foundation reports. "People may not know that they have osteoporosis until their bones become so weak that a sudden strain, bump or fall causes a fracture or a vertebra to collapse."

Brown notes in his memo that Powers was unaware that he had the disease until he underwent a bone density test in September 2002. The test was ordered by a doctor trying to treat the fracture following the Taser shock.

Portland police trainer Day says concerns about osteoporosis could reinvigorate the issues over Taser safety in general. He says those issues need to be weighed against the stun gun's benefits, which he believes are many.

He says he doesn't know if it will change the way Tasers are used, but there needs to be a full disclosure.

"I'm not just talking about officers. I'm thinking about citizens," he says. "There is obviously a risk there."

# Taser doctor's credibility questioned

Company's paid medical director denies any bias in research, statements about safety of stun guns

**Robert Anglen**
The Arizona Republic
Jan. 23, 2005 12:00 AM

The credibility of Taser International's medical director is being questioned over concerns that his research was "potentially biased" and that he may have misled a judge about his financial relationship with the company during a high-profile court case.

Robert Stratbucker, who helped lay the foundation for Taser's claims of safety, has written several medical articles on the stun gun and has conducted studies that company officials use to promote the weapon to police departments across the country.

But a Scottsdale research firm is raising concerns about Stratbucker's objectivity, which calls into question the doctor's long-held position that Taser has never caused a death or serious injury.

"In the case of Dr. Robert A. Stratbucker, in particular, the evidence of bias is extremely compelling," according to the Gradient Analytics report obtained by *The Arizona Republic*.

Stratbucker denied that his financial interests in Taser affected his objectivity, and he called the Gradient report a "piece of trash."

"I was raised as a scientist, not a whore," the 74-year-old Taser employee said Saturday from his home in Omaha, Neb. "When it gets down to taking this report apart, they missed by a mile."

Gradient's report comes only weeks after Taser's stock price dropped sharply following revelations that the U.S. Securities and Exchange Commission and the Arizona attorney general were looking into Taser's safety claims and an end-of-year sale that helped the company meet its annual projections.

The 14-page report focuses on an article about a cardiac-safety study co-written by Stratbucker, published in the peer-reviewed journal *Pacing and Clinical Electrophysiology* and trumpeted by Taser in news releases just over a week ago as evidence of the stun gun's safety.

Taser officials said Saturday that they stand by the safety article and cited Stratbucker's long list of credentials, including degrees in physiology and physics in addition to his medical and engineering licenses.

"We are disappointed to see the debate on the safety of our life-saving technology shift from the

scientific data to personal attacks on researchers," Taser spokesman Dave DuBay said.

DuBay also questioned Gradient's ability to evaluate the article.

In its report, Gradient questions the way the cardiac study was conducted and the "validity of the results." It says Taser was tested in a setting that did not match real-world circumstances. It said the study, which used a simulated device to shock pigs, does not take into account factors such as drugs, elevated heart rates and conditions such as heart disease.

Those factors have been present in many of the deaths after a police Taser strike. In fact, Taser says those factors, not the Taser, that cause death.

Taser has enjoyed remarkable success, going from a family business on the brink of bankruptcy to the nation's largest supplier of stun guns. It has armed nearly one-fifth of America's law enforcement agencies with Tasers and has made millions for investors in the past three years.

Police departments across the country credit the stun gun with reducing the number of police shootings, suspect injuries and lawsuits since arming officers with the stun gun.

But an ongoing investigation by *The Republic* has linked the stun gun to 12 deaths nationwide and the injuries of several police officers.

Gradient co-founder Donn Vickrey said Saturday that he is concerned Taser has misled the public about the safety of its stun guns.

"My only bias is finding out if they are misleading investors," he said. "That's not really a bias. I would say it is more of a goal than a bias."

Gradient grades companies on "corporate governance" and sells its findings in reports to clients; the company gave Taser an "F" in its most recent report.

The report suggests that cash and options paid to Stratbucker and others who conduct research on Tasers could lead to tainted results.

Taser has acknowledged giving options to Stratbucker.

Company officials insist other tests also have found the stun gun safe.

Gradient criticizes Stratbucker, saying he was dismissed as an expert witness in the Jon Benet Ramsey murder case where a Taser might have been used as a weapon.

"He was dismissed after it was shown that he had failed to disclose his relationship to Taser, (that) he had previously been compensated in cash and options by Taser and had ignored pertinent evidence that appeared to indicate the use of a Taser in the killing," Gradient said.

The Gradient report cited several pages of testimony from Stratbucker's deposition in the case.

Stratbucker said Saturday that his dismissal in the Ramsey civil case had nothing to do with contradictory statements he made during a depositionHe acknowledged that for years he received options and cash payments from Taser and is now a paid employee of the company. He said he also receives medical benefits from Taser.

He acknowledged that some might see this as a conflict of interest, but he said he has not let his compensation influence his opinions and research.

"Absolutely not," he said. "I have stated that in my experience, which dates back to the early '80s, I have not seen a death that I would attribute to Taser in a cardiac sense."

He also said he would be skeptical about any death being attributed to Taser.





News | Sports | Money | Entertainment | Families | Health | Food/Home | Yes | Travel | Photo/Video | Español        Site

**marketplace**

> JOBS
> AUTOS
> REAL ESTATE
> RENTALS
classified
shopping
newspaper ads
coupons

# THE ARIZONA REPUBLIC

Newspaper archive powered by **NewsBank**

Archives are actively being restored to the original start dates; archives will be added as completed by The Arizona Republic.

(from 1/1/2005-Cu
selected coverage from 1/1/

**Archive Search > Buy**    Print

Basic Search

**Search for:** [                          ]   [ Search ]

[ Return best matches first  ▾ ]   [ All articles (1/1/1999 to Current) ▾ ]

» New Search   » Advanced Search   » Pricing   » Help   » FAQ

200 article(s)    (Results 1

## 1. Taser safety claim questioned

**Medical examiners connect stun gun to 5 deaths**
**July 18, 2004 •• 4117 words •• ID: pho83806394**
Thousands of police departments, including every major law enforcement agency in the Valley, bu
a claim that the electric stun guns will instantly take down suspects without inflicting harm. That as
safety has generated record sales for Scottsdale's Taser International Inc., which markets its guns
alternatives to deadly force and says its goal is to arm every police officer in America. But an Arizc
investigation has revealed that Taser's claims   **BUY**

## 2. SCRUTINY MOUNTING ON TASER USE

**March 5, 2005 •• 3065 words •• ID: pho106875901**
A growing number of deaths involving Tasers is fueling a debate among law enforcement officers,
and state and federal regulators, who are asking if the electric stun gun is as safe as they were le
Now, a forensic engineer who has written safety standards for the most respected electrical labora
commissions in the world is warning police departments that shocks from Tasers could cause a de
cardiac arrest and that injuries to officers and suspects who   **BUY**

## 3. OFFICER'S INJURY TIED TO TASER

**December 26, 2004 •• 3327 words •• ID: pho102920505**
The makers of Taser electric stun guns say their claims of safety are backed by more than 100,00
officers who have been shocked during training sessions without suffering a single serious injury.
working for Taser says a one-second burst from the stun gun was responsible for fracturing the ba
Maricopa County sheriff's deputy in 2002. The doctor, in a memo obtained by The Arizona Repub

Taser that he evaluated former Deputy Samuel Powers and found **BUY**

### 4. TASER TIED TO 'INDEPENDENT' STUDY THAT BACKS STUN GUN
**May 21, 2005 •• 1576 words •• ID: pho112220282**
Taser International was deeply involved in a Department of Defense study that company officials
police departments and investors as "independent" proof of the stun gun's safety, according to go
documents and e-mails obtained by The Arizona Republic and interviews with military officials. Th
information is surfacing at a time when the U.S. Securities and Exchange Commission and the Ar
attorney general are pursuing inquiries into safety claims that the **BUY**

### 5. POLICE EXPAND USE OF TASER
**November 7, 2004 •• 3659 words •• ID: pho100204503**
Tasers have replaced batons, chemical spray and physical restraint as the weapons of choice for
police. The electric stun guns are touted by law enforcement authorities as a safe, non-lethal alter
using a gun in a violent confrontation. But an Arizona Republic analysis of police reports of Taser-
incidents from 2003 found that Phoenix police were far more likely to use the stun guns to make s
obey orders at a traffic stop than to bring down an armed **BUY**

### 6. FIRM PAID OFFICIAL TO PUSH STUN GUNS
**March 28, 2005 •• 1629 words •• ID: pho109039588**
A council member who pushed to make Phoenix the first major city in the country to arm all of its
with Tasers was paid $3,500 last year to help Taser sell stun guns to another city. Law and Public
Committee Chairman Dave Siebert, who has voted to spend more than $1.2 million in taxpayer m
electric stun guns since 2001, was hired by Taser last summer to make a sales presentation to th
Francisco Police Department. State law prohibits city council **BUY**

### 7. No Headline
**November 29, 2004 •• 2214 words •• ID: pho101297634**
Just in time for the holiday season, Scottsdale-based Taser International is marketing a consumer
the electric stun gun carried by police officers nationwide. CAPTION: Steve Tuttle, director of com
at Taser International, shows off the Scottsdale company's new consumer Taser model, the X26c
newspaper and billboard advertising campaign began this month in Phoenix, the only city where tl
advertisements are running. Tasers fire a pair of darts that deliver a **BUY**

### 8. FEDS LOOK AT TASER'S ACTIONS
**January 7, 2005 •• 1142 words •• ID: pho103636576**
Taser International, the Scottsdale company that has armed nearly a fifth of America's police depa
electric stun guns and made millions for investors, is being investigated by the Securities and Exc
Commission. Company officials disclosed late Thursday that federal authorities have launched an
inquiry into claims the company has made about its safety studies. The SEC also is looking into a
sale to a Prescott firearms distributor that one stock **BUY**

### 9. CORONER: TASER PUSHED FOR REVISION OF AUTOPSY
**August 25, 2004 •• 1027 words •• ID: pho87953183**
A South Carolina coroner says stun-gun manufacturer Taser International is pressuring his office
autopsy that found a Taser contributed to the death of a man last week. Anderson County Deputy
Charlie Boseman said a shock from a Taser was the "last straw" for a man who died Aug. 16 in a
deputies at a detention center. William Teasley, 31, is one of 68 people to die following a police Ti
since 1999. His death marks the seventh time a **BUY**

### 10. TASER DOCTOR'S CREDIBILITY QUESTIONED
**January 23, 2005 •• 839 words •• ID: pho104719742**
The credibility of Taser International's medical director is being questioned over concerns that his
was "potentially biased" and that he may have misled a judge about his financial relationship with
during a high-profile court case. Robert Stratbucker, who helped lay the foundation for Taser's cla
has written several medical articles on the stun gun and has conducted studies that company offic
promote the weapon to police **BUY**

[ View the next 10 items ]

All content copyrighted and may not be republished without permission.



 

News | Sports | Money | Entertainment | Families | Health | Food/Home | Yes | Travel | Photo/Video | Español     Site

marketplace
> JOBS
> AUTOS
> REAL ESTATE
> RENTALS
classified
shopping
newspaper ads
coupons

# THE ARIZONA REPUBLIC

Newspaper archive powered by **NewsBank**

Archives are actively being restored to the original start dates; archives will be added as completed by The Arizona Republic.

(from 1/1/2005-Cu
selected coverage from 1/1/

**Archive Search > Buy**    Print

Basic Search

**Search for:** [＿＿＿＿＿＿＿＿＿＿＿＿]    [Search]

[Return best matches first ▼]    [All articles (1/1/1999 to Current) ▼]

» New Search    » Advanced Search    » Pricing    » Help    » FAQ

200 article(s)                                                          (Results 11
                                                                        L

### 11. TASER TAKES ANOTHER HIT
**January 11, 2005 •• 745 words •• ID: pho103891877**
Shares of Taser International fell again Monday as investors digested the possibility of more acco
concerns. The Scottsdale stun-gun maker's stock fell $2.67, to $20.50, a fall of nearly 12 percent.
followed Friday's nearly 18 percent drop on word of an informal inquiry by the Securities and Exch
Commission into safety claims and end-of-year sales. In the wake of the SEC action, a class-actic
was filed Monday in Phoenix against Taser, alleging securities **BUY**

### 12. TASER STOCK CONTINUES TO PLUNGE
**January 12, 2005 •• 748 words •• ID: pho103936522**
Taser International's stock has gone from sizzling to singed in less than two weeks. The Scottsda
maker, a Wall Street high-flier the past two years as sales to police departments increased sixfold
company attracted international buzz, has lost more than half of its value so far this year. Its share
to $14.10 on Tuesday from $31.65 on Dec. 31, a decline of 55.5 percent. Taser's total market valu
from nearly $1.9 billion to $836    **BUY**

### 13. TASER SAFETY CLAIMS DRAW STATE SCRUTINY
**January 8, 2005 •• 934 words •• ID: pho103712264**
On the same day news of a federal inquiry sent Taser International stock into a sharp decline, the
Attorney General's Office said it is looking into claims made by the electric stun gun company. A s
for Attorney General Terry Goddard said Friday that his office shares the same concerns as the U
Securities and Exchange Commission about the Scottsdale company's statements regarding the s
stun gun. Goddard met with Taser officials at his office this    **BUY**

### 14. LA AUTOPSY REPORT 9TH TO CITE TASER USE

**November 30, 2004 •• 573 words •• ID: pho101912826**
The death of a California man two years ago is the ninth fatality to be linked to a Taser electric stu
Angeles County coroner said Taser could not be ruled out in the 2002 death of Johnny Lozoya, w
shocked by police when he fought with hospital staff attempting to help him following a seizure. "C
exclude the Taser causing above damage to the tissues, specifically the heart," Deputy Medical E
Louis Pena wrote in an autopsy report. "Thus the **BUY**

### 15. No Headline
**May 4, 2005 •• 905 words •• ID: pho111238873**
A 24-year-old man, wanted in an assault on an officer, died Tuesday, shortly after Phoenix police
with a Taser stun gun. CAPTION: Phoenix police Officers Charles Anderson and Carla Williams w
in Tuesday's Taser incident. The man is the 110th person since 1999 to die after a Taser strike. A
too soon to say if the Taser contributed to his death, the incident comes at a time when civil rights
human rights organizations and the media **BUY**

### 16. TASER GUN IS LINKED TO DEATH IN NEVADA
**September 16, 2004 •• 625 words •• ID: pho92125808**
An eighth fatality has been linked to the Taser electric stun gun. A Nevada coroner says shocks fr
contributed to the death of 29-year-old Jacob Lair during a struggle with authorities. "I would call T
the scenario," Washoe County Coroner Vernon McCarty said. "I don't think you can ignore it." The
Republic has identified 71 deaths following police Taser strikes in the United States and Canada s
Of those, medical **BUY**

### 17. AUTOPSY LINKS ANOTHER DEATH TO TASER

### MAKER SAYS STUN GUN NOT RESPONSIBLE FOR '02 ALABAMA FATALITY
**August 6, 2004 •• 739 words •• ID: pho83976800**
An Alabama medical examiner cited electrical shock from a Taser stun gun as a cause in the deat
patient two years ago. It is the sixth death that an Arizona Republic investigation has linked to the
The Scottsdale manufacturer claims that Tasers have never caused a death or injury. LeRoy Ridd
regional medical examiner, reported in a June 28, 2002, autopsy that Clever Craig Jr., 46, died of
attack during an episode of delirium "following **BUY**

### 18. TASER STOCK TUMBLES
**February 9, 2005 •• 656 words •• ID: pho105743295**
Taser International Inc. investors who were looking to the company's earnings report for their first
in weeks were sorely disappointed Tuesday. The Scottsdale-based stun-gun maker reported huge
fourth-quarter sales and earnings, but the results fell short of expectations, and usually bullish cor
executives issued their most cautious business outlook to date. Taser shares fell sharply, closing
down $1.94, or 11.3 percent, in heavy trading. The stock, **BUY**

### 19. AUTOPSY LINKS TASER TO DEATH IN MESA
**January 14, 2005 •• 710 words •• ID: pho104098738**
The Maricopa County medical examiner says shocks from a Taser stun gun contributed to the dea
in Mesa, marking the 12th case nationwide linked to the weapon. Milton Salazar, 29, of Flagstaff,
two days after a struggle with Mesa police officers attempting to arrest him for throwing candy at a
He was shocked twice during the scuffle, according to police reports. The autopsy report comes a
stock price is on a roller-coaster ride. It **BUY**

### 20. TASER STOCK RISES BY 21% IN REBOUND
**January 13, 2005 •• 634 words •• ID: pho104020693**
Taser International's stock rebounded sharply Wednesday, giving investors some cheer after a se
negative developments sliced the stock by more than half in the past week. Shares of the Scottsd
stun-gun maker rose $2.91, or nearly 21 percent, to $17.01 in heavy trading on the Nasdaq Stock
stock is still down 46.3 percent this year but remains up 43 percent over the past 12 months. Wed
bounce came as a Florida grand jury strongly recommended **BUY**

[ View the previous 10 items ]  [ View the next 10 items ]

All content copyrighted and may not be republished without permission.





News | Sports | Money | Entertainment | Families | Health | Food/Home | Yes | Travel | Photo/Video | Español    | Site

**marketplace**

> JOBS
> AUTOS
> REAL ESTATE
> RENTALS
classified
shopping
newspaper ads
coupons

# THE ARIZONA REPUBLIC

Newspaper archive powered by 

Archives are actively being restored to the original start dates; archives will be added as completed by The Arizona Republic.

(from 1/1/2005-Cu
selected coverage from 1/1/

**Archive Search > Buy**    Print

Basic Search

**Search for:** [ ]    Search

[ Return best matches first ▾ ]    [ All articles (1/1/1999 to Current) ▾ ]

» New Search    » Advanced Search    » Pricing    » Help    » FAQ

200 article(s)    (Results 21
L

### 21. TASER EXECS' TALKS AIM HIGH

**SOME STUNNED BY KUDOS FOR STOCK**
**February 29, 2004 •• 1196 words •• ID: pho57623478**
At an investment conference in Southern California a week ago, Taser International Chief Executi
Rick Smith kicked off his presentation with an animated recap of the Boston Massacre. His sugge
powerful stun guns the small Scottsdale company makes could have changed the course of histoi
available, instead of just rifles, during the deadly event that preceded the Revolutionary War. "Unt
law enforcement throughout the world has not had **BUY**

### 22. STUN-GUN MAKER'S STOCK IS STILL ROCKETING

**January 15, 2004 •• 666 words •• ID: pho57757519**
Taser International, Arizona's hottest stock last year with a nearly 2,000 percent gain, is still soarii
but even analysts who love the stun-gun maker's prospects are waving a yellow flag at these heig
small Scottsdale firm's shares jumped $14.50, to $115.75, on Wednesday after Taser announced
stock split. Just two weeks ago, the stock was around $80; a year ago $4. "I'd be very cautious as
buyer," said Joe Blankenship, **BUY**

### 23. FATHER QUESTIONS TASER'S USE ON SON

**May 5, 2005 •• 613 words •• ID: pho112053745**
The father of the man who died after Phoenix police shocked him with a Taser is questioning whe
misused the stun gun by applying it for too long. Keith Graff, 24, died Tuesday, shortly after being
Taser. His father, Terry Graff, said witnesses told him the Taser was held to his son for 45 to 60 s
stun gun delivers a 50,000-volt burst of electricity that causes involuntary muscle contractions anc

incapacitates suspects. Because an **BUY**

### 24. No Headline
**January 23, 2005 •• 1431 words •• ID: pho104728398**
The name on the door at Gradient Analytics in north Scottsdale could just as well say Quincy, M.E
Gradient Analytics' vice president of research, Matthew Kliber (left), and co-founder, Donn Vickrey
public companies' financial statements for red flags and pass the info on to investors. Like the me
examiner in the late 1970s television show, Gradient co-founder Donn Vickrey and a team of your
comb for clues. Instead of bodies, they dig through **BUY**

## 25. TASER DISPUTED AS CAUSE OF DEATH

### COMPANY, WHOSE STOCK HAS FALLEN, WAITS ON EXAMINER'S FINAL REPORT
**July 22, 2004 •• 633 words •• ID: pho83845955**
A world-renowned medical examiner is disputing an autopsy that listed electrical shocks from a Ta
cause in the death of an Indiana man. Scottsdale-based Taser International Inc. trumpeted Dr. Cy
preliminary report on its Web site and in news releases Wednesday, saying it shows that the stun
But the coroner who conducted the autopsy says he has no doubt Taser "was the trigger" in the d
James Borden, who collapsed after being shocked at **BUY**

## 26. PARTYING FOR TASER

### UNDETERRED BY STOCK'S RECENT PULLBACK, SHAREHOLDERS CELEBRATE O
GAINS AT ANNUAL MEETING
**April 30, 2004 •• 701 words •• ID: pho57884806**
With Taser's stock down nearly 40 percent in the past 10 days and company management in the l
product safety, you'd expect shareholders to be a bit prickly. They were anything but at the compa
meeting in north Scottsdale Thursday. The stock price -- or anything negative, for that matter -- di
come up. The only thing Taser shareholders had for CEO Rick Smith and President Tom Smith w
interrupting them several times with their **BUY**

### 27. AMNESTY INTERNATIONAL URGES BAN ON TASER USE
**November 30, 2004 •• 688 words •• ID: pho101912837**
Taser electric stun guns are being used by police officers to routinely shock people who are ment
or who simply refuse to obey commands, according to an Amnesty International report released to
page report concludes that officers are not using the stun gun as an alternative to drawing a firear
instead are using it primarily to shock unarmed people involved in petty crimes, sometimes with de
It calls for a nationwide ban on Tasers until medical, **BUY**

### 28. OFFICERS POINT TO LIVES TASERS SAVED
**November 7, 2004 •• 1061 words •• ID: pho100204526**
Faced with new questions about the safety of Taser stun guns, some police departments across t
are beginning to restrict the way the guns are used. Many departments, however, see no need to
procedures and view the stun gun as an important addition to an officer's choice of weapons. Fou
from Phoenix's Central City Precinct and their sergeant recently talked about their experiences wi
The officers consider the use of Tasers as a **BUY**

## 29. TASER STOCK FALLS $34.31 AFTER REPORT

### BUT FIRM'S EARNINGS ARE SOLID
**April 21, 2004 •• 703 words •• ID: pho57826837**
Taser International, the fast-growing Scottsdale stun-gun manufacturer whose stock has known o
direction the past year, saw its shares plunge Tuesday after the company revealed some challeng
quarterly earnings report and conference call. The stock, the best performer in Arizona and amon
the country the past 12 months, fell $34.31, to $84.39. The 29 percent drop made it one of the big
on Nasdaq. Even with the decline, Taser is up more than 200 percent **BUY**

## 30. POLICE GET EQUIPPED

### GILBERT, PINAL CO. GET LATEST TASER STUN GUNS
**April 2, 2004 •• 526 words •• ID: pho57835102**
Two East Valley law enforcement agencies are adding the most advanced Taser stun guns to the
stop aggressive suspects in their tracks. Gilbert police and the Pinal County Sheriff's Department
using the latest version of the Taser stun gun, the X26, in an effort to catch suspects safely and re

injuries. The Taser X26, which resembles a handgun, shoots two fishhook-like barbs up to 21 feet
hook into clothing, a 50,000-volt electric jolt sends   **BUY**

[ View the previous 10 items ]  [ View the next 10 items ]

All content copyrighted and may not be republished without permission.

