received substantial damages in an out-of-court settlement (see Cindy Grippi case under **Lawsuits, 1.7.** above). Two medical experts consulted by the woman's lawyer reportedly found a likely causal connection between the foetal death and the electro-shock.

Taser International warns that police use of tasers is "not advisable" in the case of pregnant women because of the risk of the woman falling. Otherwise, the company maintains that the electrical output from tasers is not harmful to a foetus. However, Amnesty International is concerned by the absence of thorough, independent research into the medical effects of using low-amperage, high voltage taser shocks on pregnant women. One past study has suggested an association between electrical injury from a (low powered) taser and miscarriage after reviewing a case report and the literature on electrical injuries during pregnancy. (150) The case concerned a woman 12 weeks pregnant who was shot with a taser after she refused to submit to a strip search in a Florida jail; she began to miscarry spontaneously seven days later. She was subsequently awarded $225,000 by a federal jury. (151) A study of the safety of tasers and any associated medical risks should include further research into this topic.

### 2.8. General concerns about health risks and tasers
The manufacturers of electro-shock equipment claim their products are medically safe. It has been emphasized that the electrical output/current of even the higher powered tasers is far below the threshold for which cardiac ventricular fibrillation (severe disturbance of the heart rhythm during which the heart pumps little or no blood) could occur. A training manual produced by Taser International states that "the Advanced Taser's low electrical amperage and short duration of pulsating current, ensures a non-lethal charge". According to Steve Tuttle, director of government affairs for Taser International: "In 30 years, no death has ever been attributed directly to the Taser gun, typically it's cocaine, pre-existing medical conditions and, in some cases, excited delirium".(152) Company literature suggests that tasers are safe even for people fitted with heart pacemakers.

However, there remains a lack of rigorous, independent research into the medical and safety effects of stun weapons. While there is a limited amount of literature describing clinical experience of earlier tasers, there has been no independent medical literature published to date on the effects of the more powerful Advanced Taser. The only medical studies prior to the marketing of the Advanced Taser were tests on animals commissioned by the company; none of these studies has been peer reviewed.(153)
The earlier published literature includes a review of 16 deaths occurring in Los Angeles between 1983 and 1987, all involving people struck by the original low-powered tasers.(154) In only one case did the authors find the taser may have contributed to the death of a man who already had a severely debilitated heart (in all other cases they found cause of death was clearly due to other factors, mainly drug intoxication). The findings were challenged by forensic pathologist Dr Terrence B. Allen, who expressed concern that certain medical conditions, including drug use and heart disease, may increase the risk that the taser will be lethal and found it could have contributed to nine of the deaths.(155)

Medical experts have continued to question the safety of tasers, particularly on people with underlying heart problems or other conditions. A report in the international medical journal the

*Lancet* in September 2001, for example, reviewing the available medical literature, noted that tasers were less likely than guns to cause injury or death and that tests on pigs suggested that "cardiac myocardial ... stimulation is extremely unlikely in normal use of these devices". (156) However, the authors found that "Further research on what other cardiac effects tasers and related devices would have in people with pacemakers is needed".(157) They concluded that:

"... apart from issues related to cardiac pacemakers mentioned above, there are others that still need to be researched. Injury thresholds need to be studied, as do the effects of tasers on the nerves. Methods of stratifying people at risk of respiratory or cardiac arrest should also be examined, as well as the degree of blood-gas correction needed to minimise this risk."

The UK Defence Scientific Advisory Council Subcommittee on the Medical Implications of Less Lethal Weapons (DOMILL), reporting to the UK Home Office in December 2002, also raised concern about the potential and unknown medical risks from tasers, although a decision was made in January 2003 to pilot the M26 in the UK under limited circumstances (see below). This followed a two-year review of the operational and medical aspects of the various taser models available. The DOMILL experts noted that:

"The body of manufacturers' experimental evidence from biological models of the ... effects of taser on excitable tissues is not substantial, particularly with regard to the M26; the peer-reviewed evidence is even more limited."(158)While they found, on the available evidence, that the risk of death from primary injuries presented by the M26 taser was low, and very much lower than from conventional firearms, DOMILL observed that:

"The confidence of the opinion of a very low risk from future use of the M26 is not as high as that for the low-power device". This was due in part to the "dearth of information on the potentially adverse electrophysiological effects of the higher current flow in the body, particularly in subjects who have a predisposition to cardiac arrhythmias arising from drug use, pre-existing heart disease or genetic factors".(159) DOMILL also noted:

"There is no experimental evidence that the aforementioned pro-arrhythmic factors increase the susceptibility of the heart to low or high power Tasers specifically, sufficient to cause an arrhythmic event. *Nevertheless, there is sufficient indication from the forensic data and the known electrophysiological characteristics of the heart (and the effects of drugs on this) to express a view that excited, intoxicated individuals or those with pre-existing heart disease could be more prone to adverse effects from the M26 Taser, compared to unimpaired individuals"* (AI emphasis) (paragraph A28 of the DOMILL report).

The DOMILL experts recommended that further research should be undertaken into "cardiac hazards associated with use of the taser on individuals who could be considered to have a greater risk of adverse effects", including "possible hypersusceptibility to taser currents arising from drugs commonly used illegally in the UK, acidosis and pre-existing disease".(160) They conceded, however, that approval for piloting the M26 taser, under the strict terms of the operational guidance issued by the Association of Chief Police Office (ACPO), could be considered pending such further research.

Five UK police forces subsequently introduced trials of the M26 taser under the ACPO

guidelines: these allow tasers to be deployed only by trained officers in situations where use of a firearm has been authorized. In the UK most police officers do not carry, and are not trained to use, firearms. Firearms remain in the firearms box and are only issued to officers when authorized for specific circumstances.(161) In September 2004, the UK Home Secretary, David Blunkett, announced that, in light of the outcome of the trials, he would allow chief officers of police forces across England and Wales to deploy tasers "for use in the same strictly limited circumstances" as set out in the APCO guidelines.(162)

The announcement followed an updated report by DOMILL, which considered data from the UK trials, as well as some further limited research into the effects of electrical pulses and of certain recreational drugs on the heart. While the report concluded, overall, that the risk of life-threatening or serious injuries from the M26 Taser was very low, it left unchanged the earlier caveat set out under paragraph A28 (cited above) that "excited, intoxicated individuals or those with pre-existing heart disease could be more prone to adverse effects from the M26 Taser". The report states:

"DOMILL has reviewed the paragraph in its first statement that discussed pro-arrhythmic factors (paragraph A28) and concludes that it does not require modification on the basis of the current work. The current work provides experimental evidence to support the original statement."(163) The ACPO operational guidance for taser use in the UK deals with these risk factors by limiting tasers only to authorized situations where trained officers might otherwise use a firearm, and by instructing officers to take them into account when determining the appropriate options.(164) The guidelines also recommend immediate referral to hospital of any tasered suspect who has been fitted with a pacemaker or cardiac device and state that "all arrested persons who have been subjected to discharge of a taser must be examined by a Forensic Medical Examiner as soon as practicable".(

A review of the medical literature commissioned by Taser International also raised a number of questions about safety issues and the Advanced Taser.(166) The authors pointed to the lack of clinical medical literature on recent models and absence of conclusive evidence on the effects of the electrical discharge from tasers on humans. They expressed the view that it will be

"difficult to determine absolute safety for any given quantity or nature of electrical energy delivered by these weapons. On one hand, direct discharges into animal heart muscle did not cause ventricular fibrillation, but in earlier (disputed) work, short episodes of cardiac standstill were caused and doubts raised about the effectiveness of pacemakers under Taser stimulation".

They also wrote that:

"elderly subjects and those with pre-existing heart disease are perhaps at an increased risk of cardiac complications and death following exposure to large quantities of electrical energy. Since the elderly and heart patients don't often require to be subdued or controlled with a high level of force, then this is unlikely to pose a common problem" and that

"There is not enough proof either way to determine the risk to those with implantable defibrillators or pacemakers".
Notwithstanding the potential medical risks described, the authors found that the taser had a

"lower injury potential for prisoners than current use of unarmed defensive tactics, baton strikes and deployment of police dogs" and that "stun devices are certainly less lethal than firearms and if they are to be deployed in similar circumstances and level of threat, then the outcome will almost certainly be safer".

The authors also noted that at that time no deaths had been linked conclusively to the taser, and that "All deaths have occurred whilst in custody after Taser electrical delivery rather than during or immediately afterwards". However, as described above, Amnesty International believes the latter claim may not be the case in a number of more recently reported deaths.

An article published in the *Emergency Medical Journal* (*EMJ*) in 2004 on the implications for the Advanced Taser in British policing, authored independently by the above two experts, covered similar ground and stated that "Until clinical experience with this new device is published, it is only possible to draw general conclusions about the relative safety of the device" and that "It seems that the device is essentially safe on healthy people".(167) The authors suggested management of "tasered" patients in emergency departments, noting *inter alia* that "important points in the history will include known cardiac disease, including implanted pacemaker or defibrillator, pregnancy, drug or alcohol intoxication, bizarre behaviour at the time of arrest, other psychiatric disturbance, or coincidental medical problems". On the risks of electrical injury, the article noted "there is no evidence to date that this form of electrical delivery causes interference with cardiac or neurological function in the 30,000 volunteers or in the reported operational uses". However, the authors refer to "only four reported deaths" in about 40,000 operational uses, in which "no direct association with Taser use was implicated". Amnesty International believes that the more than 70 deaths reported since those materials were reviewed, and factors arising from those cases, provides ground for urgent independent scrutiny, as does data on alleged unwarranted injuries, excessive force and ill-treatment.

The studies cited above underscore Amnesty International's concern about the potential health hazards for serious unwarranted injuries and death that may ensue from widespread deployment of the M26 or X26 taser. While the *EMJ* review gives the opinion that tasers are essentially safe on healthy people, many tasered individuals are far from healthy. Operational surveys by law enforcement agencies in North America show that more than half the number of people confronted by the M26 Advanced Taser were impaired by alcohol, drugs or mental illness -- among the population identified by some medical experts as potentially at increased risk of adverse effects such as heart arrythmias and "acidosis". As taser use proliferates, the potentially adverse effects on people with heart disease or other underlying conditions could become a significant concern.(168)

It is important to note also that deaths have been linked with other high-voltage stun weapons in the USA. An autopsy found that a foster mother's use of a 70,000 volt stun gun on a malnourished seven-month old infant was a direct cause of his death, with the case report concluding that "stun guns are dangerous weapons".(169) An autopsy in the case of a 54-year-old man killed during a botched robbery in August 2002 ascribed cause of death as "Electrocution due to a stun gun"; the autopsy found "Factors contributing to his death are Hypertensive Cardiovascular Disease, Coronary Atherosclerosis, and Cirrhosis of the Liver."(170)

An Ultron 11 stun gun, discharging 45,000 volts at 6 milliamps, was found to be a contributory factor in the death of Virginia prisoner Larry Frazier. Frazier, a diabetic, died in July 2000 after lapsing into a coma in the prison infirmary while suffering from hypoglycaemic shock. Guards in the infirmary applied the stun gun to him three times after he allegedly became "combative" during a medical examination. The autopsy report gave cause of death as "cardiac arrhythmia due to stress while being restrained following stunning with Ultron 11 device". The coroner did not find the electro-shock from the Ultron 11 caused death directly through ventricular fibrillation, noting that "it was applied on the flank, where the output would not interfere with the heart's electrical activity" and that, according to witnesses, "the decedent continued to thrash about and shout for several minutes after the device was used". Instead, she concluded,

"It seems most likely that severe physiologic stress, initiated by hypoglycaemia and exacerbated by decedent's prolonged agitation with stunning, was sufficient to induce a lethal cardiac arrhythmia", adding that "Individuals with coronary artery disease are at increased risk for such an event" (Frazier had severe atheroscelerosis).(171)

### 3 . CONCLUSIONS AND RECOMMENDATIONS

Tasers are widely promoted by US police agencies as being a useful force tool, safer than many other weapons or techniques used to restrain dangerous, aggressive and focused individuals. In practice, however, they are commonly used to subdue individuals who do not pose a serious and immediate threat to the lives or safety of others. In many reported instances police actions using tasers appear to have breached international standards on the use of force as well as the prohibition against torture or other cruel, inhuman or degrading treatment or punishment.