**SITE MAP**  azcentral.com main | news | sports | money | entertainment | style | travel | health | families | fo
español | 12 News | weather | maps | classified | shop

**CUSTOMER SERVICE**  terms of service | contact The Republic | subscribe to The Republic | Newspapers
The Republic in your community | about The Republic | about KPNX-TV

**PARTNERS**  USA Today | Gannett Co. Inc. | Gannett Foundation | Real Cities Network

**Copyright © 2005, azcentral.com. All rights reserved.**



Search for
PHOENIX HOMES
in the local MLS.



• Complete Home Details with Addresses
• Multiple Photos • 360° Virtual Tours
• Sold Homes Data



News | Sports | Money | Entertainment | Families | Health | Food/Home | Yes | Travel | Photo/Video | Español    Site

marketplace

› JOBS
› AUTOS
› REAL ESTATE
› RENTALS
classified
shopping
newspaper ads
coupons

# THE ARIZONA REPUBLIC

Newspaper archive powered by **NewsBank**

Archives are actively being restored to the original start dates; archives will be added as completed by The Arizona Republic.

(from 1/1/2005-Cu
selected coverage from 1/1/

**Archive Search > Buy** › Print

Basic Search

**Search for:** [                    ]  [ Search ]

[ Return best matches first ▼ ]   [ All articles (1/1/1999 to Current) ▼ ]

» New Search   » Advanced Search   » Pricing   » Help   » FAQ

200 article(s)                                    (Results 31
                                                    L

**31. SUSPECT DIES AFTER TASER USE BY MESA POLICE**

**INCIDENT FIRST OF ITS KIND IN VALLEY**
**July 31, 2004 •• 675 words •• ID: pho83930354**
Mesa police are reporting the Valley's first fatality that followed a Taser strike. Milton Francisco Sa
Flagstaff, was buried Friday, nine days after his struggle with Mesa police officers ended in an app
cardiac arrest. Now, Salazar's family is demanding answers about Taser's role, saying his death i:
others that have been linked to the stun gun. "He went down after they Tasered him. He went into
arrest," Salazar's  **BUY**

**32. TASER STOCK FALLS DESPITE BLOCKBUSTER EARNINGS LEAP**
**July 21, 2004 •• 294 words •• ID: pho83837074**
Taser International's stock was pummeled for the second day in a row Tuesday, despite a blockbu
earnings report from the Scottsdale stun-gun maker. The shares fell nearly 15 percent, to $31.04.
of a 10 percent drop on Monday that followed reports in The Arizona Republic and New York Time
weekend that focused on deaths linked to Taser shootings and a lack of significant medical testin;
issue overshadowed another strong sales and earnings  **BUY**

**33. OFFICERS TAKE TO SHOCK, AWE OF TASER GUNS**

**WEAPON IS NON-LETHAL, EFFECTIVE**
**May 13, 2003 •• 935 words •• ID: pho81100118**
The growing weapon of choice in Arizona law enforcement is yellow and black and stings like 50,0
Arizona, 74 law enforcement agencies are testing or using Tasers, non-lethal weapons that take c

suspects with a 50,000-volt, pulsating electrical charge but leave no permanent damage. Tasers ɑ tested even in London, where the bobbies historically have not carried firearms. This month, the ( Police Department added Tasers to every officer's arsenal, something **BUY**

## 34. TASER DEAL LEGALITY QUESITONED
**April 3, 2003 •• 467 words •• ID: pho72232992**
It was more than sticker shock that sparked a lengthy Chandler City Council discussion about spe $193,639 on 300 Taser stun guns. Before members voted 6-1 last week to buy weapons that stop suspects with 50,000 volts of electricity, Councilwoman Patti Bruno and City Manager Donna Dreːː questioned the purchase's unorthodox negotiations. By Tuesday, Councilwoman Donna Wallace ι she wanted an Arizona Attorney General's Office investigation of the purchase **BUY**

## 35. HEART NEWS GIVES TASER SMALL BOOST
**May 14, 2005 •• 427 words •• ID: pho111878348**
More than 16 million shares of Taser International Inc. traded hands Friday, three times the usual one point the price rose to $12.55 a share, although it fell later and closed up just 18 cents at $11 flurry of trading came after company officials announced that an independent medical study found guns did not affect the human heart. By early afternoon, however, a human rights group had attac study. Taser said physicians shocked 24 healthy volunteers **BUY**

## 36. SPECULATOR SOCIETY WORKING AGAINST TASER'S INTERESTS
**May 5, 2005 •• 644 words •• ID: pho111421348**
Having spent a good deal of time working with police officers, I'm sympathetic to the promise of Tɑ non-lethal option in the chaos and danger of a confrontation with a resisting suspect. Watching thɛ national security state where any of us might be suspects, I pay more attention to critics of Taser and the safety of its stun gun. Their safety concerns will be raised even further with the death this suspect in Phoenix after he was hit with a **BUY**

## 37. MESA PUTS NEW LIMITS ON TASER USE
**March 31, 2005 •• 311 words •• ID: pho110919253**
A week after the city paid out $2.4 million in a civil lawsuit involving the use of a Taser, police are restrictions to its stun-gun policy for officers and providing specifics for when the weapon should ɓ Mesa Police Chief Dennis Donna approved changes to the Taser policy last Thursday, less than ɑ Mesa paid $2.2 million to Bruce Bellemore, who fell 10 feet out of a tree onto his head in February an officer fired a stun gun at him. The city also paid **BUY**

## 38. TASER STOCK CONTINUES TWO-DAY SURGE
**January 14, 2005 •• 238 words •• ID: pho104106229**
Investors who kept the faith or stepped in to buy as Taser International's stock plunged were rewɑ second day in a row Thursday. The Scottsdale stun-gun maker's stock rose 22 percent, to $20.80 top of a 21 percent gain Wednesday. The two-day surge doesn't erase the damage inflicted after ɑ spate of negative news from a Securities and Exchange Commission inquiry to new competition. I rebound also cut Taser's losses for the year. The **BUY**

## 39. TASER SPLITS STOCK, DENIES ITS STUN GUN LED TO DEATHS
**April 7, 2004 •• 269 words •• ID: pho58275224**
Investors cheered a statement Tuesday by Taser International Inc. in which the Scottsdale compɑ a 2-for-1 share split and denied news reports critical of its stun guns. Taser stock closed at a recɔ vaulting $13.75 a share, to $92.25, amid intense trading volume of 19.8 million shares. The stock high as $95.49 after the company released the statement after 11 a.m. Arizona time. Taser also rɛ strongly to a CBS Evening News report, even before the second **BUY**

## 40. MAYOR EXPECTS MESA TO OK MORE TASER GUNS FOR POLICE
**October 13, 2003 •• 309 words •• ID: pho81846542**
Mayor Keno Hawker predicts the City Council will vote unanimously tonight to arm Mesa police wi Tasers. The request for more Tasers by Mesa police comes after the weapon failed to stop two kr assailants in the past two months. Both assailants were fatally shot. But the Taser has an overall ː of 91 percent so far in 2003 and a 96 percent success rate in 2002, according to Mesa police. "I'm it," Hawker said. "This council **BUY**

[ View the previous 10 items ]  [ View the next 10 items ]

All content copyrighted and may not be republished without permission.

**SITE MAP**  azcentral.com main | news | sports | money | entertainment | style | travel | health | families | fo
español | 12 News | weather | maps | classified | shop

**CUSTOMER SERVICE**  terms of service | contact The Republic | subscribe to The Republic | Newspapers
The Republic in your community | about The Republic | about KPNX-TV

**PARTNERS**  USA Today | Gannett Co. Inc. | Gannett Foundation | Real Cities Network

Copyright © 2005, azcentral.com. All rights reserved.





# Lake Tahoe this Spring!
Getting here is easy with non-stop flights.
Lodging packages, events, deals and more... GO



News | Sports | Money | Entertainment | Families | Health | Food/Home | Yes | Travel | Photo/Video | Español    Site

marketplace
> JOBS
> AUTOS
> REAL ESTATE
> RENTALS
classified
shopping
newspaper ads
coupons

# THE ARIZONA REPUBLIC
Newspaper archive powered by 

Archives are actively being restored to the original start dates; archives will be added as completed by The Arizona Republic.

(from 1/1/2005-Cu
selected coverage from 1/1/

## Archive Search > Buy  > Print

Basic Search

**Search for:** [                    ]  [ Search ]

[ Return best matches first ▼ ]  [ All articles (1/1/1999 to Current) ▼ ]

» New Search   » Advanced Search   » Pricing   » Help   » FAQ

200 article(s)                                          (Results 41

---

### 41. TASER PLANS NEW PLANT NEAR AIRPARK
**August 26, 2003 •• 202 words •• ID: pho81500900**
Taser International Inc. said Monday that it plans to build a headquarters and manufacturing facili
Scottsdale Airpark to keep pace with demand for its electronic stun guns. The company, which oc
12,000-square-foot facility in Scottsdale, is purchasing 4.5 acres in the Perimeter Center, near Lo
$2.9 million. Rick Smith, Taser's chief executive officer, said the 30,000-square-foot building will b
in about a year and eventually be expanded to **BUY**

### 42. '04 REPORT MISCOMPUTED TAX EFFECTS, TASER WARNS
**May 18, 2005 •• 306 words •• ID: pho112484352**
Taser International Inc. on Tuesday warned investors that its 2004 financial results are not reliable
a tax-calculation error and said they will need to be restated, triggering another slide in Taser's sto
The announcement, coming in the wake of poor first-quarter results and other problems, hurt Tas
which fell $1.35 a share to $10.33, as more than 11 million shares traded. One of the nation's hott
2003 and 2004, Taser has lost almost 70 **BUY**

### 43. TASER'S FIRST-QUARTER PROFIT TUMBLES
**April 20, 2005 •• 423 words •• ID: pho110562299**
First-quarter earnings plunged at Taser International Inc. as legal costs mounted and sales of its e
guns fell because of safety concerns. The Scottsdale company reported Tuesday that it earned $'
the quarter, down 97 percent from the $4.96 million profit in the fourth quarter of 2004 and 95 per
$3.55 million in profit reported for the first quarter of 2004. Revenue was $10.2 million, down 47 p
the fourth quarter and 22 percent from the **BUY**

### 44. No Headline

**April 2, 2005 •• 480 words •• ID: pho109380809**
Taser International Inc. on Friday estimated its first-quarter revenue will fall well short of Wall Stre
expectations, saying the controversy over the safety of its stun guns may have cut into sales for th
Taser shares fell $1.58, or 13 percent, to $10.42 Friday on the Nasdaq Stock Market. The stock h
two-thirds of its value from a late-December high of $32.59. The company estimated sales for the
ending Thursday at $10 million, shy of the average target of  **BUY**

### 45. TASER WARNS OF POSSIBLE PERIL
**April 1, 2005 •• 353 words •• ID: pho110964535**
Stun-gun maker Taser International, which has been under fire for its product-safety claims and p
disclosures, came closer than ever before to saying what critics have contended: Use of the weap
to death. In its annual 10-K filing with the U.S. Securities and Exchange Commission late Thursda
Scottsdale company gave its most detailed disclosure of the potential risks of the popular police w
products are often used in aggressive confrontations that may  **BUY**

### 46. SIEBERT'S TASER DEAL SELLS PHOENIX SHORT
**March 30, 2005 •• 260 words •• ID: pho111524459**
Phoenix City Councilman Dave Siebert has brought great harm to the city by cutting a deal with T
endorse its stun guns in meetings with San Francisco officials. Mainly because he worked so chea
is in a financial crunch. This is no time to peddle influence for peanuts. Siebert charged $3,000 for
talk up Taser. Siebert says the deal wasn't a conflict of interest. Even though he is head of the city
Safety Committee. Even though Phoenix  **BUY**

### 47. COPS CAN HANDLE TASERS WITHOUT BEING ZAPPED
**March 12, 2005 •• 481 words •• ID: pho110798061**
Scottsdale police officials' decision to stop testing Taser stun guns on their officers makes sense.
it's strange that the department ever implemented such a voluntary training procedure. We unders
a remote possibility that a police officer might be zapped by a Taser while out on patrol. And, may
training experience might better prepare him or her for the shocking experience. Or educate the o
the power of the Taser. But Scottsdale  **BUY**

### 48. CEOS FEAR INVESTORS WHO BET ON STOCK DROP
**February 17, 2005 •• 1205 words •• ID: pho106126576**
If NBC ever does an Executive Fear Factor, the perfect stunt would be a back-alley encounter with
sellers. Besides the Securities and Exchange Commission and New York Attorney General Eliot S
things make executives of publicly traded companies squirm as much as the professional investor
big, risky bets that a stock is headed for a fall and only profit when it does. "There are a lot of seni
out there that are just afraid of them," said Louis  **BUY**

### 49. No Headline
**December 30, 2004 •• 338 words •• ID: pho103829288**
It seems as if Taser stun guns are everywhere these days, even on the silver screen. CAPTION: `
Tuttle says the Scottsdale company is happy with the stun gun's use in Meet the Fockers. Most re
of the guns, manufactured by Scottsdale-based Taser International Inc., has a cameo appearance
movie Meet the Fockers. A redneck police officer fires the stun gun at the characters played by Be
Dustin Hoffman, who had been pulled over for  **BUY**

### 50. PV WANTS A TASER FOR EVERY OFFICER
**December 15, 2004 •• 332 words •• ID: pho103513743**
The Paradise Valley Town Council will be asked Thursday to spend nearly $35,000 to buy 36 poli
and to authorize a $1,215 grant application to help nab the elusive Rock Burglar. The council mee
Thursday in Town Hall, 6401 E. Lincoln Drive. The Police Department wants to equip every sworn
a Model X26 Taser from Scottsdale-based Taser International. The company has sold the electric
to about 5,500 agencies. The police said that some town  **BUY**

[ View the previous 10 items ]  [ View the next 10 items ]

All content copyrighted and may not be republished without permission.

**SITE MAP**  azcentral.com main | news | sports | money | entertainment | style | travel | health | families | fo
español | 12 News | weather | maps | classified | shop

http://nl.newsbank.com/nl-search/we/Archives?p_action=list&p_theme=gannett&s_site=a...    6/23/2005

The Arizona Republic Newspaper Archive - Purchase articles from azcentral.com    Page 3 of 3

**CUSTOMER SERVICE**  terms of service | contact The Republic | subscribe to The Republic | Newspapers
The Republic in your community | about The Republic | about KPNX-TV

**PARTNERS**  USA Today | Gannett Co. Inc. | Gannett Foundation | Real Cities Network

**Copyright © 2005, azcentral.com. All rights reserved.**

1:05-cr-10012-MMM-JAG    # 20    Page 46 of 100





FURNITURE FACTORY
INTRODUCING OUR NEW CINEMA ROOMS

News | Sports | Money | Entertainment | Families | Health | Food/Home | Yes | Travel | Photo/Video | Español       Site

## marketplace

> JOBS
> AUTOS
> REAL ESTATE
> RENTALS
classified
shopping
newspaper ads
coupons

# THE ARIZONA REPUBLIC

Newspaper archive powered by  **NewsBank**

Archives are actively being restored to the original start dates; archives will be added as completed by The Arizona Republic.

(from 1/1/2005-Cu
selected coverage from 1/1/

### Archive Search > Buy      Print

Basic Search

**Search for:** [                              ]   [ Search ]

[ Return best matches first    ▼ ]   [ All articles (1/1/1999 to Current) ▼ ]

» New Search   » Advanced Search   » Pricing   » Help   » FAQ

200 article(s)                                              (Results 51
                                                                    L

### 51. TASER STOCK SET TO SPLIT
**November 5, 2004 •• 261 words •• ID: pho100016592**
Taser International Inc.'s stock rose 13 percent Thursday after the Scottsdale stun-gun maker ann
third stock split this year. The shares rose $5.47 to $46.81 in heavy trading on the Nasdaq Stock I
two-for-one split will take place later this month. Like most companies, Taser said it is splitting the
increase trading liquidity and to make the price more affordable for investors. In a two-for-one spli
get one extra share for each share they   **BUY**

### 52. BIG ORDER FOR TASER'S STUN GUNS

### MILITARY CONTRACT WORTH $1.8 MILLION
**July 1, 2004 •• 279 words •• ID: pho83730159**
Taser International shares climbed 9 percent on Wednesday after the company announced its lar
ever, a $1.8 million contract that will put its stun guns in the hands of U.S. troops. Scottsdale-base
ship about 1,100 stun guns and 39,000 cartridges to the military in the third quarter. President To
declined to say how the weapons would be used. The U.S. Army previously placed a smaller orde
guns and accessories for use in Iraq. "We believe this is   **BUY**

### 53. PRICE OF TASER'S STOCK DROPS DESPITE A FORECAST OF GROWTH
**February 4, 2004 •• 197 words •• ID: pho57673236**
Taser International's stock ended a roller-coaster day on a down note Tuesday, underscoring for i
risks of a highflying stock and the intense scrutiny it draws. The Scottsdale stun-gun manufacture
$7.81, to $127.21, in heavy trading on Nasdaq. The stock traded as high as $154 and as low as $
ago it was at $4. The stock drop came despite better-than-expected financial results Taser reporte

Monday. The small company's quarterly **BUY**

## 54. OFFICER BACKED IN TASER USE

### CITIZENS PANEL RULES; TEEN WAS STUNNED AT LIBRARY
**January 8, 2004 •• 287 words •• ID: pho57770121**
A citizens review panel ruled Tuesday night that a Chandler police officer was justified when he st
year-old girl with an electronic Taser gun during a disturbance in a library. The 15 members voted
that Officer Arturo Salazar was within policy, did not use excessive force and was not rude to the t
during the Sept. 29 incident at Chandler Public Library. Salazar and Officer Marc Olivier had been
library at 22 S. Delaware St. after a 58-year-old **BUY**

## 55. TEMPE POLICE GETTING NEW TASERS

### MODEL WEIGHS LESS, IS SMALLER
**October 8, 2003 •• 414 words •• ID: pho81673528**
Tempe police are arming themselves with a smaller, newer version of the increasingly popular Ta
than-lethal weapon. The Taser X26, less than half the size and weight of the M26, eases the prob
putting yet another item on an officer's equipment belt. Last week, Tempe City Council approved a
buy 152 of the new models, enough to arm all uniformed street officers. The $154,208 funding car
Local Law Enforcement Block Grant won by the Police **BUY**

## 56. Tasers best option
**March 18, 2005 •• 179 words •• ID: pho110920276**
Testing Taser stun guns on police officers ("Cops can handle Tasers without being zapped," Edito
Saturday) makes about as much sense as belting each rookie behind the ear with a baton so he'll
feels like. The Taser is a less damaging option to clubs or guns. It would be the preferred method
someone at close range who might cause an officer harm. The Taser is useless beyond its range
any physical obstacle, even glass. Bullets that miss **BUY**

## 57. CAMPUS COPS ADD TASERS TO ARSENAL
**December 13, 2004 •• 625 words •• ID: pho102138969**
Clipped to the belts of security officers along with guns and pepper spray, more Tasers are comin
schools with police. Law enforcement officials say stun guns are a necessary addition to their pote
for subduing aggressive people, including students. At least five Valley districts deploy Taser-arm
resource officers in middle schools and high schools. If Tempe police get funding from the City Cc
week, their nine school resource officers will be **BUY**

## 58. $70 MIL SALE OF TASER STOCK
**November 19, 2004 •• 273 words •• ID: pho100788610**
Taser International executives sold nearly $70 million in company stock last week, their biggest sa
enough to land them atop the week's list of leading sellers on Wall Street. Chairman Phil Smith, w
the start-up funds for the Scottsdale stun-gun maker founded by his sons, led the way with the sal
shares for $27 million. His sons, Chief Executive Rick Smith and President Tom Smith, sold 250,0
each, some by exercising options, netting $13.5 **BUY**

## 59. TEEN TRADERS ... ALIEN DESIGN ... ANIMAL MAGNETISM
**May 5, 2004 •• 543 words •• ID: pho58031425**
The wild stock market ride of Scottsdale's Taser International hasn't been lost on young investors.
high school students who finished at or near the top in recent stock-picking contests rode Taser to
think I had it pretty easy from the beginning, because I held Taser," said Joshua Kosar, a 14-year-
at Paradise Valley High School who placed first in a seven-month stock-market "simulation" overs
Arizona Council on Economic **BUY**

## 60. 1ST QUARTER STOCK REPORT / STATE WINNERS OUTPACE LOSERS

### RIDE VOLATILE; GAIN SMALL OVERALL
**April 1, 2004 •• 872 words •• ID: pho58249541**
If the first three months offer any clues, 2004 will wind up as a confusing, confounding year in the
market. Equities raced out of the gates in January, gave it all back and then some in February and
March, but finally rallied enough down the stretch to finish mixed. The Dow Jones industrial avera
percent for the quarter and Nasdaq slipped 0.5 percent, but the Standard & Poor's 500 index scra
1.3 percent gain. Those figures exclude **BUY**

[ View the previous 10 items ]  [ View the next 10 items ]

All content copyrighted and may not be republished without permission.