Amnesty International considers that electro-shock weapons are inherently open to abuse as they can inflict severe pain at the push of a button without leaving substantial marks, and can further be used to inflict repeated shocks. While the capacity for abuse exists in whichever mode tasers are deployed, Amnesty International believes that tasers in "touch" stun gun mode are particularly open to abuse, as they are designed for "pain compliance" and tend to be used against individuals who are already in custody or under police control, often with multiple shocks.

Amnesty International is further concerned that, despite being widely deployed, there has been no rigorous, independent and impartial study into the use and effects of tasers. Medical opinion has continued to raise concern about potential health risks from tasers, particularly in the case of people suffering from heart disease, or under the influence of certain drugs. Amnesty International's concerns are heightened by a growing number of deaths of individuals struck by police tasers. The organization believes that the taser cannot be ruled out as a possible contributory factor in some deaths. Concerns about the risks associated with tasers increase as they become more widely deployed.

Many police agencies claim that tasers have the potential to save lives or avoid serious injury in cases where police officers might otherwise resort to firearms or other forms of deadly force. It is self-evident that tasers are less-lethal or injurious than firearms. Amnesty acknowledges that there may be situations where tasers can effectively be used as "stand-off", defensive weapons as an alternative to firearms in order to save lives. This appears to be the aim of the limited introduction of tasers to UK police who operate under strict rules. However, it appears that in

practice tasers are rarely used as an alternative to firearms in the USA and most departments place them at a relatively low level on the "force scale". Amnesty International further notes that measures such as stricter controls and training on the use of force and firearms are likely to be more effective overall in reducing unnecessary deaths or injuries.

Based on these considerations, Amnesty International makes the following recommendations to federal, state and local authorities:

1. Suspend all transfers and use of tasers and other electro-shock weapons pending a rigorous, independent and impartial inquiry into their use and effects. Such an inquiry should be carried out by acknowledged medical, scientific, legal and law enforcement experts who are independent of commercial and political interests in promoting such equipment. They should rigorously assess their medical and other effects in terms of international human rights standards regulating the treatment of prisoners and use of force; the inquiry should include the systematic examination of all known cases of deaths and injury involving the use of such weapons and also consider the mental impact of being subjected to electro-shock. The study should recommend strict rules, safeguards and oversight procedures to prevent misuse of any types of electro-shock equipment that may be viewed as having a legitimate use in law enforcement. A report of the findings of such an inquiry should be made public promptly after completion of the study.
2. International standards recognize that situations will arise in which police officers will have to use force. However, these standards, specifically the (UN) Code of Conduct for Law Enforcement Officials and the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, set specific guidelines on when, how and the extent to which force can legitimately be used. All law enforcement agencies should ensure that officers are trained to use force strictly in accordance with these standards. (172)
3. Federal, state and local authorities should ensure that use of force training programs for law enforcement officials include international standards on human rights, particularly the prohibition against torture and cruel, inhuman or degrading treatment or punishment.
4. All allegations of human rights violations and other police misconduct should be fully and impartially investigated. All officers responsible for abuses should be adequately disciplined and, where appropriate, prosecuted.
**Where law enforcement agencies refuse to suspend their use of tasers, pending the outcome of the above-mentioned inquiry, Amnesty International recommends that:**
5. departments using tasers should strictly limit their use to situations where the alternative would be use of deadly force. Examples would include: armed stand-offs, instances in which a police officer faces a life-threatening attack or injury, or threat of attack with a deadly weapon, or where the target presents an immediate threat of death or serious injury to him/herself or others. In such circumstances, tasers should be used only where less extreme measures are ineffective or without a promise of achieving the intended result.
6. Unarmed suspects should not be shot with a taser for arguing or talking back, being discourteous, refusing to obey an order, resisting arrest or fleeing a minor crime scene, unless they pose an immediate threat of death or serious injury that cannot be controlled through less extreme measures.
7. Operational rules and use of force training should include a prohibition against using tasers on the following groups, except as a last resort to avoid deadly force when no alternatives other than firearms are available: pregnant women; the elderly; children; emotionally disturbed persons or

people who are mentally or physically disabled; people in vulnerable positions where there is a risk of serious secondary injury (e.g. in dangerously elevated positions, or near flammable substances); people under the influence of drugs.

8. Repeated shocks should be avoided unless absolutely necessary to avoid serious injury or death.

9. Departments should introduce guidelines which prohibit the application of prolonged shocks beyond the five-second discharge cycle.

10. Tasers should only be used in stun gun mode as a back-up to dart-firing tasers and only when no other options are available to an officer and there is an immediate threat of death or serious injury to the officer, the suspect or another person. The stun gun function should never be used to force a person to comply with an order given by an officer where there is no immediate threat to the life or safety of the officer or others.

11. Whenever an individual has been shot with a taser, police officers or custody staff should be required to call paramedics or other medical professionals to administer treatment. It is advisable to take tasered subjects to hospital to have the barbs removed and to monitor for other adverse effects.

12. Federal, state and local agencies should ensure strict reporting by the departments concerned on all use or display of tasers, with regular monitoring and data made public. In particular:

> Departments should download data recorded by officers' tasers after every incident in which they are used. A summary of this data should be included in all use of force reports.

> Each display, "sparking" or shock administered by a taser should be reported in use of force reports, as well as whether the taser was used in dart-firing or stun gun mode and the reasons why a taser was used. The number of trigger-pulls and duration of the shock should be reported in each instance. The age, race and gender of each person against whom a taser is deployed should also be reported.

> Prisons and other institutional facilities should install remote monitoring equipment to record taser usage automatically as it occurs.

> Each department should provide a detailed break-down of its taser use in regular, public reports.

**Recommendations on private sale or use of tasers**

13. Tasers and electro-shock weapons should not be sold to members of the public whose use of the device cannot be monitored, constrained or accounted for.

14. In jurisdictions where officials refuse to ban their sale, all tasers and electro-shock weapons sold to the public should be registered with local officials.

15. The same restrictions on firearms purchased by convicted felons or individuals convicted for domestic violence, should apply to electro-shock weapons sales.

16. The sale of tasers should be regulated as firearms, even though they use compressed gas rather than gunpowder. Federal, state and local officials should set strict guidelines to curtail abuse of electro-shock weapons available to the public, with strict penalties imposed for unlawful use of such weapons.

**Additional recommendations:**

17. Mentally ill or disturbed individuals should receive appropriate treatment and alternatives to force in line with best practice. Where officers have reason to believe that a disturbed individual

may be acting in a violent or threatening manner as a result of mental illness, efforts should be made to involve mental health specialists in dealing with the disturbed person. Policing methods based on force should only be used as a last resort.

18. Dangerous restraint holds such as hogtying and use of carotid neckholds or chokeholds should be banned.

19. There should be strict limitations and guidelines on the circumstances in which pepper spray should be used, with clear monitoring procedures.

## 4. APPENDICES

### 4.1. Appendix 1: Taser deaths in USA and Canada June 2001 - 4 Oct 2004

*** To view / print this table, please use the View PDF option ***

### 4.2. Appendix 2: Selected International Instruments

*Articles of the International Covenant on Civil and Political Rights (ratified by the US Government on 8 June 1992)*

*Article 6*
1. Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life.

*Article 7*
No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. In particular, no one shall be subjected without his free consent to medical or scientific experimentation.

*Article 10*
1. All persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person.

*The United Nations (UN) Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (ratified by the US government in October 1994)*

This provides, among other things, that education and information regarding the prohibition against torture or other cruel, inhuman or degrading treatment or punishment shall be fully included in the training of law enforcement personnel and others (Articles 10 and 16). It also provides that each State Party shall ensure there is a prompt and impartial investigation whenever there is reasonable ground to believe that an act of torture or other cruel, inhuman or degrading treatment has been committed in any territory under its jurisdiction (Articles 12 and 16).

*Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment.*
*Adopted by General Assembly resolution 43/173 of 9 December 1988*

*Principle 1*

All persons under any form of detention or imprisonment shall be treated in a humane manner and with respect for the inherent dignity of the human person.

*Principle 6*
No person under any form of detention or imprisonment shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment. No circumstance whatever may be invoked as a justification for torture or other cruel, inhuman or degrading treatment or punishment.

*Principle 34*
Whenever the death or disappearance of a detained or imprisoned person occurs during his detention or imprisonment, an inquiry into the cause of death or disappearance shall be held by a judicial or other authority, either on its own motion or at the instance of a member of the family of such a person or any person who has knowledge of the case. When circumstances so warrant, such an inquiry shall be held on the same procedural basis whenever the death or disappearance occurs shortly after the termination of the detention or imprisonment. The findings of such inquiry or a report thereon shall be made available upon request, unless doing so would jeopardize an ongoing criminal investigation.


*Standards on police codes of conduct and use of force*

Relevant articles under the UN Code of Conduct for Law Enforcement Officials, adopted by the UN General Assembly in 1979:

Article 2: "In the performance of their duty, law enforcement officials shall respect and protect human dignity and maintain and uphold the human rights of all persons."

Article 3: "Law enforcement officials may use force only when strictly necessary and to the extent required for the performance of their duty."

More detailed guidelines are set out in the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, adopted by the Eighth UN Congress on the Prevention of Crime and Treatment of Offenders on 7 September 1990. These provide in part:

4. "Law enforcement officials, in carrying out their duty, shall, as far as possible, apply non-violent means before resorting to the use of force and firearms. They may use force and firearms only if other means remain ineffective or without any promise of achieving the intended result."

5. "Whenever use of force and firearms is unavoidable, law enforcement officials shall:
a. Exercise restraint in such use and act in proportion to the seriousness of the offence and the legitimate objective to be achieved;
b. Minimize damage and injury and respect and preserve human life;
c. Ensure that assistance and medical aid are rendered to any injured or affected persons at the earliest possible moment";

9. "Law enforcement officials shall not use firearms against persons except in self-defence or defence of others against the imminent threat of death or serious injury, to prevent the perpetration of a particularly serious crime involving grave threat to life, to arrest a person presenting such a danger or resisting their authority, or to prevent his or her escape, and only when less extreme means are insufficient to achieve these objectives. In any event, intentional lethal use of firearms may only be made when strictly unavoidable in order to protect life."

10. "In the circumstances provided for under principle 9, law enforcement officials shall identify themselves as such and give a clear warning of their intent to use firearms, with sufficient time for the warning to be observed, unless to do so would unduly place the law enforcement officials at risk or would create a risk of death or serious harm to others, or would be clearly inappropriate or pointless in the circumstances of the incident."

The Basic Principles also provide that law enforcement officials shall, among other things:

11(b) "Ensure that firearms are used only in appropriate circumstances and in a manner likely to decrease the risk of unnecessary harm."