**SITE MAP**  azcentral.com main | news | sports | money | entertainment | style | travel | health | families | fo
español | 12 News | weather | maps | classified | shop

**CUSTOMER SERVICE**  terms of service | contact The Republic | subscribe to The Republic | Newspapers
The Republic in your community | about The Republic | about KPNX-TV

**PARTNERS**  USA Today | Gannett Co. Inc. | Gannett Foundation | Real Cities Network

**Copyright © 2005, azcentral.com. All rights reserved.**







News | Sports | Money | Entertainment | Families | Health | Food/Home | Yes | Travel | Photo/Video | Español          Site

## marketplace

> JOBS
> AUTOS
> REAL ESTATE
> RENTALS
classified
shopping
newspaper ads
coupons

# THE ARIZONA REPUBLIC

Newspaper archive powered by **NewsBank**

Archives are actively being restored to the original start dates; archives will be added as completed by The Arizona Republic.

**(from 1/1/2005-Cu**
**selected coverage from 1/1/**

## Archive Search > Buy

Basic Search

**Search for:** [_____]  [ Search ]

[ Return best matches first ▾ ]   [ All articles (1/1/1999 to Current) ▾ ]

» New Search   » Advanced Search   » Pricing   » Help   » FAQ

200 article(s)                                                    (Results 61

---

**61. TICKER SHOCK ... TRUMP ON TOP ... TARGETING WINE**
March 20, 2004 •• 747 words •• ID: pho57790861
Scottsdale-based stun-gun maker Taser International Inc. has made it to the big time, Nasdaq-wi: founders Rick and Tom Smith and other company officials presided over the Nasdaq market oper morning in New York to celebrate the company's listing on the stock exchange's National Market : High-flying Taser, which has seen its stock price skyrocket in recent months, had been trading on Small Cap Market since May 2001. Taser CEO Rick Smith **BUY**

**62. TASER STOCK REBOUNDS AFTER POSITIVE TESTING REPORT**
March 9, 2004 •• 226 words •• ID: pho57666976
Taser International's stock, which had paused recently after a spectacular surge, soared again Mc the company said it completed another phase of research on the development of a longer-range s military use. Shares of the small Scottsdale company rose $8.49, to $57.09, a gain of 17.5 percen 17 million shares traded hands, four times its average daily volume over the past 50 days. Taser's split 3-for-1 last month, has doubled this year **BUY**

**63. No Headline**
February 12, 2004 •• 641 words •• ID: pho57603144
Scottsdale stun-gun manufacturer Taser International got a little national television exposure Wed we're not sure it was a good thing. CAPTION: Tom Smith's company, Taser International, is ment white knight. After the story broke about cable TV giant Comcast Corp.'s proposal to buy Walt Dis CNBC reporters David Faber and Joe Kernen were noodling about potential white knights who co Mouse House. They dished out a few names, then **BUY**

**64. TASER CEO TO SPEAK AT AZSNAP FORUM**

**February 9, 2004 •• 386 words •• ID: pho57723799**
The chief executive of Taser International Inc., the stun gun maker that is one of the market's hott
will speak Tuesday night at a Scottsdale Airpark networking meeting. Rick Smith, Taser co-found
Steve Hanson, former CEO of On Semiconductor, during a 6 p.m. speakers forum of the group A
Network Air Park, or AZSNAP. This month's meeting, which begins at 4 p.m. at the Scottsdale Co
College Airpark Campus, focuses on large and publicly  **BUY**

65. **CIVILIAN STUN GUN INTRODUCED**

**VALLEY FIRM HOPES FOR BIGGER MARKET**
**January 9, 2004 •• 359 words •• ID: pho57751095**
Taser International, the Scottsdale company whose sales and stock price have surged on law enf
orders for its latest stun gun, plans to introduce a consumer version later this year. The Taser X2
introduced Thursday at the Consumer Electronics Show in Las Vegas, will sell for $999 online an
telephone orders beginning this summer. The device will send out less of a jolt than the law enfor
but fire for a longer time. This is to allow individuals in danger to  **BUY**

66. **CHANDLER FORCE PANEL TO JUDGE USE OF TASER ON TEEN**
**January 6, 2004 •• 332 words •• ID: pho57689173**
A citizens panel tonight will review whether a Chandler police officer was justified in using a Taser
year-old girl during a disturbance in a library. On Sept. 29, Chandler police Officers Arturo Salazar
Olivier responded to the Chandler Public Library, 22 S. Delaware St., after a 58-year-old woman r
someone had thrown a book, striking her in the back. A police report gives this account of the inc
the officers tried to question the teen, she  **BUY**

67. **MESA POLICE CONSIDER MORE CRISIS TRAINING**
**September 9, 2003 •• 1073 words •• ID: pho81551748**
In the wake of two fatal officer-involved shootings in two weeks, Mesa Police Chief Dennis Donna
considering adopting a more intensive crisis-intervention program than the current four-hour cours
ordered a complete review of our use-of-force options, especially the less-than-lethal techniques t
department, like others, has adopted over the years," Donna said in a written statement. "The 40-
intervention training proposed by one community group is  **BUY**

68. **TASERS REDUCE OFFICERS' GUN USE**

**SHOOTINGS DOWN FROM A YEAR AGO**
**July 21, 2003 •• 581 words •• ID: pho81501631**
Sgt. Dave Lane had his finger on the trigger. The man facing him had a 12-inch butcher knife. "Dr
it!" officers yelled. "We'll shoot you." A year ago, Phoenix police almost certainly would have shot
very likely killed him. But in the first six months since all patrol officers were armed with Taser stu
officer-involved shootings have dropped. As a sergeant, Lane didn't have a Taser on his belt the
faced with  **BUY**

69. **TASER'S ARSENAL OF CLIENTS GROWING RAPIDLY**

**FIRST-QUARTER SALES INCREASE 42% FROM PREVIOUS YEAR**
**May 13, 2003 •• 261 words •• ID: pho81230369**
Taser International Inc.'s growth over the past two years has been almost as stunning as its prod
than 2,400 law enforcement agencies, including 74 in Arizona, now use the Scottsdale-based con
Advanced Taser M26 electronic stun gun. The Chandler Police Department is the latest addition t
"Things are going well," said Tom Smith, Taser's president and co-founder. "We're projecting a 3C
percent growth in sales this  **BUY**

70. **SERGEANT INVESTIGATED IN CHANDLER TASER DEAL**
**April 12, 2003 •• 245 words •• ID: pho76572714**
A police sergeant who helped persuade the City Council to buy 300 Taser stun guns for $193,00C
bid is the subject of a criminal investigation because he works for the stun gun's Scottsdale manu
Attorney Dennis O'Neill asked the Police Department to investigate whether Sgt. Jim Halstead vio
conflict of interest laws after Councilwoman Donna Wallace questioned Halstead's second job as
instructor for Taser. Government workers are  **BUY**

[ View the previous 10 items ]  [ View the next 10 items ]

All content copyrighted and may not be republished without permission.

1:05-cr-10012-MMM-JAG     # 20     Page 51 of 100

**SITE MAP**  azcentral.com main | news | sports | money | entertainment | style | travel | health | families | foc
español | 12 News | weather | maps | classified | shop

**CUSTOMER SERVICE**  terms of service | contact The Republic | subscribe to The Republic | Newspapers
The Republic in your community | about The Republic | about KPNX-TV

**PARTNERS**  USA Today | Gannett Co. Inc. | Gannett Foundation | Real Cities Network

Copyright © 2005, azcentral.com. All rights reserved.





Big squishy noses.

News | Sports | Money | Entertainment | Families | Health | Food/Home | Yes | Travel | Photo/Video | Español     Site

**marketplace**

> JOBS
> AUTOS
> REAL ESTATE
> RENTALS
classified
shopping
newspaper ads
coupons

# THE ARIZONA REPUBLIC
Newspaper archive powered by **NewsBank**

Archives are actively being restored to the original start dates; archives will be added as completed by The Arizona Republic.

(from 1/1/2005-Cu
selected coverage from 1/1/

### Archive Search > Buy  > Print

Basic Search

**Search for:** [_____]    [ Search ]

[Return best matches first ▾]    [All articles (1/1/1999 to Current) ▾]

» New Search    » Advanced Search    » Pricing    » Help    » FAQ

200 article(s)                                    (Results 71
                                                            L

### 71. OFFICER'S LIGHTNING ZAPS ZEUS
**May 18, 2005 •• 317 words •• ID: pho113308158**
The ancient Greeks believed that Zeus, the king of the gods, threw lightning from the heavens to :
displeasure. On Tuesday, Zeus the Rottweiler got a dose of his own medicine. A Chandler police
a Taser to subdue the 100-pound pooch after he and a canine companion allegedly spent the mo
terrorizing residents in a neighborhood near Ray and Dobson roads. Police were called to the 16C
West Laredo Street about 7 a.m. on reports that a stray Rottweiler  **BUY**

### 72. TASER TAG ... TALE OF 2 AIRLINES ... PASSIONATE RESORT ... ICE CREAM
**April 23, 2005 •• 558 words •• ID: pho111848880**
Tasers have caught national media attention in recent months because of questions about their s:
the stun guns, which are made by Scottsdale-based Taser International Inc., have really hit the bi;
are the subject this week of a parody by theonion.com, an irreverent Web site that presents made
of the news. In its weekly man-on-the-street feature, What Do You Think?, the site asks its usual ;
oddball "real people" if they think Tasers are  **BUY**

### 73. STUNNING ODOR
**March 30, 2005 •• 453 words •• ID: pho109136834**
There's the legal test, and there's the smell test. We won't quibble with Phoenix Councilman Dave
about the legality of taking $3,500 to be Taser International's paid pitchman in San Francisco. But
This one stinks. Siebert has undermined his credibility, undercut his work on the City Council and
underestimated the significance of appearances. He also has set a troubling example for other ele
officials. Representing District 1 in far north  **BUY**

### 74. LEGISLATURE NEEDS TO CONSIDER TASER USE-OF-FORCE RULES

**February 24, 2005 •• 206 words •• ID: pho109737027**
The International Association of Chiefs of Police issued guidelines last year at their convention, w
promoted the adoption of Taser policies and their use by law enforcement. Issuing new guidelines
its former guidelines have no enforcement, will result in nothing more than putting the public back
the issue. Over 50 deaths in 12 months keep drawing attention to the fact that something is wrong
say they would rather be shot with a gun, but none **BUY**

**75. Taser guns get drawn too quickly**
**January 16, 2005 •• 117 words •• ID: pho104244439**
Regarding "Autopsy links Taser to death in Mesa" (Republic, Friday): My heartfelt condolences to
Milton Salazar of Flagstaff. Our family has also lost a son through the same device. While 85 perc
Republic's readers said they wanted the police to continue using Tasers, there would be little agre
where or when. Many citizens see them as less lethal, to be used in preference to a gun if you're
shoot something. Many officers would **BUY**

**76. An up-down week ends on low note for Taser**
**January 15, 2005 •• 94 words •• ID: pho105088841**
Shares of Taser International Inc. ended a roller-coaster week on a down note Friday. The Scottsd
maker's stock, the best performer in Arizona last year, with a 361 percent gain, closed at $19.64,
percent. Taser's shares were hammered early in the week after news reports of an SEC inquiry on
claims and an end-of-the-year sale as well as concerns about new competition. They came roarin
Wednesday and Thursday on positive news. For the week, **BUY**

**77. ARIZONA STOCKS / 2004: A RALLY FOR SOLID GAINS**
**January 1, 2005 •• 823 words •• ID: pho103248666**
When all else fails, keep your eye on the economy. Stock-market investors who heeded that mant
money, eventually, in 2004. The year was characterized by numerous false starts as well as risks
materialized. When the dust settled, it wound up being a fairly normal investment period. The Star
Poor's 500 Index gained 10.9 percent including dividends, putting it a bit above its long-term avera
return of 10.4 percent. It was the first year the **BUY**

**78. TASERS OK'D IN TEMPE, FOOTHILLS SCHOOLS**
**December 18, 2004 •• 347 words •• ID: pho103874259**
Police officers in Ahwatukee and Tempe middle and high schools will carry stun guns within a yea
Ahwatukee Foothills parents say that's OK. On Thursday night the Tempe City Council approved
$200,000 to buy Tasers and cartridges. They'll be in Tempe schools by the spring. "I think it's prol
idea," said Mark Burman, an Ahwatukee parent. "I think it's probably necessary, if nothing else, as
In a private **BUY**

**79. TEMPE OKS TASER GUNS FOR 9 SCHOOLS**
**December 17, 2004 •• 237 words •• ID: pho103056653**
Officers stationed at nine schools will be armed with Tasers by spring, now that the City Council g
Police Department permission to buy up to $200,000 in stun guns and equipment. The council's n
Thursday night will buy 170 new Tasers for the remaining officers on the force who don't already I
outfitting everyone in the department from the lieutenant rank down. This includes the department
resource officers. Tempe police have been phasing in **BUY**

**80. TASERS COMING TO HIGH SCHOOLS**
**December 11, 2004 •• 569 words •• ID: pho103450743**
School resource officers in Ahwatukee Foothills' two public high schools are expected to be armed
within a year. Phoenix police plan to buy the stun guns for all school resource officers in the city, i
those who patrol Ahwatukee high schools, within the next year and maybe as soon as six months
Sylvester Johnson of Phoenix police. School resource officers at two of Kyrene School District's th
schools in Ahwatukee -- Kyrene Akimel A-al **BUY**

[ View the previous 10 items ]  [ View the next 10 items ]

All content copyrighted and may not be republished without permission.

**SITE MAP**  azcentral.com main | news | sports | money | entertainment | style | travel | health | families | fo
español | 12 News | weather | maps | classified | shop

**CUSTOMER SERVICE**  terms of service | contact The Republic | subscribe to The Republic | Newspapers
The Republic in your community | about The Republic | about KPNX-TV

**PARTNERS**  USA Today | Gannett Co. Inc. | Gannett Foundation | Real Cities Network

**Copyright © 2005, azcentral.com. All rights reserved.**

DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.  K

# USA

## 1. UNITED STATES OF AMERICA
### Excessive and lethal force? Amnesty International's concerns about deaths and ill-treatment involving police use of tasers

### *Introduction and summary*

*"I asked Borden to lift up his foot to remove the shorts, but he was being combative and refused. I dry stunned Borden in the lower abdominal area ... We got Borden into the booking area. Borden was still combative and uncooperative. I dried [sic] stunned Borden in the buttocks area..." After the final shock, the officer "noticed that Borden was no longer responsive and his face was discoloured."* (extract from officer's statement on James Borden, a mentally disturbed man being booked into an Indiana jail.)(1)

James Borden was arrested in a disoriented state in November 2003 and died shortly after the administration of the last of six electro-shocks, delivered while his hands were reportedly cuffed behind his back. The medical examiner released a statement listing cause of death as a heart attack, drug intoxication and electrical shock. James Borden is one of thousands of individuals shocked with stun devices by US law enforcement agents each year as a growing number of agencies move to adopt such weapons.

More than 5,000 US law enforcement agencies are currently deploying tasers, dart-firing electro-shock weapons designed to cause instant incapacitation by delivering a 50,000 volt shock. Tasers are hand-held electronic stun guns which fire two barbed darts up to a distance of 21 feet, which remain attached to the gun by wires. The fish-hook like darts are designed to penetrate up to two inches of the target's clothing or skin and deliver a high-voltage, low amperage, electro-shock along insulated copper wires. Although they were first introduced in the 1970s, the take-up rate for tasers has increased enormously in recent years, with the marketing of powerful "new generation" models such as the M26 Advanced Taser and the Taser X26. Both fire darts which strike the subject from a distance or, as in James Borden's case, can be applied directly to the skin as a stun gun.

The manufacturers and law enforcement agencies deploying tasers maintain that they are a safer alternative to many conventional weapons in controlling dangerous or combative individuals. Some police departments claim that injuries to officers and suspects, as well as deaths from police firearms, have fallen since their introduction.

Amnesty International acknowledges the importance of developing non-lethal or "less than lethal" force options to decrease the risk of death or injury inherent in the use of firearms or other impact weapons such as batons. However, the use of stun technology in law enforcement raises a number of concerns for the protection of human rights. Portable and easy to use, with the capacity to inflict severe pain at the push of a button without leaving substantial marks, electro-shock weapons are particularly open to abuse by unscrupulous officials, as the organization has documented in numerous cases around the world.(2)

Although US law enforcement agencies stress that training and in-built product safeguards (such as chips which can record the time and date of each taser firing) minimize the potential for abuse, Amnesty International believes that these safeguards do not go far enough. There have been disturbing reports of inappropriate or abusive use of tasers in various US jurisdictions, sometimes involving repeated cycles of electro-shocks.

There is also evidence to suggest that, far from being used to avoid lethal force, many US police agencies are deploying tasers as a routine force option to subdue non-compliant or disturbed individuals who do not pose a serious danger to themselves or others. In some departments, tasers have become the most prevalent force tool. They have been used against unruly schoolchildren; unarmed mentally disturbed or intoxicated individuals; suspects fleeing minor crime scenes and people who argue with police or fail to comply immediately with a command. Cases described in this report include the stunning of a 15-year-old schoolgirl in Florida, following a dispute on a bus, and a 13- year-old girl in Arizona, who threw a book in a public library.

In many such instances, the use of electro-shock weapons appears to have violated international standards prohibiting torture or other cruel, inhuman or degrading treatment as well as standards set out under the United Nations (UN) Code of Conduct for Law Enforcement Officials and the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials. These require that force should be used as a last resort and that officers must apply only the minimum amount of force necessary to obtain a lawful objective. They also provide that all use of force must be proportionate to the threat posed as well as designed to avoid unwarranted pain or injury.

International standards encourage the development of non-lethal incapacitating weapons for law enforcement "for use in appropriate situations, with a view to increasingly restraining the application of means capable of causing death or injury to persons" but state that such weapons must be "carefully evaluated" and their use "carefully controlled".(3) Amnesty International believes that this standard has not been met with regard to tasers, despite their increasing use across the country.

Amnesty International is further concerned by the growing number of fatalities involving police tasers. Since 2001, more than 70 people are reported to have died in the USA and Canada after being struck by M26 or X26 tasers, with the numbers rising each year. While coroners have tended to attribute such deaths to other factors (such as drug intoxication), some medical experts question whether the taser shocks may exacerbate a risk of heart failure in cases where persons are agitated, under the influence of drugs, or have underlying health problems such as heart disease. In at least five recent cases, coroners have found the taser directly contributed to the death, along with other factors such as drug abuse and heart disease. As discussed below, the death toll heightens Amnesty International's concern about the safety of stun weapons and the lack of rigorous, independent testing as to their medical effects.

This report includes a review by Amnesty International of information on 74 taser-involved deaths, based on a range of sources, including autopsy reports in 21 cases. Most of those who died were unarmed men who, while displaying disturbed or combative behaviour, did not appear to present a serious threat to the lives or safety of others. Yet many were subjected to extreme

levels of force, including repeated taser discharges and in some cases dangerous restraint techniques such as "hogtying" (shackling an individual by the wrists and ankles behind their back). The cases raise serious concern about the overall levels of force deployed by some police agencies as well the safety of tasers.

Tasers have been described by many police departments as "filling a niche" on the force scale.(4) However, Amnesty International is concerned that deployment of tasers, rather than minimizing the use of force, may dangerously extend the boundaries of what are considered "acceptable" levels of force. While the organization concedes that there may be limited circumstances under which tasers might be considered an alternative to deadly force, there is evidence to suggest that measures such as stricter controls and training on the use of force and firearms can be more effective in reducing unnecessary deaths or injuries (see below, page 9).

In its recommendations, contained at the end of the report, Amnesty International is reiterating its call on federal, state and local authorities and law enforcement agencies to suspend all transfers and use of electro-shock weapons, pending an urgent rigorous, independent and impartial inquiry into their use and effects.

Where US law enforcement agencies refuse to suspend tasers, the organization is recommending that their use of tasers is strictly limited to situations where the alternative under international standards would be deadly force, with detailed reporting and monitoring procedures.

## *1. GENERAL CONCERNS ABOUT TASER USE*

### *1.2. Background on Taser Use*

*"I have always stated that the only way to guarantee a knockdown of a human being is to shoot them in the central nervous system with a bullet. In my opinion the ADVANCED TASER comes extremely close to doing the same thing, but from a less-lethal perspective." Sgt Darren Laur, Control Tactics Coordinator, Victoria Police Department, Canada, writing in a review article, published in the October 1999 issue of Law Enforcement Technology.*

*"It just takes your legs out. It's like a jackhammer going Kaboom, Kaboom, Kaboom!" Sgt Burt Robinson Chandler, Police SWAT team, Arizona, describing the M26 Advanced Taser on website of security equipment company, Security Planet Corp.*

Named after the hero of a popular science fiction series,(5) tasers were originally developed by a California-based company in the 1970s. The Los Angeles Police Department (LAPD) became the first major agency to introduce them in 1974. (The videotape of the LAPD beating of Rodney King in March 1991 shows an officer holding a taser gun he had fired at King, trying to keep the wires from getting tangled as King rolled on the ground from police baton blows.) Tasers have been promoted as having advantages over other non-lethal weapons as they can be applied at a distance (avoiding injury to officers) and, unlike chemical sprays, are not affected by wind and do not risk contaminating officers or bystanders. However, the earlier taser models were not always effective, especially in the case of individuals who were highly agitated or under the

influence of drugs such as phenylcyclohexyl piperidine (PCP).(6) During the 1990s, companies started to develop more powerful prototypes of the taser and other stun weapons.

Thousands of US law enforcement agencies now deploy the M26 Advanced Taser, which are several times more powerful than the original version used by the LAPD and other agencies in the 1970s and 1980s. The M26 is one of a new generation of tasers developed by Taser International, an Arizona-based company, and was introduced for operational use in late 1999. It operates on 26 watts of electrical output (compared to 5-7 watts of earlier models) and discharges pulsed energy to deliver a 50,000 volt shock designed to override the subject's central nervous system, causing uncontrollable contraction of the muscle tissue and instant collapse.(7) In May 2003, Taser International introduced a new model, the Taser X26, which is 60% smaller and lighter than the M26 but has the same voltage and, according to the manufacturer, an incapacitating effect which is 5% greater than the M26.(8) Both fire two probes up to a distance of 21 feet and are programmed to be activated in five-second bursts of electricity, although, as shown below, the electrical charge can be prolonged beyond five seconds if the officer's finger remains depressed on the trigger. The shocks can also be repeated so long as both probes remain attached to the subject. The darts are fired by an air cartridge which has to be reloaded if a second firing is required. Both models have laser sights, for accurate targeting (and avoiding hitting vulnerable spots such as eyes or face). They also have a built-in memory option to record the time and date of each firing (see below for more on this).