Article 6 of the Basic Principles provides that officials shall promptly report any use of force or firearms that results in injury or death. Article 7 provides that governments shall ensure that "arbitrary or abusive use of force and firearms by law enforcement officials is punished as a criminal offence under their law."

Governments were asked to consider incorporating the provisions of the Code of Conduct for Law Enforcement Officials into national legislation or guidelines for law enforcement agencies.

The Eighth UN Crime Congress invited member states to bring the Basic Principles to the attention of law enforcement officials and other members of the executive branch of government, judges, lawyers, the legislature and the public and to inform the UN Secretary-General every five years of the progress achieved in their implementation.

### 4.3. Appendix 3: Distribution and deployment of tasers by Region and Country

According to a list of distributors published by Taser International in April 2000 and July 2004, there were 43 distributors covering a total of 50 countries worldwide (see table below). It is not known whether Taser is currently exporting to all these countries. However in 1997 the company was quoted as claiming that they were exporting to more than 35 countries. Electronic Telegraph 10/6/97: ...Quoted in the October 1996 issue of Security Products, Smith claims to export to more than 35 countries.(173)

Using reports from companies, distributor and media indicate that the various Taser models have been tested, trialled, deployed or are in use by police forces in at least 28 countries.

### Africa

| Country | Deployment / Trials |
|---|---|
| Algeria | |
| South Africa | Police Task Force<br>Parlimentary Committee<br>South African Police Services<br>National Task Force (SA SWAT)<br>Hostage Negotiation (174) |

## Asia Pacific

| Country | Deployment/Trials |
|---|---|
| Australia | New South Wales Police Deployed (175) |
| Malaysia | Malaysia Police3 |
| New Zealand | "TYPE=PICT;ALT=" |
| Philippines | "TYPE=PICT;ALT=" |
| Singapore | "TYPE=PICT;ALT=" |
| South Korea | "used" (176)<br><br>Korean Airlines (177)<br><br>Incheon Provincial Police Agency<br>Ministry of National Defense<br>9965 Unit ROK Army3 |
| Thailand | "used"4 |

## Europe

| Country | Deployment/Trials |
|---|---|
| Andorra | "TYPE=PICT;ALT=" |
| Austria | "TYPE=PICT;ALT=" |

| | |
|---|---|
| Belgium | Belgian Federal Police |
| Bulgaria | |
| Canary Islands | Canary Island Authority |
| Croatia | |
| Czech Republic | |
| Denmark | |
| Finland | Finnish Police Techinical Center<br>Finland Army Units<br><br>Testing (178) |
| France | French Police Dept.<br>Firearm Headquarters/DGA<br>French-German Research Institute<br>Ministry of the Interior / Paris<br>Security Republican Company / Paris<br>Public Security Headquarters<br>Marine Commando Headquarters<br>Air Army Headquarters |
| Germany | German Army Special Forces<br>German Army for Peacekeepers in Kosovo<br>German Gov't Federal Air Marshalls<br>SEK North Rhine Westphalia**<br>SEK Berlin<br>SEK Niedersachsen<br>SEK Sachsen<br>SEK Baden Wuerttemberg<br>SEK Thueringen<br>SEK Rheinland Pfalz<br>SEK Hessen<br>SEK Bavaria South (Munich SWAT team)<br>GSG 9 (German Federal Anti Terrorist unit)<br><br>"used" |
| Greece | Greek Special Forces of the Greek |

| | Air Staff3 |
|---|---|
| Ireland | |
| Latvia | |
| Lithuania | |
| Luxembourg | Luxembourg SWAT*<br>*Unites Speciales de Police<br>Grand-Ducale de Luxembourg |
| Netherlands | |
| Norway | |
| Poland | Deployed? |
| Romania | |
| Slovenia | |
| Spain | Garafia<br>Espartinas<br>UEI Guardia Civil<br>- Sp. - Castellon<br>Alcala de Xivert<br>- Sp. - Kanarske ostr.<br>Canary Island Authority |
| Sweden | Tests |
| Switzerland | Trialled and deployed (179) |
| Turkey | Turkish Special Forces<br><br>Trialled. (180) |
| UK | Trialled and deployed |

**Middle East**

| Country | Deployment/Trials |
|---|---|
| Bahrain | GHQ Bahrain Defence Force |

| Iran | |
|---|---|
| Iraq | Deployed with US Military Forces |
| Israel | Israeli Air Force<br>Israel Police |
| Jordan | |
| Kuwait | Special Forces of MOI |
| Lebanon | |
| Saudi Arabia | |
| United Arab Emirates | Abu-Dhabi Police<br>Dubai Police |

## North America

| Country | Deployment/ Trials |
|---|---|
| Canada | Trialled and deployed |
| Mexico | Mexican Army |
| United States of America | Trialled and deployed |

## South America & Caribbean

| Country | Deployment/Trials |
|---|---|
| Argentina | Argentine Federal Police<br>Gendameria<br>Argentine Coast Guard<br>Pan Air Force<br>Argentine Presidential Security<br>Justice Minstery – Jails |
| Brazil | |
| Chile | |

| Paraguay | |
|---|---|
| Peru | |
| Trinidad & Tobago | Trinidad Police |
| US Virgin Islands | |
| Venezuela | |

********

(1) ldsnews.com, 20 February 2004.

(2) See, for example, Amnesty International, The Pain Merchants: Security equipment and its use in torture and other ill-treatment (AI Index: ACT 40/008/2003)

(3) Principles 2 and 3 of the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials, Eighth United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Havana, 1990 (U.N.Doc. A/CONF.144/28/Rev.1 at 112 (1990).

(4) Many US police departments use a "use of force continuum" setting out the appropriate force options in response to each resistance level, on a rising scale from "officer's presence" to use of deadly force.

(5) It is an acronym of Thomas A. Swift's Electrical Rifle, based on the child's novel Tom Swift and his Electric Rifle by Victor Appleton, published in 1911.

(6) Known by the alternative chemical name of Phencyclidine and a range of slang terms such as "angel dust".

(7) The original taser operated on only 5 watts and was followed by Air Taser on 7 watts. The M18-M26 series of tasers, introduced by Taser International in 1999 and 2000, operate on 18-26 watts of electrical output.

(8) According to company literature, the X26 is 5% more incapacitating than the M26 while using less energy, due to its advanced Shaped Pulse Technology which sends the hardest, high voltage, short duration, pulsed energy for the first two seconds, when the darts penetrate clothing, skin or other barriers, with a reduced rate for the rest of the hit.

(9) Taser International literature.

(10) According to testimony at the inquest into the death of William Lomax on 25 June 2004, the Las Vegas Metropolitan Police Department stopped having officers "taze" each other during training after complaints from officers about having to take a "hit" and complaints about injuries from falling.

(11) Taser International, Certified Lesson Plan, Version 8.0, Advanced Taser M26.

(12) Neck and arm

(13) Outer thigh

(14) From transcript of inquest proceedings in case of William Lomax, Las Vegas, Nevada, 25 June 2004 (see more on this case under Deaths in Custody, below).

(15) In Michigan the law was changed in December 2002 to legalize tasers for law enforcement use only, since when more than 100 police agencies in the state have begun using them. Massachusetts became the most recent state to pass similar legislation in July 2004, leaving New Jersey as the only state still banning their use in all circumstances.

(16) Taser International announced in June 2004 that it had won a $1.8 million contract to provide stun weapons to US military personnel, following a previous smaller order by the U.S. Army for stun guns and tasers for use in Iraq. (AP, 30 June 2004).

(17) Aviation Daily, 2 August 2002 (available at:www.taser.com/aviation/aviation02.html)

(18) "US issuing troops more 'non-lethal' weaponry", Chicago Tribune, 11 December 2003, citing a report from retired Lt Col Wesley Barbour that members of the 800th Brigade used lethal force several times to quell detainee uprisings but that such rebellions ended after police "demonstrated" the power of the taser. A report by Major-General Antonio Taguba in December 2003 found members of the 800th Brigade were among US forces which had engaged in "sadistic, blatant and wanton" abuse of detainees in Abu Ghraib Prison in 2003 **http://news/findlaw.com/hdocs/Iraq/tagubarpt/html**.

(19) See Appendix 2 for a list of countries reported to have deployed, tested or trialled tasers, or have taser distributors based there. Amnesty International obtained the information from various sources, including Taser International's website listing distributors.

(20) Tasers are barred for citizen use in seven US states: Massachussetts, Rhode Island, New York, New Jersey, Wisconsin, Michigan and Hawaii, and in certain cities and counties.

(21) Because tasers use compressed air or gas instead of gunpowder to propel the darts, tasers are not considered as firearms and do not fall under the regulation of the Federal Bureau of Alcohol, Tobacco or Firearms.

(22) Taser International press release, 15 September 2004. The release states that the extended discharge is in order to allow the user "sufficient time to safely get away from a potentially life-threatening situation". The company reports that private citizens who purchase the device will receive a 40 minute training video and a coupon redeemable for a one-hour in-home training course from a local law enforcement officer trained in taser use.

(23) Principle 9 of the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials

(24) "Taser International Strongly Refutes New York Times Article", statement from Taser International July 2004, following a critical article in the New York Times. The statement cites company estimates that less than one in ten police reports on such incidents are received and that "Accordingly, we conservatively estimate that there are over 5,000 such incidents where the TASER has saved a life or averted serious bodily injury".

(25) From a Taser International lesson plan on the M26 Advanced Taser.

(26) City of Phoenix Police Department news release, 6 February 2004

(27) www.taser.com/pdfs/m26brochure.pdf

(28) "As Shocks Replace Police Bullets, Deaths Drop but Questions Arise", New York Times 7 March 2004 – no-one was shot and killed in Seattle for the first time in 15 years. In Miami there were no police shootings, fatal or otherwise, in 2003, for the first time in 14 years.

(29) Indeed, in a letter to the Miami City Attorney, dated 13 March 2003, the Justice Department expressed concern that the Miami Police Department's policy on tasers was insufficiently stringent, noting that it failed to define what constituted a reasonable use of force or to place tasers on a "use of force continuum". The Justice Department recommended the introduction of a force continuum as a valuable tool which "emphasizes that an officer's presence, verbal commands and use of soft hands techniques (using hands to escort rather than control) can often be used as an alternative to other, more significant, uses of force."

(30) There have been many reported instances of abusive use of pepper spray and chemical sprays by US law enforcement officials against people in police custody, in prisons and in juvenile detention facilities, including their use as a front line of control in the case of individuals who fail to comply immediately with orders. Complaints have been documented in lawsuits, by civil liberties and police monitoring bodies, and in Amnesty International reports.

(31) Justice Department press release on the MPD, dated June 2001: "In the past two years … MPD has achieved a significant reduction in the rate at which it uses deadly force and the rate at which its canines bite suspects". Officer-involved-shootings fell from 16 fatalities in 1990 to four in 1999 and two in 2000. The MPD did not have tasers at that time.

(32) In the LAPD, for example, police shootings and total use-of-force incidents deceased significantly between 1990 and 1999, during a period in which an independent monitor noted that there were "better investigations, better oversight, greater scrutiny on the use of force" than ever before (former Inspector General Jeff Eglash, quoted in L.A. Weekly, September 2002). The LASD saw police shootings fall by 70% from 1991 to 2000, during a period in which the number of arrests remained constant. The Special Monitor appointed to oversee the department reported in 2003 that that "excessive force has been substantially curbed", and that better reporting and

monitoring had contributed to this trend. Civilian Oversight of the Police in the United States, Merrick Bobb, September 2002.