Both the M26 and the X26 can also be used without the air cartridge, as "touch" stun guns, to apply electric shocks directly to the subject at close range. The duration of the cycle in stun gun mode is the same as in the dart projectile mode.

According to the literature, the new generation tasers are designed "…to incapacitate dangerous, combative, or high risk subjects that may be impervious to other less-lethal means, regardless of pain tolerance, drug use, or body size". They have been described as "the only less-lethal weapon that can stop a truly focused, aggressive subject" and as "specifically designed to stop even elite, aggressive, focused combatants".(9)

In meetings with Amnesty International, Taser International has stressed that, unlike earlier models, the M26 and X26 tasers are not designed to stop a target through infliction of pain but work by causing instant immobilization through muscle contraction. According to the company they are one of the few non-lethal weapons effective in causing incapacitation without physiological injury. They have pointed out that any pain involved is transient, with no after-effects. However, officers subjected to even a fraction of the normal taser discharge during training have reported feeling acute pain:

"Bjornstad, who was jolted for 1.5 seconds as part of his training, said all of his muscles contracted and the shock was like a finger in a light socket many times over. "Anyone who has experienced it will remember it forever …You don't want to do this. It's very uncomfortable ... and that's an understatement." (*The Olympian*, 14 October 2002)

"It's like getting punched 100 times in a row, but once it's off, you are back to normal again." (*The Olympian* 2 March 2002)F

"It felt terrible." "It hurts. I'm going to think twice before I use this on anyone." (two officers quoted in the *Mobile Register* 8 April 2002).

"It is the most profound pain I have ever felt. You get total compliance because they don't want that pain again." (firearms consultant, quoted in *The Associated Press* 12 August 2003)

"They call it the longest five seconds of their life ... it's extreme pain, there's no question about it. No one would want to get hit by it a second time." (County Sheriff, quoted in *The Kalamazoo Gazette*, Michigan, 7 March 2004)

Officers were initially exposed during training to only a fraction of the normal taser discharge of five seconds, yet still testified to experiencing considerable pain. Amnesty International understands that it is now recommended that officers are subjected to a five-second shock, although at least one department no longer allows officers to be tasered at all during training, following complaints from officers.(10) While the pain is short-lived, this would not necessarily apply in the case of someone subjected to repeated or prolonged jolts of the taser darts or stun gun (see below). Amnesty International has been told by an expert who has experienced shocks from both models that the X26 model is even more painful than the M26.

Unlike the dart-firing probes, the touch stun function only acts on a small part of the body, and causes pain and debilitation rather than total incapacitation. A Taser International training manual states that "If only the stun mode is used, the M26 becomes a pain compliance technique..."(11) The advice given in the manual for "stun mode areas" is to "aggressively drive M26 into:

    Carotid/brachial stun area(12)

    Groin

    Common Peronial(13)."

Although, as stated above, the M26 and X26 tasers are programmed to set off an automatic five-second electrical charge, this happens if an officer pulls the trigger and releases it. The electrical charge can be prolonged beyond five seconds if the officer keeps his finger depressed on the trigger. A Taser International training manual states that "holding the trigger continuously beyond the 5 second cycle will continue the electrical cycle until the trigger is released". The following testimony was given by a police training officer at an inquest into the death of William Lomax, who had a taser in stun gun mode applied repeatedly to his neck in jolts lasting up to eight seconds each:

"if you hold the trigger down, it will go until the battery life runs out of the tazer (sic)."
Juror: So it will go continuously until you let go?
Witness: correct."(14)

*1. 3 Deployment of tasers in the USA: life saver or routine force tool?*

More than 5,000 law enforcement and correctional agencies in 49 US states are currently reported to be deploying or testing taser equipment, with the take-up rate continuing to grow,

reportedly by around 170 police agencies a month. Several US states which formerly banned all stun weapons have recently changed their laws to allow local and state police to deploy tasers.(15) In some states they are deployed by police on university campuses and they have also been used in schools (see below).

Tasers have also been purchased by the US army, including for use in Iraq. (16) The US Air Force also reportedly deploys tasers aboard aircraft carrying suspected al-Qa'ida members to Guantánamo Bay, Cuba.(17) While few details have been provided about the use of tasers by US military forces, one of the units deploying them in Iraq in 2003 was the 800th Military Police Brigade, accused of grave abuses in Abu Ghraib prison.(18)

New generation tasers have also been purchased, or are undergoing testing, by police or military forces in other countries, including, reportedly, Argentina, Australia, Canada, France, Germany, Israel, Malaysia, Mexico, Spain, Turkey, the United Arab Emirates and the UK.(19)

Tasers have also been authorized for use by the general public. Forty-three US states are reported to place few or no restrictions on possession of stun weapons by members of the public for private use.(20) While promoted as self-defence tools, for private users, they are easily open to abuse, without the controls or monitoring that apply to law enforcement use. Amnesty International cites several cases, below, in which parents have been prosecuted for child cruelty after using stun weapons to discipline their children. Stun weapons have also been reportedly used during the commission of crimes, or as instruments of torture or abuse, including of women by abusive partners or former partners.

Amnesty International is opposed to the sale of stun weapons for private use, given the difficulty in ensuring adequate standards of monitoring and control and the potential for abuse behind closed doors. While police officers undergo training and are subject to regulations governing the use of force, no such controls exist for the private sector. Unlike firearms, there are no licensing requirements in the USA for private use of tasers.(21)

The latest model for private use in the USA is the Taser X26c Citizen Defense System, which was introduced for sale on-line through Taser International in September 2004. According to company literature, the Taser X26c, which can also be used as a stun gun, has a 15 feet stand-off capability and "operates at a slightly lower output than the law enforcement Taser X26". Disturbingly, it also operates "with an extended duration of up to 30 seconds per discharge".(22)

In the UK, modern tasers have since 2003 been deployed by a number of police departments under the same strict guidelines as apply to firearms. They are allowed to be used only by authorized firearms officers, are kept in the firearms box and are issued only in appropriate situations where officers are faced with a threat of deadly force and the only other option would be use of a conventional firearm.

In the USA, tasers are authorized for use in much broader circumstances, as discussed below. Nevertheless, they are promoted in the USA, as elsewhere, as an important tool in saving lives and reducing the need for lethal force. Under international standards, lethal force may only be

used by officers in self-defence or the defence of others when there is an imminent threat of death or serious injury, and "only when less extreme measures are insufficient to achieve these objectives".(23)

Taser International has repeatedly emphasized in statements and literature how taser use has saved lives. For example, in July 2004, the company issued a statement citing a case in which a woman advancing on officers with an eight-inch knife had been successfully disarmed with a taser rather than shot with a firearm and another case where a suicidal man threatening to cut his own throat was similarly disarmed without injury. The company stated that it had received "over 500 similar reports where officers have used the TASER to save a life", estimating that the true figure was likely to exceed 5,000 cases.(24) Claims that tasers save lives may, however, include incidents involving intervention at an earlier stage than a situation posing an imminent threat of death or serious injury. Taser International states in a lesson plan for US law enforcement agencies that:

"The Advanced Taser is not a substitute for lethal force. However, many situations that begin as standoffs have the potential to escalate to lethal force. Early, aggressive use of a less-lethal weapon like the M26 can prevent many of these situations from escalating to deadly force levels".(25) Some police departments have reported a significant fall in police shootings following the introduction of tasers. In February 2004, the Phoenix Police Department, Arizona, announced that officer-involved shootings had fallen by 54% from 28 in 2002 to 13 in 2003, with fatal shootings down from 13 to 9 during the same period, the lowest number since 1990. Phoenix Mayor Phil Gordon said "I am proud that Phoenix is the first city in the nation to equip all of our police officers with tasers. We are committed to providing our officers with the latest technology, support and equipment that they need in order to protect them and the community."(26) A Taser International brochure reported that use of firearms and impact weapons by Orange County (Florida) sheriff's deputies fell by 80% following the introduction of the Advanced Taser in 2000, "reducing injuries and saving lives".(27)

Reports of a fall in police shootings in the cities of Seattle and Miami have similarly been attributed, at least in part, to the introduction of tasers. Both police departments reported no fatal police shootings for the first time more than a decade in the year tasers were introduced – in Miami's case there were no police shootings, fatal or otherwise, for the first time in 14 years.(28) Other departments have reported on specific instances where officers have used tasers instead of firearms to disarm suicidal or mentally ill individuals armed with weapons such as knives, although reports of officers using tasers when confronted with people with guns appear to be much rarer.

Amnesty International welcomes any reduction in the use of lethal force. However, claims that tasers have led to a fall in police shootings need to be put into perspective, given that shootings constitute only a small percentage of all police use of force. In contrast, taser usage has increased dramatically, becoming the most prevalent force option in some departments. While police shootings in Phoenix fell from 28 to 13 in 2003, tasers were used that year in 354 use-of-force incidents, far more than would be needed to avoid a resort to lethal force.

Use of non-lethal weapons may be only one factor leading to a fall in police shootings and other serious force. In Miami, for example, the fall in officer-involved shootings may be due in part to

greater oversight following several high profile prosecutions of Miami police officers for civil rights violations involving wrongful shootings and an ongoing federal Justice Department investigation into an alleged pattern of excessive force.(29)

Representatives of Taser International who met with Amnesty International in July 2004 said there had been a significant reduction in injuries to suspects and officers following the introduction of tasers, according to police reports of operational use across the USA. The company noted that many other types of force, such as use of batons or police dogs resulted in higher injury levels than the taser. It was stressed that a reduction in injuries was likely to be more pronounced where tasers were used below the level justifying lethal force as all use of physical force, including light hands-on force, could result in some bodily injury.

However, as shown below, many departments allow officers to use tasers in situations that would not justify the use of batons or other impact weapons liable to cause serious injury. Reports suggest that, in some departments, tasers are used by officers primarily as a substitute for pepper or chemical sprays, which may themselves be considered a relatively low-level force option. Amnesty International has frequently raised concern about alleged misuse of pepper spray by law enforcement officers, including its use in situations that do not merit this degree of force.(30) The organization suggests that, rather than substituting electro-shock weapons for pepper spray or other force options, better training and restraint in the use of force would be a more appropriate strategy in many situations.

Indeed, improved policies, training and oversight have been shown to be critical factors in reducing police shootings and injuries to suspects or officers. Such measures are likely to have a more significant impact overall than use of alternative weapons. In San Jose, California, for example, the police department obtained its first sizeable batch of new tasers in 2002, a year in which police shootings fell to zero. However, police shootings in San Jose had been falling since 1999, a development attributed in large part to better training on the use of force; the introduction of a Crisis Intervention Team (CIT) to defuse potentially dangerous situations involving disturbed individuals; and an independent auditor to monitor the department. Improved use-of-force policies, investigations and training led to a fall in police shootings and dog bite injuries in Washington, DC, where the Metropolitan Police Department (MPD) was once notorious for its high rate of officer-involved-shootings and injuries to suspects from police canines.(31) Other departments, including the Los Angeles Police Department (LAPD) and the Los Angeles Sheriff's Department (LASD), have noted similar trends.(32)

In fact, in San Jose, police shootings started to rise again after the introduction of tasers (which were issued to all patrol officers in May 2004), reaching a five-year high in 2004. (33) Their effectiveness in resolving use-of-force situations has been questioned by the San Jose Independent Police Auditor, who announced a review of the department's taser use in September 2004, following concern about two incidents in which police shot disturbed individuals after tasers failed to subdue them.(34) One case concerned a mentally disturbed man who became agitated after being asked to stop smoking in a coffee shop and allegedly threw a chair at officers. He was shot after the taser failed to subdue him. Questions have been raised as to whether other force tactics might have been more safely deployed in such a situation.

### *1. 4 Low on the force scale*

Although described by the manufacturer as a suitable tool for "aggressive, focused combatants", the taser appears to be a relatively low level force option in many US police departments. A survey by Amnesty International of more than 30 US police departments (including 20 of the largest city or county agencies) indicates that tasers are typically placed in the mid-range of the force scale, *below* batons or impact weapons rather than at, or just below, lethal force. (35) Some departments place the entry level for tasers at an even lower level, after verbal commands and light hands-on force.

For example, a number of law enforcement agencies allow tasers to be used against "passive resisters" -- people who refuse to comply with police commands but do not interfere with an officer and pose no physical threat.(36) Others authorize tasers at an entry level of "defensive resistance", typically defined as "physical actions which attempt to prevent officer's control but do not attempt to harm the officer".(37) The Miramar Police Department, Florida, told Amnesty International (in response to concerns raised about the stunning of a schoolgirl during a minor disturbance) that tasers were available "prior to the use of intermediate weapons" such as batons. A Philadelphia Police Department directive states that tasers may be used, among other scenarios, to "overcome resistance to arrest". Indianapolis police told Amnesty International that the entry level at which tasers could be used was "at any point force is needed".(38) While many departments authorize tasers at the level of "active physical resistance", according to a number of policies Amnesty International has seen, this can be in the form of "bracing or tensing" or "attempts to push or pull away". These scenarios hardly depict the "combative" or "aggressive" individuals described in promotional literature.

Amnesty International believes that electro-shock weapons, which have a powerful impact on the body and can cause acute pain, should never be considered a "low" or "intermediate" force option. However, a review of reported cases suggests that some departments are deploying tasers in routine arrest situations, at the first sign of resistance or in the face of relatively minor resistance. Incidents include cases of people under the influence of alcohol or drugs who failed to comply promptly with commands, people who "mouthed off" at officers and people engaged in minor acts of public disturbance. The use of electro-shock weapons in such circumstances appear to breach international standards set out under the UN Code of Conduct for Law Enforcement Officials and the Basic Principles on the Use of Force and Firearms. These require that force should be used only as a last resort, in proportion to the threat posed and the legitimate objective to be achieved.(39)

Training materials on tasers suggest that they are safe to use against a wide age range and that repeated shocks pose no additional risks. Confidence in such claims may explain why there are reports of tasers being used against elderly people and children, and of people being subjected to multiple shocks. Tasers have also been used to subdue unarmed mentally ill or disturbed individuals who were not committing a crime or posing a threat of serious injury. Given the pain and the psychological impact or fear caused by being stunned or threatened with an electro-shock weapon, the use or threat of tasers in these and other cases, even without physical injury, may

constitute torture or other cruel, inhuman or degrading treatment.

The USA has ratified the UN Convention against Torture and the International Covenant on Civil and Political Rights (ICCPR), both of which prohibit torture and other cruel, inhuman or degrading treatment or punishment. The UN Human Rights Committee, the expert body which monitors compliance with the ICCPR, states that "the aim of the provisions of article 7 of the International Covenant on Civil and Political Rights is to protect both the dignity and the physical and mental integrity of the individual". The Committee emphasises that the prohibition of torture or cruel, inhuman or degrading treatment or punishment in article 7 "relates not only to acts that cause physical pain but also to acts that cause mental suffering to the victim."(40)

The following accounts, based on press articles, police reports and other sources, illustrate Amnesty International's concerns about the way tasers have been used in various US jurisdictions.

### *Florida*
Local police agencies in Florida were among the first to adopt the new generation tasers on a wide scale. Twelve (nearly one in five) of the recent US taser-related deaths discussed under Chapter 2 occurred in Florida, with four in Orange County alone. In addition to those cases, Florida police have reportedly used tasers to subdue:

- a man who refused to be fingerprinted and wrestled and shoved officers (Pembroke Pines Police Department, Broward County)

- a woman who interrupted a seminar at a country club and pushed officers away, shouting that they were "sick with demons" (Pembroke Pines Police Department)

- a man who refused to discard the drink he was drinking in a park and refused to turn round and be handcuffed (Orange County Sheriff's Office)

- a woman who, ordered out of a pool for swimming naked and once dressed, refused repeated commands to turn round and put her hands behind her back. (Orange County Sheriff's Office)

- a 15-year-old schoolgirl, who was tasered and pepper sprayed after arguing with officers after she and other children were put off a bus during a disturbance. (Miramar Police Department, Broward County)

- a 14-year-old schoolgirl who was tasered after fighting with a school "resource officer" in a classroom. The officer first used the taser as a "stun gun" applying it directly to her chest; when she continued to struggle he deployed the "air cartridge" twice before she was handcuffed. (Putnam County Sheriff's Office)(41)

In May 2004, the city of Melbourne, Brevard County, Florida, announced a review of police taser use after reports that officers had fired two tasers simultaneously at an unarmed 23-year-old man who had turned his back on officers when they called at his house to investigate a neighbour's complaint about loud rap music. He was allegedly jolted multiple times, causing acute pain. A study of police incident reports conducted by a local newspaper found that Melbourne police had

used tasers against 75 people in 18 months, most of whom were unarmed.(42) They included

- a 14-year-old boy who had allegedly broken a window and tried to run away;

- a 50-year-old man who refused to give police his date of birth during a disturbance at a picnic;

- a woman jolted at least five times with a taser as an officer held her down.

In most or all of the cases cited above, the use of force was found to be in accordance with departmental policies. In the case of the 14-year-old tasered in the classroom, the Putnam County Sheriff's Office informed Amnesty International that "use of the taser in this instance is in accordance with agency policy", noting that the girl in question, who weighed 221 1bs (100 Kg), had a history of assaultive behaviour at the school. While recognizing the challenges posed by such behaviour, Amnesty International remains concerned at the use of an electro-shock weapon against a disturbed, unarmed teenager.

In July 2004, it was announced that eleven police agencies in Orange County, Florida, had agreed to restrict their use of tasers following a year-long review which suggested that some officers were too quick to resort to their weapons. Before the restrictions were imposed, officers were permitted to shock anyone who prevented an officer "from taking lawful action", including people engaged in "passive resistance": those who disobeyed an officer's verbal command without engaging in any threat or act of physical harm. The new rules allow officers to stun only people who show "active resistance". However, tasers can still be used well below the "lethal force" level, including under such broad circumstances as "preventing an officer from making an arrest". Some US police agencies may continue to allow tasers to be used at the level of "passive resistance". Records from the Orange County Sheriff's Department, Florida (the largest county police agency), showed that the agency used tasers in 180 cases in which individuals were engaged in "passive resistance" from 2001 to October 2003, although this policy was reportedly under review.(43)

### Colorado
A study by the Denver Post in May 2004 found that the Denver Police Department, Colorado, commonly used tasers against people who refused to submit to handcuffing or who walked or ran away from police officers. In 90% of cases the subjects were unarmed, and most were cited for minor offences. While in some cases tasers had been used to stop dangerous suspects and disarm the suicidal, they were more often used to force people to obey police commands and to shortcut confrontations. The study found that officers had tasered at least sixteen people who were already handcuffed, and sixteen juveniles (details of the latter cases were unavailable due to their age).(44) Most such usage was found to be within the official policy.

The Denver Police Department is one of more than 100 law enforcement agencies in Colorado to have adopted tasers and, by August 2003, had purchased enough X26 and M26 tasers to have one in every patrol car.

The Denver Post study was prompted by concerns raised by the American Civil Liberties Union

(ACLU) of Colorado about inappropriate and abusive use of tasers by a number of local police and county agencies, including two cases where suspects died.(45) In several cases police subjected people to repeated shocks, sometimes while they were already restrained; other cases included people abused in local jails (see below). In many instances the accounts were corroborated by police reports. One of the cases taken up by the ACLU was that of a man who died after being tasered at least five times by Glendale police officers as he lay supine on the floor of his room in a drug-induced stupor (see Glenn Leyba case, chapter 2 below). Other cases involving the Glendale Police Department included the following:

> A man who was drunk and verbally abusive was tasered in the back for struggling while police applied handcuffs as he lay on the ground. He was given another jolt of electricity when he continued to resist as police walked him to a patrol car.

> Police tried to arrest a man for allegedly assaulting his girlfriend in the street. The man ran away and an officer followed him slowly in her police vehicle and told him to "Stop running or I am going to Tase you", before reaching out of her vehicle, while steering it with one hand, and firing the taser at him. The man fell to the ground and was tasered again when he tried to stand up.

> A man escorted from a restaurant by police officers was touch stunned in the leg for "refusing to obey verbal commands".

In September 2004, the Denver Police Department's Chief of Police, Gerry Whitman, announced that he had changed the department's use-of-force policy to allow officers to use a taser only on suspects exhibiting "active aggression" or "aggravated active aggression". Previously, about 20% of the department's taser incidents involved police responses to the lower standard of "defensive resistance" by a suspect. Under the department's policy, "active aggression" is defined as an assault or imminent assault, while "aggravated active aggression" constitutes more serious violence that could, in some cases, justify deadly force.

However, a report published by the Denver Post on 20 September 2004 found that policies among Colorado law enforcement agencies varied widely and that in some jurisdictions police continued to "shock suspects who do little more than mouth off, pull an arm away from a handcuff, run or refuse to obey an officer's orders quickly". In three local departments – Longmont, Pueblo and Glendale – police had used tasers at a rate, on average, nearly four times greater than in Denver. The article cited cases in which suspects were subjected to repeated jolts or shocked while they were handcuffed. In one case, Commerce City Police Department officers used a taser on an allegedly drunken man seven times as they tried to take him to a detoxification centre; six of the electro-shocks were administered while he was in handcuffs. Of more than 500 cases reviewed by the Post from 15 local police agencies, only two were deemed by the departments concerned to have been inappropriate.

### Portland, Oregon
An investigation by a weekly journal, *Willamette Week (WW)*, into taser use by the Portland Police Department, Oregon, published in February 2004, reported that, over a 19 month period, officers had deployed tasers in more than 400 cases, including on 25 people who were already in

handcuffs.(46) The *WW* report, which was based on a review of police incident reports, stated that "numerous potentially lethal situations" had been averted using the taser, including suicidal individuals trying to force the police to kill them.(47) However, the *WW* also reported on incidents in which tasers were used against people who were not a serious threat but were merely verbally abusive or failed to comply with police commands. According to the newspaper, Oregon police had tasered people "after stopping them for non-violent offenses, such as littering and jaywalking, selling plastic flowers without a license, and failing to go away when told to". Police also used tasers on two 71-year-olds, one a woman who was blind in one eye, and the other a man who was trying to restrain a knife-wielding woman. The elderly man was shot with the taser after dropping onto his hands and knees instead of lying flat on the floor, as ordered by police. (See under **Lawsuits**, below, for details of the 71-year-old woman).