(33) There were eight police shootings in San Jose in 1999; five in 2000; four in 2001; zero in 2002; four in 2003 and six in the first nine months of 2004. (1999-2003 statistics from IPA 2003 Report.)

(34) "Police to review use of stun gun", Mercury News, 29 September 2004

(35) The mid-range on the force continuum is generally where pepper or chemical sprays are placed. Taser International told Amnesty International that 86% of US agencies placed tasers at this level.

(36) Several police departments have recently changed their policies to raise the entry level for taser use from "passive" to "active" resistance following controversial cases. These include 11 police agencies in Orange County, Florida. Other departments reportedly continue to authorize such use, either in a written policy or in practice (they include the Honolulu Police Department, Hawaii; the Portland Police Department, Oregon, which is reported to allow taser use against people who are non-compliant but not a physical threat; several agencies in Colorado are also reported, in practice, to have used tasers against people passively resisting arrest, or refusing to obey a police order.)

(37) Examples include the Mesa Police Department, Arizona; the Chula Vista Police Department, California and the Putman County Sheriff's Office, Florida.

(38) Telephone interview, March 2004

(39) "Law enforcement officials may use force only when strictly necessary and to the extent required for the performance of their duty" (Article 2, UN Code of Conduct for Law Enforcement Officials); "Law enforcement officials, in carrying out their duty, shall, as far as possible, use non-violent means before resorting to the use of force and firearms.." and should "exercise restraint in such use and act in proportion to the seriousness of the offence and the legitimate objective to be pursued" (Articles 5 and 5(a) of the Basic Principles on the Use of Force and Firearms by Law Enforcement Officials.

(40) General Comment 20, 10 April 1992

(41) Sources include: Miami Herald 14 April 2002; Orlando Sentinel 4 August 2002; Miramar Police Department; WJXT News4-Jax.com, 8 January 2004; Putnam County Sheriff's Office, March 2004.

(42) Report by J.D. Gallop, Florida Today, June 2004

(43) Source: from statistics in an Orange County Sheriff's Department document dated October 15, 2003, under heading Orange County Use of Force Successes. The taser was most widely used in cases of "Active Physical Resistance", a level below "Aggressive Physical Resistance".

(44) Police Tasers set to stun, by David Migoya, Denver Post 4 May 2004; the study was based on a review of court and police records.

(45) Concerns outlined in a 10-page letter dated 26 February 2004 to Gerry Whitman, Chief of Denver Police Department, from Mark Silverstein, Legal Director, ACLU of Colorado

(46) Series of articles by Nick Budnick, appearing in the Willamette Week, Portland Oregon, on 4, 11 and 18 February 2004

(47) Widely reported incidents, often called "suicide by cop", in which deranged individuals brandishing weapons allegedly goad officers into shooting them.

(48) Information attributed to Trainng Captain Mike Crebs, reported in Oregonlive.com, 24 May 2004.

(49) Chandler Police Department: Advanced Taser Use of Force, 2003 Annual Report, published February 2004.

(50) Tasers were added to every Chandler officer's arsenal in May 2003

(51) A 15-member Citizen Review Panel ruled unanimously in January 2004 that use of the taser in this case, which occurred in September 2003, was within policy and did not constitute excessive force.

(52) SDP Special Reports: The M26 Taser, Two Years' Experience, March 2003; SPD Taser Use 2001-2003 Key Findings, May 2004.

(53) SPD Special Report: The M26 Taser, Two Years' Experience, March 2003

(54) According to the OPARB report, while one officer stated he had used his taser four times on the complainant, the data retrieval device on the other officer's taser had been inadvertently "corrupted" and it was unclear how many times he had pulled the trigger (OPARB 2003 Year End Report, April 30, 2004).

(55) Information from the Seattle Times, 21 September 2004

(56) Advanced Taser M26 Field Report Analysis, Taser International, November 2002. Amnesty International has also received a copy of a later analysis prepared for Taser International of 2,690 taser field uses, dated May 2003, in which 83% of cases the suspect was unarmed, with the remaining percentages broadly similar to the figures given in the November 2002 report.

(57) Amnesty International recognizes that this breakdown may not provide a complete picture of which incidents involved some form of violent or threatening behaviour, as these were the initial call-out categories.

(58) Such standards include the UN Convention on the Rights of the Child, signed but not ratified by the USA. As a signatory to the treaty, the US is bound not to do anything to undermine the object and purpose of the treaty. The treaty further enshrines the right of those under 18 to protection "from all forms of physical or mental violence, injury or abuse ...". A child is defined under international standards as a person under 18.

(59) Concerns arise over dangers youths face being zapped by San Jose police; "Chief defends officers' practices", Mercury News, 16 September 2004

(60) Analysis produced for Taser International, dated May 2003, cited at note 47, above.

(61) As noted earlier, Taser International has estimated that it receives only about a tenth of all reports of taser use from police. An article in the Arizona Daily Star on 26 May 2004 reported that ten children under 10, nine aged from one to six years, had been hit by tasers, some inadvertently. The information was reportedly based on a print-out received from Taser International. Taser International told Amnesty International that the statistics cited were inaccurate and that the data had been misinterpreted (five uses, it said, were of animals). Amnesty International has not seen the print-out in question and at the time of writing was seeking further clarification from Taser International.

(62) Associated Press, 1 June 2004

(63) Houston Chronicle 26 September 2002

(64) St Petersburg Times, 11 June 2003

(65) As described above (1.2), the electrical charge can continue beyond the default five seconds, for as long as the officer's finger remains depressed on the trigger.

(66) According to a report in the Denver Post on 20 September 2004, a third of the 112 people tasered by Pueblo police since January 2003 were handcuffed.

(67) Police incident report

(68) See United States of America: Cruelty in Control? The stun belt and other electro-shock equipment in law enforcement (AI Index: AMR 51/054/1999)

(69) Advanced Taser M26 Field Report Analysis, op cit.

(70) Seattle Police Department Taser Use 2001-2003, Key Findings, May 2004

(71) The Oklahoman, 6 July 2004

(72) Willamette Weekly, op. cit.

(73) Taser International Certified Lesson Plan, op cit.

(74) The cartridge also releases confetti-like identification tags when fired (see Safeguards below).

(75) Letter from Mark Silverstein, Legal Director, ACLU of Colorado, to Denver Mayor's Task Force on police, 15 March 2004.

(76) Willamette Week report, op cit

(77) See, for example, Amnesty International reports USA: Cruelty in Control? The Stun Belt and other Electro-shock equipment in Law Enforcement (AI Index AMR 51/54/99); USA: Cruel and inhuman treatment in Virginia supermaximum security prisons (AMR 51/065/2001); USA: A briefing for the UN Committee against Torture (AMR 51/56/00); Combating Torture: a manual for action (Amnesty International Publications 2003, pp 35-36).

(78) US Department of Justice, Civil Rights Division, letter to Maricopa County Board of Supervisors, 25 March 1996.

(79) See Amnesty International Report USA: Ill-treatment of inmates in Maricopa County Jails, Arizona (AMR 51/51/97).

(80) Report of Corrections Consultant on the Use of Force in the Marricopa County Jails, Phoenix, Arizona, prepared by George E Sullivan, Salem, Oregon May 14, 1997.

(81) United States of America v County of Maricopa et al, US District Court for the District of Arizona, Proposed Order 18 November 1997.

(82) Autopsy report in case of Lawrence Frazier, see below, under 2.7.

(83) The City of Mesa authorities informed Amnesty International that, following the decision not to prosecute the officer, the case would be reviewed by a Mesa Police Department Board of Inquiry to review the incident for possible violations of its policies and procedures.

(84) Information provided through conversations with Cindy Grippi's lawyer. Amnesty International was unable to obtain the transcripts of the expert testimony.

(85) Report to Amnesty International by Sidsel Rogde MD, PhD, Professor of Forensic Medicine, University of Oslo, Norway.

(86) City Pays Excessive Force Claim, OregonLive.com 23 April 2004

(87) Aldred was also one of five officers involved in the arrest and death of Luis Torres, a migrant worker from Mexico, in January 2002. A medical examiner ruled Torres' death a homicide during a police struggle, caused by compression of his airways. However, Aldred and others were cleared of using excessive force in the case.

(88) Source: attorney for plaintiff; Houston Chronicle, 27 October 2003

(89) There remains some discrepancy between the injuries and the taser strikes recorded, unless the probes jumped around as they were fired into her body. However, it is clear from the record that the trigger was pulled (in dart and stun mode) at least 12 times.

(90) Sources: The Vancouver Columbian, 26 April 2004, citing police reports; Oregonian, 9, 23 April 2004.

(91) A term of abuse for gay males

(92) email from Rick Smith, Taser International, 7 October 2004

(93) There is no maximum cycle and the duration of the charge could last until the battery is depleted, which Amnesty International has been told could, in theory, be just over four minutes, although no such instance has been recorded.

(94) Testimony of a Las Vegas Metropolital Police Department taser training officer at the inquest of William Lomax, 25 June 2004 (see under Deaths in Custody, below).

(95) Amnesty International has seen several cases in which officers' reports on the number of trigger pulls are inconsistent or contradict witness statements. In one case, the record could not be verified as the data on the officer's unit had become "corrupted"; a police review board quotes an instructor as stating that such data corruption is "not unusual" due to inability to insulate the data retrieval instrument from the high voltage components of the device (Seattle Office of Professional Accountability Review Board Annual Report 2003). This is listed as a potential occurrence in Taser International's website which states that "there is no correction available for this problem" but that "new data will be recorded normally". In another case, the various clocks involved failed to record the time sequences accurately due to inaccurate settings (see ref to Glenn Leyba death in custody case, Glendale, Colorado, below).

(96) See note 24, above

(97) See Bruce Bellemore case, under 1.7 above. Bellemore's attorney told AI there appeared to be no specific warnings of the dangers of firing tasers at people in elevated positions in the department's policies. The officer was cleared of criminal wrongdoing. The officer's actions were under police administrative review at the time of writing.

(98) Certified Lesson Plan, Version 8 (op cit). The company maintains that the electrical output of tasers is not harmful to a fetus , but that secondary injuries from falling are a possible issue for pregnant women. The question of whether electro-shocks from tasers could trigger miscarriage remains a matter of some dispute (see 2.9, below).

(99) Cases of Cindy Grippi, and Romona Madson (see above, under Lawsuits). Amnesty

International was unable to obtain information on whether the force used in the Cindy Grippi case was within police policy, as the results of police internal investigations are "privileged information" and not available to the public under California law. Amnesty International was seeking more information on the recent Madson case (Illinois) at the time of writing.

(100) "City's use of taser similar to others", The Charlotte Observer, 31 October 2004

(101) Reported in the Denver Post, 20 September 2004.

(102) Associated Press, 12 October 2004, "Police baffled by cause of fatal explosion".

(103) Robert C Trouth was "sprayed repeatedly with pepper spray and zapped with a Taser that set his hair on fire" before he was fatally shot after reportedly taking an officer's gun (Washington Post, 18 August 2004).

(104) Orlando Sentinel, 29 April 2004

(105) "Taser Works So Its Use Increases", Orlando Sentinel, 29 July 2002 (based on data obtained from the Orange County Sheriff's Office).

(106) www.taser.com/pdfs/m26brochure.pdf. The brochure states: "Deputy injuries in Orange County, FL dropped by 80% from 1999 to 2002 despite a 72% increase in use of force over the same period – from 410 force incidents in 1999 to an annual rate of 708 incidents in 2002".

(107) "Police Taser Use Grows, Controversy Continues, Local 6 News (local6.com), 4 May 2004

(108) The data lists type of force used. The total is thus higher than the total number of incidents, as more than one type of force was used in some incidents.