The paper also reported on the case of 20-year-old Dontae Marks, a bystander who protested when police tried to arrest a friend for being drunk outside a night-club. Police reportedly pointed a taser at Marks' chest when he refused an order to leave, then tasered him in the back as he walked away shouting an obscenity. Six officers then reportedly grappled with him in a struggle in which Marks was pepper-sprayed and touch-stunned at least ten times while lying face-down on the ground. He was reported to have sustained 13 taser burn marks across his back, neck, buttocks and the rear of his legs. He was later acquitted on charges of affray and has filed a lawsuit. According to the *WW* report, an internal police review found the taser use to be justified.

Dontae Marks' attorney is quoted as saying "They went straight for the Taser because it was quick and easy for them. He was doing what they wanted him to do, but because they didn't believe him, they tased him. And that's what blew the situation up." The following incidents were also cited in the article. All were reportedly found to be within police departmental policy.

- An 18-year-old was tasered when he told police responding to an under-age drinking party to "get the f...out of my house". He was tasered again when, after complying with an order to put his hands up, his hands started to drop.

- A driver pulled over on a bridge, angry that his car was being towed away for lack of insurance, was tased after repeatedly complaining and turning his head and body towards an officer.

- A woman who fell asleep in her parked car was tasered when officers woke her up when they opened her car door and, according to the police report, she glared at them and reached for her pocket. According to the WW review, police reports were inconsistent as to whether or not she was warned before the taser was used.

The Portland Police Department subsequently reviewed its taser use, finding that out of 595 uses since a pilot project began in July 2002, only one had been ruled out of policy.(48) In May 2004, Portland Police Chief Derrick Foxworth reported to the city commissioners that the department would introduce stricter policies and training on taser use. The new policies would reportedly continue to allow officers to use tasers against handcuffed suspects but would instruct officers to consider other methods of control before stunning children, pregnant women and the elderly. At the time of writing, plans were underway to expand the deployment of tasers in the Portland

Police Department, by issuing one to every patrol officer.

### Chandler, Arizona

The Chandler Police Department, Arizona, is one of several agencies to have compiled detailed statistics about its taser use in a publicly available report.(49) The report documented 86 uses of the taser from April through December 2003, 42 of which involved police firing darts at suspects. In 17 cases the taser was used in touch stun mode and in five cases both the probe deployment and touch stun mode were used.(50) There were also 24 incidents in which the taser was used in Display Mode only. 97% of dart or stun deployments were in response to "active physical resistance" or higher on the force scale. "Active physical resistance" is defined in departmental policy as "acts of fleeing or escaping" or "suspect attempts to resist arrest without assaulting officer".

The report included a summary of each incident. Most of the incidents involved unarmed suspects who were reportedly engaged in aggressive or disorderly behaviour, and were resisting arrest; many occurred after or during a police chase. A breakdown of taser usage by "call type" (incident to which the police responded) showed that most police responses were to reports of domestic violence (19% of cases), followed by "suicide attempt" (13%). Others ranged from minor offenses to burglary. There is no indication that any of the incidents were found to violate the Chandler Police Department policy. The reports included use of tasers to subdue:

- a female driver of a stolen vehicle being followed by police who, after she crashed the car and fled on foot and was caught by officers, "would not comply with verbal commands and made a move towards her waistband".

- A trespassing suspect who was tasered when he "resisted being handcuffed".

- a female suspect who had broken into her grandfather's apartment and was tasered when she "attempted to walk away from the officer" and "pulled away" when he tried to stop her. The taser was applied five additional times before other officers arrived on the scene.

- a burglary suspect hiding in an attic when he "refused to comply with commands".

- a suspect who, stopped for driving with a suspended license, ran away from police.

- an autistic teenager after he assaulted his mother and wrestled an officer to the ground.

- a man standing on the sidewalk yelling and screaming at the sky. He was threatened with the taser if he did not comply with police commands to be quiet. He refused to comply and the taser was then deployed. The taser was effective but "as the subject began to get up, the taser was cycled a second time".

- A thirteen-year-old girl was tasered in a public library after she threw a book at someone and was "yelling obscenities". The case summary states: "The juvenile continued to be verbally disruptive and resisted when officers attempted to place her under arrest. The Taser was displayed and threatened. The juvenile continued to resist by curling into a ball. As the juvenile was preparing to kick at the officer, she was touch-stunned in the middle of her back". (51)

The Chandler Police Department study reported on 17 instances in which the taser was used solely as a touch stun gun. In most of the cases, it appears to have been used in order to gain compliance and included the following cases:

An "out-of-control" high school student "continued to resist in the patrol car". The Taser was used on the leg as a touch stun to gain compliance.

A suspect was stopped for "driving under the influence" and refused to comply with commands to place his hands behind his back to be handcuffed. The taser was displayed and he started to comply but placed his hands against his chest. The taser was then used in touch stun mode.

During another arrest for "illegal consumption of alcohol", the "suspect resisted and the Taser was used in touch stun mode to gain compliance".

The stun gun was used to gain compliance from a suspect in custody who was refusing to have blood drawn as per a court order. The taser was used a total of four times against the suspect.

### Seattle, Washington

The Seattle Police Department (SPD) has issued two reports reviewing the first three years of the department's use of the M26 Advanced Taser: from January 2001 through December 2003. (52) During this period, the department recorded 428 taser applications. The SPD reported that tasers were used in a "wide variety of incidents", with "violent crimes and drug/alcohol incidents" together comprising nearly 40% of the situations in which tasers have been used. In only 23% of cases were the taser subjects armed, mostly with knives. Nearly two-thirds of taser subjects (65%) were impaired, often severely, by alcohol, drugs or a mental illness or delusion. The reports cite instances in which lives were saved through police use of tasers against armed, mentally impaired, individuals. In other cases the subjects did not appear to have engaged in life-threatening behaviour, but were combative or disturbed. Some of the incidents appear relatively minor. Interestingly, the proportion of dart deployments fell in relation to touch stun use over the three-year period. By the end of the third year, tasers had been deployed in dart projectile mode in 53% of incidents (compared to 56% in 2002 and 60% in 2001) and in touch stun mode in 34% of cases.

According to the above data, in 14% of cases tasers were deployed against subjects aged 20 or younger, and included at least one minor. This was a case in which an intoxicated male was observed near the fraternity houses of a university district, stumbling and walking into a lamp post. The report's summary of the case states: "when contacted, the subject refused to stop or cooperate, became extremely belligerent and verbally abusive, and then attempted to flee. After several commands to stop, the officer deployed a taser, which gained the subject's compliance".(53)

The SPD provided a racial break-down of individuals subjected to tasers through to May 2004, which showed that 45% of subjects were African American and 42% Caucasian.

In a report published in April 2004, the Office of Professional Accountability Review Board: OPARB, the police complaints oversight body for the SPD, recommended that "SPD Taser policy be refined to provide more detailed guidance and training delimiting officer discretion in light of growing Taser experience". The recommendation followed a critical review in the OPARB's annual report of two complaints involving police taser use. In one complaint, a young African-American male (described as "a domestic violence assault suspect") alleged that he was tasered 14 times – a claim disputed by the officer who said he had tasered the suspect "only" four times. The OPARB questioned the police finding that the complaint was "unfounded", noting that, despite the disparity in testimony, the complainant was "undisputably tasered multiple times", an issue which it said raised questions about appropriate use. The other complaint included a claim that a suspect was tasered simultaneously by two officers in touch stun mode while lying handcuffed on the ground. The OPARB criticized the decision of the police department's Office of Professional Accountability to exonerate the officers without determining clearly how many times the complainant (who had photographic evidence of burn marks) had been tasered.(54) The SPD said it would review the OPARB recommendation and their policy and training.

In September 2004, a 17-year-old teenager zapped with a taser four times on the back of the neck during a traffic stop received $25,000 in damages in settlement of a claim that Seattle police used had used excessive force and improper procedures. The incident happened in July 2003, when the youth, then aged 16, was riding in a car which was pulled over for a faulty headlight. The police report said he appeared to make furtive movements in the back seat. He was tasered when police searched him outside the car and, according to officers, he struggled and resisted. His attorney has reported that scars were still visible on the back of his neck one year later. In agreeing to an out-of-court settlement, the City of Seattle did not admit wrongdoing on the part of the police, but ordered the officer who had used the taser to receive additional training.(55)

### Kansas City, Missouri
In June 2004, a Kansas City police officer electro-shocked an unarmed 66-year-old African American woman in her home, as she resisted being issued with a ticket for honking her car horn at police. The incident started when Louise Jones honked her horn while parking behind a police car. The police officers, who were responding to an unrelated disturbance in the street, returned to Ms Jones' house and tried to issue her with a ticket for unlawful use of her horn. She protested and a tussle ensued, during which an officer shocked her twice with his taser.

Kansas City Police Department's policy, introduced in April 2004, allowed officers to use tasers on subjects who displayed "passive resistance": people who refuse to follow police instructions but do not physically resist an officer. Following publicity about the Louise Jones case, the department set up a task force to review its taser policy. It also raised the threshold for when police could deploy tasers, allowing their use only against those engaging in some form of "active resistance". Two officers involved in the Louise Jones incident were later reported to have been disciplined in the case, although the type of disciplinary action was not made public.

The Task Force issued preliminary recommendations to the Kansas City Police Department in September 2004, stating that officers could keep tasers but the department should continually

evaluate their use and conduct an independent study into their safety.

*Cases reflect wider pattern*
Amnesty International considers that using powerful electro-shock technology against unruly children; disturbed, intoxicated but non-dangerous individuals; and people who are non-compliant but who do not pose a probable threat of serious injury to themselves or others, is an excessive use of force which may also constitute torture or other cruel, inhuman or degrading treatment.

There are no national standards on police use of tasers and practice varies between departments, and even (as shown above) within states. However, it appears that many of the situations described above are not confined to a few departments but reflect a wider pattern across the USA. Reports suggest that tasers are commonly used to secure compliance in routine arrest and non-life-threatening situations.

A statistical analysis of 2,050 taser field applications across the USA, produced for Taser International in November 2002, for example, showed that in 79.6% of cases the suspects were unarmed; of the other cases, 15.6% had an "edged weapon" and 4.8% a firearm; in 4.9% of cases the "suspect weapon" category was "blunt force". An analysis of the "suspect force level" in which a taser was deployed gave the most common category (37% of cases) as "verbal non-compliance". This was followed by "active aggression" in 32.6% of cases; "defensive resistance" in 27.7% of cases and "deadly assault" in only 2.7% of cases.(56)

The survey also provided a "call-out" analysis (the type of incident to which police had responded) which listed 29.8% of cases as "violent" and 27.5% as "resisting arrest". The other categories were "suicide"14.7%; "civil disturbance"11.9%; "Barricade" 5.8%; "serve warrant" 5.6% and "officer assault" 4.7%(57)

## 1. 5 Children

Several of the cases described above involve use of electro-shock weapons against unarmed children, including use of a taser against a child in school and another in a public library. Amnesty International considers that the use of electro-shock weapons against recalcitrant or disturbed children is an inherently excessive and cruel use of force, contrary to international standards recognizing that children are entitled to special care and protection.(58)

While no national statistics are available, such cases may not be isolated. Amnesty International has received reports of tasers being used by police in schools to break up fights or when dealing with other incidents. In some cases, police reportedly fired their tasers when juveniles walked or ran away from officers. A review of cases published by a California newspaper found that few police agencies in Northern California had any minimum age restrictions on use of tasers, a situation that may be similar in other jurisdictions.(59)

According to the field study statistics cited above, 7.69% or 148 of the 2050 taser applications involved people aged from 12 to 18, although no breakdown was given of children under 18. A later analysis of 2,690 taser field uses shows 183 applications (7.4%) involving children aged 10

to 18.(60) Taser International has informed Amnesty International that it has records of four children under ten who were subjected to police tasers: one seven-year-old, one eight-year-old and two nine-year-olds, two of whom it says were armed with knives and one with a machete. However, there may be other cases.(61)

Most of the children whose cases are described above were involved in relatively minor incidents for which other measures could have been taken to de-escalate the situation. While one child (the schoolgirl tasered in Putnam County, Florida) had a reported history of disturbed or assaultive behaviour, children suffering from mental health or behavioural problems are more appropriately dealt with by health professionals trained in control, restraint and other techniques to deal with potentially violent situations. Rather than helping to control a child's behaviour, the infliction of electro-shocks is liable to increase mental stress and suffering as well as causing physical pain.

Disturbing cases continue to be reported. In May 2004 a police officer from South Tuscon, Arizona, used a taser on a nine-year-old girl who was a runaway from a residential home for severely emotionally disturbed children. According to reports, the child was already handcuffed with her hands behind her back and sitting in the back of a police car when the taser was used as an officer struggled to put her into nylon leg-restraints. The officer is reported as saying that the girl was "screaming, kicking and flailing, and would not listen". Reportedly, the officer had requested the taser because he was aware of the girl's combative behaviour from past incidents. Fred Chaffee, president and chief executive of the children's home, was quoted as saying that a lot of children from the home "no matter what they're diagnosed with, have poor self esteem, poor impulse control and poor judgment, a learnt set of behaviours that aren't terribly socially acceptable". (62) The officer in the case was cleared of criminal wrongdoing but faced an administrative review at the time of writing.

There are also several reported cases in the USA in which parents have disciplined their children with legally available stun guns: such incidents have been characterised as child abuse and sanctions taken against the parents. For example, in May 2003, in Texas, Theodore Moody was sentenced to two years' imprisonment on conviction of injuring and endangering a child, for having repeatedly jolted his eight-year-old stepson with a stun gun to hurry him along to school. Reminiscent of arguments used for adopting stun weapons in law enforcement, both parents reportedly told officers that they did not consider stun gun jolts harsh punishment, noting that they left fewer injuries than other forms of discipline such as the "strap". (63) In June 2003, a woman was arrested in Florida for placing a stun gun near to the ear of her 13-year-old daughter to frighten her for disobeying an order not to use a computer.(64) While US law enforcement policies specifically prohibit using instruments of restraint as punishment, the distinction can become blurred when stun weapons are used as a "compliance" or "control" tool.

### *1. 6 Tasers used against people already restrained or in custody.*

While dart-firing tasers are promoted primarily as incapacitating, "stand-off," weapons which can stop an attacker from a distance, there are reports of people being stunned or threatened with repeated cycles of electro-shocks while already restrained and under police control. Amnesty International considers that using 50,000 volts of electro-shock against people who are restrained and pose no serious threat, is an excessive use of force, amounting in some cases to torture or

cruel, inhuman or degrading treatment. The capacity to inflict repeated and extended shocks(65) at the push of a trigger makes the taser open to abuse in both dart and stun gun mode.

In some cases, individuals have been shot with taser darts, then threatened or stunned with repeated jolts of electricity while the darts remain in place during transportation or custody. For example:

> A handcuffed man tasered during his arrest, who still had the barbs attached, was stunned three more times by police officers for not cooperating when being walked to a police car to be taken to hospital, and for yelling and lifting his foot in the police car. While he was on a gurney (stretcher) in the hospital, an officer shocked him two more times "until he settled down". (Pueblo Police Department, Colorado)(66)

> An intoxicated man, arrested at a residence after complaints of loud noise, refused to allow police to attend to a cut on his eye and was taken out of the house in handcuffs and leg restraints. He was placed on a gurney to be taken to hospital. When he resisted having his hands tied to the gurney, an officer shot him in the chest with a taser. After going limp, the man again began to "thrash about" on the gurney and the officer "pulled the trigger for another five seconds". After the man became compliant and was placed in the ambulance, the officer handed his taser to one of the transporting officers "in case she needed to use it again". When the officer went to retrieve the taser later, the transporting officer told him that "she had to use the Taser for one five-second cycle while on the way to hospital because J again became resistive". The suspect was in full restraints at the time.(67) (Lakeland Police Department, Colorado)

In some US jurisdictions, high security prisoners are made to wear electro-shock stun belts during transportation, hospital visits or court hearings. Amnesty International has condemned such devices as inherently cruel and degrading because the wearer is under constant fear of being subjected to an electro-shock at the push of a remote control button by officers for the whole time the belt is worn.(68) A similar concern arises in cases such as those described above, where individuals in custody are under threat of repeated cycles of electro-shock at the pull of a trigger for as long as the barbs remain attached.

**1. 6 (i) Tasers used as stun guns**
While tasers appear to be used most often as dart-firing weapons, in a significant proportion of cases they are used close-up as stun guns. The statistical analysis of taser use, cited above, showed that just over 18% of taser applications were in stun mode.(69) Some departments have reported a higher percentage. For example, in Seattle, from January through December 2002, tasers were used as stun guns in 32% of cases, and both darts and stun guns were used in 12% of cases; stun gun use rose to 34% of cases in 2003.(70) In Oklahoma City, in 2003, nearly a third of all taser strikes against suspects were in touch stun mode.(71) In Portland, Oregon, 43% of taser use was reportedly in touch stun mode.(72)

A Taser International training manual states that the M26 can function in stun mode after the probes have been fired, as a back-up weapon. The training manual also states that, if used only in touch stun mode, the taser becomes a "pain compliance" tool and officers are instructed to apply it "aggressively" to sensitive areas, including the neck and groin.(73) Company representatives

have told Amnesty International that the primary intent of the stun gun mode is to act as a back-up to the dart-firing function, in case the darts fail to hit their target or become dislodged when the target remains a threat and there is no back-up team or time to reload the cartridge. This is reportedly the only way in which they are permitted to be deployed in the UK. However, it appears that some US agencies frequently deploy tasers in stun gun mode, without using them primarily as a back-up to dart failure in stand-off situations.

Tasers in stun gun mode are particularly easy to use because there is no need to load or reload a cartridge. Their use may be less easy to monitor than the dart-firing function, especially if, as has been reported, the in-built memory chip fails or is not regularly downloaded (see safeguards).(74) As they are applied through touch stunning the subject's skin or clothing, they tend to be used against individuals who are already in custody or under police control in some way. Amnesty International believes that these factors, together with the capacity to inflict severe pain to sensitive areas of the body, make the stun gun particularly open to abuse. Tasers in stun gun mode have been used to shock or threaten individuals restrained in police cars, hospitals and in local jails. In some instances they appear to have been used to punish prisoners for non-compliance or for simply yelling or "mouthing off" at officers.

Amnesty International is disturbed to note that some departments consider stun guns to constitute a low level of force, on a par with other "pain compliance" techniques such as wrist locks and control holds. There are reports of stun guns being used for minor resistant behaviour, such as prodding someone into a police car, or for getting individuals to comply more quickly while being booked into jail.

The Colorado ACLU has reported on several cases in which individuals were touch stunned while already restrained. Some of the details are confirmed in police reports seen by Amnesty International.

  a man was shocked in the genitals for continuing to resist while he was handcuffed and sitting in the back of a police car. The officer admitted to applying a "drive stun to the groin". (Westminster Police Department, Colorado)

  Police responded to a report of a possible overdose and took an apparently intoxicated and possibly suicidal man to hospital. A police officer applied a taser to the man while he was restrained on a hospital bed, screaming for his wife. According to the police report, "Officer Furney repeatedly told Andre to be quiet and when he did not comply placed the Taser against Andre's chest and tased him once". (Pueblo Police Department)

  A prisoner was strapped into a restraint chair for three hours for yelling and mouthing off. According to the ACLU "Officers periodically approached the prisoner, held a stun gun to his chest, and threatened to shock him. The prisoner has an enlarged heart and may be particularly vulnerable to adverse effects from electroshock weapons".(75) (Broomfield Detention Center, Colorado)

Similar cases have been reported elsewhere. In Baytown, Texas, a man who had reportedly

suffered from two epileptic seizures was touch stunned in an ambulance when, confused and disoriented, he resisted while being strapped onto a stretcher (see **1.7**, below). In Minneapolis, Minnesota, an unresponsive, ill man, who was handcuffed behind his back, was touch stunned twice in the back as police tried to lift him into the back of a police car. The man never regained consciousness and subsequently died (see case of Walter C Burks, under **2.6.** below).

Some people have been hit with taser darts and then jolted with stun guns while being taken under arrest, as illustrated by the case of Mark Dontae, who was struck ten times with a stun gun as he lay on the ground being handcuffed by police officers (see Oregon cases, above). Most of the 25 people shocked by Portland police while in handcuffs had the taser applied in "touch stun mode".(76)

**1. 6 (ii) Jails and custody facilities**

Although there are no national statistics on the number of custody facilities which currently deploy stun weapons, according to Taser International at least 1,000 US jails and prisons have adopted the new generation M26 or X26 Tasers, where they are deployed in both dart projectile and stun mode. They join an array of other electro-shock devices, including stun belts, stun shields and stun guns, used for some years in various US custody facilities. While in some facilities stun weapons are deployed only in response to specific incidents (such as disturbances, or movement of high-risk prisoners) in others they are more widely deployed. Amnesty International is concerned by reports that tasers have been used to gain compliance in the case of emotionally disturbed, intoxicated or uncooperative individuals in the booking section of jails. One inmate was reportedly shocked for clenching his fist instead of opening the palm to be fingerprinted; another for refusing to provide a blood sample. Other cases include

> An inmate of Creek County Jail, Colorado, was tasered with escalating jolts of electricity when he refused to pick up a food tray he had thrown onto his cell floor. The inmate was not combative in any way and the taser appears to have been used to punish him for repeatedly ignoring an order. According to the jail incident report, after throwing his food tray onto the floor, he was asked to step out of his cell and told "he would be tazed (sic) if he would not comply". He came out of the cell, as instructed, and sat on a bench. When he ignored orders to go back into the cell to pick up his food tray, he was shot with a taser and subjected to three separate two-to-three second cycles of electricity before a "full five second burst" was applied.