(109) There are no official national figures for the number of deaths in custody involving taser use. The list of cases comes mainly from news reports, backed up where possible by other data.

(110) In many of the more recent cases, autopsy reports were not yet available. In some other cases Amnesty International's requests for autopsy reports were denied as state law prevented them from being made publicly available. Other information includes media reports, statements issued by coroners' offices, paramedic reports, lawsuits and information from lawyers acting for the deceased's family. In some cases Amnesty International sought additional information, including copies of police incident reports, from the police agencies involved; however, this latter information was often not made available due to ongoing investigations or pending litigation. In three cases, Amnesty International's sole source was information provided in a list of deaths published by Taser International on 5 April 2004, in response to a CBS Evening News report on stun fatalities broadcast on the same date.

(111) In many cases the deceased's race was not reported.

(112) A condition known as "excited delirium", sometimes also referred to as "in-custody death syndrome", has been attributed by some US coroners to a number of deaths in custody, especially in the case of persons on drugs or suffering from psychosis. It is a combination of signs and symptoms, including dangerously elevated body temperature levels, leading to sudden death. The theory relating to such a syndrome is controversial and disputed by some medical experts.

(113) See, for example, reference below (2.7) to the UK Defence Scientific Advisory Council subcommittee on non-lethal weapons' recommendation that further research should be undertaken into cardiac hazards associated with use of the taser on certain at-risk subjects, including "possible hyper-susceptibility to taser currents arising from drugs commonly used illegally in the UK, acidosis and pre-existing disease".

(114) Report to Amnesty International from Sidsel Rogde MD, PhD, Professor of Forensic Medicine, University of Oslo, June 2004. Cases where Dr Rogde found the taser to be a possible contributory factor were: Eddie Alvarado, Richard Baralla, James Borden, Dennis Hammond, Glenn Leyba, Gordon Randall Jones and Michael Sharp Johnson. In some of the 16 cases reviewed there was insufficient information to assess the possible or likely role of the taser. Dr Rogde also reviewed autopsies in two cases of individuals who died from other stun weapons, cited later in this report (Garcia and Frazier); in those cases she concurred with coroners' findings that the stun weapons played a role in the deaths.

(115) Star-Telegram, 13 September 2004, reporting on case of Samuel Wakefield.

(116) There were reports of multiple taser discharges in 41 of the 73 cases reviewed. However, the true number is likely to be higher as in 28 cases the number of discharges was not reported in the information available.

(117) Certification Lesson Plan, op cit.

(118) Advanced Taser M26, Field Report Analysis, November 2002 (Taser International) According to the data, one five-second discharge or less was used in 68% of incidents, with 32% of incidents requiring more than one cycle. In 521 incidents the duration and number of cycles is listed as "unknown", suggesting possible shortcomings in the reporting of data from the agencies involved.

(119) According to his family, Borden, who was diabetic and also suffered from bipolar disorder, was confused because he had not taken his insulin for several days.

(120) This means the taser was used as a stun gun; it may have meant "drive stun", the common term for taser use in stun-gun mode.

(121) Report of Dr Sidsel Rodge, op cit.

(122) From autopsy report on Eddie R. Alvarado, the Department of Coroner, Los Angeles, California, 15 June 2002.

(123) From Officer Involved Use of Force Report, by Brian K. McHugh, Chief Deputy District Attorney, 18th Judicial District, Colorado, July 7 2004. The report reviewed written reports of the police investigation, officer and witness statements and other materials.

(124) The in-built memory chip downloaded from the taser showed that the trigger had been pulled seven times, but collectively people at the scene observed only five discharges, so the report concluded that the two additional trigger pulls must have been within the five-second default period. However, there were inconsistencies in reports of when, for how long and how many times the taser was used in stun or dart mode. There were also discrepancies in the time line due to the "variance in the accuracy of the various clocks involved".

(125) Orlando Sentinel 5 August 2002 and 2 October 2002 – one report states he was jolted 12 times, another states he was struck 13 times. The autopsy refers only to "Taser usage" by police and notes two areas of circular abrasions with underlying dermal thermal effect.

(126) Pathologist William Anderson, cited in media reports at the time and more recently in "Taser Safety Claim Questioned", Arizona Republic, 18 July 2004

(127) Report of Dr Sidsel Rogde, op cit.

(128) Emergency Medical Services Agency

(129) From transcript of testimony at inquest held in Las Vegas on 25 June 2004

(130) transcript of inquest op cit.

(131) sources: "Nevada Man Dies in Struggle with Authorities, Taser Involved", Associated Press, 16 September 2004; Arizona Republic, 17 September 2004. Amnesty International was seeking a copy of the autopsy at the time of writing.

(132) "Pathologist says Taser contributed to jailed man's death", Associated Press, 23 August 2004

(133) There have been several cases reported of the onset of ventricular fibrillation hours after a low voltage shock (e.g.Journal of Critical Illness, March 2002 "Electrical injuries: an emergency department approach; Cardiac monitoring and an ECG are essential"; Cardiac fibrillation, **http://radsafe.berkeley.edu/lsm1101appj.html**.)

(134) Reported in Taser International News Bulletin, Topic: In-Custody Deaths, February 2002.

(135) Letter to ACLU, Colorado, op cit.

(136) "Man Dies After Brea Police Shoot Him With Stun Gun", Los Angeles Times 8 October 2003. This reports only when the officers noticed he had stopped breathing

(137) Metabolic acidosis is a condition in which the acid level within the blood is higher than

normal; this can have a number of causes, including ingestion of toxic substances. If metabolic acidosis becomes severe, the person may develop: weakness; confusion; shock; heart problems such as arrhythmias.

(138) This was noted in a letter from Taser International to Mark Silverstein of the ACLU, Colorado, dated 26 February 2004, in response to concerns raised by the ACLU about the possibility of tasers contributing to deaths caused by metabolic acidosis.

(139) J.M. Kenny, W. Bosseau Murray, Wayne J. Sebastianelli, W. J. Kraemer, R. M. Fish, D.T. Mauager, T. L. Jones, "Human Effects Advisory Penal Report of Findings: Sticky Shocker Assessment", National Criminal Justice Reference Service Doc. No. 188262 (1999).

(140) Fish RM, Geddes LA, "Effects of stun guns and tasers", Lancet, September 2001.

(141) Traditional "hogtying" involves the individual's wrists and ankles being bound together, so that the shoulders and ankles are raised, placing pressure on the abdomen, a particularly dangerous procedure. The hobble restraint may have a longer cord between the wrist and ankles, allowing somewhat more movement, mainly to allow the individual to be transported in an upright position; while this is less dangerous, deaths have been reported from the hobble restraint, even where someone is placed on their side or upright.

(142) These include U.S. Department of Justice National Institute of Justice (NIJ) Advisory Guidelines for the Care of Subdued Subjects (June 1995); NIJ Bulletin on Positional Restraint, October 1995; Metropolitan Police Complaints Authority (UK), bulletin July 2001.

(143) The most common forms of chokehold are the "carotid" restraint or the "lateral vascular neck" restraint both of which involve the application of pressure to the arteries in the side of the neck. Some of the largest US police agencies ban all forms of chokehold in all circumstances; these include the New York, Chicago, Philadelphia, Detroit and Houston police departments.

(144) Since the early 1990s more than 100 people in the USA are reported to have died after being subjected to pepper spray. While most deaths have been attributed by coroners to other causes, such as drug intoxication or positional asphyxia, there is concern that pepper spray could be a contributory factor in some cases. Pepper spray has been found to be a factor in several recent in-custody deaths. Studies discounting a link between physical restraint and pepper spray have generally been conducted on healthy subjects and do not replicate what happens in the field. Further research is needed.

(145) See, for example, Amnesty International report: The Restraint Chair: How Many More Deaths? AI Index AMR 51/31/2002

(146) It is unclear what the coroner meant by this, as the external marks from taser burns bear no relation to the effect the shocks may or may not have on the heart.

(147) Dr Sigdel Rogde's report to Amnesty International (op cit).

(148) Autopsy report in case of Terrence Hanna, July 2003

(149) Communities United Against Police Brutality "The Death of Walter C. Burks, An Analysis of Police Actions", April 12, 2004

(150) Mehle L.E. "Electrical Injury from Tasering and Miscarriage", Acta.Obstet Gynaecol Scand, 1992; 71:118-23.

(151) Orlando Sentinel June 16, 1991

(152) The Olympian 11 November 2002

(153) The US Department of Defense is reportedly conducting an ongoing study, based, in part, on materials by Taser International, including operational use, but the results have not yet been made public.

(154) (R. Kornblum, M.D., S. Reddy, M. D, "Effects of the Taser in Fatalities Involving Police Confrontation," 36 Journal of Forensic Sciences, 434-48, 1991).

(155) 37 Journal of Forensic Sciences, 956-58, 1992

(156) R.M.Fish, L.A. Geddes,"Effects of stun guns and tasers", Lancet, September 2001, op cit.

(157) The early medical literature includes concern about the potential of tasers to disrupt the software or cable in pacemakers: Koscove ME. "The Taser Weapon: a new emergency medicine problem", Annals of Emergency Medicine, 1985; 14:1205-8.

(158) First DOMILL statement on the medical implications of the use of the M26 Advanced Taser, December 2002

(159) Ibid, paragraph A18

(160) Ibid, paragraph A30 (b)

(161) The ACPO guidelines state that "Authorized Firearms Officers (AFOs) … are issued with firearms where the authorising officer has reason to suppose that they, in the course of their duty, may have to protect themselves or others from a person who is: in possession of a firearm or has immediate access to a firearm, or is otherwise so dangerous that the officer's use of a firearm may be necessary". (Operational Guidance on use of Taser, ACPO, 13 August 2004, p 3)

(162) During the year-long pilot study, tasers were deployed by UK police in 60 incidents but fired on only 13 occasions, resulting in minimal injury.

(163) Second statement on the medical implications of the use of the M26 Advanced Taser,

DOMILL, July 2004, page 3. This current work included research into the effect of recreational drugs on cardiac function. DOMILL reported that the "results from the study ... suggest that some frequently abused drugs have the potential to contribute to any cardiac-related morbidity or mortality that may arise in the context of Taser use. Furthermore, it seems reasonable to assume that this conclusion could be generalised to other emotionally charged and possibly violent confrontations with law enforcement personnel." (ibid at page 3)

(164) The guidance states that "where it becomes apparent that the subject has an existing medical condition or is under the influence of drugs, assessment of these additional risk factors should be made on determining the appropriate option."

(165) The guidelines also state that "Close monitoring of a subject throughout the period following application of the taser is of utmost importance. If the person is detained in a cell they should be subject to the same cell supervision provided for persons who have consumed alcohol or drugs. If there are any signs of adverse or unusual reactions then medical attention should be provided immediately and if necessary this must be given precedence over conveying the subject to the police station".

(166) The review was conducted by Dr Anthony Bleetman (Consultant in Accident and Emergency Medicine, Birmingham Heartlands Hospital, UK and Honorary Senior Clinical Lecturer, Dept of Surgery, University of Birmingham, UK) and Dr Richard Steyn (a Consultant in Thoracic Surgery, Birmingham Heartlands Hospital, Birmingham, UK). Their findings have been published as The Advanced Taser: a Medical Review, Bleetman and Steyn, April 27 2003 (available at the Taser International web-site).