> James Borden, a mentally disturbed man arrested for a parole violation, died in November 2003 after being shocked at least six times with an M26 Taser for being "uncooperative" while he was being booked into Monroe County Jail, Indiana. He was reportedly face-down on the floor with his hands cuffed behind his back when a custody officer applied the shocks. A statement released by the county Sheriff's office after the incident said "standard procedures by trained officers to control combative or uncooperative individuals" had been used. However, a jail officer was later charged with battery in the case, after a judge found that Borden, while uncooperative, had not engaged in threatening or violent behaviour. (see Section 2 for further details of the case).

> During 2003, nearly a dozen inmates of Greene County Jail, Missouri, were allegedly threatened or abused with tasers for failing to comply with orders. They include a woman allegedly tasered for failing to remove an eyebrow ring while being booked into the jail;

and a distraught woman tasered when she failed to quieten down. (See lawsuits, below). More recent allegations from the jail include disturbed inmates being shocked with tasers while strapped down on restraining beds.

Reports of abusive use of electro-shock weapons in US jails and correctional facilities are not new. Amnesty International and others have in the past reported on cases of prisoners being tortured or ill-treated with stun guns, stun shields and stun belts.(77) In some cases abuses have been linked to guards routinely carrying such devices.

For example, in 1994 in Maricopa County, Arizona, most jail custody staff were equipped with Nova 500 stun guns as part of a pilot study to evaluate the effectiveness of non-lethal weapons. A federal Justice Department investigation subsequently found a serious problem of excessive force in the Maricopa County jails, including misuse of stun guns, which they attributed, in part, to the "easy availability of these weapons."(78) The Justice Department's report noted with concern that stun guns were used to gain compliance from passively resisting inmates or against prisoners who were already restrained. Amnesty International also reported on similar complaints.(79) The Justice Department's expert consultant found that part of the problem was due to a change in jail policy to permit stun guns to be used against inmates engaging in "passive resistance" as a "preferred alternative to hands-on force". He believed this policy, which was in place for two years until changed in 1997, to be "the primary contributor to Detention Staff using these 'tools' in ways and under conditions that could well be, and have been, defined as 'excessive force'." (80) In order to avoid a federal lawsuit, the Maricopa County Sheriff's Office agreed to implement a more restrictive use of force policy which stated that "neither passive nor active resistance" alone were sufficient to justify use of non-lethal weapons such as Electronic Restraint Devices (stun guns) and prohibited their use "solely to gain compliance".(81)

In Virginia, routine deployment by guards of stun weapons in Wallens Ridge and Red Onion supermaximum security prisons led to widespread allegations of prisoner abuse between 1999 and 2001, including use of stun guns on inmates as punishment for minor acts of non-compliance. Several lawsuits were filed against the department for excessive force and in May 2001 the Ultron 11 stun gun was suspended for use in Virginia prisons, following an autopsy report questioning the device's role in the death of a prisoner.(82)

Amnesty International is concerned that, despite the experience in Virginia and the Justice Department's findings in Maricopa County, use of electro-shock weapons as a routine force tool appears to be on the increase as thousands of officers – in jails and on the streets – are issued with new, advanced tasers. The organization believes that this may similarly increase the potential for abuse of such weapons.

*1. 7. Lawsuits for excessive force or ill-treatment*

Tasers have been promoted as reducing liability against police departments for excessive force, on the grounds that they are less likely to cause injury than other more dangerous or lethal weapons. However, Amnesty International is aware of a number of lawsuits in which individuals claim to have sustained serious injury or trauma as a result of being tasered, in some cases in grossly inappropriate circumstances. In several cases, the officers' actions appear to have resulted from a lack of clear guidelines or training on the risks involved in using tasers in certain situations. In other cases, the alleged actions appear to amount to deliberate ill-treatment.

Substantial damages have been awarded in several cases. Cases include the following:

**Arizona: tasered man falls from tree**
An $8m claim was filed against the City of Mesa Police Department, Arizona, in the case of Bruce Bellemore, after he was allegedly left paralyzed in February 2004 when a police officer fired a taser at him as he stood in a tree. The shocks from the taser caused him to fall out of the tree onto his head. Bruce Bellemore was an unarmed suspect who had run from a house into a neighbouring garden, where he climbed the tree in order to escape from four guard dogs. At the time he was shot, he was already surrounded by four police officers, one of whom was pointing a gun at him, with the other three pointing tasers. Bruce Bellemore claims he told officers he was having difficulty climbing from the tree due to an injured wrist. Despite this, it is alleged, the fourth officer shot him once with a taser some 20 seconds after arriving on the scene and fired a second taser shot some 15-20 seconds later while Bellemore was convulsing from the first shot. The whole incident, from the time of the arrival of the first officer on the scene, to the time police called paramedics after Bellemore was on the ground, reportedly lasted no more than three and a half minutes. In a letter to the city authorities, Amnesty International said that use of the taser in the case appeared to constitute a grossly excessive use of force, amounting to cruel, inhuman or degrading treatment. Amnesty International also expressed concern at the speed at which the officer resorted to the taser, contrary to standards which require that force be used only as a last resort after non-violent measures have been exhausted, and in a manner designed to minimize damage and injury.

Bellemore's lawyer told Amnesty International that he was concerned that there appeared to be no specific warnings or guidelines in police training manuals he had seen about the inherent risks involved in firing tasers at someone in a dangerously elevated position. An investigation into the incident by the Maricopa County Attorney's office concluded in July 2004 that the officer involved "did not commit any acts that warrant criminal prosecution". The incident was reportedly under police administrative review at the time of writing. (83)

**California: pregnant woman loses baby.**
The City of Chula Vista, California, recently paid $675,000 to settle a damages claim in the case of Cindy Grippi, a woman, six-months' pregnant, who lost the baby she was carrying after she was shot with a taser. The incident occurred in December 2001 when Cindy Grippi reportedly went to enter her house against instructions of police officers during a domestic dispute involving her violent husband. According to her lawyer, she was not engaged in criminal or disruptive behaviour of any kind and no-one was fighting or arguing when police arrived. A police officer reportedly shot her in the back with a Taser as she was walking away from him, some ten seconds after he had got out of his car. She fell belly-down onto the concrete driveway and says she felt a sharp pain in her abdomen as the taser struck her. She was taken to hospital, where a check-up reportedly registered foetal heartbeats and she was discharged. However, some 12 hours later, she was diagnosed with a foetal demise. She underwent delivery of a stillborn child two days later.

According to the initial autopsy report, the 26-week-old female foetus was of normal gestational weight with no evidence of natural disease or trauma. The Medical Examiner could not find a

cause of death, but suggested it might be linked with the mother's methamphetamine use. Two experts consulted by Cindy Grippi's attorney reached a different opinion, both finding the most likely cause of the foetal demise to be the electro-shock. One, a perinatalist, suggested that the foetal movement detected, after some difficulty, in the Emergency Room may in fact have been the mother's heart-beat. (84) Cindy Grippi had reportedly experienced a normal pregnancy, with regular check-ups and foetal movement up until the time she was tasered. The mother reported that there was no foetal activity beginning from the time of the taser incident. Furthermore, she had reportedly not taken any drugs during the seven days prior to being exposed to the taser.

The Medical Examiner's report was reviewed by an independent pathologist for Amnesty International, who noted that foetal movement some two hours after the taser incident would appear to suggest no clear link with the taser. However, she also raised a question as to whether the foetal heart tones really had been detected by the Emergency Room, and wondered whether Grippi had been thoroughly examined, given her claim of lack of foetal movement.(85)

Training manuals on taser use state that they are not advised for pregnant women, mainly because of the risk of trauma to the foetus from the mother falling. Otherwise, the company claims that there is no evidence that the electro-shock from a taser could damage an unborn child. However, Amnesty International is concerned by the absence of thorough, independent research into the medical effects of tasers and other electro-shock weapons on pregnant women. One past study has suggested an association between between electrical injury from a taser and miscarriage during pregnancy (see **2.7.** below).

The officers in Gindy Grippi's case reportedly claimed that they were unaware that she was pregnant at the time the taser was deployed, although Cindy Grippi's relatives have stated that they shouted out that she was pregnant. If the officers' claims are true, this demonstrates a risk of tasers being deployed unwittingly against vulnerable subjects – a risk that could increase if tasers continue to be used as a routine force tool.

**Illinois: Pregnant woman sues police**
In September 2004, a lawsuit was filed against police from Evergreen Park Police Department, Illinois, by Clarence Phelps and his pregnant daughter, Romona Madison, alleging that they were tasered and subjected to excessive force outside their home. The incident took place on 18 September 2004 at the daughter's wedding reception, when police arrived in response to a complaint about loud music and people dancing in the driveway. According to police accounts reported in the media, Phelps was uncooperative, refusing to produce identification, and was stunned with the taser after he allegedly pushed two officers. The police claimed Madison struck and shoved several officers and ran into the house. She was discovered hiding in a clothes cupboard and, after being warned, was shot twice in the abdomen with a taser when she refused to come out. Lawyers for the family claim that neither Phelps nor Madison had fought with officers and that Madison was followed into the house by overzealous officers who tasered her despite being told by several guests that she was two months pregnant. Madison was taken to a police station and released the same night, after being charged in connection with the incident. She received no medical attention while in police custody, apart from having taser darts removed by paramedics. She went to a hospital immediately on her release and, according to her lawyer,

was told her baby's vital signs were weak. Her situation was still being monitored at the time of writing.

**Portland, Oregon: elderly, bind woman paid damages**
In April 2003, the City of Portland, Oregon, agreed to pay $145,000 to 71-year-old Eunice Crowder in an out-of-court settlement of an excessive force claim. The claim arose from an incident in June 2003 in which City employees arrived at her home with a warrant to remove rubbish and debris from her yard. Police were called when Ms Crowder, who was blind and hard of hearing, failed to follow orders not to enter a trailer where items from her premises were being placed. The lawsuit claimed that two officers struck Ms Crowder in the head with a taser, dislodging her prosthetic right eye from its socket. It also claimed that she was tasered in the back and on the breast as she lay on the ground.

In legal briefs filed by the City, police reportedly acknowledged that Ms Crowder was "pushed onto the dirt next to the sidewalk" when she ignored their orders not to enter the trailer. The police also reportedly admitted that Ms Crowder's eye became dislodged; that they pepper-sprayed her (when she reportedly refused to stop kicking them) and stunned her three times with a Taser (twice in the lower back and once in the upper back). The City argued that the officers' actions were "lawful, justified and privileged" and that they used a "reasonable amount of force to defend themselves". (86) Nevertheless, City commissioners voted to approve the settlement rather than defend the case in court. The case is believed to have been one factor in a decision by the Portland Police Department to review its policies and impose restrictions on use of the Taser in the case of vulnerable people such as the elderly, children and pregnant women (see above).

**Texas: disabled woman one of several to sue Baytown police**
Several lawsuits have been filed against officers from the Baytown Police Department, Texas, for alleged abusive use of Tasers. Naomi Autin, a 59-year-old disabled Latina woman, was reportedly tasered three times by police officer Micah Aldred in July 2003 for banging on her brother's door with a brick. According to a lawsuit filed by Autin, she had gone to her brother's house to collect mail while he was away, and became worried after failing to get an answer from the house-sitter and seeing a truck parked in the driveway. She called the police and officer Aldred arrived on the scene. Autin, who is 5 feet 2 inches tall and suffers from severe arthritis, was allegedly tasered in the back by Aldred after she continued to try to gain entry to the house; the officer also allegedly threw her against a post, causing a severe cut to her head. A grand jury indicted the officer on charges of using excessive force, but he was acquitted at trial. Reportedly, police officers corroborated his account that the use of force was justified. Amnesty International understands that no disciplinary action has been taken against the officer.
The same officer is a defendant in another lawsuit in which an unarmed woman wanted on an outstanding arrest warrant was allegedly "shocked numerous times about the back, face, neck, shoulders and groin".(87)

A lawsuit is pending against another Baytown officer for alleged excessive force during an incident in July 2003, in which the officer used a taser as a stun gun on a man who had just suffered epileptic seizures. The officer reportedly stunned 30-year-old Robert Stanley Jr at close range in an ambulance as medical personnel struggled to strap him down as he struggled in the throes of post-seizure confusion. An Internal Affairs investigation into the incident found that the

officer had not violated any policies, and a grand jury investigation reportedly supported police accounts that Stanley had been sufficiently combative to warrant use of the taser.(88)

## Washington: immigrant woman tasered in front of sons

A lawsuit has also been filed in the case of Olga Rybak, a 5 feet 4 inches tall Russian immigrant woman who was tasered multiple times by an officer from the Washougal Police Department, Washington, in August 2003, after she refused to sign a citation for a dog violation. The officer had gone to her house with the citation after her dog had bitten an officer the previous day. Rybak, who spoke little English, at first refused to sign it, asking for a translator. While attempting to arrest her, the officer shocked her at least 12 times in 91 seconds in front of her two young sons – first using the weapon as a stun gun, then stepping back to insert a cartridge and twice firing darts at Rybak who was writhing around on the front porch. When the boys (aged 11 and 12) tried to help their mother, the officer reportedly threatened to taser them as well. Rybak's attorney has informed Amnesty International that the boys have been receiving psychiatric treatment for Post Traumatic Stress Disorder as a result of the incident.

According to the attorney, the shocks caused extreme pain and left 27 red burn marks on Olga Rybak's body. The officer who used the taser (who was a taser Training Officer for the department) did not record the number of jolts in his report. The taser chip was tested only after photos of Ms Rybak's injuries were presented, and this recorded that the taser had been discharged 12 times during the incident.(89) In April 2004, Washougal's police chief, Robert D Garwood, reported that the officer had been demoted for using "poor judgement" in the case even though he had acted "within proper legal boundaries". Garwood said that the department would review its policy on taser use.(90)

## Greene county jail, Missouri

A federal lawsuit was filed in February 2004 against the Sheriff and officers of Greene County Jail, Missouri, alleging a pattern of serious ill-treatment of jail inmates, including abusive use of tasers. The lawsuit was brought on behalf of 11 former inmates, most in temporary custody pending the posting of bail. The allegations of abuse ranged from physical brutality and excessive force to acts of humiliation, including guards forcing female inmates to take off their clothes in the presence of male staff and exposing them to the gaze and ridicule of guards and male prisoners. They include the following accounts from the alleged victims:

An African American woman was asked to remove her jewellery on being booked into the jail in June 2003. She removed everything except an eyebrow ring, which was difficult to remove. When she asked for a mirror she was allegedly sprayed in the face with pepper spray and, when she put her hands up to protect her face, was shot with a taser, causing her to fall to the ground and lose control of her bladder. While on the ground, a male officer forcibly removed her eyebrow ring with pliers. She was left in her urine for several hours without being given anything to clean herself with.

A man being taken to the "drunk tank" was slammed to the ground face-first. As he lay on the ground bleeding, a guard allegedly fired a taser gun at him, causing acute pain, although he was not moving or struggling. He was taken to hospital where he had stitches to his mouth. On return to the jail, when told he had failed to shampoo his hair satisfactorily, an

officer threatened him with a taser gun, saying "you don't want this again". On his release, the jail tried to get him to sign "reprimand papers" stating that he was shocked with a taser because he had attempted to run to the jail entrance; according to the lawsuit, he refused to sign the papers because the facts in it were not true.

A man who said he might be allergic to soap in the shower was threatened with a taser gun and told to use the soap provided.

A man booked into the jail on an outstanding traffic warrant was allegedly assaulted and subjected to an "overly invasive bodily search" and repeatedly called a "faggot"(91). He was allegedly tasered while he was prostrate and in handcuffs.

A woman booked into the jail in March 2003 was placed in a cell by herself in a distraught condition. A jail employee said he would taser her if she did not be quiet and calm herself. It is alleged that, while she was attempting to calm down, two guards entered her cell and one attached two taser clips to her shirt in the chest region; the other guard then activated the taser gun. According to the lawsuit, she suffered "severe burns and permanent scars to her chest and stomach" as a result of being tasered.

A woman instructed to strip front of male guards hesitated after removing all her clothes except her underwear; she was pushed into the shower by a male guard and saw an officer pointing a taser at her as she emerged from the shower. It looked like a firearm and she was very scared, begging the officer "don't do this". She was given nothing to dry herself with and she was escorted from the room by male guards while wearing a small paper garment resembling a "diaper" and forced to walk past male inmates waiting to be booked into to the jail.

The lawsuit alleges that the complaints formed part of a pattern of abuse and poor training at the jail. According to Amnesty International's information, no charges have been filed against any of the officers involved and they remain on duty at the jail. The lawsuit was still pending at the time of writing.

### 1. 8. Safeguards and monitoring of taser use

One of Amnesty International's concerns is that electro-shock weapons can easily be used to ill-treat people without leaving substantial visible marks or injury. This can make it difficult for victims of abuse to obtain redress through complaints or lawsuits: one way of holding officers or police departments or authorities accountable. It remains essential - all the more so when deploying techniques that may not leave substantial marks or physical injury - for police and oversight agencies to ensure there are stringent safeguards in place to prevent abuse.

The new generation M26 or X26 type tasers are promoted as having a number of in-built safety features intended to guard against abuse and provide an audit trail to monitor each taser deployment. When darts are fired, confetti-like identification tabs are ejected which are printed with the cartridge's serial number, allowing departments to determine which officer fired the cartridge. Both the M26 and X26 tasers also have an on-board microchip memory function which records the date and time of each firing (trigger pull); this applies whether the taser is used in dart or touch stun mode (although the microchip cannot distinguish which mode the weapon is in).

The data can be downloaded onto a computer which, according to the company, downloads to text in the case of the M26 but is encrypted in the case of the X26 to protect the integrity of the data.

The X26 Taser also records the duration and battery strength of each firing. This is important safeguard in monitoring how much force has been applied because, as shown above, the cycle of electricity can be prolonged beyond the five-second automatic discharge and can continue for as long as the operator's finger remains depressed on the trigger (reportedly, until the battery runs out). Officers may also cut off the flow of electricity before the standard five-second burst by switching the safety switch. However, the ability to record the duration of each firing is *not* contained in the M26 Taser, which remains widely used (possibly by a majority of US police agencies).

When asked by Amnesty International if there was a cut-off point for the duration of the cycle, Taser International replied that "there is no automatic cut-off" and "Given that these devices may be used in life-threatening situations, we believe it would be dangerous to build in an automatic weapon failure point", adding that "This is an area where we must rely upon the professional judgment and training of the officer".(92) However, Amnesty International is concerned that the ability to inflict prolonged electro-shocks increases the weapon's potential for abuse, particularly in the case of the M26.(93) The fact that, in practice, tasers are used in a wide range of non life-threatening situations adds to the organization's concern. According to the testimony of a police taser training officer in one department, officers were trained to use the taser "as many times as it takes to gain compliance."(94)

The microchip function provides an important tool of accountability, especially in the case of the X26. However, it is not failsafe. In certain instances a "corruption" may occur during the firing cycle which prevents the software from recording the firing record, and the internal clock may not always be set accurately.(95) Amnesty International was told that the clock has to be re-set whenever the device is stored without batteries. Most importantly, such safeguards need to be backed-up by monitoring and regular downloading of information, as well as detailed use-of-force reports filed by all officers at the scene. There are a number of concerns about the adequacy of safeguards and monitoring of taser use in practice, including the following

>   While most departments require officers to fill out a written use-of-force report whenever they fire their tasers, sources have reported that not all departments automatically download the microchip data to match against the police reports (to check, for example, how many times the charge was triggered). It is also unclear how many departments regularly download the microchip data for general monitoring purposes. The organization believes it is essential that all relevant data on taser use be regularly reviewed and analysed.

>   The quality of information provided in police reports varies. It appears that not all departments, for example, explicitly require officers to record when tasers are drawn and displayed, when not fired. According to Taser International's website, it is quite common for officers to "spark" their tasers or direct the laser beam at someone to secure compliance without actually firing the weapon. As this is a significant threat of force, such incidents should be recorded on the use-of-force form so that the appropriateness of the force level can be reviewed. All police officers should also be required to record every

trigger pull; this has not always happened, according to reports Amnesty International has seen.

Because often they do not leave substantial marks or injuries, police taser use may not be subjected to the same levels of scrutiny as weapons such as batons or flashlights which trigger investigations when injuries result. Tasers receive far less scrutiny than police firearms use, where incidents are usually reviewed at a higher level within the department (such as a Firearms Review Board) as well as by outside review bodies.

There is little public scrutiny of taser use either nationally or within police departments. Police use-of-force reports are generally not made public and most police departments have not released detailed public reports about their taser use to date. Amnesty International believes it is essential for police departments and authorities to provide detailed, public reporting on use of electro-shock weapons given their capacity for misuse. Public concern about reports of inappropriate use have led some departments to review their policies (see Portland, Oregon, for example).

There are no national standards and no official statutory, national, reporting system on taser use, or any independent mechanism for collecting and evaluating field data. While Taser International maintains its own database of use, the company estimates that only one in ten deployments of Advanced Taser are reported to the company by police forces.(96)

## 1. 8 (i) Safeguards against unwarranted injuries

While tasers are promoted as causing less injury than other impact weapons, serious injuries can arise if the barbs strike certain parts of the body or the subject is in a vulnerable location. Officers are trained not to fire the dart projectiles at sensitive areas such as the head, throat, eyes or groin, and both the M26 and X26 models have laser trained beams designed to ensure accuracy when the darts are fired.

Secondary injuries can also occur when the subject collapses and falls to the ground. The manufacturer's safety guidelines warn of the risks of death or serious injury if someone is tasered while at risk of falling from a high building, although it is unclear to the organization how far law enforcement policies include a more general warning about the dangers of firing tasers at people in elevated or other vulnerable situations. One man in Arizona, whose case is described above, was paralyzed after being tasered out of a tree.(97) In June 2004, in Louisiana, Jerry Pickens, aged 55, died after falling and hitting his head on concrete when police shot him with a taser. Pickens, who was drunk and unarmed, was shot in the back as he tried to walk back inside his house following a domestic argument. His family questioned why police had resorted to the taser in his case.

The taser darts can puncture skin and cause burns at the barb sites. These are reported to be minor in most cases. However, several cases have been reported in which scars from taser burns have remained visible many months after the incident. Some US departments require all persons struck by taser darts to be taken to hospital to have the barbs removed but not all agencies have this requirement.