(167) A Bleetman, R Steyn, C Lee. "Introduction of the Taser into British policing. Implications for UK emergency departments: an overview of electronic weaponry", Emerg Med J. 2004; 21: 136-140 (accepted for publication June 2003)

(168) Data from US Department of Health and Human Services, published in July 2004, showed that 11% of US adults aged 18 and over had ever been told they had some form of heart disease and 13 million (6%) had been diagnosed with coronary heart disease. This figure does not include those with undiagnosed heart problems.

(169) Turner MS, Jumbelic ML, Case Report: Stun Gun Injuries in the Abuse and Death of a Seven-Month-Old Infant, Journal of Forensic Sciences 2003, 48: 180-2.

(170) Report of Coroner, Will County, Illinois, in case of Jose Guadalupe Garcia.

(171) Report of Autopsy in case of Larry Frazier, Office of Chief Medical Examiner, Commonwealth of Virginia, July 2000.

(172) These require inter alia that law enforcement officials shall, as far as possible, apply non-violent means before resorting to the use of force and firearms; exercise restraint in such use and act in proportion to the seriousness of the offence and the legitimate objective to be pursued;

minimize damage and injury, and respect and preserve human life. Law enforcement officials shall not use firearms except in self-defence or the defence of others against the imminent threat of death or serious injury; in any event, intentional lethal use of firearms may only be made when strictly unavoidable to protect life. (See appendix for extracts from the standards)

(173) "Overseas we primarily sell to law enforcement, and then when they are comfortable, we move to the mass market.

(174) **http://www.harpia.cz/taser/taser12.html** (accessed 9/2004) Reference : ADVANCED TASER M26 se pouziva v ozbrojenych slozkach techto statu:

(175) Australasian Business Intelligence, July 2, 2002: This gun's a stunner but not for criminals.

(176) Knight Ridder/Tribune Business News 23/9/2003: Scottsdale, Ariz.-Based Stun Gun Maker Continues to See Growth

(177) Airline Industry Information, March 28, 2002: Korean Airlines signs contract with TASER International.

(178) **http://www.cnn.com/2001/WORLD/europe/08/01/taser/** "There are to be tests in Sweden at the beginning of the year 2002 and we already have equipment in Poland," said Tuttle. Tasers are also bound for Finland.

(179) www.prnewswire.co.uk/cgi/news/release?id=105900 25/7/2003: Switzerland approves use of TASER brand conducted energy weapons. Becomes first European country to formally approve the new TASER X26

(180) Turkish Daily News 1/4/98: 'Is electro-shock safe enough to use?'



Become a card-carrying member of the ACLU: JOIN

ADVANCED
HELP

Search

# Police Practices

Police Pract
General

ISSUES

Crimin
LATEST NEWS

In Testi
Commissio
Massachus
for Change
Police Dep
Lethal For

ACLU of
Massachus
Applauds P
Police Com
Opposition
CLEAR Ac
More this s

RELATED INFO
Press Rele
Action Aler
Publications
Legal Docu
Legislative
General Iter
Resources

Disabili
Shun
Free S

Immigra

Lesbia
Nation:
Prisons
Privat

Religio
Reprod
Rights
Safe an
Young

More

🖶 Printer-friendly

✉ Email Article

### ACLU of Massachusetts Issues Recommendations on Less Lethal Force Policies for Police
May 10, 2005

**FOR IMMEDIATE RELEASE**
Contact: media@aclu.org

BOSTON -- Citing safety concerns following the death of Victoria Snelgrove and other fatal incidents arising from the introduction of new police weaponry around the country, the American Civil Liberties Union of Massachusetts today issued a report setting forth specific recommendations for improved training, use, and monitoring of so-called "less lethal" weapons by the Boston Police Department and other law enforcement agencies in the Commonwealth.

The death in October 2004 of Ms. Snelgrove, who was killed after being shot in the eye by a Boston Police officer with a pepper spray pellet, led to the appointment of the Stern Commission, led by former U.S. Attorney Donald K. Stern, which was charged with reviewing the incident as well as police policies on less lethal force.

"No police department should be permitted to adopt new weapons technologies without first establishing clear protocols for training, use, and monitoring to avoid needless injury," said John Reinstein, Legal Director for the ACLU of Massachusetts, who presented the ACLU's recommendations to the Stern Commission.

"Good police practices don't get in the way of good law enforcement. In particular, we object to the current practice allowing weapons manufacturers to control the training and use of these new, often lethal, technologies."

In Massachusetts and around the country, police departments are adopting so-called "less lethal" weapons technology for use in situations in which the use of firearms is neither required nor justified. These weapons are intended to incapacitate or restrain a dangerous or threatening person without causing serious injury in incidents such as hostage rescue, attempted suicide, crowd control, unruly and potentially violent individuals, and domestic disturbances.

DEFENDANT'S EXHIBIT

CASE
NO.

EXHIBIT
NO.   L

In July 2004, Massachusetts became the 49th state to allow law enforcement officials to use electroshock weapons -- known as "stun guns" or "Tasers" -- without any legislative standards regarding the training in or use of these weapons. Since 2001, more than 100 people have died in the United States after being stunned with a Taser. As a result, police departments nationwide -- notably Chicago and the State of New Jersey -- have suspended or delayed the use of Tasers, citing safety concerns following fatal incidents.

The ACLU of Massachusetts report addresses a range of less lethal weapons currently available to law enforcement, including chemical sprays, pepper spray, impact projectiles, electroshock weapons, and other devices. It then examines the national legislative and legal landscape regarding less lethal weapons and surveys current less lethal force policies of major metropolitan police departments, including Boston, New York, Seattle, and Los Angeles.

Specifically, the ACLU's recommendations cover (1) independent review of weapons systems (2) training; (3) use; (4) post-use practices; and (5) monitoring of less lethal force weapons. The report, Less Lethal Force: Proposed ndards for Massachusetts Law Enforcement Agencies, is online at http://www.aclu-mass.org/Less%20Lethal%20Force%20Report.pdf.

YOUR LOCAL ACLU ⌄

| CONGRESSIONAL SCORECARD | MULTIMEDIA | FORUMS | PUBLICATIONS | SUPPORT US | STORE |

© ACLU, 125 Broad Street, 18th Floor New York, NY 10004 This is the Web site of the American Civil Liberties U ACLU Foundation.
Learn more about the distinction between these two components of the ACLU.

User Agreement | Privacy Statement | FAQs

AMERICAN CIVIL LIBERTIES UNION
Become a card-carrying member of the ACLU: JOIN

# Police Practices

## ACLU Urges Rhode Island Police to Shun "Stun Guns"

September 2, 2004

**FOR IMMEDIATE RELEASE**

PROVIDENCE, RI--The American Civil Liberties Union of Rhode Island today urged police departments across the state not to purchase Taser "stun guns," a controversial electroshock weapon that many U.S. law enforcement agencies, including four in Rhode Island, have begun adding to their arsenal.

"Recent reports from several sources have both challenged the guns' safety and noted that they may be prone to gratuitous use," said ACLU of Rhode Island Executive Director Steven Brown. "Until the many questions that have been raised about Taser guns have been satisfactorily answered, Rhode Island police departments should not jump to join other agencies in the purchase of this weapon."

The Taser gun, which can shoot 50,000 volts of electricity through a person's body to cause temporary paralysis, is marketed as a "non-lethal" alternative to handguns. However, the ACLU said that Tasers appear to be commonly used against unarmed persons or in other situations where deadly force is not authorized.

Taser International, the Arizona-based company that manufactures the weapon, claims that the guns have never caused a fatality. However, national news reports have begun to question that claim. The New York Times recently reported that six people died in June after being shot by Tasers. Similarly, a study of Taser-related deaths conducted by the Arizona Republic found that in several cases, medical examiners' reports listed Taser shocks as a contributing cause of death. However, because none of the reports ruled that the Taser guns were solely responsible for the deaths, Taser International continues to market its product to police departments as a safe weapon. Despite the controversy, no government study has been conducted to evaluate the Taser's safety or its effect on victims.

"Because the Taser gun is believed to have no lasting effects, some data suggest that officers are more willing to deploy it against suspects who are not armed, are questionably threatening, or are already restrained," Brown said.

A study conducted by the sheriff's office in Orange County, Florida found a 58 percent increase in the use of force since Tasers were adopted there. Taser International has said that 85 percent of shock recipients are not armed.

The ACLU also said evidence shows that drug and alcohol use may

make a subject more prone to electroshock injury – or death – from the Taser. This is problematic because the Taser is often used to subdue intoxicated people.

According to published reports, the Newport, Woonsocket, Bristol and North Providence police forces already use the weapons. In July, the Providence Police Department became the latest Rhode Island force to purchase Taser guns, although only designated officers are being given access to them.

| CONGRESSIONAL SCORECARD | MULTIMEDIA | FORUMS | PUBLICATIONS | SUPPORT US | STORE |
|---|---|---|---|---|---|

© ACLU, 125 Broad Street, 18th Floor New York, NY 10004 This is the Web site of the American Civil Liberties L
ACLU Foundation.
Learn more about the distinction between these two components of the ACLU.

YOUR LOCAL ACLU ⌄

User Agreement | Privacy Statement | FAQs





**DEFENDANT'S EXHIBIT**

CASE
NO.

EXHIBIT
NO. M

**USA TODAY**  Classifieds: Cars (cars.com) | Jobs careerbuilder.com | Dating eHarmony.com | USA

Home
News
Travel
Money
Sports
Life
Tech
Weather
Search

powered by Google (GO)

**Wash/Politics**
Washington home
Washington briefs
Election 2004
Government guide
**Health**
Health home
Medical resources
Health information
**Editorial/Opinion**
Ed/Op home
Columnists
Cartoons
**More News**
Top news briefs
Nation briefs
World briefs
States
Lotteries
By the Numbers
Special reports
Day in pictures
Snapshots
Offbeat
Video headlines
Talk Today
**Marketplace**
Newspaper
Classifieds

# Nation

■ E-MAIL THIS   ■ PRINT THIS   ■ SAVE THIS   ■ MOST POPULAR   ■ SUBSCRIBE

Posted 5/12/2005 8:28 PM

## Taser official removed as adviser on stun gun study

MADISON, Wis. (AP) — A Wisconsin researcher has removed Taser International's medical director as an adviser to a study of the safety of stun guns after critics said his involvement with the manufacturer tainted the research.

University of Wisconsin-Madison professor John Webster had described his two-year, $500,000 study funded by the U.S. Department of Justice as the first to look at the safety of stun guns independent of Taser, the Arizona-based company that makes the weapons.

But documents uncovered this week show Robert Stratbucker, an Omaha physician who is Taser's top medical officer, is one of four consultants to the study, which will look at how pigs' hearts react to electric shocks from the devices.

Reacting to the connection on Thursday, Webster told The Associated Press: "In view of this potential conflict of interest, I can make the statement that I have not received advice or paid Stratbucker and I will not use him in the future."

Stratbucker's studies are often cited by the company as evidence the weapons are a safe way to subdue unruly suspects. He has acknowledged receiving cash and stock options from Taser.

Tasers are used by more than 7,000 police agencies but blamed by Amnesty International in the deaths of more than 100 people in the United States and Canada since 1999.

USA TODAY first reported Stratbucker's link to Taser and the research Thursday. Stratbucker did not immediately return a phone call from the AP. (**Related:** Fairness of Taser study in question)

Advertisement



THESE PRICES...

D∕ELL

**Today's Top News Stories**
- Existing home sales surge 4.5% April - 10:18 AM
- Graner may testify at Abu Ghraib
- First Lady wraps up Mideast tour
- House to vote on stem cell resea
- Car bomb kills six in Baghdad; Ei killed - 10:07 AM

- Add USATODAY.com RSS feeds

**E-Mail Newsletters**

Sign up to receive our free **Daily Br newsletter** and get the top news of inbox.