Although maintaining that tasers are "medically safe" (an issue discussed below), Taser International has warned in training literature that it is "not advisable" to use the Advanced Taser on a pregnant woman or an elderly person, unless all other means short of lethal force have been used, because of potential risks in such cases.(98) However, it is unclear how far such warnings are incorporated into police agencies' guidelines. As described above, two women were stunned despite alleged warnings by others present that they were pregnant.(99) Several elderly people have been tasered despite posing no serious threat. At least one agency, the Portland Police Department, Oregon, had no guidelines restricting taser use against pregnant women or the elderly, until the policy was changed earlier this year. It has recently been reported that the warning against using tasers on the elderly is no longer included in Taser International training manuals, as the device is no longer considered harmful in such cases.(100) Amnesty International was seeking clarification of this with the company at the time of writing. Meanwhile, the organization remains concerned about the use of tasers against elderly people, given their enhanced risk of suffering injury from falls as well as an increased risk of underlying health problems.

The company also issues a warning not to use tasers in flammable or combustible environments because of a risk of ignition from the sparking action. However, in Colorado, a police officer reportedly fired a taser at a man parked next to gasoline pumps at a convenience store, despite this being a high-risk environment. (101) In California, a man was touch-stunned while lying on a garage forecourt (see case of Roman Gallius Pierson, at **2.3**, below).

In Joplin, Missouri, there was concern that a gas explosion that killed a suicidal man and fatally injured a police officer in August 2004 may have been triggered by police use of a taser. The disturbed man had turned on the gas in his home before police arrived and the house exploded after one of the officers fired his taser at him. The final report of the investigation into the 11 August incident, made public in October 2004, found there was not enough conclusive evidence to determine the cause. Police said that electric light switches, a pilot light, an electric fan or static electricity on the suicidal man's clothes could have ignited the gas.(102)

Company literature includes a warning never to use a taser on someone who has been exposed to alcohol-based pepper sprays, which are highly flammable. Some police agencies are reported to have switched to non-flammable water-based pepper sprays following the introduction of tasers. However, flammable sprays remain on the market, available for both law enforcement and private use. Several people have been pepper sprayed and then struck with tasers (see **2.6**, below). In one recent case, a man's hair is reported to have caught fire after he was pepper sprayed and tasered.(103) Amnesty International was seeking information on the solution contained in the sprays used in this and other cases, at the time of writing.

Amnesty International believes that all tasers should be subjected to safety tests to ensure that they will not cause unwarranted injuries or fatalities because of their design and technological functioning in real-life situations. All agencies which deploy tasers should issue detailed safety guidelines, with clear warnings and restrictions on their use in high-risk situations. Amnesty International also believes it is advisable to take tasered subjects to hospital to have barbs removed and to check for other possible adverse effects.

*1.9 Widening taser use*

In many of the police taser incidents described in this report, officers appear to have breached international standards requiring that law enforcement officials must apply only the minimum necessary force after exhausting non-violent alternatives. However, in most such cases, the officers' actions were not found to have violated police use-of-force policies. Amnesty International believes that no safeguards can be effective without tighter policies and measures to limit the circumstances under which tasers are authorized.

Some US law enforcement agencies, including the New York City Police Department (NYPD), issue tasers only to specialised units such as emergency response teams. However, many departments, far from limiting taser use, are moving towards routinely arming all their patrol officers with such weapons. As of June 2004, more than 700 US police agencies, including those in Albuquerque, Phoenix, Reno, Sacramento, San Diego, San Jose and the Orange County Sheriff's Office (Florida), are reported to have purchased Taser products for every front line patrol officer, a trend which appears to be increasing.

Data from the Orange County Sheriff's Office in Florida showed that, by May 2002 – just over a year after they were first deployed – tasers had become the most prevalent force option for the department, constituting 68% of all use-of-force incidents (see chart, below). Taser use reportedly rose to 77.6% of all force incidents in 2003.(104)

However, the data also reveals that, while police use of chemical sprays, police dogs, physical force and firearms dropped by about 21% in the year after tasers were introduced, the overall number of times force was used by Orange County deputies actually *increased* by 37%.(105) A brochure on Taser International's website reports a staggering 72% increase in use of force by Orange County deputies from 1999 to 2002, in line with increased taser use.(106) Similarly, in May 2004, a local news agency reported that the use of force against suspects in the city of Orlando, Florida, had "nearly doubled in the last 14 months since Tasers were issued to police", although they arrested fewer suspects.(107) According to the same source, while police injuries in Orlando decreased significantly, injuries to suspects stayed the same.

Use-of-Force Breakdown for the Orange County Sheriff's Office, Florida

| "TYPE=PICT;ALT=" | 1999 | 2000 | 2001 | 2002* |
|---|---|---|---|---|
| Chemical Force | 300 | 263 | 221 | 64 |
| Physical Force | 78 | 75 | 52 | 29 |
| Firearms | 5 | 13 | 4 | 0 |
| K9 | 62 | 60 | 48 | 29 |
| Impact Weapons | 27 | 21 | 13 | 5 |

| Impact Rounds | 0 | 1 | 2 | 0 |
| Total Use-of-Force incidents | 410 | 383 | 527 | 295 |


| Impact Rounds | 0 | 1 | 2 | 0 |
| TASER | 0 | 3 | 228 | 201 |
| Total Use-of-Force incidents | 410 | 383 | 527 | 295 |

* Data through May 2002 only. Source: Orlando Sentinel, 29 July 2002.(108)

The above data suggests that officers may be using tasers in situations which would previously have been resolved without the use of force. Amnesty International is concerned that issuing such weapons to all patrol officers may increase officers' readiness to resort to such force, given the ease with which tasers can be used, and the temptation to use them pre-emptively at the first sign of resistance. This may lead to an increase in cases of excessive force and ill-treatment, especially given the broad range of circumstances in which tasers may be authorized.

In addition, Amnesty International is concerned about the potential risks of unwarranted injuries and deaths if tasers are used against a widening pool of the population, many of whom may have underlying health conditions which could make them vulnerable to adverse reactions from electro-shock. The potential health risks are discussed in chapter 2 below.

## 2. DEATHS IN CUSTODY AFTER TASER USE
Since June 2001, more than 70 people have died in police custody in the USA and Canada after being struck with tasers, with the number of reported cases rising each year. Amnesty International's data shows two deaths reported in 2001, 13 in 2002, 20 in 2003 and 38 from January to mid-October 2004.(109) These figures are higher than the total number of taser-related deaths reported in the previous 25 years.

The manufacturers of stun weapons claim that their products are medically safe, an issue discussed in more detail below. Taser International, which told Amnesty International that it tracks reports of deaths, has issued a number of public statements asserting that in no case has the taser been found to be a "direct cause" of a fatality. The company has pointed out that the deaths are similar to thousands of other in-custody deaths in the USA from drug induced causes or other factors unrelated to taser use. They claim that the increase in taser-related fatalities is due to the fact that tasers are now more widely deployed and will inevitably be used in some cases where people are in the throes of toxic overdoses or other fatal conditions. In several cases their own medical experts have reviewed the evidence and specifically excluded the taser as a cause of death.

Amnesty International acknowledges that coroners have usually attributed cause of death to factors unrelated to taser use, such as drug intoxication or heart disease. However, some medical experts believe taser shocks may exacerbate a risk of heart failure in cases where people are agitated or under the influence of drugs or have underlying health problems. In at least five recent cases, coroners have found the taser contributed to the deaths (see below). The rising death toll heightens Amnesty International's concern about the safety of such weapons and the lack of rigorous, independent testing of their medical effects. While there have been some limited

studies of earlier stun weapons, there has been no peer-reviewed medical literature published on the medical effects of the new more potent M26 or X26 Advanced Tasers deployed in the cases described in this report.

Amnesty International has reviewed information on 74 deaths reported since June 2001, including autopsy reports in 21 cases.(110) Nine of the deaths occurred in Canada, with the rest in the USA. The deceased were males aged between 18 and 59 years of age, of varying racial or ethnic origin, with the exception of one case involving the death of a female foetus after the pregnant mother was tasered.(111) Most cases are believed to involve use of the M26 Taser which was the version most widely deployed during the period in question. While detailed information was not always available, the cases nevertheless highlight some disturbing concerns which Amnesty International believes should provide the basis for a full, independent inquiry and further research.

### 2. 1. Overview of AI concerns:

Many of the deaths involved individuals who had apparently high concentrations of drugs in their system or other risk factors for fatal arrhythmias. Drug intoxication, sometimes combined with other factors, was overall the most common cause of death reported (although coroners' reports were still pending in many of the more recent cases). Violent struggle, "positional asphyxia" following restraint, and "excited delirium"(112) were cited in some cases as a sole or contributory factor leading to sudden cardiac arrest. However, Amnesty International believes that questions remain about the role of the taser in at least some of the fatalities: whether the electro-shock could have exacerbated breathing difficulties caused by factors such as violent exertion, drug intoxication or use of other restraint devices, triggering or contributing to cardiac arrest. At least 15 of the victims had underlying heart disease which some medical experts believe may cause more susceptibility to electro-shock. Concerns have also been raised about the potential risk of adverse effects from taser currents in people under the influence of certain drugs.(113)

These concerns are supported by the fact that, in five cases (James Borden, William Lomax, William Teaseley, Jacob Lair and Keith Tucker), medical examiners found that the taser had directly contributed to the deaths, along with other factors, including heart disease, restraint and/or drug intoxication. In another case (Gordon Randall Jones), a coroner is cited as stating he believed the taser played a role in the death. The short time lapse between taser use and cardiac or respiratory arrest in some cases also raises issues of concern, and in one case (Alvarado) the coroner noted a temporal link between the taser and cardiac arrest and said he was unable to exclude the taser use as a possible cause. In another case (Clever Craig), the coroner also may have indicated a link with the taser given his autopsy finding of cause of death to be: "cardiac dysthythmia during an episode of excited delirium following electrical shock". In several cases death was given simply as "sudden cardiac arrest", with no clear underlying causes (see, for example, the case of Frederick Jerome Williams, below and also the case of Richard Baralla, under **2.6**). These cases also raise questions as to whether the taser may have been a factor. A chart attached as Appendix A lists the 74 cases, giving (where information was available) cause of death; contributory factors cited in coroners' reports; number of taser discharge cycles; time lapse between taser shock and cardiac or respiratory arrest.

Dr Sidsel Rogde, an independent forensic pathologist who reviewed 16 autopsies for Amnesty International, also raised concern about a possible link between the taser and deaths, giving her opinion that it could not be ruled out as a contributory factor in at least seven cases.(114)(It should be noted that the autopsy reports were not available to Amnesty International in three other cases where coroners reportedly found the taser played a role in the deaths – William Lomax, William Teaseley and Jacob Lair – so these cases were not included in Dr Rogde's findings.). Dr Rogde also questioned the findings relating to drug toxicity in some autopsies, noting that high blood concentrations *post mortem* may reflect a redistribution of blood during, for example, resuscitation, and do not necessarily reflect toxic levels of drug concentration before death. There were also several cases in which death was attributed to drug intoxication where the drug levels were not necessarily fatal. Dr Rogde stated: "In my opinion, death can be attributed to drug overdose only when other causes are excluded". Dr Rogde's comments are included in some of the individual case summaries, below.

Amnesty International is also concerned about the overall levels of police force used in the cases reviewed which, in many instances, appears to have gone beyond what was warranted by the threat posed. In only eleven cases were suspects reported to be armed. While most of the deceased had been engaged in disturbed or agitated behaviour, and some were reportedly combative during arrest, few appeared to pose an immediate threat of substantial physical harm at the time force was used. Yet they were subjected to high levels of force which sometimes involved multiple restraints, including use of chemical spray, taser and dangerous techniques such as "hogtying" (see below). Two people died in Gwinnett County, Georgia, after being tasered and strapped into restraint chairs. In several cases the taser appears to have been deployed against individuals passively resisting arrest or refusing to comply immediately with an order. In one case, for example, a mentally disturbed man was reportedly tasered after refusing to step out of his shorts while being booked into a jail; another man was tasered as he lay supine on the floor of his home in a drug-induced stupor. Another man stopped on suspicion of driving while intoxicated was tasered after he had fallen into a ditch and, according to a police spokesperson, "was resisting, but he wasn't fighting".(115)
Based on the available information, Amnesty International believes that in many cases the police use of force was excessive, contravening international standards and amounting in some cases to cruel, inhuman or degrading treatment. In only one case (Borden) was an officer criminally charged with excessive force; in most cases officers' actions were found not to have contravened either criminal statutes or policies, although a number of cases remained under investigation.

Several lawyers representing families of the deceased expressed concern to Amnesty International at what they believe was undue force in the case of individuals who were ill or mentally disturbed and should have received treatment rather than a response more appropriate, as one lawyer put it, to a "crime in progress". At least a third of those who died had histories of mental illness or showed signs of mental disturbance at the time of their arrest. Others were ill through drug intoxication or other causes (e.g. epilepsy). One person was observed to have seizure activity before he was shocked (see Alvarado case, below). Many of these individuals were not involved in criminal behaviour at the time they were taken into custody. Amnesty International believes that the appropriate response in such cases should have been to seek medical attention or the assistance of services such as a mental health crisis intervention team

rather than a law enforcement response. Although paramedics were often called to the scene, in some cases there were delays, or the deceased were taken to jail rather than to hospital.

In some of the above cases officers' actions appear in breach of Article 6 of the UN Code of Conduct for Law Enforcement Officials which states that "Law enforcement officials shall ensure the full protection of the health of persons in their custody and, in particular, shall take immediate action to secure medical attention whenever required." Article 6 (b) states that where medical personnel are attached to a law enforcement operation "… law enforcement officials must take into account the judgement of such personnel when they recommend providing the person in custody with the appropriate treatment through, or in consultation with, medical personnel from outside the law enforcement operation".

## 2. 2. Multiple or prolonged taser discharges

Amnesty International is further concerned that, in more than half the cases, the deceased were subjected to multiple taser discharges (cycles of electro-shock), in one case as many as 12 or 13 jolts and in some others six or more discharges.(116) In most such cases each cycle would normally last for the full default five-seconds (or in some cases, longer, see below). Information on these cases suggests not only that the taser was not immediately effective on the first shock but that it may have caused the subject to become more agitated in some instances, leading to further use of force. A training manual on the Advanced M26 Taser produced by Taser International, advises officers to "be prepared to deliver more than one cycle from the Taser, and be prepared to use strikes, impact weapons and other uses of force in conjunction with the Taser to gain compliance".(117) The company maintains that it is safe to use repeated cycles as the amperage (current) remains the same and the charge is not multiplied. However, Amnesty International believes that questions remain about the harm and stress caused by subjecting someone already in an agitated state to multiple electro-shocks, especially in conjunction with other force.

According to a field study of 2050 taser uses, most incidents involved only one taser discharge.(118) It appears that the reported fatalities cases may therefore involve a disproportionate number of multiple discharges (as well as other force), an issue which Amnesty International believes requires urgent review.

The ability to prolong the electrical cycle beyond five seconds, for as long as the officer keeps his finger depressed on the trigger, is also of concern as this may dangerously increase stress levels. In one case, an officer applied repeated jolts of the taser in stun mode to the neck of a disturbed man high on drugs who was being pinned down by four security guards trying to handcuff him. One jolt lasted for eight seconds; another for six seconds. The man subsequently went into cardiac arrest and later died. An inquest jury attributed cause of death, in part, to the taser (see case of William Lomax, below). The psychological and physiological effects of prolonged, as well as repeated, taser shocks also requires urgent review by relevant independent experts, including those in the field of cardiology and electrophysiology.

### 2.3. Sample case summaries

James Borden, aged 47, died in Monroe County Jail, Georgia, on 6 November 2003, after

being stunned at least six times with an M26 Taser. Police had arrested him earlier that evening for violating a home detention order (Borden had been spotted the previous day acting in a confused and disoriented state near a local convenience store).(119) According to a subsequent lawsuit, at the time of his arrest Borden "exhibited slurred speech, was unstable on his feet and was physically weak". An Emergency Medical Team (EMT) ambulance was called and medical personnel indicated that he needed to go to hospital but he was taken to jail instead. He was tasered on arrival at the jail, reportedly for "thrashing around" and talking incoherently as he was being removed from a police car. Once in the jail, still with his hands cuffed behind him, the same officer (Shaw) shocked Borden several more times for being "uncooperative" and failing to comply with a command to step out of his shorts or pyjama pants which had fallen around his ankles. In one statement, Shaw is reported to have said:

"... I asked Borden to lift up his foot to remove the shorts, but he was being combative and refused. I dry stunned(120) Borden in the lower abdominal area ...We got Borden into the booking area. Borden was still combative and uncooperative. I dried stunned Borden in the buttocks area".

Borden was then reportedly pinned to the floor of the booking area and shocked again, after which he turned blue and lost consciousness. An ambulance was called and he was taken to hospital where he was pronounced dead. A statement released by the county jail authorities just after Borden's death said that "standard police procedures by trained officers to control combative or uncooperative individuals" had been used.

The autopsy report gave cause of death as consistent with "cardiac dysrhythmia, secondary to hypertrophic cardiomyopathy [abnormal thickening of the heart muscle], pharmacological intoxication and electrical shock", with manner of death "accidental".

A Special Prosecutor was appointed to investigate the case and, in May 2004, the officer who had used the taser on Borden was charged with two counts of battery (battery with a deadly weapon and battery causing serious bodily injury). Each charge carries up to eight years' imprisonment. Another officer present, who had pinned Borden to the ground as the last electro-shock was applied, was not charged. The trial was still pending at the time of writing.

The forensic pathologist who reviewed the autopsy for Amnesty International found that, although the concentration of the drugs ephedrine and prometazine were "apparently high", many drugs are redistributed after death, especially after aggressive resuscitation, and that "high blood concentrations of a drug do not necessarily mean that death is caused by intoxication".(121) Noting the short time frame between the cardiac arrest, struggle and use of the taser, she gave the opinion that "death might be related to the use of the taser, in combination with his heart disease". She noted that "people with heart disease might also die in connection with such a stressful situation without the use of a taser". She found the "excruciating pain" invoked by the taser might also be a factor in the death of a person with serious heart disease who "may have an increased risk of death during stressful situations, including physical as well as mental stress".

Eddie Alvarado, aged 32, died in June 2002 in Los Angeles after being tasered five times

while handcuffed behind his back. The autopsy report states that "According to the history, the decedent exhibited violent and irrational behavaiour. He was observed to have seizure activity and collapsed prone on the floor". The taser was used when he continued to exhibit "irrational behaviour, growling and yelling, thrusting upper torso and kicking firefighters and LAPD officers". He was placed in a "hobble restraint" (a form of hogtie) and was subsequently found to be in pulmonary arrest. Cause of death was given as "sequelae of methamphetamine and cocaine use, status post restraint, including taser use." (122) The coroner also noted a "temporal relationship" between restraint, taser application and his cardiopulmonary arrest but found the manner of death "undetermined" (see below).

Glenn Richard Leyba, aged 37, died in Glendale, Colorado in September 2003. According to a report on the case by the District Attorney's office, paramedics arrived at Leyba's apartment after his landlady called for an ambulance, and found him "laying face-down, rolling from side to side … making moaning and whimpering sounds". A police officer twice used her taser on him as a stun-gun when he failed to respond to attempts to roll him over and became "physically resistant". The police report is cited as stating that the second stun mode discharge "increased his level of agitation". The same officer then fired a taser dart into Leyba's back, resulting in Leyba "moaning, screaming and 'flailing' his legs and in an increase in his level of physical agitation. It did not, however, gain Mr Leyba's compliance". Altogether, Leyba was electro-shocked in stun or dart mode at least five times, after which he "stopped all physical resistance" and was handcuffed behind his back. The report states that "while being wheeled to the ambulance, the paramedics noticed that Mr Leyba's skin color was grayish, that he had stopped breathing, and that he had no pulse". Efforts to resuscitate him were unsuccessful and he was pronounced dead in hospital.(123)

The coroner gave cause of death as "cardiac arrest during cocaine-induced delirium".

The report from the District Attorney's office noted that there were inconsistencies in the various police and witness reports as to the mode, placement and time of taser discharges.(124) There was also disagreement about the level of Leyba's resistance. The four paramedics on the scene separately testified that he was not trying to hurt anyone and was "delirius" and kicking his feet "in no particular direction". One paramedic noted that he appeared to be very scared and was "combative from altered mental status, not combative as if resisting". One wrote in a "Patient Care Report" that he and another paramedic disagreed with the officer's use of the taser "at least when it was being used in the stun mode" and that *the stun discharges "only served to further agitate Mr Leyba"*(AI emphasis). Despite these findings, the District Attorney's office concluded that the officer's actions did not violate any Colorado criminal statute and "constituted both a legitimate defense of others and a legitimate effort to prevent Mr Leyba from causing himself serious bodily injury".

Roman Gallius Pierson, aged 40, died in October 2003 in Yorba Linda, California. Police had

responded to reports that a disturbed man had been running in and out of traffic. According to press reports, Pierson had run into a gas station forecourt and was rubbing ice onto his face, complaining of being hot and thirsty, when the police arrived; he was shot with a taser when he ignored an order to lie down on the pavement; while on the ground, he was tasered again when he began "grappling with police", according to a police spokesman. He went into cardiac arrest at the scene and died in hospital. The autopsy found cause of death due to acute methamphetamine toxicity, and notes a history of coronary artery disease.