**E-mail:**                     [

Select one:  ◉ HTML

**Breaking News E-Mail Alerts**

• Get breaking news in your inbox :

Webster said he listed the Taser official as a consultant
to show he would have experts available for advice on
the study, which is just getting underway.

"I'm acting independently and forming my own conclusions," said Webster, a professor
emeritus of biomedical engineering.

In a statement, the Justice Department said the agency was aware of the Taser
connection when granting the project. The department said Stratbucker had a small
role that "would not influence the research goals, scientific measurement, data
collection or conclusions."

In March, both Webster and a Taser spokesman told the AP the company had no ties
to the research.

In his grant proposal, Webster proposed Stratbucker receive $18,000 in salary and
travel expenses for his advice. Stratbucker's resume was included but did not mention
his work for Taser, and Webster checked a box to deny any conflict of interest.

Amnesty International and People for the Ethical Treatment of Animals, which calls the
research cruel and unnecessary, called for an end to the study on Thursday.

"This is not independent and there's an appearance that there was an attempt to hide
the conflict," said Edward Jackson, a spokesman for Amnesty International, which
says more independent studies are needed to determine whether Tasers are safe.

Eric Sandgren, a UW-Madison professor who leads a committee overseeing animal
research, had previously defended the study but said he was troubled by the
revelations. He said removing Stratbucker was appropriate.

"I saw one of the strengths of this study as being that it is distanced from Taser," he
said. "To the extent that this calls that into question, we have to address that as a
university."

---

*Copyright 2005 The Associated Press. All rights reserved. This material may not be
published, broadcast, rewritten or redistributed.*

Related advertising links What's this?

| **Mortgage Rates Hit Record Lows** | **Mortgage Rates as Low as 2.9%** | **American Medical Alarms, Inc.** |
| --- | --- | --- |
| Get $150,000 loan for $720 per month. Refinance and pay less each month. Compare mortgage rates now - Bad credit OK. **www.lowermybills.com** | Up to four free quotes. Compare rates and choose the best offer! Refinance and save. No obligation. Bad credit OK!. **www.homeloantrust.com** | It's good to know that during a medical emergency help is always available. Our system allows you to get help with just the push of a button if you are unable to reach a telephone. **www.americanmedica.,.** |

**Subscribe Today: Home Delivery of USA TODAY - Save 35%**



USATODAY.com partners: USA Weekend • Sports Weekly • Education • Space.com

Home • Travel • News • Money • Sports • Life • Tech • Weather

Resources: Mobile News • Site Map • FAQ • Contact Us

Email News • Jobs with Us • Terms of service • Privacy Policy • Media Kit • Press Room

Add USATODAY.com RSS feeds
Add USATODAY.com headlines to your Web site

© Copyright 2005 USA TODAY, a division of Gannett Co. Inc.

---

# Taser tied to 'independent' study that backs stun gun

author: Robert Anglen [Arizona Republic]

Taser International was deeply involved in a Department of Defense study that company officials touted to police departments and investors as "independent" proof of the stun gun's safety, according to government documents and e-mails obtained by The Arizona Republic and interviews with military officials.

Taser International was deeply involved in a Department of Defense study that company officials touted to police departments and investors as "independent" proof of the stun gun's safety, according to government documents and e-mails obtained by The Arizona Republic and interviews with military officials.

This information is surfacing at a time when the U.S. Securities and Exchange Commission and the Arizona attorney general are pursuing inquiries into safety claims that the Scottsdale firm has made.

The stun guns are being used by more than 7,000 law enforcement agencies in the United States, but a series of deaths and injuries associated with the devices have raised safety concerns.

E-mails that military officials exchanged also reveal for the first time that they asked Taser to tone down public statements about the study. In addition, they urged the company to commission an independent study rather than rely on the Defense study.

The Air Force conducted the study for the Defense Department to assess the risks and effectiveness of Tasers so the military could decide whether to buy them.

Since October, Taser officials have contended that the company had no involvement in the Defense study, which helped fuel a sharp rise in the company's stock price last year.

Bulk of research

But information obtained by The Republic shows that Taser officials not only participated in three panels to determine the scope of the study, analyze data and review findings, it also provided the bulk of research material used in the study.

"Were they (Taser) totally disconnected (from the study)? The answer is no. They were not disconnected,"



DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.   N

said Larry Farlow, a spokesman for the Air Force Research Laboratory in Texas that oversaw the study.

Taser critics - civil rights lawyers, human rights activists and government officials - contend that there is insufficient evidence to support the company's assertions that the stun gun is safe. They have called for independent research.

Taser has repeatedly characterized research that its own employees or consultants helped conduct or write as independent. The company has also paid training fees and given valuable stock options to police officers involved in decisions to purchase the stun guns.

In an interview earlier this month, Steve Tuttle, Taser's vice president of communications, maintained the company's position that the Defense Department study was independent. He acknowledged that Taser employees had some involvement in the study but insisted that that did not influence the findings.

Taser officials have described the Defense research as "a major independent safety study." But Air Force researchers said the study was not meant to be a comprehensive review of stun-gun science or safety, and they made no findings on the device's safety.

Touting findings early on

Taser trumpeted results of the study long before the actual report came out on April 1. In an October news release, Taser Chief Executive Officer Rick Smith said, "This comprehensive independent study further supports the safety of Taser" and "reaffirms the lifesaving value of Taser technology."

That announcement had an immediate impact on Taser stock: It shot up 60 percent during the next month. Taser executives and board members sold 1.28 million shares for $68 million in November.

Since then, the stock has dropped dramatically as a series of deaths caused cities nationwide to reconsider purchases of Tasers and to delay deployments.

An ongoing investigation by The Republic has found that medical examiners have cited Tasers in 15 deaths across the country. They called it a cause of death in three cases, a contributing factor in nine cases and said the stun gun couldn't be ruled out as a cause of death in three cases.

Taser maintains that its stun guns have never caused a death.

Taser involvement

When the Defense Department first released its study, it made no mention of who was involved in the study.

Another version obtained by The Republic shows that

Taser's CEO, director of technical services, general counsel, medical director, chief instructor, electrical engineer and vice president of communications were involved in various panels over five months.

The report also shows that companies doing business with Taser, including General Dynamics, were heavily involved in the study and, along with Taser executives, sat on a final "Independent External Review Panel" to examine all the findings.

Farlow, the spokesman for the Air Force Research Laboratory, said his office, not Taser, made the decision to strike the names from the final report in order to protect the privacy of researchers and scientists.

A separate panel of medical and scientific experts that did not include Taser employees wrote the final report.

Tuttle, the Taser spokesman, said the company's involvement does not minimize the report's significance or its independence.

"This was all pre-planning stuff," he said. "We didn't do the study itself." He added that government rules require manufacturers to be involved in such reviews of their products. "If you are going to do a study of Milk Duds . . . you are going to have to talk to the (makers) of Milk Duds."

But, according to the Air Force, Taser provided most of the data used in the study, which was supposed to look at the "effectiveness" of Tasers in order to provide guidance for officials in charge of purchasing non-lethal weapons.

Information gaps

Although researchers determined the stun guns were "generally effective for their intended use," researchers found significant "data gaps" in the information Taser provided, Farlow said.

Chief among those gaps: enough information to determine whether Tasers can cause seizures or induce ventricular fibrillation, the sudden irregular heartbeat characterized by a heart attack.

In addition, Taser apparently did not provide some information about injuries involving the stun gun. For example, researchers said in the study that "no reports were identified that describe bone fractures resulting from the rapid induction of strong muscle contraction" caused by the stun gun.

At the time that Taser officials were sitting on the panel, they had already been served legal notice that a Maricopa County sheriff's deputy was going to sue the company over a fractured back that he reportedly suffered when shocked with a Taser during a training exercise.

Former Deputy Samuel Powers was the first to file a product liability lawsuit against Taser; his case is scheduled to go to trial in June. A doctor hired by Taser last year concluded that a one-second burst from a Taser was responsible for Powers' injury.

Since then, several police officers from departments across the country have come forward with allegations of bone fractures that they blame on Taser shocks.

The study concluded that Tasers may cause several unintended side effects, "albeit with estimated low probabilities of occurrence." It also said the need to "rely on a database of case reports compiled by manufacturers also generates uncertainty in the results."

Farlow pointed out that the Defense study made no conclusions about the stun gun's safety.

When asked about Taser's characterization of the research as a "major, independent safety study," Farlow said: "The simple answer is consider the source. . . . The press and public relations folks are doing their jobs."

E-mail correspondence

Despite the fact that the Air Force lab's study made no findings on safety, the government officials who commissioned the study allowed Taser to issue a news release saying that the Defense Department considered "Tasers generally safe and effective."

E-mails show that although these officials were concerned about Taser's characterization of the study, their desire to support Taser prevailed.

"I've expressed my personal view to (Taser) that the company might want to take a different approach to their (public affairs) efforts" and "i.e., tone it down," wrote Capt. Daniel McSweeney, spokesman for the Joint Non-Lethal Weapons Directorate, a Pentagon office that recommended purchasing Tasers for the armed services.

"My opinion is that they probably want to commission an independent (human effects) study, in which a variety of stakeholders participate," McSweeney said in a January e-mail from his office in Quantico, Va. "To settle this issue once and for all."

Dave DuBay, a Taser vice president, confirmed that McSweeney asked the company to temper its statements. He said McSweeney felt Taser is sometimes "too passionate in defense" of its stun guns. DuBay also confirmed that McSweeney asked Taser to commission its own independent study.

But DuBay said the government's study was independent and questioned whether the public would

perceive a Taser-sponsored study to be independent.

Despite McSweeney's concerns, he still recommended backing Taser.

McSweeney's rationale

"My rationale is that Taser is, in effect, some kind of partner to us, since we purchase and field their systems," he wrote in the same e-mail. "Not supporting them can hurt us in the public's eye."

At issue in the e-mails were requests from Taser asking the government to put out a news release declaring the stun guns safe.

The e-mails were written after reports in the New York Times and other media raised questions over Taser's claims about the Defense study and if researchers actually found the stun guns safe.

In an interview this week, McSweeney confirmed that he told Taser officials they should "tone it down" and conduct their own independent study.

"I was referencing not just to the (study) but other things I have been privy to," he said, adding that Taser has been at the center of several controversial issues. "Given the ongoing questions regarding the health effects of Taser, it would behoove Taser to do an independent study."

McSweeney acknowledged that the Defense study was not comprehensive but called it an "excellent first step" and said that more studies are under way. He said that non-lethal weapons are needed in military zones and that the study served "an urgent need" by providing a foundation for the Defense Department.

source url:
http://www.azcentral.com/arizonarepublic/news/articles/0521TaserDOD21.html



**LEARN**
latest news
countries
topics
events

**JOIN**
monthly giving
membership
donate
shop

**ACT**
action center
campaigns
networks
act locally

español
youth

search

[_____] go!