Gordon Randall Jones, aged 37, died in Orange County Florida, in July 2002, after reportedly being jolted at least 12 times with a taser. (125) According to media reports, the taser was used after Jones became disruptive outside a hotel and "refused to leave and pulled away from deputies". He walked with deputies to an ambulance but died on the way to hospital. Cause of death was given in the initial autopsy report as "positional asphyxia, secondary to the application of restraints in the setting of acute cocaine intoxication". The autopsy findings noted "history of recent electrical trauma" and the Deputy Chief Medical Examiner William Anderson, who conducted the autopsy, has been quoted in press reports as stating that he believed the taser shocks contributed to Jones' death, making it harder for Jones to breathe.(126) However, county officials requested a second expert opinion from forensic pathologist Dr Cyril Wecht who concluded that Jones had died primarily from a cocaine overdose. The independent forensic pathologist who reviewed the first autopsy for Amnesty International noted that "the concentrations of cocaine are fairly high but not necessarily lethal", citing her previously stated concerns about the reliability of accurately measuring toxic drug levels *post mortem*. She gave her opinion that "cocaine, taser and restraint may all have played a role in his death".(127)

Dennis Hammond, aged 31, died in Oklahoma City, in October 2003. Officers had responded to complaints by residents that Hammond was walking up and down the street and screaming at the sky. They found him sitting on top of a mailbox in a delusional state, bleeding from the legs, chest and feet. Police reportedly used a taser on him when he refused to listen to their commands. He was jolted five times in total but he pulled out the darts. He was then struck with a beanbag device before officers were able to handcuff him. Paramedics from an emergency ambulance team called to the scene were bandaging his wounds when "he turned blue and stopped breathing". The autopsy report noted a blunt force head injury and multiple injuries to his abdomen, thighs and back, multiple abrasions and superficial cuts. Cause of death was given as "acute methamphetamine intoxication".

Michael Sharp Johnson, aged 32, died in Oklahoma City in November 2003. Officers responded to reports of a burglary in progress and found Johnson sitting in the living room, yelling. When he would not calm down or follow orders to get on the ground, officers shocked him five times with a taser and three others helped gain control to handcuff him. The autopsy report states: "During the brief struggle, he was 'tasered' multiple times before they were able to handcuff him. Approximately two minutes later he stopped breathing and EMSA(128) was called. He was transported to the emergency room in full cardiorespiratory arrest and was placed on the ventilator. … He died

approximately 22 hours and 30 minutes later". The autopsy report gave cause of death as "acute congestive heart failure due to cocaine induced cardiac arrest," with manner of death "accident".

William Lomax, aged 26, died in Las Vegas, Nevada in February 2004, after allegedly fighting with police and security guards at a housing complex. At an inquest in the case, the security guards testified that they had approached Lomax because he appeared to be overdosing on drugs, "dazed and confused", walking in circles, lifting his shirt and sweating. A struggle followed, during which a Las Vegas police officer jolted Lomax seven times with an X26 taser in stun gun mode. Some of the jolts were applied as he was pinned face-down on the ground by four security guards who were trying to handcuff him and again when he was face-down on a gurney (stretcher). According to inquest testimony, at least three of the jolts were applied to the side of his neck, a procedure authorized during police training. When asked if the Las Vegas Police Department placed a limit to the number of shocks which could be applied, a taser training officer said:

"What we tell and train our officers is, you can use this as many times as it's going to take to get compliance".(129)

Data downloaded from the taser's microchip revealed that the seven shocks were applied over a period of 9 minutes, 55 seconds, in cycles lasting, respectively, two seconds, four seconds, two seconds, six seconds, eight seconds and six seconds. A paramedic called to the scene testified that "the Taser didn't seem to have any effect. It made him angry".(130) After Lomax was placed face-down on a stretcher, officers noticed he had stopped breathing. Paramedics got his heart beating again in the ambulance and he was placed on a ventilator. He died the next day without regaining consciousness.

At the inquest, the Medical Examiner, Ronald Knoblock, testified that "cause of death was a cardiac arrest during restraining procedures", with Phencyclidine (PCP) intoxication and early bronchial pneumonia contributing factors. The pathologist found that Lomax's obesity and the fact that he was placed face-down with pressure on his diaphragm had restricted Lomax's breathing, which would already have been affected by the drugs and the physical struggle. When asked if the taser had played a role in the death, he responded:

"Yes. The tazer (sic) was used in this instance as a restraining device, and in the cause of death I incorporated that into the restraining procedures during which the cardiac arrest took place."

Dr Knoblock also observed that, while the levels of PCP in Lomax's system raised his metabolic rate, the amount of drug was "not an extremely toxic level". He added that he could not establish that the taser of itself caused the death or that Lomax would not have died without it. The inquest jury's verdict was that:

"the means by which the deceased met his death was a combination of drugs, restraining force, and the use of the tazer (sic)".

The jury also found the guards and officer's actions in restraining Lomax to be

"excusable" and cleared them of wrongdoing. The Las Vegas Police Department was reported to be re-evaluating its training policies in light of the ruling.

Frederick Jerome Williams, aged 31, died in Gwinnett County Jail, Georgia, in June 2004, after being shocked with a taser while being strapped into a restraint chair. According to media reports, police went to his home after receiving a call from Williams' nine-year-old son saying that his dad was "talking crazy" and not taking his epilepsy medication. The boy reportedly asked for an ambulance "because my dad is saying all sorts of stuff and he is hitting my mom with a belt". When police arrived, Williams called the officer "the devil" and grabbed the officer's baton and threw it at him. Despite the son's request for a "hospital truck", police arrested him and took him to jail. He was reportedly struck twice with a taser while being strapped into a restraint chair and was noticed to have stopped breathing seconds later. He died later in hospital.

The autopsy is reported to have found that Williams had died of brain damage caused by "lack of oxygen and/or blood to the brain" from a heart attack triggered during the altercation. The forensic examiners reported that "There is no evidence the Taser directly caused or contributed to his death", but were unable to determine the reasons for the heart attack.

Williams was the second person to die in Gwinnett County Jail after being tasered and strapped into a restraint chair. Ray Austin, aged 25, died in September 2003 after fighting with deputies, being shocked three times with a taser, restrained in a chair and given psychotropic drugs. He had a history of mental illness and disciplinary problems.

Following William's death, two Georgia police agencies (Macon Police Department and Forsyth County Sheriff's Department) said they were suspending their use of tasers and a third (College Park Police Department) was reported to have shelved plans to purchase them.

Jacob Lair, aged 29, died in June 2004, following an altercation with officers in Sparks, Washoe County, Nevada, when police entered his residence to question him about an alleged theft. In September 2004, the Washoe County Coroner, Vernon McCarty, reported that Lair had died of "acute methamphetamine intoxication with associated cardiac arrhythmia while engaged in a physical struggle with law enforcement officers involving a Taser gun, pepper spray and restraints". McCarty said that the Taser was "part of the scenario" which had contributed to his death, observing that, while Lair had methamphetamines in his system, the levels "were not as high as you would normally expect" and that the death could not be called a drug overdose.(131)

Willam Teasley, aged 31, died in Anderson County Detention Center, South Carolina in August 2004. According to media reports, officers used a taser to subdue him after he became violent while being booked into the jail and "shortly after he was shocked [he] stopped breathing". A preliminary autopsy reportedly showed he had died from cardiac arrest. The deputy county coroner, Charlie Boseman, is quoted as saying the taser contributed to Teasley's death, combined with a medical history that included heart

disease.(132) Teasley reportedly had other health problems, including severe brain damage resulting from an accident in 2003. The preliminary autopsy report was passed to the State Law Enforcement Division investigation team, with a final determination of manner of death pending the results of this inquiry.

Keith Tucker, aged 47, died in August 2004 in Las Vegas, Nevada – his was the second taser-related death in the city in six months (see Lomax case, above). According to media accounts, police responded to a 911 call from a roommate that Tucker was acting strangely. They found him talking incoherently and used batons and a stun gun after he allegedly punched an officer. He went into cardiac arrest at the scene and died later in hospital. In October 2004, the Clark County coroner determined that Tucker suffered a cardiac arrest brought on by the attempted restraint, including the batons and the taser. An inquest was scheduled for 22 October 2004.

### 2. 4. *Questions regarding time lapse between taser and death or loss of consciousness in the cases reviewed*

A major cause of sudden cardiac arrest is severe disturbance of the heart rhythm known as ventricular fibrillation: rapid contractions of the heart caused by irregular signals in the ventricles, preventing blood from being pumped from the heart. The condition causes loss of consciousness in seconds, and death (or brain death) usually within minutes if the patient cannot be successfully resuscitated. Ventricular fibrillation can be caused by a myocardial infarction (heart attack), electrocution or drowning and, in the case of electrocution, would usually follow immediately after application of the shock.(133)

In February 2002, Dr Robert Stratbucker, Medical Director for Taser International, reviewed three cases in which people had died after being struck with M26 tasers and held that the time delay between the application of the Taser and the deaths clearly ruled out the Taser as a cause of death. Dr Stratbucker asserted: "The only plausible cause of death from electrical injury not leaving tell-tale skin lesions – clearly not present in any of the cited cases – is ventricular fibrillation, a fatal disturbance of heart rhythm which ensues immediately upon shocking the heart with greater-than-threshhold, non-Taser-like electric current pulses. Specifically, if the Taser output were to cause cardiac arrests, it would be immediate."(134)

In a letter to the ACLU of Colorado in February 2004 on deaths of people struck by police tasers, Taser International reiterated Dr Stratbucker's findings, stating: "If the electrical stimulation of the TASER device were to play a causal role in the death, the death would be immediate (this has never happened)."(135)

However, there are several cases in which cardiac or respiratory arrest appears to have occurred immediately or very shortly after the taser discharge, or after the last of multiple shocks. This may indicate a causal link between the taser and the death or cardiac or respiratory arrest. Amnesty International does not have complete information on the cases and the exact time lag is not always clear in autopsy reports (which rely on police reports which themselves may not always give an exact time sequence). In some cases, autopsy reports or investigations are still pending. However, Amnesty International believes that a temporal link between the use of the taser and loss of consciousness cannot be ruled out in a number of deaths and that this issue

raises a serious concern that requires further careful review and investigation by independent medical and scientific experts.

For example, in the cases cited above:

> According to reports, after the final shock, an officer noted that James Borden was no longer responsive and his face was discoloured. An ambulance was called and attempts at resuscitation failed. He was pronounced dead on arrival at hospital.

> The autopsy report in the case of Eddie Alvarado states that: "After the 5th taser application, he moved away from the mirror and prone on the floor (sic). He was then hobble-restrained. Subsequently, he was found to be in pulmonary arrest ... and was pronounced dead on arrival to the hospital". Although cause of death was given as drug intoxication, the autopsy report stated:

> "The circumstances indicated a temporal relationship between restraint, including taser application, and his cardiopulmonary arrest. However, this autopsy does not provide sufficient medical evidence to conclude or exclude that taser use contributed to the death. It should be noted that after taser, the decedent was noted to have a weak pulse and agonal EKG change. Hence, the manner of death is undetermined."

> In Glenn Richard Leyba's case, a paramedic on the scene reported that Leyba "is limp after the last taser" and appears to be unconscious; after being lifted onto the stretcher he "became apnic (sic)" (non-breathing) and a monitor "confirmed pulselessness". Attempts to resuscitate him failed and he was pronounced dead on arrival at hospital.

The forensic pathologist who reviewed the autopsy for Amnesty International found that, although the coroner had ruled out the taser effect, there might well be a connection between the last taser and the handcuffing behind the back, with cocaine also being a major factor. Several other individuals are also reported to have gone into respiratory or cardiac arrest at the scene. According to media reports, Roman Gallius Pierson, for example, was handcuffed after the second taser shot and "after about a minute, officers noticed he was not breathing".(136) Terrence Brian Hanna, who died in Canada, was tasered and "subsequently went into cardiac arrest at the scene." Frederick Williams was shocked while being strapped into a restraint chair and "seconds later" his heart stopped. William Teasley was shocked with a taser and "shortly after he was shocked, he stopped breathing".

### 2. 5. Delayed death: metabolic acidosis

There has been some discussion in the medical literature of the possible effect of tasers on metabolic acidosis – a potentially fatal disturbance of the body acid-base balance.(137) Metabolic acidosis can occur in individuals who are severely agitated and this can lead to ventricular arrhythmia, especially in the presence of certain toxic drugs.

Taser International has suggested that the taser is not only safer than many weapons but can actually work to prevent metabolic acidosis because its instant incapacitation of the subject cuts short the duration of struggle and any dangerous build up of acid.(138) However, one federal

study suggested that "deaths following Taser use may be related to the ability of these devices to cause increased muscle activity and decreased breathing"(139) and other studies have suggested that further research into the effects of tasers in acidosis is required (see **2.7**, below). As noted above, in several of the cases reviewed by Amnesty International, the deceased continued to struggle and exhibit agitated behaviour, sometimes after repeated stunning.

An article on the effects of stun guns and tasers, published in the medical journal, the *Lancet*, in September 2001, addressed the risk of acidosis and ventricular dysrhythmias in people in states of severe agitation or physical aggression, particularly when under the influence of drugs such as phencyclidine (PCP) or cocaine. The article noted:

"The taser itself may affect acid-base balance by briefly increasing skeletal muscle activity and decreasing respiration."(140)
The authors reviewed one earlier study in which three people (high on drugs) went into cardiac arrest between 5-25 minutes after being hit with tasers and stated:

"By this time, taser-induced muscle contractions would no longer be present, and one would expect the individuals to be relaxing and able to breathe in a way that would compensate for a metabolic acidosis. *Such may not be the case if the individuals remained agitated or were prevented from breathing freely*" (*AI* emphasis).
Amnesty International believes that these concerns should be examined in the light of a number of recent taser-related deaths, particularly in cases where individuals were tasered and continued to fight or struggle, and were then hogtied or subjected to other restraint after application of taser.

### 2. 6. Impact of other restraints
In at least 24 of the cases reviewed, the deceased appear to have been coerced into restraint positions which can dangerously restrict breathing and have been associated with deaths in custody from "positional asphyxia". Such positions include being held face-down on the ground with weight or pressure applied to the chest. Individuals who are obese, have underlying heart disease and/or who are severely agitated or intoxicated from drugs or alcohol are believed to be at increased risk from such procedures.

In at least eight cases, the deceased were placed in a "hogtie" or "hobble restraint", with their wrists or elbows bound behind them to their shackled ankles. This form of restraint is considered to be a particularly dangerous and potentially life threatening procedure, especially if the subject is in a prone position.(141) Standard-setting bodies discourage use of hogtying and urge that departments avoid holding anyone in restraints, even handcuffs, in a face-down position.(142) While some US departments have banned hogtying Amnesty International is disturbed that many agencies continue to use the procedure in some form.

Four of the deceased were reportedly put into "chokeholds": the application of pressure to the neck, constricting the flow of blood to the brain. The procedure is known to be dangerous and many departments either ban all forms of chokehold or restrict their use only to deadly force situations where no alternatives are available.(143)

Several of the deceased were pepper sprayed before being tasered. Pepper spray, which acts on

the mucus membranes and respiratory system, can further restrict breathing and has been associated with in-custody deaths in the USA and Canada. Amnesty International is concerned that use of multiple restraint techniques, including pepper spray, might increase the risk of respiratory failure.(144) In one case (see below), an unarmed suspect died after being pepper sprayed, electro-shocked and hog-tied.

Two prisoners (Ray Austin and Frederick Jerome Williams) died after being tasered and strapped into restraint chairs in Gwinnett County Jail, Georgia (see above). In recent years, at least 18 prisoners have died in US detention facilities after being immobilized in restraint chairs, including several who had also been struck with pepper spray and/or electro-shock weapons. The manner of restraint was found to be a primary or contributory cause of death in several cases. Amnesty International has called for a national inquiry into use of restraint chairs in the USA, based on concerns about their safety and the lack of clear regulation or monitoring of their use.(145)

Positional asphyxia was listed as a direct cause of death in four of the cases examined, and use of restraints was noted as a contributory factor in at least six other cases. In some cases, however, restraint was not listed as a causal or contributory factor even though death or loss of consciousness appears to have occurred very shortly after the use of restraints.

Experts have noted that multiple factors may play a role in deaths where restraints have been applied, particularly if other risk factors are involved. Amnesty International is concerned that using combined techniques such as pepper spray, tasers and physical restraint could exacerbate stress levels, leading to cardiac arrhythmias. The organization believes that all the cases require further evaluation. They also underscore the need for clear protocols and training for law enforcement officers on use of restraints and how to avoid excessive or dangerous force when dealing with people with mental health problems and/or acute behavioural disturbance. Case examples include the following:

Richard Baralla died in May 2002 in Pueblo County, Colorado. According to media accounts, police were called after he was seen acting strangely in the street and threatening to jump into traffic. The autopsy report states that Baralla, who was unarmed, was restrained

"… while exhibiting threatening behaviour. The efforts to restrain him included pepper spray, the application of a Taser stun gun device, the placement of handcuffs behind his back, as well as placement of a hobble on his legs. During the struggle, he became unresponsive.…Efforts at resuscitation at the scene and hospital were unsuccessful".

Although the coroner noted that on Baralla's body there were "two sets of electrical injury consistent with Taser application", he found that they were "not of sufficient severity to have contributed to the death."(146) The autopsy also found "there was no evidence of natural disease which could be considered a contributing cause of death" and the toxicology results were "essentially negative". The opinion also noted: "Witness statements did not suggest a significant asphyxial component". The coroner attributed the death to "cardiac arrest occurring during excited delirium necessitating restraint." A wrongful death lawsuit has been filed by Richard Baralla's family, claiming police used excessive force.

The forensic pathologist who reviewed the autopsy for Amnesty International considered that the taser may have been a factor, along with the use of restraints, noting a temporal relationship between the restraint, use of taser and cardiac arrest. She found that the absence of any asphyxial component, if true, may increase the significance of the taser. She also noted that the heart was somewhat enlarged (something not commented on in the autopsy report) – another possible risk factor for adverse reaction to electro-shock. (147)

Vincent Del'Ostia, aged 31, died in January 2002 in Broward County, Florida. According to the autopsy report, he had a history of psychosis, drug abuse and asthma. Police were called after he had caused a disturbance in the lobby of a motel and found him banging on the motel door. He was "reportedly agitated, incoherent and perspiring". He continued to flail about after being tasered and to strike at officers with his hands and feet while on the ground. Officers rolled him onto his stomach, placing handcuffs on his wrists and ankles, after which an officer "placed his foot on the upper mid-back to keep him from rolling back over. Paramedics arrived within approximately 30 seconds of his being restrained and observed he had stopped breathing and was unresponsive". According to a press article, a motel employee said that when the police arrived, he saw them "kicking and teasing" Del'Ostia and asked them to take it easy on him. Cause of death was determined to be cocaine toxicity.

Eddie Alvarado (see above) was hobble restrained after being tasered for the fifth time while lying prone on the floor and was subsequently (at the scene) "found in pulmonary arrest".

Terry Hanna, aged 51, died in Burnaby, Canada, in April 2003 after being shot with a taser. Police said they used the taser on him when he became "aggressive" when they tried to get him out of a police car. He went into cardiac arrest at the scene. The coroner found cause of death to be "acute cocaine intoxication", with coronary artery disease and restraint to be contributory factors. The autopsy report noted that it was "of significance … that the patient was placed face-down, handcuffed behind his back and hogtied during the restraint process."(148) An inquest in the case was still pending at time of writing.

Walter C Burks, aged 36, an unarmed, homeless man, died in Minneapolis, Minnesota, in August 2003. According to a report from a community group, based on a review of police records, Burks had entered a convenience store shirtless and sweating, "looking frightened" and begging for help, saying he was going to die.(149) After he grabbed an employee on the shoulders, staff and customers took him to the ground and tried to calm him while police were called. When the police arrived he was lying face-down on the floor with his right arm tucked under his torso. When he failed to respond to police commands to get up, he was sprayed in the face with pepper spray. He was handcuffed behind his back and dragged to a police car, still unresponsive. Officers lifted his upper body into a police car, and when he still failed to respond, tasered him twice in the lower back with an M26 in touch-stun mode. He was placed face-down on the back of the police car, handcuffed behind his back with his legs bent backwards (effectively in a hobble restraint position), and reportedly left in that position for some 27 minutes. He was wheeled into hospital in a wheelchair and staff noted him to be "drooling and still

unresponsive". He was pronounced dead a short while later. The Hennepin County Medical Examiner reportedly ruled his death to be "sudden, unexpected death associated with cocaine excited delirium", with heart disease and pulmonary emphysema underlying health factors.

Louis Morris, aged 50, died in Orange County, Florida in October 2003 as police tried to arrest him for suspicious behaviour in a grocery store car park. According to media reports, he died "just minutes after Orange County sheriff's deputies used a Taser stun gun on him". The autopsy found *inter alia* that he had a "history of bizarre, excited, paranoid behaviour prior to sudden arrest" and that he went into cardiac arrest "after being restrained with handcuffs and ankle restraints (hobbled)". There was no evidence of significant external trauma or internal injury. He had a high concentration of cocaine in his system, and the cause of death was listed as "cocaine excited delirium".

The forensic pathologist who reviewed the case for Amnesty International questioned the finding of "cocaine excited delirium" as this is a condition that cannot be diagnosed by autopsy without the history and circumstances being taken into account. She also found that, although he had relatively high levels of cocaine in his system, the distribution of this in the body may have been affected by resuscitation. Although it was impossible to assess the role of the taser on the information provided, she believed it could not be ruled out as a contributory factor, along with the restraint.

Kevin O'Brien, aged 31, died in Pembroke Pines, Florida, in November 2003. According to his attorney he was mentally disturbed, unarmed and half naked (dressed only in swimming shorts) when arrested for beating on cars. He was tasered multiple times and placed in a hogtie restraint. The autopsy report gave cause of death "positional asphyxia due to 'hogtying' and facedown (prone) restraint in an individual displaying 'excited delirium'". In his report, the Medical Examiner noted the known danger of sudden respiratory arrest caused by this procedure, especially in the case of individuals involved in a violent struggle or strenuous exercise. However, he found "There is no evidence of illegal behaviour by police, as hogtying (hobbling) face down (prone) restraint is not prohibited by Florida's laws. The Medical Examiner concurs with the policy of the Pembroke Pines Police Department that hobble restraint ("hogtying") should not be used". At the time of writing, Amnesty International was seeking information on whether any disciplinary action was taken against the officers involved, after they were cleared of criminal wrongdoing.

Lawrence Davis, aged 27, died in Phoenix, Arizona, in August 2004. According to press reports, he was involved in a struggle with officers after he jumped onto a parked patrol car, yelling incoherently. He continued to struggle after being hit with taser darts, and police tasered him again in the leg after bringing him to the ground. An officer then used a "chokehold" on him. He was pronounced dead in hospital about 45 minutes later.

### 2.7. Taser and pregnancy

One of the cases included in Amnesty International's review was the death of an unborn child in December 2001 after the pregnant mother was struck by an M26 taser. Although the coroner failed to establish a link between the taser and the foetal demise, the mother subsequently