# Denounce Torture

**AMNESTY INTERNATIONAL
PRESS STATEMENT**

**May 23, 2005**

## Amnesty International USA: Third So-Called "Independent" TASER Study Linked to Manufacturer

(Washington, DC)—Today Dr. William F. Schulz, Executive Director of Amnesty International USA (AIUSA), released the following statement regarding documents listing Taser International executives, consultants and businesses partners as panelists in the U.S. Department of Defense (DoD) TASER study. This discovery reported over the weekend by the *Arizona Republic* marks the third time in five months that the manufacturer has been linked to "independent" studies:

"Police departments around the world are purchasing TASERs based, in part, on constant reassurances from the manufacturer that numerous 'independent' studies have proven the electro-shock weapons to be safe and effective. But new revelations reported by the *Arizona Republic* over the weekend have made it abundantly clear that the company did not voluntarily reveal its connections to this study and the individuals who actually made the claim that TASERs are safe. In October 2004, a Taser International executive called the DoD report the 'granddaddy' of all independent studies. However, even as he made that claim, the company knew that their employees, business partners, and a long list of Taser's clients and supporters had participated in virtually every aspect of producing this report.

For example, the report states that the final version is a product that was reviewed by the 'Independent External Review Workshop.' But, Taser International has consistently failed to voluntarily reveal the fact that nearly half of the members of that panel were either employees of or had some other type of relationship with the company."

(End of Statement)

The Arizona Republic story marks the third time in five months that it has been revealed that Taser International has tried to hide its involvement in so-called independent studies. In January, media reports exposed information that three of the four researchers on an allegedly independent study were employees of Taser International and one was a paid consultant for the company. Two weeks ago, the public learned that the recipient of a $500,000 federal research grant tried to hide the fact that he would be paying Taser International's medical director $18,000 to consult on his supposedly independent study.

**DENOUNCE TORTURE**
Actions
News
Reports
Success Stories!
Activist Toolkit

**Register** for the Day of against Torture
**Join the Online Action**
**Get Involved in Your Community**

**Denounce Torture**
*June 26th*
Join Amnesty International in a Day of Action Against Torture. **Sign u** to plan actions and acti your community or at y school.

**BACKGROUND:**
**About Torture**
**Torture & the Law**
**US and International Standards against To**

**RESOURCES:**
**June 26 Organizing G** PDF)
**The Torture Test**
**Amnesty's 12-point P** for the prevention of tor agents of the State
**Talking Points:** How t respond to those advoc: use of torture

**Torture Worldwide: A Affront to Human Dig** available in our online s

**MORE INFORMATION**
**Tortured Logic:**
**Thumbscrewing**
**International Law**
Torturers used to practi craft behind a wall of se Now some U.S. officials

Amnesty International continues to call for comprehensive, independent medical studies to determine the risks TASER shocks pose to the general public. Everyday that TASER supporters refuse to engage in an honest debate and stonewall attempts to find answers to these questions is another day that the real, lifesaving potential of this new technology will go unrecognized.

### #

Contact: Edward Jackson (202) 544-0200 x 302 or (202) 251-3894 (cell)**More information on the AIUSA's position on TASERs**

defending torture as a necessary tool in the "w terror."—*Amnesty Now* Magazine, Summer 200

**LATEST NEWS**
**Report 2005**: Forewor Irene Khan, Secretary C
May 24, 2005

**USA**: Third So-Called "Independent" TASER S Linked to Manufacturer
May 23, 2005
*More News »*

**LATEST REPORTS**
**Turkmenistan**: Appeal Religious leader Nasrull: Ibadullah remains in pri allegations of beatings ( unpunished
May 22, 2005

**Lebanon**: A Human Rig Agenda for the Parliame Elections
May 17, 2005
*More Reports »*



DEFENDANT'S
EXHIBIT

CASE
NO.

EXHIBIT
NO.

| LEARN | JOIN | ACT | |
|-------|------|-----|---|
| latest news | monthly giving | action center | español |
| countries | membership | campaigns | youth |
| topics | donate | networks | |
| events | shop | act locally | |

# Denounce Torture

**AMNESTY INTERNATIONAL**
**PRESS RELEASE**

### April 1, 2005
### TASER-Related Deaths Hit Triple-Digits as Manufacturer (TASR) Grossly Exaggerates the Number of Lives Saved By TASERs
### Amnesty International Documents 103 TASER-Related Deaths and Disputes Claims That TASERs Have Saved 6,000 Lives

(Washington, DC)—Amnesty International USA (AIUSA) released today a document announcing that TASER-related deaths in the United States and Canada have hit triple digits growing from 74 in November 2004 to 103. The new number covers June 2001 to March 2005. Additionally, AIUSA presented evidence proving that Taser International, Inc., has been misleading the public and law enforcement about the number of lives allegedly saved by TASERs. AIUSA admits that lives have undoubtedly been saved by TASERs and welcomes any news that there has been a decrease in fatal shootings by law enforcement, but a review of the cases on Taser's Website actually provided more evidence to support Amnesty International's conclusion that there is widespread abuse of TASERs that, in some cases, constitutes ill-treatment and torture.

"AIUSA supports the development of non-lethal alternatives to firearms, and we believe that police officers should have every tool necessary to do their jobs safely and effectively," said Dr. William F. Schulz, Executive Director, Amnesty International USA. "However, it has been difficult to engage in an honest debate about TASER usage when the truth seems to be as elusive as an independent, comprehensive medical study supporting claims that TASERs are generally safe."

In May 2004, Taser International Inc., spokesman Steve Tuttle made a frighteningly accurate prediction when he told the *Atlanta Journal Constitution* that the number of TASER-related deaths "will continue to increase with the number of devices we sell." Of the 103 TASER-related deaths documented by Amnesty International, 65 percent of them occurred during the last 15 months. If the current trend continues—noting that TASER-related deaths appear to spike between May and August—this year is on track to be a record-breaking year. In the first three months of 2005, there have already been twice as many TASER-related deaths (13) as there were during the same period in 2004 (six), and as many as there were all year in 2002 (13). The analysis provides a state-by-state breakdown of the deaths, which occurred in 25 states and Canada.

The updated information flags a disturbing pattern that parallels the alarming increase in deaths. Amnesty cites that the weapons have been mentioned 17 times (out of 103) by medical examiners who have said that the TASER played a role, could not be ruled

**DENOUNCE TORTURE**
Actions
News
Reports
Success Stories!
Activist Toolkit

**Register** for the Day of against Torture
**Join** the Online Action
**Get Involved in Your Community**

**Denounce Torture**
*June 26th*
Join Amnesty International in a Day of Action Against Torture. **Sign u** to plan actions and acti your community or at y school.

**BACKGROUND:**
About Torture
Torture & the Law
US and International Standards against To

**RESOURCES:**
June 26 Organizing G PDF)
The Torture Test
Amnesty's 12-point P for the prevention of tor agents of the State
Talking Points: How to respond to those advoc use of torture
Torture Worldwide: A Affront to Human Dig available in our online s

**MORE INFORMATION**
Tortured Logic: Thumbscrewing International Law
Torturers used to practi craft behind a wall of se Now some U.S. officials

out, or could not determine the exact role the TASER played. Now, according to the information released by Amnesty International, TASERs have been referenced frequently enough that they are the fourth most commonly listed factor in TASER-related deaths. Drug intoxication is first, pre-existing heart conditions second, and excited delirium is third.

In its November 2004 report on TASER use in the United States and Canada, Amnesty International cited pre-existing heart conditions as a possible contributing factor in TASER-related deaths. The U.S. Department of Defense and the English, Canadian, and Australian governments have also cited the potential vulnerability of individuals with pre-existing heart conditions to TASER shocks as an area in which further studies are needed. Amnesty International's information points out that all but one of the deaths were among men with an average age of 37. According to the U.S. Centers for Disease Control, pre-existing heart conditions are the second leading cause of death for men age 25-44, and the American Heart Association says that approximately one in three men in the United States is currently living with a pre-existing cardiovascular disease.

"The prevalence of pre-existing heart conditions in the population that has died after being shocked with a TASER is an example of why Amnesty International has called for the suspended use of TASERs by law enforcement," said Gerald LeMelle, Deputy Executive Director for Advocacy. "Do the math. If one out of every three men in the United States is living with a pre-existing heart condition, each time the police shock someone with a TASER, they are playing a game of high-tech Russian roulette. Now it is not a question of if, but a matter of when, the next TASER-related death will occur."

Taser frequently boasts that its electro-shock weapons are "saving lives everyday." The company has posted a document on its Web site alleged to contain more than 685 reports involving individuals who would now be dead if a TASER had not been used. They say that, "the use of the TASER non-lethal weapon saved a subject's life" by preventing a suicide or an escalation of violence. AIUSA accepted Taser International's challenge to read the reports, and found that the company is not only overstating the life-saving potential of its weapon, but it is misleading the public and law enforcement about the actual content of these reports. AIUSA provides 111 examples from the company's Web site in which it would be difficult, if not impossible, to say that in the absence of a TASER police would have killed the individuals in these respective cases.

In fact, AIUSA read more examples to support its assertion that the electro-shock weapons are being abused. The reports on Taser International's Web site showed that TASERs are being used on unarmed individuals, children, people who were restrained, individuals who are physically disabled, and an overwhelming number of emotionally distressed individuals. If anything, TASERs are frequently being used instead of seeking the assistance of mental health professionals. Using categories provided by the U.S. Bureau of Justice Statistics (BJS), AIUSA was able to disaggregate the reports showing that 52 percent of the reports were alleged to be attempted suicides; 15 percent involved officers disrupting a crime in progress; 13 percent were individuals fleeing, and 5 percent were undetermined. The combined instances of a suspect attacking a police officer or a civilian only accounted for 14 percent of the cases.

The company claims, "a reasonable and conservative estimate is that over 6,000 lives have been saved with TASER energy weapons," meaning that in the absence of a

defending torture as a necessary tool in the "w terror."—Amnesty Now Magazine, Summer 200

**LATEST NEWS**

**Report 2005**: Forewor Irene Khan, Secretary C
May 24, 2005

**USA**: Third So-Called "Independent" TASER S Linked to Manufacturer
May 23, 2005

*More News »*

**LATEST REPORTS**

**Turkmenistan**: Appeal Religious leader Nasrull Ibadullah remains in pri allegations of beatings ( unpunished
May 22, 2005

**Lebanon**: A Human Ri( Agenda for the Parliame Elections
May 17, 2005

*More Reports »*

TASER these 6,000 people would be dead. But this highly speculative assumption is statistically improbable. For instance, if Taser International's claims were true, and 6,000 lives had been saved during a six-year period, justifiable homicides by police, a statistic maintained by the BJS, would have dropped significantly. For Taser's claims to be true, no people would have been killed by police in the line of duty for the last six years. Taser's data is impossible to corroborate or verify.

AIUSA applauds the noble efforts of police officers to make split seconds decisions that have, without question, resulted in saved lives, but it is disingenuous for the cases that clearly do not rise to that level to be exploited. AIUSA calls on Taser International to stop using misleading information—like claiming that its product has saved 6,000 lives—and to remove this information from its Website and all of its promotional materials.

The review of the cases also yielded unanticipated results. Based on information from Taser's Web site, it appears as though TASERs failed to incapacitate suspects 32 percent of the time, requiring officers to apply more shocks. This means that TASERs only worked 63 percent of the time—far from the 95 percent effectiveness rate mentioned in Taser International's marketing materials.

Amnesty International supports the development of non-lethal alternatives to firearms. However, a sincere, honest debate on TASER use should be based on the truth.

-30-

CONTACT: Edward Jackson (202) 544-0200 x 302 or (202) 251-3894 mobile

**More information about Amnesty International's position on TASER** (in PDF)

**Home** | **About** | **Mission** | **Contact** | **Jobs** | **Privacy** | **Newsletters** | **RSS** | **AI Worldwide**

© Copyright 2005   Amnesty International USA    5 Penn Plaza 14th Floor    New York, NY 10001    212.807.8400